# EXHIBIT C

ORIGINAL FILED
07 AUG 10 PM 3:54
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Patrice L. Bishop (182256)
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087

Jules Brody
Howard T. Longman
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

Jeffrey S. Abraham
Lawrence D. Levit
ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza
Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C 07 4140

| | |
|---|---|
| HOWARD J. KAPLOWITZ IRA, individually and on behalf of all others similarly situated, | CASE NO. |
| | **CLASS ACTION** |
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| LUMINENT MORTGAGE CAPITAL, INC., S. TREZEVANT MOORE, JR., and CHRISTOPHER J. ZYDA, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**CLASS ACTION COMPLAINT**
**CASE NO.**
W:\STULL\LUMINENT\PLD\Complaint.wpd

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Luminent Mortgage Capital, Inc. ("Luminent" or the "Company"), as well as regulatory filings and reports, analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of purchasers of the common stock of Luminent between May 10, 2007 and August 6, 2007, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(c).

5. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Howard J. Kaplowitz IRA, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Luminent at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant Luminent is a real estate investment trust (REIT), which purportedly invests in (a) mortgage loans purchased from selected high-quality providers within certain

2

CLASS ACTION COMPLAINT
CASE NO.
W:\STULL\LUMINENT\PLD\Complaint.wpd

established criteria as well as subordinated mortgage-backed securities and other asset-backed securities that have credit ratings below AAA; and (b) U.S. agency and other highly-rated single-family, adjustable rate and hybrid adjustable rate mortgage-backed securities. Luminent is a Maryland Corporation with its headquarters located at One Market, Spear Tower, 30th Floor, San Francisco, California. The Company's stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "LUM."

8. Defendant S. Trezevant Moore, Jr. ("Moore") at all relevant times herein was the Chief Executive Officer ("CEO") of Luminent and a member of the Board of Directors.

9. Defendant Christopher J. Zyda ("Zyda") at all relevant times herein served as the Company's Chief Financial Officer ("CFO") and Principal Financial and Accounting Officer.

10. Moore and Zyda are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects through, *inter alia*, internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), and conversations and connections with other corporate officers and employees.

11. As officers and controlling persons of a publicly-held company, the common stock of which was and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information, the Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations. The Individual Defendants participated in the drafting, preparation, and/or

3

1  approval of the various public and shareholder and investor reports and other communications
2  complained of herein and were aware of, or recklessly disregarded, the misstatements contained
3  therein and omissions therefrom, and were aware of their materially false and misleading nature.
4  Because of their Board membership and/or executive and managerial positions with Luminent,
5  each of the Individual Defendants had access to the adverse undisclosed information about
6  Luminent's business prospects and financial condition and performance as particularized herein and
7  knew (or recklessly disregarded) that these adverse facts rendered the positive representations made
8  by or about Luminent and its business issued or adopted by the Company
9  materially false and misleading.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

12. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Luminent during the Class Period (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

13. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Luminent common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Luminent or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

4

15. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

16. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Luminent;

(c) whether the Company and/or the Individual Defendants acted with scienter in making false or misleading statements;

(d) whether the Individual Defendants were control persons of Luminent within the meaning of Section 20(a) of the Exchange Act and are liable under that statute for any Section 10(b) violations by the Company; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

17. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

18. The Class Period commences on May 10, 2007. On that date, Luminent issued a press release announcing its financial results for the first quarter of quarter of 2007, the period ending March 31, 2007. The Company reported net income of $0.30 per share. The press release touted the Company's solid credit footing, its excellent access to credit markets, and the like.

The Company also attempted to distance itself from the widely publicized downturn in the subprime mortgage business. The press release stated in relevant part:

> Luminent's credit quality is strong. 93% of Luminent's securitized assets are rated A or higher. 62%, or $5.6 billion, of Luminent's total assets are first lien, prime quality mortgages, with an overall average FICO score of 714 and an average loan-to-value ratio, net of mortgage insurance, of 72.8%. 25%, or $2.3 billion, of Luminent's total assets consist of AAA-rated or agency-backed mortgage-backed securities. 11%, or $965 million, of Luminent's total assets consist of other mortgage-backed securities with an average credit rating of A-. Only 3% of Luminent's total assets are non-investment grade and just 0.6% are exposed to first loss. Luminent has no subprime loan exposure.
>
> Luminent's credit performance is solid. Serious delinquencies (90+ days) stand at 87 basis points, significantly less than the Mortgage Bankers Association average for prime loans. Credit losses were virtually zero in the quarter. Luminent's reserve for loan losses now stands at $8.3 million, which is based on an appropriately conservative loan loss policy that considers portfolio characteristics, seasoning and expected loss severities.
>
> * * *
>
> Luminent maintains a strong capital position and modest leverage. Cash and unencumbered assets were in excess of $200 million at March 31, 2007. ... Luminent has ample liquidity to finance its investments, and successfully executed two major financing transactions during the first quarter despite market dislocations. Luminent expects to complete additional financing facilities in the second quarter, as major lenders refocus their businesses on sound counterparties such as Luminent.
>
> * * *
>
> In March 2007, Luminent further improved its capital efficiency by issuing its first collateralized debt obligation (CDO) in the amount of $400 million. 'We were extremely pleased to be able to issue a CDO in the first quarter's difficult market environment,' said Mr. Moore. 'Our ability to complete a CDO during a time when most issuers could not is a testament to the respect we have earned with investors.'

19. On May 29, 2007 the Company issued a press release further touting the credit performance of its hybrid and pay-option mortgage loans. The press release highlighted the Company's purported low level of delinquencies as compared to other institutions. Specifically, as to hybrid loans, one table in the press release for the 60+ day delinquencies, foreclosures and real estate-owned as a percentage of the outstanding loan principal balance at nine months of seasoning for loans originated in 2006 showed that among several well-known Alt-A residential mortgage-

6

backed securities shelves as published in the *Merrill Lynch Mortgage Investor* on May 17, 2007, Luminent had the second lowest percentage of 1.07% compared to the average of the other sixteen entities of 4.20% (with Lehman's entity being the highest at 8.52%). A second table in the press release applicable to pay-option loans for the 60+ day delinquencies, foreclosures and real estate-owned as a percentage of the outstanding loan principal balance at nine months of seasoning for loans originated in 2006 showed that among several well-known Alt-A residential mortgage-backed securities shelves as published in the *Merrill Lynch Mortgage Investor* on May 17, 2007, Luminent had the third lowest percentage of 0.84% compared to the average of the other nine entities of 1.16% (with Countrywide' entity being the highest at 2.05%).

20. On May 31, 2007 the Company announced the pricing of its offering of $90 million aggregate principal amount of 8.125% convertible senior notes due 2027. Luminent stated that it expected to "use up to $18 million of the net proceeds from the offering to concurrently repurchase shares of its common stock at a price of $9.13 per share . . . and to apply the balance for general corporate purposes, principally investment in its target asset classes." The press release further stated: "Prior to June 1, 2026, upon the occurrence of specific events, the notes will be convertible at the option of the holder at an initial conversion rate of 89.4114 shares per $1,000 principal amount of notes. The initial conversion price of $11.18 represents a 22.5% premium to the closing price of $9.13 per share of Luminent common stock on May 30, 2007."

21. On July 23, 2007 the Company issued its newsletter-- Pharos-- to shareholders for the quarter ended June 30, 2007. The newsletter was signed by defendant Moore. The newsletter attempted to distinguish the Company from the ongoing mortgage subprime downturn and further touted the Company's superior credit position and prospects. The newsletter stated in relevant part:

> In my almost 30 years in the U.S. mortgage-backed securities market, I have never before seen the intensity of confusion, uncertainty and outright fear as right now. I have experienced the Volker recession of '79-'81, the Oil Patch and New England corrections in the mid-to-late 80's, California '89 to '94, and significant bond market corrections in '87, '94 and '98. At none of these times has the distaste for mortgage and mortgage-related securities been as high as we see now. As a dedicated investor in this market, we need to ask how did we get to

7

this sorry state, and what can one do to protect one's self if you are, as we are, focused by charter on real estate oriented investments.

Almost exactly 20 years ago, I was managing First Boston's (now Credit Suisse) due diligence effort. The late 1980's were also characterized by a real estate boom, sloppy underwriting and some nasty credit surprises. First Boston was lead managing a private label security for a client. My group was part of the whole loan trading effort and was 'borrowed' by investment banking for due diligence. As our orientation was as a principal buyer, our team underwrote the loans as if we were going to buy them for our own account. The client focused on 'no doc' loans and explicitly told us they did not question anything the potential mortgagor said. Needless to say, we found significant misrepresentations of income (e.g., gas station attendants making $6,000 a month in 1988) and, even worse, appraisals that were, uh, imaginative. My team recommended underwriting every loan or not underwriting the transaction. At the end of the day, the client took the deal to a different investment bank, which presumably did the legally necessary due diligence. Within a year, even the senior class was downgraded and ultimately defaulted.

In my view, history has repeated itself. Many residential mortgage-backed securities are or will default because investors do not have the capacity or legal ability to actually review a reasonable sample of individual loans in a pool. The rating agencies don't underwrite loans, but rely on the veracity of the loan tapes they receive. (After our happy experience related above, we wrote to the rating agencies suggesting they do individual loan sampling. No extra credit for guessing the answer.) Now the rating agencies are stating that they will disadvantage institutions that have inadequate procedures for ferreting out fraud.

Luminent is a fairly young firm, only four years old, but its senior management is not (much to my chagrin). When we started buying loans in 2005, we started with a 25% due diligence sample. The management team knew the principals and operating philosophies of the firms we were working with, but we knew there was no substitute for looking at appraisals, deciding whether income seemed reasonable and determining if the mortgagor was really going to live in that condo. As the origination market continued to become more frothy in early 2006, we saw pockets of appraisal weakness that concerned us causing our appraisal sample to expand, first to 50% and then to all loans. We do not hesitate to decline to purchase loans if we have issues with the quality of the underlying loans and/or quality of the originator's underwriting . . .

\* \* \*

Careful attention to detail isn't particularly glamorous, but it has real value. Our loans are safer, not only according to our own metrics, but validated by third parties such as Moody's. Our delinquencies are approximately 50 basis points less than the Alt-A market as a whole. We believe that we will have materially lower loss severities than the market as we have solid appraisal results on all our loans. And our corporate performance, as a whole, is very solid during a time of substantial stress in the overall mortgage market. At June 30, 2007,

8

|   |   |
|---|---|
| 1 | our book value per share increased to $9.98, 1.1% higher than our book value per share of $9.87 at March 31, 2007. Our REIT taxable income for the quarter ended June 30, 2007 was approximately $0.33 cents per share outstanding, and at June 30, 2007 we had approximately $0.24 cents per share of undistributed taxable income. Our net income per share for the quarter ended June 30, 2007 was $0.30 cents per share. We will provide additional detail on our second quarter financial performance in our August 9, 2007 earnings release and our form 10-Q filing for the quarter ended June 30, 2007. |

In our view, the mortgage market is perhaps a little more dependent on analysis of loan characteristics without actually ever reviewing the loan. Investors often cannot or are unable to examine the accuracy of the data used to make investment decisions. We make a concerted effort to do our homework using both traditional due diligence methods and state of the art software to cull out, for example, possible fraud. We believe that our underwriting discipline will hold our stakeholders in good stead and applaud the many other organizations that are being similarly careful. Next quarter, we will talk about some of our other risk management tools. I personally hope you found this modest effort helpful, and will invite you, once again, to let Kate O'Brien know if you would like subsequent issues sent to you directly.

22. On July 30, 2007, on the heels of substantial declines of other companies in the mortgage business, *i.e.*, American Home Mortgage Corp., the Company issued a press release further confirming its dividend, liquidity, and other measures of financial performance. The press release stated in relevant part:

> Luminent Mortgage Capital, Inc. (NYSE: LUM) announced today that its second quarter dividend payment of $0.32 per share, payable to stockholders on August 8, 2007, is secure and will not be canceled.
>
> In addition, Luminent confirmed that as of July 30, 2007 it is in full compliance with all its financial covenants. Furthermore, Luminent confirmed that as of July 30, 2007 it had ample liquidity to manage its business.
>
> Luminent reiterated that it is an investor in, and not an originator of, mortgage loans. As such, Luminent is not subject to the loan repurchase risk that is currently impacting certain loan originators. Instead, Luminent purchases high quality mortgage loans from originators, and only after Luminent conducts exhaustive due diligence on each and every loan. As of June 30, 2007, Luminent's 15,327 of whole loans had a weighted-average FICO score of 715, a weighted-average loan-to-value ratio net of mortgage insurance of 71%, and 86.4% of these loans were on owner-occupied properties.
>
> In addition, Luminent reiterated that it employs a disciplined and sophisticated hedging program for the interest rate and credit risks in its portfolio using Eurodollar futures, interest rate swaps, swaptions, interest rate caps, and by shorting various portions of the ABX indices

9

CLASS ACTION COMPLAINT
CASE NO.
W:\STULL\LUMINENT\PLD\Complaint.wpd

as well as employing single-name credit default swaps. During the quarter ended June 30, 2007, the strong performance of Luminent's credit hedges more than offset the income statement and balance sheet impact of mark-to-market pricing and certain impairment charges related to its credit sensitive assets. This strong performance of Luminent's disciplined hedging program was one of the contributors to the increase in Luminent's book value per share to $10.05 as of June 30, 2007.

## THE TRUTH BEGINS TO EMERGE

23. On August 6, 2007, before market opened, the Company's stock was downgraded by J.P. Morgan, due to the Company's exposure to the residential mortgage market.

24. The downgrade caused the Company's stock to open trading on August 6, 2007 at $5.70 per share, down 9.9%. Later in the morning, the Company's stock was halted at $4.38 per share due to pending news. Later that day, the Company issued a press release announcing that its cash dividend (which the Company reaffirmed it would pay one week earlier) would be "suspended", that the Company was experiencing an increase in margin calls, and that the Company would delay filing of its quarterly report with the SEC. The press release stated in relevant part:

> Luminent Mortgage Capital, Inc. announced today that, since August 3, 2007, the mortgage industry, and the financing methods that the mortgage industry relies upon, have deteriorated significantly and in an unprecedented fashion. Effectively, the secondary market for mortgage loans and mortgage-backed securities has seized-up. As a result, Luminent is simultaneously experiencing a significant increase in margin calls on its highest quality assets and a decrease on the financing advance rates provided by its lenders.
>
> In a Board of Directors meeting today, Luminent's Board unanimously voted to take the following actions:
>
> -- The Board of Directors suspended payment of Luminent's second quarter cash dividend of 32 cents per share on Luminent's common stock.
>
> -- The Board of Directors extended the maturity of the outstanding commercial paper issued by Luminent Star Funding Trust I, a special purpose subsidiary of Luminent, by 110 days.
>
> -- The Board of Directors cancelled Luminent's second quarter 2007 earnings release conference call, scheduled for Thursday, August 9, 2007, at 10:00 a.m. PDT, to discuss its second quarter of 2007 results of operations.
>
> -- The Board of Directors delayed the filing of Luminent's quarterly report on form 10-Q for the second quarter of 2007. Luminent's

10

> second quarter of 2007 unaudited condensed financial information is attached to this press release. Luminent's independent registered public accounting firm has not completed a review of the financial information for the three and six months ended June 30, 2007.
>
> -- The Board of Directors authorized Luminent's senior management to inform the New York Stock Exchange of these unfolding events and, as a result, trading was halted in Luminent's common stock.
>
> The Board of Directors currently is considering the full range of strategic alternatives to enhance Luminent's liquidity and preserve shareholder value during this period of market volatility.

25. The August 6, 2007 announcement shocked the market and caused the Company's stock to decline further. The Company's stock resumed trading on August 7, 2007 and closed at $1.08 per share or down 75% from the previous day.

## ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER

26. As alleged herein, Defendants acted with scienter in that Defendants knew that the public statements issued by the Company or in its stead were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Luminent, their control over, and/or receipt and/or modification of Luminent's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Luminent, participated in the fraudulent scheme alleged herein. Defendants were motivated by a desire to maintain access to the capital markets for the various offerings of securities in which the Company routinely engaged.

## FRAUD ON THE MARKET

27. At all relevant times, the market for Luminent common stock was an efficient market for the following reasons, among others:

   a. Luminent stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

11

   b. As a regulated issuer, Luminent filed periodic public reports with the SEC and the NYSE;

   c. Luminent regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   d. Luminent was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

28. As a result of the foregoing, the market for Luminent's common stock promptly digested current information regarding Luminent from all publicly available sources and reflected such information in Luminent's stock price. Under these circumstances, all purchasers of Luminent's common stock during the Class Period suffered similar injury through their purchase of Luminent's common stock at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

29. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Luminent who knew that those statements were false when made.

12

# COUNT I

**(Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder)**

**Alleged Against All Defendants**

30. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein,

31. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading.

32. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

33. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Luminent common stock. Plaintiff and the Class would not have purchased Luminent common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

34. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Luminent common stock during the Class Period.

13

COUNT II

(Violation of Section 20(a) of the Exchange Act)

Alleged Against the Individual Defendants

35. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

36. The Individual Defendants acted as controlling persons of Luminent within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Luminent, and their ownership of Luminent stock, the Individual Defendants had the power and authority to cause Luminent to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

//

//

//

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS
PURSUANT TO CIVIL L.R. 3-16**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated: August 10, 2007

Patrice L. Bishop
STULL, STULL & BRODY

*/s/ Patrice Bishop*

Patrice L. Bishop
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087

Jules Brody
Howard T. Longman
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

Jeffrey S. Abraham
Lawrence D. Levit
ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

Counsel for Plaintiff

1

CLASS ACTION COMPLAINT
CASE NO.
W:\STULL\LUMINENT\PLD\Complaint.wpd

## PLAINTIFF CERTIFICATION

Howard J. Kaplowitz IRA ("Plaintiff") hereby states that:

1) Plaintiff has reviewed the complaint and has authorized the filing of the complaint on its behalf.

2) Plaintiff did not purchase any common stock or other securities of Luminent Mortgage Capital, Inc. ("Luminent") at the direction of his counsel or in order to participate in this private action.

3) Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.) The following includes all of Plaintiff's transactions in Luminent securities:

Plaintiff made the following purchases: on 12/22/06 1000 shares at $9.80; on 01/08/07 1000 shares at $8.93; on 3/29/07 100 shares at $9.01 and 1000 shares at $9.03; and on 7/11/07 1000 shares at $9.41. Plaintiff has not sold any shares.

5) Plaintiff has not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years.

5) Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of August, 2007.

_____
Howard J. Kaplowitz on behalf of Howard J. Kaplowitz IRA