1  Joseph J. Tabacco, Jr. (SBN 75484)
   E-mail: jtabacco@bermanesq.com
2  Nicole Lavallee (SBN 165755)
   E-mail: nlavallee@bermanesq.com
3  BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO
   425 California Street, Suite 2100
4  San Francisco, California  94104
   Telephone:    415-433-3200
5  Facsimile:    415-433-6382

6  *Local Counsel*

7  Richard W. Cohen (admitted *pro hac vice*)
   E-mail: rcohen@lowey.com
8  Barbara J. Hart
   E-mail: bhart@lowey.com
9  David C. Harrison (admitted *pro hac vice*)
   E-mail: dharrison@lowey.com
10 LOWEY DANNENBERG COHEN & HART, P.C.
   One North Broadway, Suite 509
11 White Plains, New York  10601-2310
   Telephone:    914-997-0500
12 Facsimile:    914-997-0035

13 *Lead Counsel and Attorneys for Lead Plaintiff*
      *and the Putative Class*

14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17

18

19  IN RE LUMINENT MORTGAGE CAPITAL, INC.          C-07-04073 PJH
    SECURITIES LITIGATION
20                                                  **CONSOLIDATED CLASS
                                                    ACTION COMPLAINT**
21  This Document Relates To:

22        ALL ACTIONS.                              **JURY TRIAL DEMANDED**

23

24

25        Lead Plaintiff, The Southern Improvement Company, VSA, Inc., and Allen Dayton

26  (collectively "Southern"), for its Consolidated Class Action Complaint (the "Complaint"),

27  alleges the following upon personal knowledge as to itself and its own acts, and upon

28  information and belief based upon the investigation made by and through its attorneys.  Lead

1   Plaintiff's investigation included, *inter alia*, a review and analysis of public documents

2   pertaining to: (a) Luminent Mortgage Capital, Inc. ("Luminent" or the "Company") and the other

3   defendants named herein; (b) filings with the Securities and Exchange Commission (the "SEC");

4   (c) the Company's press releases and public statements; (d) analyst reports concerning the

5   Company; (e) newspaper and magazine articles and other media coverage regarding Luminent

6   and its business; (f) interviews with former Company employees; and (g) legal proceedings

7   brought by Luminent relating to its investments in residential mortgage-backed securities, *i.e.*,

8   securities for which residential mortgage loans serve as collateral.

9   **NATURE OF THE ACTION**

10  1.    This is a class action alleging violations of the Securities Exchange Act of 1934

11  (the "Exchange Act") on behalf of purchasers of the publicly traded securities of Luminent and

12  sellers of put option contracts on Luminent stock.  The class period is June 25, 2007 through

13  August 6, 2007, inclusive (the "Class Period").  The defendants are Luminent and certain of its

14  officers and directors.

15  2.    Luminent is a publicly traded real estate investment trust ("REIT").  Formed in

16  2003 by defendant Gail Seneca ("Seneca"), Luminent, together with its subsidiaries, uses

17  leveraged financing to invest in pools of mortgage loans, mortgage-backed securities ("MBS"),

18  and other asset-backed securities.

19  3.    Luminent continuously sought to separate itself from other companies

20  experiencing subprime and mortgage–related losses by assuring the investing public that, *inter*

21  *alia*, "investors should distinguish Luminent's business model" from mortgage companies that

22  deal with subprime loans; that "our disciplined and high quality investment strategy has allowed

23  us to increase our dividend . . . during a period of unprecedented turmoil in the mortgage

24  industry"; that the Company had "more than ample liquidity to invest in today's market

25  conditions"; that "Luminent is uniquely positioned to prosper in a challenging mortgage

26  environment"; and that its "disciplined and sophisticated hedging program" more than offset any

27  losses on impairment charges related to its MBS portfolio.

28

1    4.    On June 27, 2007, the Company declared a new, higher dividend for the second

2    quarter (the "2Q2007 Dividend"), which it stated would be "easily sustainable" in the future.  As

3    late as July 30, 2007, Luminent reiterated that it had "ample liquidity"and confirmed that its 2Q

4    2007 Dividend "was secure" and "will not be cancelled."

5    5.    However, despite these assurances, in July 2007, Luminent was frantically selling

6    off its MBS portfolio in order to satisfy margin calls and reduce leverage.  On August 6, 2007,

7    Luminent shocked investors by announcing that it was suspending the 2Q 2007 Dividend it had

8    confirmed the prior week.  Contrary to the Company's representations on June 27, 2007 and July

9    30, 2007 that it had ample liquidity, Luminent's financial condition had been dependent upon a

10   mountain of margin debt which threatened to sink the Company at any time.  To satisfy the

11   margin calls, Luminent had to sell $1.9 billion in MBS and $1.0 billion in mortgage-backed

12   loans at distressed prices.  This resulted in more than $150 million in losses and the writedown

13   of the value of its MBS portfolio by $256 million, as reported by the Company in its Form 10-Q

14   for the period ended June 30, 2007, which was belatedly filed with the SEC on September 26,

15   2007 (the "2Q2007 10-Q").

16   6.    Defendants failed to correct their brash public statements distancing Luminent

17   from the taint of the subprime debacle affecting other real estate investment companies until long

18   after the damage was visible.  As defendants subsequently admitted in a November 19, 2007

19   presentation to the financial community, "the dramatic reduction in [Luminent's] market

20   liquidity and mortgage-backed security prices [was] caused by subprime mortgage

21   underperformance."

22   7.    Defendants' representations about the quality of Luminent's MBS portfolio, made

23   in connection with the release of the Company's first-quarter 2007 financial results, should also

24   have been corrected no later than the start of the Class Period.  Among other things, defendants

25   failed to disclose the extent of their exposure to risky MBS, which resulted in a $14 million

26   writedown during the second quarter of 2007, and caused Luminent to engage in fire-sale

27   liquidations on a massive scale starting in July 2007.

28

8.    Securities analysts were stunned to learn that Luminent's bullish pronouncements were made out of whole cloth.  As reported by the Associated Press on August 7, 2007 in an article captioned "Ahead of the Bell: Luminent Mortgage":

> As buyers flee the market for risky mortgage debt, all types of mortgage-backed securities are fast losing value.  The banks that finance investors in these markets are pulling the plug, leading to widespread defaults, liquidations and bankruptcies.
>
> <u>Luminent said last week it was not really subject to this risk.</u>  It does not issue loans, but rather purchases loans backed by good credit.  <u>The company confirmed it still planned to pay its dividend and had enough cash to keep operating.</u>
>
> A week later, Luminent issued a news release some analysts said spells the company's demise.

(Emphasis added.)

9.    As a result of the adverse disclosures beginning on August 6, 2007, the market price of Luminent stock plummeted by 87% on extraordinary trading volume from its opening price of $7.28 per share on August 3, 2007 to close at $0.95 per share on August 8, 2007.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this District because, at all relevant times, Luminent had its principal place of business in this District, and many violations of law complained of herein occurred in substantial part in this District, including the dissemination of materially false and misleading statements and the omission of material information complained of herein.

12.    Defendants used the instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities markets in connection with the wrongful activity alleged herein.

## PARTIES

13.    During the Class Period, Lead Plaintiff Southern purchased shares of Luminent common stock and sold put options on Luminent stock and was damaged thereby.  Southern's

1    certifications evidencing its transactions in Luminent securities were previously filed with the

2    Court on October 17, 2007 (Dkt. No. 59), and are adopted here by reference.

3         14.   Defendant Luminent is a Maryland corporation, qualified as a REIT, which at all

4    relevant times maintained its principal executive office at 101 California Street, Suite 1350, San

5    Francisco, California.  As of December 31, 2007, Luminent closed its San Francisco office and

6    moved its headquarters to Philadelphia.

7         15.   Defendant Gail Seneca is the Company's founder.  From its formation in 2003,

8    Seneca served as Chairman of its Board of Directors until she resigned in August 2007, and as

9    Chief Executive Officer ("CEO") until May 2007.

10        16.   Defendant Seneca participated in the preparation of and signed the Company's

11   false and misleading press releases and reports filed with the SEC, including the Form 10-Q for

12   the quarter ended March 31, 2007, filed on May 10, 2007 (the "1Q2007 10-Q").

13        17.   Defendant Sewell Trezevant Moore, Jr. ("Moore") served as the Company's

14   President and Chief Operating Officer ("COO") from March 2005 through May 10, 2007, at

15   which date Moore replaced Seneca as the Company's CEO.  Moore has also served on the Board

16   of Directors since November 2005.  Moore participated in the preparation of and signed the

17   Company's false and misleading press releases and reports filed with the SEC, including the 1Q

18   2007 10-Q.

19        18.   Defendant Christopher J. Zyda ("Zyda") served from August 2003 as the

20   Company's Chief Financial Officer ("CFO") and Senior Vice President until he resigned,

21   effective as of year-end 2007.  Zyda participated in the preparation of and signed the Company's

22   false and misleading press releases and reports filed with the SEC, including the 1Q2007 10-Q.

23        19.   Defendants Seneca, Moore, and Zyda are referred to herein as the "Individual

24   Defendants."  These three defendants comprised the senior management of Luminent, which had

25   only five officers and a total of 32 full-time employees.  Each of the Individual Defendants was

26   responsible for the Company's day-to-day operations, and had integral involvement in the

27   selection and management of Luminent's loan and MBS portfolios.

28

1      20.     The Individual Defendants held themselves out as having significant expertise in

2  the mortgage industry.  Defendant Moore represented that he had almost 30 years' experience in

3  the U.S. mortgage-backed asset market, and formerly managed First Boston's (now Credit

4  Suisse's) due diligence efforts.  Defendant Seneca, the Company's founder, also had a lengthy

5  history in the mortgage business.  Prior to forming Luminent, she founded Seneca Capital

6  Management, LLC, an institutional asset management firm which managed Luminent's

7  mortgage portfolio until September 2006.  Defendant Zyda likewise has substantial experience in

8  management and accounting for investment assets.

9      21.     As the Company's top officers and/or directors, the Individual Defendants

10  controlled the contents of Luminent's public disclosures, SEC filings, press releases, and

11  presentations to securities analysts, money and portfolio managers, and institutional investors.

12  Each Individual Defendant reviewed, authorized, and/or signed the Company's reports and press

13  releases.  Because of their positions and access to material non-public information available to

14  them, their attendance at management and/or Board of Directors meetings, and their receipt of

15  reports and other information relating to the financial condition of Luminent and its access to

16  credit markets, each of the Individual Defendants knew that the adverse facts described herein

17  had not been disclosed to, and were being concealed from, the investing public, and that the

18  positive representations then being made were materially false and misleading.

19      22.     By reason of their positions as directors and/or officers of Luminent, and because

20  of their ability to control the business, corporate, and financial affairs of Luminent, each

21  Individual Defendant was obligated to exercise due care and diligence in the management and

22  administration of the affairs of the Company, including the evaluation of the Company's

23  financial condition and dissemination of accurate information relating thereto, in compliance

24  with all applicable federal and state laws, rules, and regulations, including the federal securities

25  laws.  The Sarbanes-Oxley Act of 2002 ("SOX") requires an issuer and its CEO (*i.e.*, Seneca and

26  Moore) and CFO (*i.e.*, Zyda) to publicly certify the accuracy of its financial statements and the

27  adequacy of its internal controls.

28

1

## CLASS ACTION ALLEGATIONS

2    23.    Lead Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a)

3 and (b)(3), on behalf of a class consisting of all persons who purchased the publicly traded

4 securities of Luminent and/or sold Luminent put options from June 25, 2007 through August 6,

5 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are

6 defendants, the officers and directors of the Company, members of their immediate families and

7 their legal representatives, heirs, successors and assigns, and any entity in which defendants have

8 or had a controlling interest.

9    24.    The members of the Class are so numerous that joinder of all members is

10 impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this

11 time and can only be ascertained through appropriate discovery, approximately 46 million shares

12 of Luminent stock, which was listed on the New York Stock Exchange under the symbol

13 "LUM", traded during the Class Period. Lead Plaintiff believes that there are hundreds, if not

14 thousands, of Class members. Members of the Class may be identified from records maintained

15 by Luminent or its transfer agent.

16    25.    Lead Plaintiff's claims are typical of those of the Class members, as all Class

17 members were similarly affected by defendants' wrongful conduct in violation of federal law.

18    26.    Lead Plaintiff will fairly and adequately protect the interests of the other members

19 of the Class and has retained counsel competent and experienced in class action and securities

20 litigation. Lead Plaintiff has no interests antagonistic to those of the Class.

21    27.    There are questions of law and fact common to all Class members, which

22 predominate over any questions affecting only individual Class members, including:

23        a.    Whether the federal securities laws were violated by defendants' actions
            as alleged herein;

24

25        b.    Whether documents, releases, and/or statements disseminated to the
            investing public during the Class Period omitted and/or misrepresented
            material facts which were necessary to have been included in order to

26        make the representations not misleading;

27        c.    Whether defendants acted knowingly or with reckless disregard of the
            truth in omitting and/or misrepresenting material facts;

28

1          d.      Whether the market price of the Company's publicly traded securities was
2                           artificially inflated during the Class Period due to the non-disclosures
and/or material misrepresentations complained of herein; and

3          e.      Whether the Class members have suffered damages following disclosure
4                           of the adverse facts concerning Luminent and, if so, what is the proper
measure of damages.

28.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because, among other things, joinder of all members of the Class

is impracticable; however, because the damages suffered by individual Class members may be

relatively small, the expense and burden of individual litigation make it virtually impossible for

Class members to seek redress individually for the wrongful conduct alleged.

29.     Lead Plaintiff does not foresee any difficulty in the management of this litigation

which would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

## I.  Luminent's Mortgage Investment Strategies

### A.  The Spread Strategy.

30.     Luminent's business operations began in June 2003 following the private

placement of the Company's common stock.  The Company has two core mortgage investment

strategies: the "Spread" strategy and the Residential Mortgage Credit ("RMC") strategy.

31.     The Spread strategy involves the leveraged purchase of U.S. agency (*e.g.*, Ginnie

Mae, Fannie Mae, Freddie Mac) and non-agency AAA-rated single-family adjustable-rate and

hybrid adjustable-rate MBS in the secondary market.

32.     The Spread strategy involves a reduced level of credit risk, but is extremely

sensitive to changes in interest rates and liquidity risk because the Company's borrowing levels

depend upon the value of the MBS that serve as collateral for the Spread portfolio.  Luminent

seeks to profit on the interest rate spread between the Company's borrowing costs and the

returns paid by these securities.

33.     According to the Company's Form 10-K for the year ended December 31, 2006,

filed March 16, 2007 (the "2006 10-K"), Luminent's Spread portfolio was valued at $2.1 billion,

and accounted for about 25% of Luminent's interest income as of year-end 2006.

**B.**     **The Residential Mortgage Credit Strategy.**

34.     Luminent's RMC strategy has two components.  The first component involves the leveraged purchase of pools of adjustable-rate Alt-A mortgage loans in the secondary market, which the Company securitizes and markets to institutional investors.

35.     Alt-A loans are designed for borrowers who provide less than full documentation to verify income in exchange for paying a slightly higher mortgage rate than the rates available for borrowers who apply for full-documentation prime loans.  Alt-A loans are considered less risky than subprime loans, but generally have lower credit quality than fully documented prime loans.

36.     The second component of the RMC strategy involves the leveraged purchase of non-agency subordinated MBS that have credit ratings below "AAA" from rating agencies such as Standard & Poor's ("S&P").  A credit rating of AAA (or "Aaa" from Moody's Investors Services) constitutes the highest level of safety with respect to the timely payment of principal and interest.

37.     Luminent's RMC strategy is far less sensitive to interest rates than its Spread strategy, but it is highly credit-sensitive and is subject to liquidity risk because the Company's leveraged borrowing depends upon the value of the mortgage loans and MBS which serve as collateral.

38.     As reported in the 2006 10-K, the RMC loan portfolio accounted for approximately $5.6 billion, or two-thirds of Luminent's $8.6 billion in total assets, as of year-end 2006.

39.     The 2006 10-K also reported that the Company also held approximately $800 million in subordinated MBS as of year-end 2006.  Within this portfolio, $157 million of subordinated MBS were non-investment-grade, mostly rated "BB," and $273 million of MBS in the portfolio were rated "BBB," the lowest level of investment grade.  These subordinated MBS comprised about 54% of the Company's RMC MBS portfolio, with the remaining 46% rated "A" or "AA."  By the end of the first quarter 2007, the subordinated MBS portfolio had increased to $965 million, according to the 1Q2007 10-Q.

40.     Luminent reported net income of $47 million, or $1.15 per share for 2006, compared with a loss of $83 million, or $2.13 per share, for 2005.  Defendants explained in the 2006 10-K that "the year-over-year increase in interest income is primarily due to higher yields on our mortgage assets that have resulted from the restructuring and sale of assets in our Spread portfolio and the redeployment of our capital into the higher-yielding assets of our Residential Mortgage Credit portfolio during 2006."

### C.     Luminent's Borrowing Arrangements

41.     Luminent financed its MBS portfolios at short-term rates primarily with repurchase agreements.  Repurchase agreements are common financing tools that permit a buyer of a security to obtain temporary financing for the purchase price by effectively borrowing funds from a counterparty who receives, in exchange for a loan, a security interest in the security to be purchased.  More specifically, in exchange for funding the purchase, the purchased security (*i.e.*, mortgage-backed assets) is transferred to the counterparty as collateral.  After an agreed-upon period, the borrower/purchaser then repurchases the security from the counterparty.  The repurchase price typically consists of the principal amount the buyer originally received plus interest that has accrued at an agreed-upon rate.

42.     If the aggregate value of the securities purchased fell below the repurchase price, then the purchaser was subject to a margin call and would be obligated to post cash or additional securities sufficient to cover the shortfall in value.

43.     Defendants represented in the 2006 10-K that the Company had $2.9 billion in outstanding borrowings under repurchase agreements with at least 13 different investment banking firms and other large financial institutions, including Barclays Capital, Bear Stearns & Co., Cantor Fitzgerald, Citigroup, Countrywide Securities Corporation, Credit Suisse First Boston, Deutsche Bank Securities Inc., Greenwich Capital Markets Inc., HSBC Securities, Merrill Lynch Government Securities Inc./Merrill Lynch Pierce, Fenner & Smith Inc., Nomura Security International, Inc., UBS Securities LLC, and Washington Mutual.

44.     MBS are typically separated into various classes having different levels of seniority.  The various classes thus had different priorities among them regarding (a) distribution

1   of money received on the underlying mortgage loans (*i.e.*, the principal and interest paid by the

2   homeowners) and (b) the allocation among them of losses suffered on the mortgage loans.

3   Distributions to investors are made to the most senior class first, then the next most senior class,

4   and so on. Subordinated securities such as those purchased by Luminent were not entitled to any

5   amounts received on the mortgage loans until all senior holders were paid.

6       45.   Investors in subordinated securities representing "residual" interests in the

7   mortgage loans are entitled to be paid only from the excess interest cash-flow after more senior

8   holders were paid the interest owed to them and certain losses (*i.e.*, delinquencies and

9   foreclosure losses/shortfalls) were accounted/compensated for. Because residual interests had

10  the lowest priority with respect to payment, those securities represented a riskier investment. As

11  explained herein, Luminent falsely denied having residual interest securities in its MBS

12  portfolio.

13      46.   As of December 31, 2006, Luminent also had an outstanding balance of

14  approximately $600 million on a $1.0 billion commercial paper facility, Luminent Star Funding

15  I, which also financed the Spread MBS portfolio through short-term borrowings.

16      47.   Luminent also initially financed the purchase of mortgage loans through short-

17  term warehouse lending facilities provided by banks and other financial institutions. These

18  warehouse facilities were also structured as repurchase agreements under which residential

19  mortgage loans were acquired through secured borrowings (up to 120 days) at low interest rates

20  based on LIBOR.

21      48.   Luminent then securitized the loans with long-term, collateralized notes which

22  were marketed to institutional investors. The proceeds from the securitizations were used to pay

23  down the warehouse facilities.

24      49.   The securitization process involves transferring the mortgage loans to a separate

25  (bankruptcy-remote) legal entity, which issues multi-class mortgage-backed notes collateralized

26  by the loans. Each class had a different level of seniority and thus had different priorities among

27  them regarding distribution of money received on the underlying mortgage loans (*i.e.*, the

28

1   principal and interest paid by the homeowners) and the allocation among them of losses suffered

2   on the mortgage loans.  Losses on the securitized loans were non-recourse to Luminent.

3       50.    In the 2006 10-K, defendants represented that Luminent had issued seven

4   mortgage loan securitizations reported to be valued at $3.9 billion, while approximately $1.7

5   billion of the loan portfolio was subject to short-term financing.

6   **II.    Pre-Class-Period Statements: Luminent Touts Its Liquidity and
        Stellar Performance In Comparison to the Deteriorating Subprime Market**

7       **A.    2006 Year-End Results**

8       **1.    The 2006 Earnings Release**

9       51.    On Friday, February 9, 2007, Luminent released its financial results for the fourth

10  quarter and year-ended December 31, 2006 (the "February 9 Release").  In the February 9

11  Release, the Company reported net income for the quarter ended December 31, 2006 of $18.0

12  million, or $0.39 per share.  For the year ended December 31, 2006, Luminent reported net

13  income of $46.8 million, or $1.14 per share.

14      52.    In the February 9 Release, CEO and Chairman Seneca and COO Moore touted the

15  success of the Company's business model:

16          "We distinguished ourselves among mortgage REITs by growing
17          our dividend, our book value, and our profitability in 2006.
            During the year, we built the foundation to deliver an ongoing
18          stream of strong and consistent dividends.  Our high credit quality,
            non-interest rate sensitive model is working."

19                          *        *        *

20          "Luminent is uniquely positioned to prosper in a challenging
21          mortgage environment," commented Trez Moore, President and
            Chief Operating Officer.  "Luminent's business is investment
22          management.  Our model is neither volume driven nor sub prime
            focused.  We manage mortgage assets and employ risk disciplines
23          that ensure high credit quality and minimize interest rate
            sensitivity.  With Luminent's sophisticated infrastructure and
24          seasoned professionals, we are confident that we can sustain solid
            credit performance and produce attractive dividends.  We look
25          forward to another year of delivering strong returns to our
            investors."

26

27  (Emphasis added.)

28

53.    The February 9 Release also reported that Luminent was well capitalized to fund

operations and meet the Company's borrowing obligations:

> Luminent maintains a strong capital position and modest leverage. Cash and unemcumbered assets were in excess of $200 million at December 31, 2006.  Luminent's recourse leverage ratio, defined as recourse financing liabilities as a ratio of stockholders' equity plus long-term debt, was 7.4x at December 31, 2006.  During the fourth quarter, Luminent improved its capital efficiency by launching a single-seller commercial paper program, Luminent Star Funding I.  Luminnet intends to issue CDOs in 2007 which will further improve its capital efficiency.
>
> Luminent's funding strategy exhibits diversification, low borrowing costs, and extensive reliance on non-recourse matched-funded financing.  Repurchase agreement financing declined to just 33% of total liabilities at December 31, 2006, down from 87% at December 31, 2005.

54.    Securities analysts based their evaluations and recommendations regarding

Luminent upon defendants' upbeat presentation in the February 9 Release.  On February 9, 2007,

UBS maintained its "Buy" rating on Luminent, reporting that, "[d]espite investors' concerns

about nonprime credit, LUM continues to buck the general trend."  UBS concluded that given

LUM's lower credit and rate risk vs. its peers, "we find the current valuation of $9.52

compelling as we believe current dividends are secure."

55.    Deutsche Bank likewise issued a positive report on Luminent in response to the

February 9 Release:

> **Expect portfolio growth to drive 2007 earnings growth**
> We are reiterating our Buy rating after Luminent reported solid 4Q results.  Luminent continues to build a high quality portfolio, as approximately 92% of the portfolio was rated A or higher at year end.  Given the current leverage levels, we expect Luminent to continue growing its portfolio through 2007 without needing additional capital.  We expect the portfolio growth to drive earnings growth and believe the company will increase its dividend in 2H07.  We are maintaining our price target of $12 per share.

56.    On February 12, 2007, Flagstone Securities raised its 2007 EPS estimates from

$1.40 to $1.70.  Flagstone also contrasted its bullish outlook for Luminent with the credit

problems then plaguing companies with substantial exposure to the subprime market:

> While we understand the obvious concern that most investors have regarding mortgage credit performance, we believe that LUM's

exclusive focus on prime quality loans, its strong internal credit
process, along with its use of lender paid mortgage insurance
(LPMI) for loan exposures between 75% and 80% of property
value will allow it to avoid the type of credit problems currently
seen in the subprime space.

57.    In response to these positive disclosures concerning Luminent's financial results and prospects, the market price of Luminent stock increased 6% on Monday February 12, 2007, to close at $10.22 per share.

**2.    The 2006 10-K**

58.    On March 16, 2007, the Company filed its 2006 10-K, which included Luminent's 2006 financial results contained in the February 9 Release. Defendants Seneca, Moore and Zyda were signatories to the 2006 10-K.

59.    In the 2006 10-K, defendants repeatedly highlighted Luminent's substantial liquidity position and the strength of its business model, notwithstanding the deterioration of the subprime market. For example, defendants emphasized that "[w]e have designed our liquidity management policy to maintain an adequate capital base sufficient to provide required liquidity to respond to the effect under our borrowing arrangements of interest rate movements and changes in the market value of our mortgage-related assets." Defendants also stated that "our liquidity level is in excess of that necessary to satisfy our operating requirements" and that "current financing and operating cash flow is sufficient to fund our business for the foreseeable future."

60.    Luminent specifically highlighted in the 2006 10-K the differences between Luminent's business model and the market conditions relating to companies with exposure to the deteriorating subprime mortgage business:

The increased scrutiny of the subprime lending market is one of
the factors that have impacted general market conditions as well as
perceptions of our business.

Investors should distinguish our business model from that of a
subprime originator. We do not acquire subprime mortgage loans.
We are not a direct originator of mortgage loans and therefore we
are not subject to "early payment default" claims. We acquire
mortgage loans exclusively from well-capitalized originators, who
meet our standards for financial and operational quality. We
maintain ample liquidity to manage our business and have largely

match-funded our balance sheet.  During the last year, we have substantially reduced our reliance on short term repurchase agreement funding.  As such, we experienced no liquidity strains during the recent market turmoil.

We invest in high-quality residential mortgage loans, AAA-rated and agency-backed mortgage-backed securities and subordinated mortgage-backed securities which have significant structural credit enhancement. . . . This portfolio has virtually no credit risk.  Our subordinated mortgage-backed securities portfolio represented 9% of our assets at December 31, 2006 and had a weighted-average credit rating of BBB+.  Structured credit enhancements in this portfolio provide us with significant protection against credit loss . . .

\*     \*     \*

Our mortgage loan portfolio has virtually no exposure to the subprime sector which is currently generating high delinquencies.  At December 31, 2006, mortgage loans with FICO scores less than 620, a measure which is generally considered to be an indicator of subprime, represented just 0.1% of our total mortgage loan portfolio.  In addition, at December 31, 2006, none of our mortgage loans had loan-to-value ratios, net of mortgage insurance, greater than 80%.  "No documentation" loans as a percentage of our total loan portfolio was just 2.5% at December 31, 2006.  We believe that our collateral characteristics, as well as our comprehensive underwriting process, provide us with strong protection against credit loss.

(Emphasis added).

**B.**    **First Quarter 2007 Results**

**1.**    **The May 10 Earnings Release**

61.    On May 10, 2007, Luminent released its financial results for first quarter ended March 31, 2007 (the "May 10 Release").  In the May 10 Release, Luminent reported net income for the quarter ended March 31, 2007 of $14.4 million, or $0.30 per share.

62.    In the May 10 Release, defendant Seneca stated: "Our solid first quarter results reflect Luminent's asset management skill and effective risk management" and that "our dividend [$0.30 per share for the past two quarters] will remain strong."

63.    Similarly, defendant Moore reiterated that "Luminent is performing well in this challenging mortgage market.  As the market struggles, our investment opportunities increase."

64.    Moore further emphasized in the May 10 Release:

1
2
3
4

> Luminent's profile is ideal for the current environment. . . . We are an asset manager, not a loan originator. As such, we lack the loan repurchase risk, high cost infrastructure and earnings volatility of an originator. We own no subprime loans. Our credit profile is strong. We assume no interest rate risk. We have safeguarded our liquidity, and are now able to invest on very attractive terms.

5 (Emphasis added.)

6          65.    Defendants further emphasized, as they had when announcing results for the

7 previous quarter that:

8
9
10
11
12

> Luminent maintains a strong capital position and modest leverage. Cash and unencumbered assets were in excess of $200 million at March 31, 2007. Luminent's recourse leverage ratio, defined as recourse financing liabilities as a ratio of stockholders' equity plus long-term debt, was 7.1x at March 31, 2007 . . . Luminent has ample liquidity to finance its investments, and successfully executed two major financing transactions . . . during the first quarter despite market dislocations.

13 (Emphasis added.)

14          **2.    The 1Q2007 10-Q**

15          66.    On May 10, 2007, the Company also filed its 1Q2007 10-Q, which included the

16 financial results previously reported in the May 10 Release. The 1Q2007 10-Q was signed by

17 defendants Moore and Zyda.

18          67.    The 1Q2007 10-Q made substantially the same disclosures as the 2006 10-K,

19 contrasting Luminent's stellar business model with the rapid deterioration of the subprime

20 market. The 1Q2007 10-Q stated:

21
22
23
24

> Recently, the subprime mortgage banking environment has been experiencing considerable strain from rising delinquencies and liquidity pressures and some subprime mortgage lenders have failed. The increased scrutiny of the subprime lending market is one of the factors that have impacted general market conditions as well as perceptions of our business.

25
26
27
28

> Investors should distinguish our business model from that of a subprime originator. We do not acquire subprime mortgage loans. We are not a direct originator of mortgage loans and therefore we are not subject to "early payment default" claims. We acquire mortgage loans exclusively from well-capitalized originators, who meet our standards for financial and operational quality. We maintain ample liquidity to manage our business and have largely match-funded our balance sheet. During the last year, we have

substantially reduced our reliance on short term repurchase agreement funding.  As such, we experienced no liquidity strains during the recent market turmoil.

We invest in high-quality residential mortgage loans, AAA-rated and agency-backed mortgage-backed securities and subordinated mortgage-backed securities which have significant structural credit enhancement.  At March 31, 2007, 61.5% of our assets consisted of first lien, prime quality residential mortgage loans, with a weighted-average FICO score of 714 and a weighted-average loan-to-value ratio, net of mortgage insurance, of 72.8%.  Our AAA-rated and agency-backed mortgage-backed securities portfolio represented 25.3% of our assets at March 31, 2007.  This portfolio has virtually no credit risk.  Our subordinated mortgage-backed securities portfolio represented 10.7% of our assets at March 31, 2007, and had a weighted-average credit rating of A-.  Structured credit enhancements in this portfolio provide us with significant protection against credit loss . . .

*      *      *

Our mortgage loan portfolio has virtually no exposure to the subprime sector, which is currently generating high delinquencies. At March 31, 2007, mortgage loans with FICO scores less than 620, a measure that is generally considered to be an indicator of subprime, represented only 11 loans or 0.1% of our total mortgage loan portfolio.  In addition, at March 31, 2007, none of our mortgage loans had loan-to-value ratios, net of mortgage insurance, greater than 80%.  "No documentation" loans as a percentage of our total loan portfolio was just 2.3% at March 31, 2007.  We believe that our collateral characteristics, as well as our comprehensive underwriting process, provide us with strong protection against credit loss.

(Emphasis added.)

68.     Similarly, the 1Q2007 10-Q made substantially similar disclosures as the 2006 10-K about defendants' ability to manage leverage and its ample liquidity:

We manage the levels of the financing liabilities funding our portfolios based on recourse leverage.  At March 31, 2007, our recourse leverage ratio, defined as recourse financing liabilities as a ratio of stockholders' equity plus long-term debt, was 7.1x.  We generally seek to maintain an overall borrowing recourse leverage of less than 10 times the amount of our equity and long-term debt.

*      *      *

We manage liquidity to ensure that we have the continuing ability to maintain cash flows that are adequate to fund operations and meet commitments on a timely and cost-effective basis.  At March 31, 2007, we had unencumbered assets of over $200 million, consisting of unpledged mortgage-backed securities, equity securities, and cash and cash equivalents.  We believe that

1    our liquidity level is in excess of that necessary to satisfy our
     operating requirements and we expect to continue to use diverse
2    funding sources to maintain our financial flexibility.

3    (Emphasis added.)

4    69.    With respect to internal disclosure controls, the 1Q2007 10-Q reported:

5           At March 31, 2007, our principal executive officer and our
            principal financial officer have performed an evaluation of the
6           effectiveness of our disclosure controls and procedures . . . and
            concluded that our disclosure controls and procedures are effective
7           to ensure that information required to be disclosed by us in the
            reports we file or submit under the Exchange Act is recorded,
8           processed, summarized and reported within the time periods
            specified in the SEC rules and forms, and our disclosure controls
9           and procedures are also effective to ensure that information
            required to be disclosed in the reports we file or submit under the
10          Exchange Act is accumulated and communicated to our
            management, including our Chief Executive Officer and our Chief
11          Financial Officer, to allow timely decisions regarding required
            disclosure.

12

13   70.    Pursuant to SOX, defendants Moore and Zyda signed certifications which were

14   attached to the 1Q2007 10-Q, representing that that Form 10-Q was accurate, fairly presented the

15   Company's financial condition in all material respects, and that Luminent maintained effective

16   internal disclosure controls and procedures.

17                  **3.    The May 10, 2007 Conference Call**

18   71.    In conjunction with the May 10 Release and 1Q2007 10-Q, defendants Seneca,

19   Moore and Zyda held a conference call that day (the "May 10 Conference Call") with securities

20   analysts and members of the financial community in which they discussed Luminent's financial

21   results for the first quarter of 2007.

22   72.    In the May 10 Conference Call, defendants reiterated the pronouncements made

23   in the Company's May 10 Release and 1Q2007 10-Q.  For example, defendant Moore

24   represented:

25          •    We believe that our high quality investment management
                 business model will continue to distinguish itself through
26               solid performance over time.

27          •    The well-publicized troubles in the subprime market did
                 not spread to our high quality prime loan portfolio.
28

- We grew the Spread portfolio in the first quarter by 23% year-over-year as we identified attractive return opportunities . . . There is no credit risk and virtually no interest rate risk in these assets.

- Credit sensitive mortgage-based securities were 11% of total assets with an average credit quality of A-. In this portfolio, <u>we hold virtually no residuals or first loss tranches. None of these bonds have been downgraded nor are any on watch to be downgraded by ratings agencies.</u>

- <u>We have no subprime first loss exposure nor any noninvestment grade subprime exposure in this portfolio.</u>

(Emphasis added.)

73. In the May 10 Conference Call, defendant Zyda added:

We maintain solid liquidity. Unencumbered assets were over $200 million at quarter end. We have experienced no difficulties in financing our positions throughout the recent period of market turbulence.

74. Commenting on the fact that the Company reported a $15 million loss on the sale of subordinated MBS based on "rising delinquencies in the underlying loan collateral," defendant Moore stated that "our process is to sell incipient problems rather than mark them [to market]."

75. Moore elaborated further on the decision to sell MBS for a loss in response to a follow-up question:

[W]e had situations obviously in which a few bonds started to deteriorate quickly out of the gate as soon as [we] bought them. Perhaps different than other institutions, our general solution to issues that are deteriorating is we sell them and then lift hedges that we have put into the market to defray precisely that event rather than to mark them down and hope things will get better. So we did that to the tune of $15 million in the first quarter. <u>I am happy to report that we do not have anything that I would expect to occur in the near-term future</u> . . .

(Emphasis added.)

76. By no later than the start of the Class Period, defendants were aware that their representations made six weeks earlier in the May 10 Release, the May 10 Conference Call and the 1Q2007 10-Q (the "May 10 Statements") were materially false and misleading. The May 10

1   Statements, highlighting the distinctions between Luminent's operations and companies involved

2   in the subprime mortgage loan business, misled investors by failing to disclose that the subprime

3   debt was negatively impacting prices and liquidity with respect to Luminent's MBS portfolio,

4   and that the deterioration was expected to continue.  Defendants also misled investors as to the

5   level of risk in its subordinated MBS portfolio in stating that the portfolio did not include

6   (a) securities secured by subprime mortgage loans or (b) "residual interests" in MBS, which are

7   at the bottom of the payment priority ladder, and therefore highly risky.

8         **C.**    **The Reasons Defendants' May 10, 2007**
9               **Statements Were False and Misleading**

           **1.**    **The Expansion of the Subprime Credit Crunch**

10  77.    Defendants made bullish statements (¶¶ 62-65, 67-68, 72-73, *supra*) that

11  Luminent's business was not only weathering the mortgage market turbulence, but was thriving

12  and would continue to do so; they then portrayed Luminent as isolated from the dangers of the

13  subprime market, which by 2007 comprised about 25% of the mortgage assets in the United

14  States.  (¶¶ 64, 67,72, *supra*.)

15  78.    Defendants' pronouncements were materially and intentionally misleading when

16  made and/or were at a minimum deliberately reckless.  The Company's mortgage loan and MBS

17  portfolios were swept under by the very risks they denied were applicable to Luminent.  As

18  Luminent ultimately conceded in a November 19, 2007 written presentation (the "November 19

19  Presentation") to the financial community, there was "a dramatic reduction in market liquidity

20  and mortgage-backed security prices, caused by subprime mortgage underperformance."

21  (Emphasis added).  The November 19 Presentation was attached to a Form 8-K filed with the

22  SEC.

23  79.    In making the misleading statements, defendants concealed, ignored or

24  disregarded information to the contrary.  More egregiously, in their public statements, they

25  repeatedly distanced Luminent from the risks which sank the Company and injured Class

26  members.  The adverse impact on the Alt-A loan market, and on MBS secured by Alt-A loans,

27  was well documented by the beginning of the Class Period.

28

80.     For example, on February 22, 2007, the *American Banker* reported that "there are a number of signs that the credit problems that have plagued subprime loans are creeping up to the alternative-A sector."  The article noted that, on February 14, 2007, S&P placed a negative watch on the ratings of 18 subordinated classes for 11 residential MBS deals issued in 2006, both in the subprime and Alt-A sectors.

81.     On February 27, 2007, *The Financial Times* reported that, according to Merrill Lynch analyst Charles Sorrentino, "[t]he delinquency numbers for 2006 Alt-A originations are materially worse than a lot of people would have expected."  UBS strategist William O'Donnell expressed similar sentiments:  "The sub-prime story seems to have developed legs as Treasury traders seized on the idea that ABX [subprime index] woes may seep into other markets and create a credit dilemma."

82.     On March 13, 2007, *Market Watch* issued an article under the caption: "Losses on So-called Alt-A home loans are accelerating and could hit the value of lower-rated portions of some mortgage-backed securities, according to a study released on Tuesday."  The *Market Watch* article stated:

> Delinquencies have jumped on Alt-A mortgages originated last year with adjustable interest rates that let borrowers pay only the interest for a time.
>
> These loans, known as Alt-A ARM IOs, have seen a four-fold increase in delinquencies of at least 60 days, four times the level of similar loans originated in 2003 and 2004, according to the study by David Liu, head of mortgage credit research at UBS, and Loan Performance, a division of real estate data firm First American (FAF).
>
> This "alarming" deterioration could have dire consequences for some investors in the BBB- rated parts of mortgage-backed securities (MBS) that contain these types of loans, but the market hasn't priced these risks in yet, Liu warned.
>
> Losses "could potentially wipe out most of the credit support on BBB- rated bonds backed by Alt-A hybrids," Liu wrote, "And yet we have not seen any spread movements that suggest investors are taking this into consideration."
>
> Liu's study, which used LoanPerformance data from the end of January, is based on the housing market remaining relatively flat over the next few years.

"If house prices fall over the next few years, everything in this scenario will be much worse," he said in an interview.

(Emphasis added.)

83.     However, in the February 9 Release and the 2006 10-K, defendants specifically denied that the deterioration in the subprime market had impacted Luminent's business.  On the contrary, defendants represented that "[i]nvestors should distinguish our business model from that of a subprime originator," that "Luminent is uniquely positioned to prosper in a challenging mortgage market," and that "[w]e maintain ample liquidity to manage our business."

84.     On April 3, 2007, the *Houston Chronicle* reported that the "subprime mortgage crisis is likely to spread to a higher tier of loans known as Alt-A, according [to David Shulman], an economist affiliated with the University of California at Los Angeles.  'The question is to what extent. . . . We suspect the problem in the subprime area is just the tip of the iceberg for the mortgage market as a whole,' Shulman wrote."

85.     On April 11, 2007, the *Associated Press* reported that the "so-called Alternative-A mortgage sector, which loans to borrowers with better credit than subprime borrowers but not quite prime, is starting to hurt."  The article stated that One "Alt-A lender, American Home Mortgage Investment Corp. of Melville, N.Y., announced . . . that it was having trouble selling its mortgages into the secondary market and would have to cut its earnings forecast."  The *Associated Press* also reported that Doug Duncan, chief economist for the Mortgage Bankers Association in Washington, DC, "expected to see some increase in delinquencies and defaults in the Alt-A market this year, but said the bigger problem was that investors appeared less willing to invest in these loans because of the deepening subprime problems."  (Emphasis added.)

86.     The *International Herald Tribune* also reported on April 11, 2007 that the problems affecting subprime credit increasingly appear to be cropping up in the Alt-A market.

Reports that Wall Street is becoming more wary of Alt-A by putting loans back to lenders or by bidding less for them could be an indication that default rates will worsen before they improve.

*        *        *

"The credit markets were showering the mortgage market with capital, and now that's just evaporating," said Mark Zandi, chief

1

> economist at Economy.com. "The capital markets are going to exacerbate the problem, seemingly."

2

> Until recently, mortgage companies had been able to sell loans to Wall Street banks and other investors for a premium that was big enough to cover their costs of making the loans and to make a tidy profit. The banks would then package the loans into pools to be sold as bonds to hedge funds, insurance companies and other investors.

3

4

5

6

> "Now you are selling at par or lower in some instances," said Thomas McCarthy, a managing director at Carlton Group, a real estate investment firm that brokers the sale of mortgages. "It really throws the business upside down."

7

8

> For American Home Mortgage, the lower prices investors are willing to pay for Alt-A loans means that the company will earn between 40 cents and 60 cents a share in the first quarter. Analysts had expected it to earn $1.06 a share . . .

9

10

11

> Beginning in the second quarter, the company, which is structured as a real estate investment trust, will reduce the dividend for its common shares to 70 cents a share, down from $1.12 in the first quarter. The company also said it would write down $484 million of mortgage securities it owns because of the lower prices at which the bonds were now trading.

12

13

14

(Emphasis added.)

15

      87.    The *International Herald Tribune* further reported that, according to Zach Gast,

16

an analyst at the Center for Financial Research and Analysis, which engages in forensic

17

accounting, "[t]his is a definite sign that, at least in the secondary market, that subprime issues

18

are spilling over."

19

      88.    On May 29, 2007, the *St. Paul Legal Ledger* published an interview with Prentiss

20

Cox, an associate clinical professor at the University of Minnesota and former attorney in the

21

Consumer Division of the Minnesota Attorney General's office. Cox explained that

22

> the foreclosure crisis will continue for the next several years, and not because of subprime loans. The primary culprit of foreclosures just starting to show up are so-called Alt-A mortgages, or those between prime and subprime. Until now, the foreclosure crisis has been almost all subprime loans, Cox said. But now we're getting the Alt-A loans beginning to kick in. That's why foreclosures should stay high for the next few years.

23

24

25

26

      89.    Defendants' May 10 Statements, however, distanced Luminent from the risks

27

relating to market liquidity impacting other companies with exposure to subprime mortgage

28

1    assets.  Indeed, defendant Moore boasted (¶¶ 63-64, 72, *supra*) that "Luminent's profile is ideal

2    for the current environment"; that "[w]e have safeguarded our liquidity"; that "the well

3    publicized troubles in the subprime market did not spread to our high quality prime loan

4    portfolio"; and that "[a]s the market struggles, our investment opportunities increase."  These

5    statements were false and misleading by the beginning of the Class Period, if not sooner.

6              **2.    The Quality and Risks of the MBS Portfolio**

7         90.    Defendants also misled investors in the May 10 Conference Call by representing

8    that the Company had "no subprime first loss exposure nor any noninvestment grade subprime

9    exposure," and "virtually no residual interest tranches" in its MBS portfolio.

10        91.    In fact, as revealed in litigation commenced by the Company following the close

11   of the Class Period, Luminent had substantial subprime exposure and residual interests in its

12   subordinated MBS portfolio, the most subordinated securities in terms of the priority of

13   payment.  Defendants were aware of or recklessly disregarded these facts throughout the Class

14   Period.

15        92.    On October 18, 2007, the Company filed a civil action captioned *Luminent*

16   *Mortgage Capital, Inc., et al. v. HSBC Securities (USA), Inc.*, No. 07 Civ. 9340 (S.D.N.Y.).  In

17   its complaint, Luminent alleged that, pursuant to "Master Repurchase Agreements," Luminent

18   subsidiaries financed the purchase of nine bonds (the "HSBC Bonds") worth approximately $39

19   million which were the subject of margin calls by HSBC Securities (USA), Inc. ("HSBC").

20   HSBC effectively held these securities as collateral for financing Luminent's multimillion-dollar

21   borrowings.

22        93.    In its answer and counterclaims dated November 29, 2007 ("the "Answer" or

23   "HSBC Answer") , HSBC revealed for the first time that eight of the bonds were financed

24   between May 7 and 11, 2007, and a ninth bond called the "NIM Bond" was financed on or

25   before July 23, 2007.

26        94.    HSBC further revealed in its Answer the negative impact that the subprime

27   debacle had on the value of the HSBC Bonds, as follows:

28

1            74.     Payment of the eight Bonds that [Luminent] sold to
HSBC were <u>collateralized by so-called "subprime mortgages."</u> As

2 a result, the value of the Bonds and the likelihood of ultimate
repayment were dependent on, among other factors, the payment

3 performance of borrowers under such subprime mortgages.

4            75.     Payment of the NIM Bond that [Luminent] sold to
HSBC was not backed directly by subprime mortgage loans but

5 <u>was backed by so-called "residual interests,"</u> the most
subordinated securities issued in securitized pools of subprime

6 mortgage loans.  <u>As a result, the NIM Bond was particularly
susceptible to the risk of non-payment on the underlying subprime</u>

7 <u>mortgages</u>.

8            76.     The rate of default in the market for subprime
mortgages rose significantly in 2007.  Rising default rates on

9 subprime home loans have led to large declines in the values of
securities, such as the Bonds, collateralized by such mortgages.

10 . . .  Many such securities once rated AAA by credit rating
agencies have been significantly downgraded due to the non-

11 payment or predicted non-payment of principal and interest
payments.  Large financial institutions have been forced to mark

12 down, and continue to mark down, billions of dollars of subprime-
mortgage-backed assets.  <u>Not surprisingly, the subprime mortgage</u>

13 <u>crisis also affected the market value of the Bonds</u>.

14            77.     The subprime mortgage crisis has also affected the
payment window of the Bonds.  In particular, because the NIM

15 Bond was highly susceptible to the performance of subprime
mortgages, rising default rates and declining rates of subprime

16 mortgage prepayment cause the NIM Bond to fall behind its
projected payment plan, thus extending its payment window

17 beyond the projections in its offering plan.

18            78.     As a result of the Bonds' decline in market value,
HSBC issued several margin calls to [Luminent] prior to August 6,

19 2007.

20 (Emphasis added.)

21      95.     Recently, Luminent has also conceded in another civil action that during the Class

22 Period, it held a $26 million investment in the Merrill Lynch Mortgage Investors Trust, Series

23 2005-A6, comprised of the most subordinated MBS, including "residual" securities.  In its

24 complaint in the action captioned *Luminent Mortgage Capital, Inc., et al., v. Merrill Lynch &*

25 *Co., Inc.*, No. 07 Civ. 5423 (E.D. Pa.) (filed Dec. 24, 2007), Luminent alleges that on August 30,

26 2005, it purchased mortgage loan asset-backed certificates which gave it a beneficial interest in a

27 pool of certain mortgage loans securitized by Merrill Lynch.

28

1    96.    In its first Amended Complaint, filed January 23, 2008, Luminent acknowledged

2    purchasing the certificates representing the most junior payment classes. The complaint states:

3          26.    The issued Certificates consisted of fourteen
          different classes, three of which were junior in payment priority
4          and/or had a different source of payment as compared to the other
          11 classes. Those three junior classes [**which Luminent bought**],
5          the securities primarily at issue in this matter, were designated
          "Class B-3," "Class C," and "Class P" (herein, collectively, the
6          "Junior Certificates"). (The remaining, more senior, classes were
          designated "Class I-A-1," "Class I-A-2," "Class II-A-1," "Class II-
7          A-2," "Class II-A-3," "Class II-A-4" (collectively, the "Class A
          Certificates"), "Class M-1," "Class M-2," Class B-1," "Class B-2,"
8          and "Class R.")

9                    *    *    *

10          28.    The general priority among the Certificates was as
          follows: Classes A and R; M-1; M-2; B-1; B-2 and B-3. Thus,
11          holders of the Class B-3 were not entitled to receive any amounts
          received on the Mortgage Loans until the (eleven) more senior
12          holders were paid.

13          29.    The Class C Certificates were junior to the Class B-
          3 Certificates. Moreover, the Class C Certificates represented a
14          "residual" interest in the Mortgage Loans, as the holders of that
          class of Certificates were entitled to be paid only from the so-
15          called "excess cash-flow" resulting from that pool of loans. The
          "excess cash-flow" was the amount of interest received on the
16          Mortgage Loans that remained after more senior holders were paid
          the interest owed to them and certain losses (delinquencies and
17          foreclosure losses/shortfalls) are accounted/compensated for.

18          30.    Investors in the Class P Certificates, on the other
          hand, were not entitled to any of the interest payment amounts
19          received on the Mortgage Loans, as they (and only they) were
          instead entitled to receive any "prepayment penalties" incurred by
20          homeowners upon paying off all or a substantial portion of a loan
          in advance of the expiration of the prepayment penalty term.

21
22    (Emphasis added.)

      97.    The foregoing facts, which were asserted in pleadings in connection with
23
      litigation commenced by Luminent, demonstrate that defendants' representations in the May 10
24
      Conference Call were false and misleading.
25
      **III.    Additional False and Misleading Statements During the Class Period**
26
          **A.    June 2007**
27

28

98.     The Class Period begins on June 25, 2007, the date *Barron's* published an interview of Arnie Schneider, the founder and Chief Investment Officer of Schneider Capital Management.  The article, titled "Staying Out of Trouble," reported that Mr. Schneider had selected Luminent as one of his favorite stock picks.

99.     In the *Barron's* article, Mr. Schneider described Luminent as a "disciplined buyer of mortgage product" whose "portfolio is showing significantly better credit performance than portfolios with similar metrics.  Most important, they benefit from the wider credit spreads, mortgage spreads that have existed since February [2007]."  Schneider also noted that Luminent's dividend was yielding more than 12%.  Schneider's bullish analysis and conclusions were based upon misleading information released by Luminent regarding the Company's ability to prosper "during a period of unprecedented turmoil in the mortgage industry."

100.    On June 27, 2007, the Company issued a press release (the "June 27 Release") entitled "Luminent Mortgage Capital Announces a Dividend Increase to $0.32 Per Share for the Second Quarter of 2007."  The June 27 Release stated that $0.32 per share dividend represented a 7% increase quarter-over-quarter and a 60% increase year-over-year.  Luminent's annualized dividend yield, based on its second-quarter 2007 cash dividend and the June 27, 2007 closing stock price of $9.90, was 12.9%.

101.    In the June 27 Release, defendant Moore emphasized that "[o]ur disciplined high quality investment strategy has allowed us to increase our dividend to our shareholders by nearly 7% during a period of unprecedented turmoil in the mortgage industry. . . . He also touted the fact that "[o]ur recently completed convertible bond offering [$90 million issued on June 5, 2007] has provided us with more than ample liquidity to invest in today's market conditions.  We are optimistic that further profitable investments may be available to us in the near term as capital markets continue to rebalance.  In fact, we expect that our new, higher, dividend will be easily sustainable in the near future."  (Emphasis added.)

102.    Defendants' representations were materially false and misleading because the proceeds from the convertible offering, together with available cash and other unencumbered assets, were insufficient to cover Luminent's obligations in the event of margin calls under its

1   repurchase agreements due to steep declines in the value of the MBS portfolio securing the

2   Company's borrowings.  These price declines would result in massive losses in the MBS

3   portfolio due to sales and asset writedowns.  As a result, the Company did not have "more than

4   ample liquidity to invest in today's market conditions."  Nor was its dividend "easily sustainable

5   in the near future."

6        103.    Defendants also failed to disclose that Luminent had marked down the value of its

7   portfolio by $14.4 million due to higher than expected losses resulting from increasing

8   delinquency and default rates on mortgage loans securing the MBS portfolio.  For example, the

9   default rate approached 15% of the amount of outstanding loans securing the $26 million

10  investment in Merrill Lynch certificates.

11       104.    Luminent belatedly confirmed the writedown in its Form 10-Q for the second

12  quarter ended June 30, 2007 (the "2Q2007 10-Q"), filed September 26, 2007, and noted that,

13  after the close of the June 30 quarter, MBS rated "B" and "BB" in its portfolio had been

14  downgraded.

15       **B.    July 2007**

16       105.    On July 23, 2007, Luminent issued a newsletter titled "Pharos, Quarter Ended

17  June 30, 2007" under the signature of defendant Moore.  The Pharos newsletter was attached to

18  the Company's Form 8-K dated July 23, 2007, signed by defendant Zyda.

19       106.    In the Pharos newsletter, defendant Moore admitted:

20             In my almost 30 years in the U.S. mortgage-backed securities
               market, I have never before seen the intensity of confusion,
21             uncertainty and outright fear as right now.  I have experienced the
               Volker recession of '79-'81, the Oil Patch and New England
22             corrections in the mid-to-late 80's, California's '89 to '94, and
               significant bond market corrections in '87, '94 and '98.  At none of
23             these times has the distaste for mortgage and mortgage-related
               securities been as high as we see now.
24

25  (Emphasis added.)

26       107.    Despite acknowledging a major disruption in market conditions relating to the

27  purchase of MBS, Moore proceeded to make a misleading sales pitch to persuade investors,

28

1    institutional lenders and rating agencies that Luminent's loans and MBS were still a safe and

2    secure investment.

3        108.    On July 30, 2007, the Company issued a press release (the "July 30 Release")

4    captioned "Luminent Mortgage Capital, Inc. Confirms Second Quarter Dividend Payment of

5    $0.32 per Share Secure, Full Compliance With All Financial Covenants, and Ample Liquidity."

6    The July 30 Release reported that Luminent's "second quarter dividend payment of $0.32 per

7    share, payable to stockholders on August 8, 2007, is secure and will not be canceled." Luminent

8    also confirmed that as of July 30, 2007, it was "in full compliance with all its financial covenants

9    . . . It had ample liquidity to manage its business." (Emphasis added.)

10        109.    In the July 30 Release, Luminent again touted its "disciplined and sophisticated

11    hedging program for the interest rate and credit risks in its portfolio using Eurodollar futures,

12    interest rate swaps, swaptions, interest rate caps, and by shorting various portions of the ABX

13    indices as well as employing single-name credit default swaps." The Company emphasized that

14    "during the quarter ended June 30, 2007, the strong performance of Luminent's credit hedges

15    more than offset the income statement and balance sheet impact of mark-to-market pricing and

16    certain impairment charges related to its credit sensitive assets. (Emphasis added.)

17        110.    The foregoing representations in ¶¶ 99, 101, and 107-09 were false and

18    misleading in numerous respects:

19            a.    At the same time defendants were touting the Company's "ample

20                liquidity" and its "secure" and "easily sustainable" dividend, Luminent

21                MBS were subject to margin calls (described herein at ¶¶ 111-17) that

22                required the Company to sell $1.9 billion of its MBS assets at distressed

23                prices, resulting in losses of $114 million.

24            b.    Defendants failed to disclose that during the second quarter of 2007, the

25                Company had marked down its MBS portfolio by over $14 million due to

26                increased delinquencies and expected losses, which led to ratings

27                downgrades in the Company's MBS portfolio.

28

c.  Defendants' representation that Luminent's credit hedges had "more than offset" losses from MBS writedowns and sales was materially misleading in failing to disclose that the hedges had proven insufficient to protect against widespread reductions in values of the subordinated MBS portfolio, and that the Company's Spread portfolio was effectively unhedged. In the Company's Form 10-Q for the third quarter ended September 30, 2007 (the "3Q2007 10-Q"), Luminent reported that it had sustained over $400 million in losses from writedowns and sales of MBS, which dwarfs its previously reported gains on hedges from financial contracts such as credit default swaps.

**C.  Luminent's Margin Calls**

111.  Contrary to defendants' representations about the Company's ample liquidity and secure dividend, in fact Luminent had been liquidating a significant part of its MBS portfolio in July 2007 to satisfy multiple margin calls from at least eight lenders. As defendants acknowledged in the November 19 Presentation:

**Asset Sales/Financing Arrangements**

**July/August [2007]**  Sold mortgage-backed securities with amortized cost of approximately $1.9 billion at a loss of approximately $114 million.

112.  The HSBC Bonds and other MBS in the portfolio, as described at ¶¶ 91-96, *supra*, were subject to significant deterioration in market value for, among other reasons, they were secured by "residual interests," the most subordinated securities issued in securitized pools of mortgage loans, and subprime loans. HSBC issued several margin calls to Luminent during July and early August 2007, when the value of the HSBC Bonds sank as a result of the continued deterioration of the underlying subprime mortgages.

113.  As set forth in the HSBC Answer, on July 10, 2007, HSBC issued a margin call to Luminent in the sum of $500,224.42, which was satisfied on July 11. On August 3, 2007, HSBC issued a margin call to Luminent in the sum of $1,612,000, which was also satisfied that same day.

1     114.    On August 3 and August 6, 2007, as it had done previously, HSBC again issued

2    margin calls to Luminent based on the HSBC Bonds' continued decline in market value, as set

3    forth in HSBC's Answer and Counterclaim.  However, Luminent defaulted on these margin

4    calls.  Accordingly, HSBC declared an "event of default" and sold the HSBC Bonds through an

5    auction at distressed prices.

6     115.    Luminent also received margin calls from Barclays Capital, Inc. ("Barclays"),

7    which are the subject of a civil action titled *Luminent Mortgage Capital, Inc., et al. v. Barclays*

8    *Capital, Inc.*, No. 07 Civ. 10275 (S.D.N.Y.).  In its complaint filed November 12, 2007 (the

9    "Barclays Complaint"), Luminent alleges that as of June 2007, Luminent had financed at least

10    $77 million MBS through short-term repurchase transactions with Barclays.  Barclays also

11    financed the purchase of a $9.0 million bond issued by Fremont NIM Trust 2006-B and an $8.0

12    million bond issued by RAMP-Series 2005-RSG Trust.  The Fremont and RAMP bonds,

13    together with the other securities subject to the Barclays MRAs are referred to as the "Barclays

14    Bonds."

15     116.    The Barclays Bonds were particularly susceptible to the risks of nonpayment of

16    the underlying mortgages.  As set forth in the Barclays Complaint, Luminent was required to

17    post additional securities with Barclays when the market values of the MBS, which served as

18    collateral, declined.  Luminent rolled over its obligations on the repurchase dates with respect to

19    these securities.

20     117.    Luminent alleges in the Barclays Complaint that, on August 2, 2007, Barclays

21    issued margin calls because the value of the Barclays Bonds had declined substantially and

22    demanded $35 million in cash or additional collateral to satisfy the margin calls.  When

23    Luminent failed to deposit the required cash or value, Barclays sold the securities at prices far

24    lower than the repurchase price set forth in the Barclays MRAs.

25     118.    Luminent ultimately acknowledged in its 2Q2007 10-Q that (1) it had received

26    default notices for eight different repurchase agreements for borrowings totaling $1.6 billion;

27    (2) it was unable to roll over approximately $168.0 million of commercial paper financing; and

28

1   (3) an event of default had occurred on Luminent's convertible senior notes of $90 million and

2   the Company's commercial paper of $580 million.

3          119.    As a result, MBS with an amortized cost of approximately $1.9 billion were sold

4   in order to meet margin calls and reduce its leveraged position.  The sales resulted in losses of

5   $114 million.  The Company ceded another $207 million of securities to another lender to satisfy

6   its margin calls.  Luminent also liquidated $1.0 billion of mortgage loans at a loss of almost $39

7   million to avoid margin calls on its warehouse lines of credit.

8          120.    The Company acknowledged that these significant losses raised a "substantial

9   doubt about the Company's ability to continue as a going concern for a reasonable period of

10  time."

11  **IV.    The Truth Begins to Emerge**

12         121.    On August 6, 2007, prior to the opening of trading, J. P. Morgan issued a report

13  downgrading Luminent stock to underweight.  In its August 6 report, J. P. Morgan questioned

14  the Company's repeated claims that it had "ample liquidity."  The J. P. Morgan report stated in

15  relevant part:

16                 LUM has recently assured the market that liquidity is not a
                   concern at present.  However, all aspects of the mortgage market
17                 have been changing dramatically on a daily basis, and liquidity
                   could become an issue should this trend continue.  Perfect storm of
18                 market forces.  The market for ABS [asset-backed security] CDOs,
                   CMOs [collateralized mortgage obligations], and whole loans has
19                 seized, with investors on the sidelines and banks unwilling to
                   provide warehouse lines.  On existing lines, haircuts have been
20                 increased, creating the potential for margin calls as asset values
                   continue to decline.  Given the dislocation in the non-agency
21                 mortgage market, we believe LUM is currently in no position to
                   purchase loans for its securitization arm or non-agency RMBS for
22                 its CDO unit.  Liquidity stable at present, LUM issued a press
                   release on July 30 to affirm its liquidity and the payment of its
23                 $0.32 2Q dividend.  We have analyzed the securitized loan assets
                   that the firm has retained based on March 31, 2007 data that
24                 displays how it would be able to withstand the current dislocation
                   later in this note.  However, the bid for non-agency assets has
25                 continued to dry up, causing large value declines, and banks have
                   been increasingly vigilant of lent capital.  As a result, further
26                 deterioration could put liquidity at risk.

27  (Emphasis added.)

28

1      122.    Market reaction to the J.P. Morgan report was immediate and dramatic.  In two

2  hours, Luminent shares fell 30 percent, or $1.95, from a close of $6.33 on August 3, 2007 to

3  $4.38, on unusually heavy volume of 2 million shares.  Trading was halted at 10:19 a.m. pending

4  an announcement from Luminent did not resume for the remainder of the day.

5      123.    Following the close of business on August 6, 2007, the Company issued a press

6  release entitled "Luminent Mortgage Capital, Inc. Announcements."  The press release, in

7  relevant part, stated:

> Luminent Mortgage Capital, Inc. (NYSE: LUM) announced today that, since August 3, 2007, the mortgage industry, and the financing methods that the mortgage industry relies upon, have deteriorated significantly and in an unprecedented fashion. Effectively, the secondary market for mortgage loans and mortgage-backed securities has seized up.  As a result, Luminent is simultaneously experiencing a significant increase in margin calls on its highest quality assets and a decrease on the financing advance rates provided by its lenders.
>
> In a Board of Directors meeting today, Luminent's Board unanimously voted to take the following actions:
>
> •      The Board of Directors suspended payment of Luminent's second quarter cash dividend of 32 cents per share on Luminent's common stock.
>
> •      The Board of Directors extended the maturity of the outstanding commercial paper issued by Luminent Star Funding Trust I, a special purpose subsidiary of Luminent, by 110 days.
>
> •      The Board of Directors cancelled Luminent's second quarter 2007 earnings release conference call, scheduled for Thursday, August 9, 2007, at 10:00 a.m. PDT, to discuss its second quarter of 2007 results of operations.
>
> •      The Board of Directors delayed the filing of Luminent's quarterly report on form 10-Q for the second quarter of 2007. Luminent's second quarter of 2007 unaudited condensed financial information is attached to this press release.  Luminent's independent registered public accounting firm has not completed a review of the financial information for the three and six months ended June 30, 2007.
>
> •      The Board of Directors authorized Luminent's senior management to inform the New York Stock Exchange of these unfolding events and, as a result, trading was halted in Luminent's common stock.

1      The Board of Directors currently is considering the full range of
       strategic alternatives to enhance Luminent's liquidity and preserve
2      shareholder value during this period of market volatility.

3      124.    Analysts reacted swiftly and negatively to the Company's announcement.  On

4   August 7, 2007, Deutsche Bank issued a report entitled "Luminent Mortgage – How quickly

5   things change; Downgrading to Sell."  The report, in relevant part, stated:

6      **Margin calls and decreased advance rates impact Luminent**

7      Just seven days after confirming its 2Q dividend and "ample"
       liquidity, Luminent suspended the payment of its 2Q dividend as it
8      faces margin calls and decreased advance rates.  The significant
       and sudden market deterioration will likely force Luminent to sell
9      assets to meet margin calls.  As a result of the market deterioration,
       our belief the difficulties will continue, and the uncertainty of
10     future dividends, we are cutting our rating to a Sell from Buy.  We
       are decreasing our target to $3 per share from $12 per share.

11
       **How quickly things change**
12
       On July 30, Luminent stated its 2Q dividend was secure and would
13     not be canceled and stated the company had ample liquidity to
       operate.  On August 6, just seven days later, the company was
14     forced to suspend the payment of its 2Q dividend as it faced a
       significant increase in margin calls against the highest-quality
15     assets and decreased advance rates.  As a result of the significant
       and rapid market deterioration, we expect Luminent to liquidate
16     assets to meet margin calls.

17                                    *      *      *

18     **Reducing Target to $3 per share**

19                                    *      *      *

20     Luminent faces liquidity risk as a result of margin calls due to
       deterioration in the market for residential loans and credit-sensitive
21     RMBS.  Additionally, Luminent manages interest rate,
       prepayment, and credit risk as well as execution risk.  Increases in
22     short-term rates or increases in refinance activity could negatively
       impact Luminent's business through higher-than anticipated
23     expenses.  The company faces credit risk on the credit-sensitive
       MBS it began purchasing under its diversification strategy.

24
    (Emphasis added.)
25
       125.    UBS expressed similar sentiments in its August 7, 2007 report on Luminent, in
26
    which it reduced its price target on Luminent to $0.00.  The UBS report stated in pertinent part:
27
       After announcing on 7/30 that its 2Q dividend was safe, LUM did
28     an about-face today and suspended its dividend, announcing it is

1    "simultaneously experiencing a significant increase in margin calls
2    on its highest quality assets & a decrease on the financing advance
     rates provided by its lenders." LUM will delay filing its 10-Q. Is
3    this the end of LUM? LUM is considering strategic alternatives to
     enhance liquidity, but we see limited chances of success, given the
4    current environment. One out may be the new $1B warehouse
     line, of which $250M is committed. However, it is unclear if that
5    option still exists & mgmt may be unable to restore investor &
     lender confidence anyway, after recently claiming to have "ample
6    liquidity to manage its business." In asset sale scenario, value of
     LUM stock could fall towards $0. Should access to current
7    funding sources be unavailable, we see limited benefit to
     shareholders from asset sales. Warehouse lenders are likely
8    pricing LUM's assets below 95, given typical 5% haircuts on
     warehouse lines. Using a 95 bid as a best case price, this indicates,
9    in a liquidation scenario, that equity value could fall toward $0.
     We have reduced '07E taxable EPS to $0.56 from $1.25 & believe
10   asset impairment charges are likely to significantly impact book
     value. Valuation: Moving price target to $0; Rating downgraded
11   to Sell.

12   (Emphasis added.)

13       126.    Similarly, on August 7, 2007, Keefe Bruyette & Woods ("KBW") slashed its

14   price target to $3.00. In its report, KBW expressed surprise that the Company's touted hedging

15   strategies did not offset the markdown of its MBS portfolio by lenders:

16       On July 23 the company had preannounced favorable 2Q earnings
         and book value and on July 30 it had reaffirmed its 2Q dividend.
17       Despite the deterioration in mortgage credit spreads subsequent to
         June 30, we had believed that the company's hedge positions
18       would have offset potential mark-to-market losses on its securities
         portfolio, as was the case in 1Q and 2Q07.
19

20   (Emphasis added.)

21       127.    J. P. Morgan also issued a report on August 7, 2007 to follow up on its report the

22   day before. The August 7 report stated in relevant part:

23       We reiterate our Underweight rating on LUM, as our dire
         predictions seem to have quickly come to pass. LUM reported
24       after the close that it has been receiving a significant increase in
         margin calls, even on high quality assets, and a simultaneous
25       decrease on financing advance rates from lenders. The board has
         suspended the dividend and the 2Q earnings call scheduled for this
26       Thursday and released its 2Q financials in the filing . . . Based on
         the recent pattern of banks pushing mortgage companies into
27       default due to unmet margin calls, we believe there is little hope
         that LUM shares can recover in the absence of securing a well
28       funded financial backer. June 30 recourse leverage at 9.2x. LUM

had over $4B of recourse debt on-balance sheet at June 30, 2007
against just $435M of GAAP equity.  It is clear that the drastic
spread widening in mortgages, especially high grade bonds, caused
significant margin call activity over the course of the last five
trading days . . . As a result, we would deem any new investment
in LUM shares as highly speculative, and reiterate our
Underweight rating.

(Emphasis added.)

128.    On August 7, 2007, the Company also issued a press release entitled "Luminent

Moving Forward with Efforts to Enhance Its Liquidity."  Luminent's press release, in relevant

part, stated:

Luminent Mortgage Capital, Inc. (NYSE:LUM) today reported it
is moving forward with its efforts to enhance its liquidity and
preserve the value of its portfolio of assets which is comprised
substantially of high quality mortgage loans.  Luminent
emphasized that, unlike other companies that are being affected by
the sudden and extraordinary disruptions in the secondary and
national real estate markets, it is an investor in, and not an
originator of, mortgage loans.  Luminent purchases its mortgage
loans only after extensive due diligence.

*       *       *

Luminent recently reported that, because the financing methods the
mortgage industry normally relies upon have deteriorated in an
unprecedented fashion, it has experienced a significant increase in
margin calls on its highest quality assets, especially since August
3, and a decrease on the financing advance rates provided by its
lenders.

Trez Moore, Chief Executive Officer of Luminent, stated,
"Luminent is committed to undertaking all appropriate initiatives
with respect to its business.  With the expertise of our strong
management team, which has consistently proven its ability to
successfully execute on our business model, we are moving
forward with our efforts to address the company's liquidity needs
caused by the current mortgage market dislocations."

129.    Following these disclosures, Luminent's shares fell 75%, or $3.30 per share, to

close on August 7, 2007 at $1.08 per share, on extraordinary trading volume of 32 million

shares.

130.    The price of Luminent shares dropped another 12% on August 8, 2007 to close at

$0.95 per share, on extraordinary trading volume of 12 million shares.

131.    Luminent cut its workforce by about one-half at the end of August 2007.  On September 25, 2007, the Company announced that, as part of its consolidation efforts, its headquarters in San Francisco would be closed and relocated to Philadelphia.

132.    In addition, three members of the Company's Board, Lenny Auerbach, Don Putnam, and Chairman and founder Gail Seneca resigned.

133.    On October 23, 2007, CFO Zyda resigned as of year-end 2007.  Luminent's auditor, Deloitte & Touche, also resigned and was replaced on November 9, 2007 by Grant Thornton LLP.

134.    On December 27, 2007, Luminent belatedly filed its 3Q2007 10-Q, which included the Company's financial results on a going-concern basis.  The Company reported a net loss of $520 million, or $12.17 per share, primarily due to a $138 million loss from the sale of MBS, a $46 million loss from the sale of mortgage loans, and a $269 million charge for the writedown of the MBS portfolio.

135.    As anticipated by the investment community, the Company's repayment of liabilities through asset sales has not improved the Company's operating business or shareholders' equity.  As of February 14, 2008, Luminent stock closed at $0.77.

## RELIANCE ALLEGATIONS
## FRAUD-ON-THE-MARKET DOCTRINE

136.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Luminent common stock met the requirements for listing, and was listed, on the New York Stock Exchange, a highly efficient market;

b.    as a regulated issuer, the Company filed periodic public reports with the SEC;

c.    the trading volume of the Company's stock was substantial, reflecting numerous trades each day;

d.    Luminent was followed by securities analysts employed by several major brokerage firms, which wrote reports which were distributed to the sales

1     force and certain customers of such firms, and which were available to

2     various automated data retrieval services;

3     e.     the misrepresentations and omissions alleged herein were material and

4     would tend to induce a reasonable investor to misjudge the value of

5     Luminent common stock; and

6     f.     Lead Plaintiff and the other members of the Class are entitled to a

7     presumption of reliance upon the integrity of the market for the purpose of

8     class certification, as well as for ultimate proof of their claims on the

9     merits.  Lead Plaintiff will also rely, in part, upon the presumption of

10     reliance established by material omissions.

11     **NO STATUTORY SAFE HARBOR**

12     137.     The statutory safe harbor provided for forward-looking statements under certain

13     circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

14     Many of the specific statements pleaded herein were not identified as "forward-looking

15     statements" when made.  To the extent there were any forward-looking statements, there were no

16     meaningful cautionary statements identifying important factors that could cause actual results to

17     differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

18     extent that the statutory safe harbor does apply to any forward-looking statements pleaded

19     herein, defendants are liable for those false forward-looking statements because, at the time each

20     of those forward-looking statements was made, the particular speaker knew that the particular

21     forward-looking statement was false or misleading and/or the forward-looking statement was

22     authorized and/or approved by an executive officer of Luminent who knew that the statement

23     was false when made.

24     **COUNT I**

25     **VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**(AGAINST ALL DEFENDANTS)**

26

27     138.     Lead Plaintiff repeats and realleges each and every allegation contained in the

28     preceding paragraphs as if set forth herein.

1    139.    During the Class Period, defendants carried out a plan, scheme and course of

2    conduct which was intended to, and throughout the Class Period did, deceive the investing

3    public, including Lead Plaintiff and other Class members, as alleged in this Complaint, and

4    caused Lead Plaintiff and other Class members to purchase Luminent stock at artificially inflated

5    prices.  In furtherance of this unlawful scheme and course of conduct, defendants took the

6    actions set forth in this Complaint.

7    140.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

8    untrue statements of material fact and/or omitted to state material facts necessary to make the

9    statements made not misleading; and (c) engaged in acts, practices, and a course of business

10    which operated as a fraud and deceit upon the purchasers of the Company's common stock in an

11    effort to maintain artificially high market prices for Luminent stock in violation of § 10(b) of the

12    Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful

13    and illegal conduct and fraudulent scheme and course of business charged in this Complaint.

14    141.    These defendants employed devices, schemes, and artifices to defraud.  While in

15    possession of material adverse non-public information, they engaged in acts, practices, and a

16    scheme as alleged herein in an effort to assure investors of Luminent's business and financial

17    success and prospects for continued success.  This included the making of, or the participation in

18    the making of, untrue statements of material fact and concealing facts necessary in order to make

19    these statements, in the light of circumstances under which they were made, not misleading.

20    This conduct artificially inflated the price of Luminent stock and operated as a fraud and deceit

21    upon the purchasers of Luminent stock during the Class Period, proximately causing them

22    economic loss and damage.

23    142.    Defendants had actual knowledge of the misrepresentations and omissions of

24    material facts set forth in this Complaint or acted with reckless disregard of the truth in that they

25    failed to ascertain and to disclose such facts, even though such facts were available to them.

26    143.    As a result of the dissemination of the materially false and misleading information

27    and failure to disclose material facts, as set forth above, the market price of Luminent stock was

28    artificially inflated during the Class Period.  Relying directly or indirectly on the false and

1  misleading statements made by defendants or upon the integrity of the market in Luminent stock,

2  Lead Plaintiff and the other Class members purchased Luminent stock during the Class Period at

3  artificially high prices and were damaged thereby.

4       144.    At the time of defendants' misrepresentations and omissions, Lead Plaintiff and

5  other Class members were ignorant of their falsity.  Had Lead Plaintiff, other Class members,

6  and the market known the truth which was not disclosed by defendants, Lead Plaintiff and other

7  Class members would not have purchased their Luminent stock, or, if they had acquired such

8  stock during the Class Period, they would not have done so at the artificially inflated prices

9  which they paid.

10      145.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff

11  and the other Class members suffered damages in connection with their respective purchases and

12  sales of the Company's stock during the Class Period.

13                                 **COUNT II**

14                     **VIOLATION OF § 20(a) OF THE EXCHANGE ACT**
                        **(AGAINST THE INDIVIDUAL DEFENDANTS)**

15

16      146.    Plaintiff repeats and realleges each and every allegation contained in the

17  preceding paragraphs as if set forth herein.

18      147.    During the Class Period, the Individual Defendants acted as controlling persons of

19  Luminent within the meaning of § 20(a) of the Exchange Act as alleged in this Complaint.  By

20  virtue of their business expertise, high-level positions, ownership, and participation in and/or

21  awareness of the Company's operations, accounting policies, and methods and/or intimate

22  knowledge of the financial statements filed by the Company with the SEC and disseminated to

23  the investing public, the Individual Defendants had the power to influence and control, and did

24  influence and control, directly or indirectly, the decision-making of the Company, including the

25  content and dissemination of the various statements which Lead Plaintiff contends are false and

26  misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of

27  the Company's reports, press releases, public filings and other statements alleged by Lead

28

1  Plaintiff to be misleading prior to, and/or shortly after, these statements were issued and had the

2  ability to prevent the issuance of the statements or cause the statements to be corrected.

3      148.    In particular, each of these defendants had direct and supervisory involvement in

4  the day-to-day operations and in the accounting policies and practices of the Company and,

5  therefore, each is presumed to have had the power to control or influence the particular

6  transactions giving rise to the securities violations as alleged in this Complaint, and exercised the

7  same.  The Company controlled the Individual Defendants and all of its employees.

8      149.    As set forth above, Luminent and the Individual Defendants each violated § 10(b)

9  and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

10  positions as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the

11  Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct,

12  Lead Plaintiff and other Class members suffered damages in connection with their purchases of

13  the Company's stock during the Class Period.

14                                  **PRAYER**

15      WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

16      A.    Determining that this action is a proper class action, certifying Lead Plaintiff as a

17  Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying its

18  counsel as Class counsel;

19      B.    Awarding compensatory damages in favor of Lead Plaintiff and the other

20  members of the Class against all defendants, jointly and severally, for all damages sustained as a

21  result of defendants' wrongdoing, including pre-judgment and post-judgment interest thereon;

22      C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses

23  incurred in this action, including counsel fees and expert fees; and

24      D.    Such other and further relief as the Court may deem just and proper.

25

26

27

28

1

**JURY TRIAL DEMANDED**

2          Lead Plaintiff hereby demands a trial by jury.

3

4   Dated: February 15, 2008                    LOWEY DANNENBERG COHEN & HART, P.C.

5

6                                               By: _____/s/_____
                                                              David C. Harrison

7                                               Richard W. Cohen
                                                Barbara J. Hart
8                                               1 North Broadway, Suite 509
                                                White Plains, NY  10601-2310
9                                               Telephone:  914-997-0500
                                                Facsimile:  914-997-0035

10
                                                *Counsel for Lead Plaintiff and the Putative Class*
11
                                                BERMAN DeVALERIO PEASE TABACCO
12                                                 BURT & PUCILLO
                                                Joseph J. Tabacco, Jr. (SBN 75484)
13                                              Nicole Lavallee (SBN 165755)
                                                425 California Street, Suite 2100
14                                              San Francisco, California  94104
                                                Telephone:     415-433-3200
15                                              Facsimile:     415-433-6382

16                                              *Local Counsel*

17

                                        **E-Filing Attestation**
18
           I, Nicole Lavallee, am the ECF User whose ID and password are being used to file this
19   document.  In compliance with General Order 45 X.B., I hereby attest that David C. Harrison,
     whose e-filing signature appears above, has concurred in the filing of this document.
20

21

22

23

24

25

26

27

28