EXHIBIT 4



# FORM 10-Q

## LUMINENT MORTGAGE CAPITAL INC - LUM

**Filed: May 10, 2007 (period: March 31, 2007)**

Quarterly report which provides a continuing view of a company's financial position

## PART I

**ITEM 1.**    FINANCIAL STATEMENTS 1

## PART I

**Item 1.**    Financial Statements.
**Item 2.**    Management s Discussion and Analysis of Financial Condition and Results of Operations.
**Item 3.**    Quantitative and Qualitative Disclosures About Market Risk.
**Item 4.**    Controls and Procedures.

## PART II

**Item 1.**    Legal Proceedings.
**Item 1A.**    Risk Factors
**Item 2.**    Unregistered Sales of Equity Securities and Use of Proceeds.
**Item 3.**    Defaults Upon Senior Notes.
**Item 4.**    Submission of Matters to a Vote of Security Holders.
**Item 5.**    Other Information.
**Item 6.**    Exhibits.
SIGNATURES
EXHIBIT INDEX
EX-10.1 (EXHIBIT 10.1)

EX-31.1 (EXHIBIT 31.1)

EX-31.2 (EXHIBIT 31.2)

EX-32.1 (EXHIBIT 32.1)

EX-32.2 (EXHIBIT 32.2)

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-Q

(Mark One)

☑ **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

for the quarterly period ended March 31, 2007

OR

☐ **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

for the transition period from          to

**Commission File Number: 000-31828**

# LUMINENT MORTGAGE CAPITAL, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | **06-1694835** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **101 California Street, Suite 1350, San Francisco, California** | **94111** |
| (Address of principal executive offices) | (Zip Code) |

**(415) 217-4500**

(Registrant's Telephone Number, Including Area Code)

**N/A**

(Former Name, Former Address and Former Fiscal Year, if Changed Since Last Report)

Indicate by check mark whether registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes  ☑ No  ☐.

Indicate by check mark whether registrant is a large accelerated filer, an accelerated filer, or a non- accelerated filer. See definition of "accelerated filer and large accelerated filer" as defined in Rule 12b-2 of the Exchange Act. (Check one)

Large accelerated filer  ☐     Accelerated filer  ☑     Non-accelerated filer  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act ).
Yes  ☐. No  ☑.

The number of shares of common stock outstanding on April 30, 2007 was 46,822,244.

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

**INDEX**

| | PAGE |
|---|---|
| **PART I** | |
| ITEM 1. FINANCIAL STATEMENTS | 1 |
| ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 23 |
| ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 51 |
| ITEM 4. CONTROLS AND PROCEDURES | 54 |
| **PART II** | |
| ITEM 1. LEGAL PROCEEDINGS | 56 |
| ITEM 1A. RISK FACTORS | 56 |
| ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 56 |
| ITEM 3. DEFAULTS UPON SENIOR SECURITIES | 56 |
| ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 56 |
| ITEM 5. OTHER INFORMATION | 56 |
| ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K | 56 |
| **SIGNATURES** | 57 |
| **EXHIBIT INDEX** | 58 |
| EXHIBIT 10.1 | |
| EXHIBIT 31.1 | |
| EXHIBIT 31.2 | |
| EXHIBIT 32.1 | |
| EXHIBIT 32.2 | |

i

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Form 10-Q contains certain forward-looking statements under the Private Securities litigation Reform Act of 1995. Forward-looking statements convey our current expectations or forecasts of future events. All statements contained in this Form 10-Q other than statements of historical fact are forward-looking statements. Forward-looking statements include statements regarding our financial position, business strategy, budgets, projected costs, plans and objectives of management for future operations. The words "may continue", "estimate", "intend", "project", "believe", "expect", "plan", "anticipate" and similar terms may identify forward-looking statements, but the absence of such words does not necessarily mean that a statement is not forward-looking. These forward-looking statements include, among other things, statements about:

- our ability to purchase sufficient mortgages for our securitization business;

- the flattening of, or other changes in the yield curve, on our investment strategies;

- changes in interest rates and mortgage prepayment rates;

- our ability to obtain or renew sufficient funding to maintain our leverage strategies;

- continued creditworthiness of the holders of mortgages underlying our mortgage-related assets;

- the possible effect of negative amortization of mortgages on our financial condition and REIT qualification;

- potential impacts of our leveraging policies on our net income and cash available for distribution;

- the power of our board of directors to change our operating policies and strategies without stockholder approval;

- the effects of interest rate caps on our adjustable-rate and hybrid adjustable-rate loans and mortgage-backed securities;

- the degree to which our hedging strategies may or may not protect us from interest rate volatility;

- our ability to invest up to 10% of our investment portfolio in residuals, leveraged mortgage derivative securities and shares of other REITs as well as other investments;

- volatility in the timing and amount of our cash distributions; and

Any or all of our forward-looking statements in this Form 10-Q may turn out to be inaccurate and actual results could differ materially from those anticipated or implied by our forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and future trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. They may be affected by inaccurate assumptions we might make or by known or unknown risks and uncertainties.

You should not rely unduly on those forward-looking statements, which speak only as of the date of this Form 10-Q. Unless required by the federal securities laws, we undertake no obligation to update publicly or revise any forward-looking statements to reflect new information or future events.

This Form 10-Q contains market data, industry statistics and other data that have been obtained from, or compiled from, information made available by third parties. We have not independently verified any third party data.

ii

Table of Contents

PART I

FINANCIAL INFORMATION

Item 1. Financial Statements.

## INDEX TO FINANCIAL STATEMENTS

**Condensed Consolidated Financial Statements of Luminent Mortgage Capital, Inc.:**

| | |
|---|---|
| Condensed Consolidated Balance Sheets (unaudited) at March 31, 2007 and December 31, 2006 | 2 |
| Condensed Consolidated Statements of Operations (unaudited) for the three months ended March 31, 2007 and March 31, 2006 | 3 |
| Condensed Consolidated Statement of Stockholders' Equity (unaudited) for the three months ended March 31, 2007 | 4 |
| Condensed Consolidated Statements of Cash Flows (unaudited) for the three months ended March 31, 2007 and March 31, 2006 | 5 |
| Notes to the Condensed Consolidated Financial Statements (unaudited) | 7 |

1

Table of Contents

# LUMINENT MORTGAGE CAPITAL, INC.
## CONDENSED CONSOLIDATED BALANCE SHEETS
### (Unaudited)

| (in thousands, except share and per share amounts) | March 31, 2007 | December 31, 2006 |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents | $ 60,343 | $ 5,902 |
| Restricted cash | 57,445 | 7,498 |
| Loans held-for-investment, net of allowance for loan losses of $8,262 at March 31, 2007 and $5,020 at December 31, 2006 | 5,569,169 | 5,591,717 |
| Mortgage-backed securities (including $65,880 of trading securities at March 31, 2007) at fair value | 200,918 | 141,556 |
| Mortgage-backed securities pledged as collateral (including $70,609 of trading securities at March 31, 2007) at fair value | 3,052,451 | 2,789,382 |
| Debt securities, at fair value | 1,263 | — |
| Equity securities, at fair value | 925 | 1,098 |
| Interest receivable | 38,117 | 36,736 |
| Principal receivable | 1,462 | 1,029 |
| Derivatives, fair value | 19,401 | 13,021 |
| Other assets | 52,072 | 25,856 |
| **Total assets** | $ 9,053,566 | $ 8,613,795 |
| **Liabilities:** | | |
| Mortgage-backed notes | $ 4,273,596 | $ 3,917,677 |
| Repurchase agreements | 2,880,678 | 2,707,915 |
| Commercial paper | 619,022 | 637,677 |
| Collateralized debt obligations | 270,013 | — |
| Warehouse lending facilities | 403,232 | 752,777 |
| Junior subordinated notes | 92,788 | 92,788 |
| Unsettled security purchases | 2,271 | — |
| Cash distributions payable | 14,418 | 14,343 |
| Accrued interest expense | 9,340 | 12,094 |
| Accounts payable and accrued expenses | 14,885 | 6,969 |
| **Total liabilities** | 8,580,243 | 8,142,240 |
| **Stockholders' Equity:** | | |
| Preferred stock, par value $0.001; 10,000,000 shares authorized; no shares issued and outstanding at March 31, 2007 and December 31, 2006 | — | — |
| Common stock, par value $0.001; 100,000,000 shares authorized; 47,958,510 and 47,808,510 shares issued and outstanding at March 31, 2007 and December 31, 2006, respectively | 48 | 48 |
| Additional paid-in capital | 584,204 | 583,492 |
| Accumulated other comprehensive income | 4,929 | 3,842 |
| Accumulated distributions in excess of accumulated earnings | (115,858) | (115,827) |
| Total stockholders' equity | 473,323 | 471,555 |
| Total liabilities and stockholders' equity | $ 9,053,566 | $ 8,613,795 |

See notes to condensed consolidated financial statements

2

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

### LUMINENT MORTGAGE CAPITAL, INC.
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
### (Unaudited)

| (in thousands, except share and per share amounts) | Three months ended March 31, | |
| --- | ---: | ---: |
| | 2007 | 2006 |
| **Revenues:** | | |
| Interest income: | | |
| Mortgage loan and securitization portfolio | $ 98,690 | $ 22,611 |
| Spread portfolio | 30,376 | 30,965 |
| Credit sensitive bond portfolio | 16,500 | 8,016 |
| Total interest income | 145,566 | 61,592 |
| Interest expense | 115,204 | 46,072 |
| Net interest income | 30,362 | 15,520 |
| **Other Income (Expense):** | | |
| Gains on derivatives, net | 15,264 | 8,694 |
| Impairment losses on mortgage-backed securities | (4) | (1,717) |
| Gains (losses) on sales of mortgage-backed securities | (15,453) | 2,063 |
| Other expense | (80) | (477) |
| Total other income (expense) | (273) | 8,563 |
| **Expenses:** | | |
| Salaries and benefits | 3,084 | 2,423 |
| Servicing expense | 5,986 | 1,482 |
| Provision for loan losses | 3,543 | — |
| Due diligence expense | 254 | 83 |
| Professional services | 844 | 622 |
| Board of directors expense | 80 | 113 |
| Insurance expense | 162 | 141 |
| Custody expense | 151 | 112 |
| Management compensation expense to related party | — | 712 |
| Incentive compensation expense to related parties | — | 98 |
| Other general and administrative expenses | 1,138 | 507 |
| Total expenses | 15,242 | 6,293 |
| Income before income taxes | 14,847 | 17,790 |
| Income tax expense | 460 | 11 |
| Net income | $ 14,387 | $ 17,779 |
| Net income per share — basic | $ 0.30 | $ 0.45 |
| Net income per share — diluted | $ 0.30 | $ 0.45 |
| Weighted-average number of shares outstanding — basic | 47,316,058 | 39,491,786 |
| Weighted-average number of shares outstanding — diluted | 47,427,502 | 39,718,552 |
| Dividend declared per share | $ 0.30 | $ 0.05 |

See notes to condensed consolidated financial statements

3

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.
### CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY
#### (Unaudited)

| (in thousands) | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Distributions in Excess of Accumulated Earnings | Comprehensive Income/(Loss) | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | | |
| Balance, January 1, 2007 | 47,809 | $ 48 | $ 583,492 | $ 3,842 | $ (115,827) | | $ 471,555 |
| Net income | | | | | 14,387 | $ 14,387 | 14,387 |
| Securities available-for-sale, fair value adjustment | | | | 1,531 | | 1,531 | 1,531 |
| Amortization of derivative gains | | | | (444) | | (444) | (444) |
| Comprehensive income | | | | | | $ 15,474 | |
| Distributions to stockholders | | | | | (14,418) | | (14,418) |
| Issuance and amortization of restricted common stock | 150 | | 712 | | | | 712 |
| Balance, March 31, 2007 | 47,959 | $ 48 | $ 584,204 | $ 4,929 | $ (115,858) | | $ 473,323 |

See notes to condensed consolidated financial statements

4

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

# LUMINENT MORTGAGE CAPITAL, INC.

## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

### (Unaudited)

| | Three months ended March 31, | |
|---|---|---|
| (in thousands) | 2007 | 2006 |
| **Cash flows from operating activities:** | | |
| Net income | $ 14,387 | $ 17,779 |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Amortization of premium/(discount) on loans held-for-investment and mortgage-backed securities and depreciation | 4,442 | (1,733) |
| Impairment losses on mortgage-backed securities | 4 | 1,717 |
| Provision for loan losses | 3,543 | — |
| Negative amortization of loans held-for-investment | (35,466) | (3,428) |
| Share-based compensation | 712 | 1,199 |
| Net realized and unrealized gains on derivative instruments | (4,550) | (5,209) |
| Net gain (losses) on sales of mortgage-backed-securities available-for-sale | 15,453 | (2,063) |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in interest receivable, net of purchased interest | (1,251) | 6,106 |
| (Increase) in other assets | (18,492) | (245) |
| Increase (decrease) in accounts payable and other liabilities | 7,485 | (361) |
| Decrease in accrued interest expense | (2,754) | (14,774) |
| Increase in management compensation payable, incentive compensation payable and other related-party payable | — | 221 |
| Net cash used in operating activities | (16,485) | (791) |
| | | |
| **Cash flows from investing activities:** | | |
| Purchases of mortgage-backed securities | (461,640) | (1,079,321) |
| Proceeds from sales of mortgage-backed securities | 14,887 | 3,151,447 |
| Principal payments of mortgage-backed securities | 115,838 | 201,647 |
| Purchases of loans held-for-investment, net | (414,262) | (1,671,093) |
| Principal payments of loans held-for-investment | 460,433 | 21,744 |
| Purchases of derivative instruments | (8,880) | (77) |
| Proceeds from derivative instruments | 6,701 | — |
| Net change in restricted cash | (49,947) | 777 |
| Other | (136) | — |
| Net cash provided by (used in) investing activities | (337,006) | 625,124 |
| | | |
| **Cash flows from financing activities:** | | |
| Repurchases of common stock | — | (9,008) |
| Capitalized financing costs | (4,414) | (3,902) |
| Borrowings under repurchase agreements | 11,312,497 | 12,975,841 |
| Principal payments on repurchase agreements | (11,139,734) | (14,946,878) |
| Borrowings under warehouse lending facilities | 834,153 | 1,634,658 |
| Paydown of warehouse lending facilities | (1,183,515) | (1,375,181) |
| Borrowings under commercial paper facility | 1,840,410 | — |
| Paydown of commercial paper facility | (1,859,065) | — |
| Distributions to stockholders | (14,343) | (1,218) |
| Proceeds from issuance of mortgage-backed notes | 718,451 | 1,283,630 |
| Principal payments on mortgage-backed notes | (362,535) | (26,060) |
| Proceeds from issuance of collateralized debt obligations | 266,027 | — |
| Principal payments on margin debt | — | (3,548) |
| Net cash provided by (used in) financing activities | 407,932 | (470,856) |
| | | |
| Net increase in cash and cash equivalents | 54,441 | 153,477 |
| Cash and cash equivalents, beginning of the period | 5,902 | 11,466 |
| | | |
| Cash and cash equivalents, end of the period | $ 60,343 | $ 164,943 |

5

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

**LUMINENT MORTGAGE CAPITAL, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (continued)**

**(Unaudited)**

| (in thousands) | Three months ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid | $ 122,217 | $ 48,795 |
| Taxes paid | 56 | |
| | | |
| **Non-cash investing and financing activities:** | | |
| Increase in unsettled security purchases | $ 2,271 | $ 179,773 |
| (Increase) decrease in principal receivable | (433) | 9,215 |
| Transfer of loans held-for-investment to real estate owned | 2,879 | |
| Acquisition of mortgage-backed securities available-for-sale through collateralized debt obligations | (3,986) | — |
| Principal payments of mortgage-backed securities available-for-sale | 183 | — |
| Paydown of warehouse lending facilities | (183) | — |
| Increase in cash distributions payable to stockholders | 75 | 766 |

See notes to condensed consolidated financial statements

6

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### (Unaudited)

### NOTE 1—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Luminent Mortgage Capital, Inc., or the Company, was organized as a Maryland corporation on April 25, 2003. The Company commenced its operations on June 11, 2003 upon completion of a private placement offering. On December 18, 2003, the Company completed the initial public offering of its shares of common stock and began trading on the New York Stock Exchange, or NYSE, under the trading symbol LUM on December 19, 2003. On March 29, 2004 and October 12, 2006, the Company completed follow-on public offerings of its common stock.

The Company is a real estate investment trust, or REIT, which, together with its subsidiaries, invests in two core mortgage investment strategies. Under its Residential Mortgage Credit strategy, the Company invests in mortgage loans purchased from selected high-quality providers within certain established criteria as well as subordinated mortgage-backed securities and other asset-backed securities that have credit ratings below AAA. Under its Spread strategy, the Company invests primarily in U.S. agency and other highly-rated single-family, adjustable-rate and hybrid adjustable-rate mortgage-backed securities. The Company operates as only one reportable segment as defined in Statement of Financial Accounting Standards, or SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information.*

The information furnished in these unaudited condensed consolidated interim statements reflects all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the periods presented. These adjustments are of a normal recurring nature, unless otherwise disclosed in this Form 10-Q. The results of operations in the interim statements do not necessarily indicate the results that may be expected for the full year. The interim financial information should be read in conjunction with the Company's 2006 Form 10-K filed with the Securities and Exchange Commission, or SEC, on March 16, 2007.

Descriptions of the significant accounting policies of the Company are included in Note 2 to the consolidated financial statements in the Company's 2006 Form 10-K. There have been no significant changes to these policies during 2007 with the exception of the required adoption of SFAS No. 155 *Accounting for Certain Hybrid Financial Instruments — an Amendment of FASB Statement No. 133 and 140.* See the description of recent accounting pronouncements below.

*Recent Accounting Pronouncements*

The FASB has placed an item on its SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* project agenda relating to the treatment of transactions where mortgage-backed securities purchased from a particular counterparty are financed via a repurchase agreement with the same counterparty. Currently, the Company records such assets and the related financing gross on its consolidated balance sheet, and the corresponding interest income and interest expense gross on its consolidated statement of operations. Any change in fair value of the security is reported through other comprehensive income or current period income, depending on its classification under SFAS No. 115.

However, in a transaction where the mortgage-backed securities are acquired from and financed under a repurchase agreement with the same counterparty, the acquisition may not qualify as a sale from the seller's perspective under the provisions of SFAS No. 140. In such cases, the seller may be required to continue to consolidate the assets sold to the Company, based on the seller's continuing involvement with such investments. Depending on the ultimate outcome of the FASB deliberations, the Company may be precluded from presenting the assets gross on its balance sheet and may instead be required to treat its net investment in such assets as a derivative.

This potential change in accounting treatment does not affect the economics of the transactions but does affect how the transactions would be reported in the Company's consolidated financial statements. The Company's cash flows, liquidity and ability to pay a dividend would be unchanged, and it is expected that its REIT taxable income and its qualification as a REIT would not be affected. Also, net equity would not be materially affected.

7

Table of Contents

### LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### (Unaudited)

In February 2006, the FASB issued SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments — an Amendment of FASB Statements No. 133 and 140.* This Statement provides entities with relief from having to separately determine the fair value of an embedded derivative that would otherwise be required to be bifurcated from its host contract in accordance with SFAS No. 133. The Statement allows an entity to make an irrevocable election to measure such a hybrid financial instrument at fair value in its entirety, with changes in fair value recognized in earnings. The election may be made on an instrument-by-instrument basis and can be made only when a hybrid financial instrument is initially recognized or when certain events occur that constitute a remeasurement (i.e., new basis) event for a previously recognized hybrid financial instrument. An entity must document its election to measure a hybrid financial instrument at fair value, either concurrently or via a pre-existing policy for automatic election. Once the fair value election has been made, that hybrid financial instrument may not be designated as a hedging instrument pursuant to SFAS No. 133. The Statement is effective for all financial instruments acquired, issued or subject to a remeasurement event occurring after the beginning of an entity's first fiscal year that begins after September 15, 2006. In January 2007, the FASB released Statement 133 Implementation Issue No. B40, *Embedded Derivatives: Application of Paragraph 13(b) to Securitized Interests in Prepayable Financial Assets (B40).* B40 provides a narrow scope exception for certain securitized interests from the tests required under paragraph 13(b) of SFAS No. 133. Those tests are commonly referred to in practice as the "double-double" test. B40 represents the culmination of the FASB staff's consideration of the need for further guidance for securitized interests, following the issuance in February 2006 of SFAS No. 155. B40 is applicable to securitized interests issued after June 30, 2007. The Company reviewed all securities that were purchased from January 1, 2007 to March 31, 2007. The adoption of this statement as of January 1, 2007 did not have a material effect on the Company's financial statements; however, this review is required to be performed on an ongoing basis. From January 1, 2007 to March 31, 2007, the Company purchased certain hybrid securities which require bifurcation. The Company has elected to carry these securities at fair value as trading securities, although these securities were not acquired for resale. See Note 2 for further discussion. Changes in fair value of these securities will be recognized in other income.

In June 2006, the FASB issued Interpretation, or FIN, No. 48, *Accounting for Uncertainty in Income Taxes.* FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes.* FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Company's adoption of this interpretation did not have a material impact on its financial statements.

In February 2007, FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities.* This Statement allows entities to make an election to record financial assets and liabilities, with limited exceptions, at fair value on the balance sheet, with changes in fair value recorded in earnings. SFAS No. 159 is effective for fiscal years beginning after November 17, 2007. Early adoption of SFAS No. 159 was permitted as of the beginning of the fiscal year ending after November 17, 2007. The Company elected not to early adopt the Statement and is still evaluating the impact of this Statement on its consolidated financial statements.

8

Table of Contents

### LUMINENT MORTGAGE CAPITAL, INC.

#### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### (Unaudited)

### NOTE 2—SECURITIES

#### *Mortgage-backed securities*

The following table summarizes the Company's mortgage-backed securities including securities classified as available-for-sale and hybrid securities classified as trading at March 31, 2007 and December 31, 2006, which are carried at fair value (in thousands):

|  | March 31, 2007 | December 31, 2006 |
| --- | --- | --- |
| Amortized cost | $ 3,251,597 | $ 2,930,878 |
| Unrealized gains | 10,051 | 7,549 |
| Unrealized losses | (8,279) | (7,489) |
| Fair value | $ 3,253,369 | $ 2,930,938 |

At March 31, 2007 and December 31, 2006, mortgage-backed securities had a weighted-average amortized cost, excluding residual interests, of 99.1% and 99.0% of face amount, respectively.

The Company purchased securities in the three months ended March 31, 2007 with an amortized cost basis of $136.4 million at March 31, 2007, which are hybrid securities under the definition of SFAS No. 155. The Company elected to account for these securities as trading securities for which changes in fair value will be recognized in income. The change in fair value for the three months ended March 31, 2007 was $59 thousand.

Actual maturities of mortgage-backed securities are generally shorter than stated contractual maturities. Actual maturities of the Company's mortgage-backed securities are affected by the contractual lives of the underlying mortgages, periodic payments of principal and prepayments of principal.

The following table summarizes the Company's mortgage-backed securities at March 31, 2007, according to their estimated weighted-average life classifications (dollars in thousands):

| Weighted-Average Life | Fair Value | Amortized Cost | Weighted-Average Coupon |
| --- | --- | --- | --- |
| Less than one year | $ 297,025 | $ 296,494 | 5.77% |
| Greater than one year and less than five years | 2,905,998 | 2,900,655 | 5.88 |
| Greater than five years | 50,346 | 54,448 | 6.93 |
| Total | $ 3,253,369 | $ 3,251,597 | 5.88% |

9

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### (Unaudited)

The following table summarizes the Company's mortgage-backed securities at December 31, 2006, according to their estimated weighted-average life classifications (dollars in thousands):

| Weighted-Average Life | Fair Value | Amortized Cost | Weighted-Average Coupon |
|---|---|---|---|
| Less than one year | $ 235,186 | $ 234,932 | 5.52% |
| Greater than one year and less than five years | 2,612,020 | 2,608,627 | 5.89 |
| Greater than five years | 83,732 | 87,319 | 6.46 |
| Total | $ 2,930,938 | $ 2,930,878 | 5.88% |

The weighted-average lives of the mortgage-backed securities at March 31, 2007 and December 31, 2006 in the tables above are based upon data provided through subscription-based financial information services, assuming constant prepayment rates to the balloon or reset date for each security. The prepayment model considers current yield, forward yield, steepness of the yield curve, current mortgage rates, mortgage rates of the outstanding loans, loan age, margin and volatility.

The actual weighted-average lives of the mortgage-backed securities could be longer or shorter than the estimates in the table above depending on the actual prepayment rates experienced over the lives of the applicable securities and are sensitive to changes in both prepayment rates and interest rates.

The following table shows the Company's mortgage-backed securities' fair value and gross unrealized losses, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position at March 31, 2007 (in thousands):

| | Less than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| Agency-backed mortgage-backed securities | $ 5,986 | $ (29) | $ 1,210 | $ (17) | $ 7,196 | $ (46) |
| Non-agency-backed mortgage-backed securities | 1,109,960 | (3,321) | 180,997 | (4,912) | 1,290,957 | (8,233) |
| Total temporarily impaired mortgage-backed securities | $ 1,115,946 | $ (3,350) | $ 182,207 | $ (4,929) | $ 1,298,153 | $ (8,279) |

10

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### (Unaudited)

The following table shows the Company's mortgage-backed securities' fair value and gross unrealized losses, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position at December 31, 2006 (in thousands):

| | Less than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| Agency-backed mortgage-backed securities | $ 8,850 | $ (66) | $ — | $ — | $ 8,850 | $ (66) |
| Non-agency-backed mortgage-backed securities | 971,034 | (3,058) | 138,210 | (4,365) | 1,109,244 | (7,423) |
| Total temporarily impaired mortgage-backed securities | $ 979,884 | $ (3,124) | $ 138,210 | $ (4,365) | $ 1,118,094 | $ (7,489) |

At March 31, 2007, the Company held $3.3 billion of mortgage-backed securities at fair value, comprised of $2.3 billion in the Spread portfolio and $1.0 billion in the Residential Mortgage Credit portfolio, net of unrealized gains of $7.7 million and unrealized losses of $7.4 million. At December 31, 2006, the Company held approximately $2.9 billion of mortgage-backed securities at fair value, comprised of approximately $2.1 billion in the Spread portfolio and $0.8 billion in the Residential Mortgage Credit portfolio, net of unrealized gains of $7.5 million and unrealized losses of $7.5 million.

During the three months ended March 31, 2006, the Company recognized total impairment losses on mortgage-backed securities in the Spread portfolio of $1.7 million. The impairment loss recognized in the three months ended March 31, 2006 was due to the Company's decision to reposition the Spread portfolio. The Company did not intend to hold certain mortgage-backed securities in the Spread portfolio that were at unrealized loss positions for a period of time sufficient to allow for recovery in fair value. The Company determined that the unrealized losses on these mortgage-backed securities reflected at March 31, 2006 were other-than-temporary impairments as defined in SFAS No. 115, and therefore the Company recognized impairment losses in its consolidated statement of operations. No impairment losses were recognized in mortgage-backed securities in the Spread portfolio during the three months ended March 31, 2007

At March 31, 2007 and December 31, 2006, the Spread portfolio contained mortgage-backed securities with unrealized losses of $0.8 million and $0.4 million, respectively. The Company intends to hold the mortgage-backed securities in the Spread portfolio for a period of time, to maturity if necessary, sufficient to allow for the anticipated recovery in fair value of the securities held. The temporary impairment of these mortgage-backed securities results from the fair value of the mortgage-backed securities falling below their amortized cost basis and is solely attributable to changes in interest rates. At March 31, 2007 and December 31, 2006, none of the securities held had been downgraded by a credit rating agency since their purchase and all of the securities were AAA-rated non-agency-backed or agency-backed mortgage-backed securities. As such, the Company does not believe any of these securities are other-than-temporarily impaired at March 31, 2007 and December 31, 2006.

Certain of the mortgage-backed securities in the Company's Residential Mortgage Credit portfolio are accounted for in accordance with the Emerging Issues Task Force, or EITF 99-20, *Recognition of interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets.*. Under EITF 99-20, the Company evaluates whether there is other-than-temporary impairment by discounting projected cash flows using credit, prepayment and other assumptions compared to prior period projections. If the discounted projected cash flows have decreased due to a change in the credit, prepayment and other assumptions, then the mortgage-backed security must be written down to market value if the market value is below the amortized cost basis. If there have been no changes to the Company's assumptions and the change in value is solely due to interest rate changes, the Company does not recognize an impairment of a mortgage-backed security in its consolidated statement of

11

Table of Contents

LUMINENT MORTGAGE CAPITAL, INC.

NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

operations. It is difficult to predict the timing or magnitude of these other-than-temporary impairments and impairment losses could be substantial. During the three months ended March 31, 2007, the Company recorded losses due to other-than-temporary impairments of $4 thousand in the Residential Mortgage Credit portfolio due to changes in loss assumptions on certain Residential Mortgage Credit securities.

At March 31, 2007 and December 31, 2006, the Residential Mortgage Portfolio contained mortgage-backed securities with unrealized losses of $7.4 million and $7.1 million in mortgage-backed securities held in the Company's Residential Mortgage Credit portfolio. The Company has the intent to hold these mortgage-backed securities for a period of time, to maturity if necessary, sufficient to allow for the anticipated recovery in fair value. The temporary impairment of these mortgage-backed securities results from the fair value of the mortgage-backed securities falling below their amortized cost basis and is solely attributable to changes in interest rates. At March 31, 2007 and December 31, 2006, none of the securities held had been downgraded by a credit rating agency since their purchase. As such, the Company does not believe any of these securities are other-than-temporarily impaired at March 31, 2007 and December 31, 2006.

During the three months ended March 31, 2007, the Company had realized losses of $15.5 million on the sale of securities in its Residential Mortgage credit portfolio. These securities were selected for sale due to their rising level of delinquencies in the underlying loan collateral which was noted in the first quarter of 2007, as well as to reduce the Company's exposure to certain mortgage-backed asset issuers. During the three months ended March 31, 2006, the Company had realized gains of $9.6 million and realized losses of $7.6 million on the sale of mortgage backed securities. Securities were sold during the first quarter of 2006 in order to reposition the portfolio.

*Other securities*

The following table summarizes the Company's other securities classified as available-for-sale at March 31, 2007 and December 31, 2006, which are carried at fair value (in thousands):

|  | March 31, 2007 | | | December 31, 2006 | | |
|---|---|---|---|---|---|---|
|  | Equity Securities | Debt Securities | Total | Equity Securities | Debt Securities | Total |
| Amortized cost | $ 1,050 | $ 1,271 | $ 2,321 | $ 1,050 | $ — | $ 1,050 |
| Unrealized gains | — | — | — | — | 48 | 48 |
| Unrealized losses | (125) | (8) | (133) | — | — | — |
| Fair value | $ 925 | $ 1,263 | $ 2,188 | $ 1,098 | $ — | $ 1,098 |

## NOTE 3—LOANS HELD-FOR-INVESTMENT

The following table summarizes the Company's residential mortgage loans classified as held-for-investment at March 31, 2007 and December 31, 2006, which are carried at amortized cost, net of allowance for loan losses (in thousands):

|  | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Principal | $ 5,452,591 | $ 5,472,325 |
| Unamortized premium | 124,840 | 124,412 |
| Amortized cost | 5,577,431 | 5,596,737 |
| Allowance for loan losses | (8,262) | (5,020) |
| Total residential loans, net of allowance for loan losses | $ 5,569,169 | $ 5,591,717 |

12

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

#### (Unaudited)

At March 31, 2007 and December 31, 2006, residential mortgage loans had a weighted-average amortized cost of 102.3% and 102.3% of face amount, respectively.

The following table summarizes the changes in the allowance for loan losses for the Company's residential mortgage loan portfolio during the three months ended March 31, 2007 (in thousands):

|  | For the Three Months Ended March 31, 2007 |
|---|---|
| Balance, beginning of period | $ 5,020 |
| Provision for loan losses | 3,543 |
| Usage of allowance | (301) |
| Balance, end of period | $ 8,262 |

On a quarterly basis, the Company evaluates the adequacy of its allowance for loan losses. Based on this analysis, the Company recorded a provision for loan losses of $3.5 million for the three months ended March 31, 2007 on the residential mortgage loan portfolio. At March 31, 2006, the Company had not recorded an allowance for loan losses because none of the loans held in the portfolio were considered impaired. At March 31, 2007 and December 31, 2006, $51.8 million and $33.9 million, respectively, of residential mortgage loans were 90 days or more past due all of which were on non-accrual status. Net of delinquent loans which are 90 days or more past due which we believe will be repurchased, our allowance for loan losses represent 21.6% of our loans 90 days or more past due.

## NOTE 4—BORROWINGS

The Company leverages its portfolio of mortgage-backed securities and loans held-for-investment through the use of various financing arrangements.

The following table presents summarized information with respect to the Company's borrowings at March 31, 2007 and December 31, 2006 (dollars in thousands):

|  | March 31, 2007 | | | December 31, 2006 | | |
|---|---|---|---|---|---|---|
|  | Borrowings Outstanding(1) | Weighted-Average Interest Rate | Fair Value of Collateral(2) | Borrowings Outstanding(1) | Weighted-Average Interest Rate | Fair Value of Collateral(2) |
| Mortgage-backed notes | 4,270,888 | 5.56% | $ 4,270,739 | $ 3,914,932 | 5.60% | $ 3,919,354 |
| Repurchase agreements | 2,880,678 | 5.42 | 3,046,210 | 2,707,915 | 5.45 | 2,909,895 |
| Commercial paper facility | 619,022 | 5.36 | 625,041 | 637,677 | 5.36 | 643,823 |
| Collateralized debt obligations | 271,000 | 6.44 | 268,390 | — | — | — |
| Warehouse lending facilities | 403,232 | 5.82 | 420,925 | 752,777 | 5.80 | 794,420 |
| Junior subordinated notes | 92,788 | 8.58 | none | 92,788 | 8.58 | none |
| Total | $ 8,537,608 | 5.57% | $ 8,631,305 | $ 8,104,089 | 5.58% | $ 8,267,492 |

(1) Outstanding balances for mortgage-backed notes exclude $2.7 million in unamortized premium at March 31, 2007 and December 31, 2006. Outstanding balances of collateralized debt obligations exclude unamortized discounts of $1.0 million at March 31, 2007.

(2) Collateral for borrowings consists of mortgage-backed securities available-for-sale and loans held-for-investment.

### Mortgage-backed Notes

At March 31, 2007 and December 31, 2006, the Company had mortgage-backed notes with an outstanding balance of $4.3 billion and $3.9 billion, respectively, and with a weighted-average borrowing rate of 5.56% and

13

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

#### (Unaudited)

5.60%, respectively, per annum. The borrowing rates of the mortgage-backed notes reset monthly based on LIBOR except for $0.2 billion of the notes which, like the underlying loan collateral, are fixed for a period of three to five years then become variable based on the average rates of the underlying loans which will adjust based on LIBOR. Unpaid interest on the mortgage-backed notes was $5.0 million and $4.5 million at March 31, 2007 and December 31, 2006, respectively. The stated maturities of the mortgage-backed notes at March 31, 2007 were between 2035 and 2047. The stated maturities of the mortgage-backed notes at December 31, 2006 were between 2035 and 2046. At March 31, 2007 and December 31, 2006, residential mortgage loans with an estimated fair value of $4.3 billion and $3.9 billion were pledged as collateral for mortgage-backed notes issued.

Each series of mortgage-backed notes issued by the Company consists of various classes of securities which bear interest at varying spreads to the underlying interest rate index. The maturity of each class of securities is directly affected by the rate of principal repayments on the associated residential mortgage loan collateral. As a result, the actual maturity of each series of mortgage-backed notes may be shorter than the stated maturity.

The following table presents the outstanding balance and weighted-average interest rate of each series of mortgage-backed notes issued by the Company at March 31, 2007 and December 31, 2006 (dollars in thousands):

|  | March 31, 2007 | | December 31, 2006 | |
|  | Borrowings Outstanding(1) | Weighted-Average Interest Rate | Borrowings Outstanding(1) | Weighted-Average Interest Rate |
|---|---|---|---|---|
| LUM 2005-1 | $ 343,966 | 5.60% | $ 368,203 | 5.63% |
| LUM 2006-1 | 421,909 | 5.61 | 495,453 | 5.64 |
| LUM 2006-2 | 581,403 | 5.55 | 668,049 | 5.58 |
| LUM 2006-3 | 548,254 | 5.67 | 588,999 | 5.69 |
| LUM 2006-4 | 292,568 | 5.52 | 324,819 | 5.55 |
| LUM 2006-6 | 664,131 | 5.55 | 712,959 | 5.58 |
| LUM 2006-7 | 752,061 | 5.53 | 756,450 | 5.55 |
| LUM 2007-1 | 666,596 | 5.49 | — | — |
| Total | $ 4,270,888 | 5.56% | $ 3,914,932 | 5.60% |

(1) Outstanding balances for mortgage-backed notes exclude $2.7 million in unamortized premium as of March 31, 2007 and December 31, 2006. Collateral for borrowings consists of loans held-for-investment.

### Repurchase Agreements

The Company has entered into repurchase agreements with third-party financial institutions to finance the purchase of most of its mortgage-backed securities. The repurchase agreements are short-term borrowings that bear interest rates that have historically moved in close relationship to the three-month London Interbank Offered Rate, or LIBOR. At March 31, 2007 and December 31, 2006, the Company had repurchase agreements with an outstanding balance of $2.9 billion and $2.7 billion, respectively, and with weighted-average interest rates of 5.42% and 5.45%, respectively. At March 31, 2007 and December 31, 2006, mortgage-backed securities and loans held-for-investment pledged as collateral for repurchase agreements had estimated fair values of $3.0 billion and $2.9 billion, respectively.

At March 31, 2007, repurchase agreements had the following remaining maturities (in thousands):

| | |
|---|---|
| Overnight 1 day or less | $ — |
| Between 2 and 30 days | 2,377,123 |
| Between 31 and 90 days | 60,800 |
| Between 91 and 1,094 days | 442,755 |
| Total | 2,880,678 |

14

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

#### (Unaudited)

At December 31, 2006, repurchase agreements had the following remaining maturities (in thousands):

| | |
|---|---:|
| Overnight 1 day or less | $ — |
| Between 2 and 30 days | 2,070,939 |
| Between 31 and 90 days | 201,976 |
| Between 91 and 636 days | 435,000 |
| Total | $2,707,915 |

### Commercial Paper Facility

In August 2006, the Company established a $1.0 billion commercial paper facility, Luminent Star Funding I, to fund its mortgage-backed security portfolio. Luminent Star Funding I is a single-seller commercial paper program that provides a financing alternative to repurchase agreement financing by issuing asset-backed secured liquidity notes that are rated by the rating agencies Standard & Poor's and Moody's. At March 31, 2007 and December 31, 2006, the outstanding balance on the commercial paper facility was $619.0 million and $637.7 million, respectively. The weighted-average interest rate was 5.36% at March 31, 2007 and December 31, 2007, respectively.

### Collateralized Debt Obligations

In March 2007, the Company issued $400.0 million of collateralized debt obligations, or CDOs, from Charles Fort CDO I, Ltd., a qualified REIT subsidiary of the Company. The CDOs were in the form of floating-rate pass-through certificates collateralized by $289.1 million of the Company's mortgage-backed securities and $59.1 million of mortgage-backed securities that the Company retained from prior whole loan securitizations. Of the $400.0 million of CDOs issued, $271.0 million were purchased by third party investors and the Company retained $129.0 million of certificates including subordinated certificates, which provide credit support to the certificates issued to third party investors. The interest rates on the floating-rate pass-through certificates reset quarterly and are indexed to three-month LIBOR. The entity has an uninvested cash balance at March 31, 2007 of $51.4 million which will be used to purchase additional mortgage-backed securities as collateral for the CDOs. This securitization transaction was accounted for as a financing of the mortgage-backed securities. At March 31, 2007, the Company's CDOs had a balance of $271.0 million, the weighted-average interest rate was 6.44%. See Note 11, Subsequent Events for further detail of CDOs.

### Warehouse Lending Facilities

*Mortgage Loan Financing.* The Company has established warehouse lending facilities which are structured as repurchase agreements. These facilities are the Company's primary source of funding for acquiring mortgage loans. These warehouse lending facilities are short-term borrowings that are secured by the loans and bear interest based on LIBOR. In general, the warehouse lending facilities provide financing for loans for a maximum of 120 days.

The Company acquires residential mortgage loans with the intention of securitizing them and retaining the securitized mortgage loans in the Company's portfolio to match the income earned on mortgage assets with the cost of the related liabilities, also referred to as match-funding the balance sheet. In order to facilitate the securitization or financing of its loans, the Company generally creates subordinate certificates, providing a specified amount of credit enhancement, which the Company intends to retain in its investment portfolio. Proceeds from securitizations are used to pay down the outstanding balance of warehouse lending facilities.

*Asset-backed Securities Financing.* During the year ended December 31, 2006, the Company established a $500 million warehouse lending facility with Greenwich Capital Financial Products, Inc. The facility was used to

15

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

### (Unaudited)

purchase mortgage-backed securities rated below AAA until the Company financed the securities permanently through CDOs. This warehouse lending facility was a short-term borrowing arrangement that was secured by asset-backed securities, bearing interest based on LIBOR. The facility was terminated in March 2007 concurrently with the permanent financing of the asset-backed securities by the CDOs.

The total borrowing capacity under the Company's warehouse lending facilities was $2.5 billion and $3.0 billion at March 31, 2007 and December 31, 2006, respectively. At March 31, 2007 and December 31, 2006, $0.4 billion and $0.8 billion, respectively, were outstanding under the Company's warehouse lending facilities.

At March 31, 2007 and December 31, 2006, the Company's warehouse lending facilities included the following (in millions):

| Counterparty | At March 31, 2007 | | | At December 31, 2006 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Borrowing Capacity | Borrowings Outstanding | Weighted-Average Interest Rate | Borrowing Capacity | Borrowings Outstanding | Weighted-Average Interest Rate |
| Mortgage loan financing: | | | | | | |
| Greenwich Capital Financial Products, Inc. | $ 1,000.0 | $ 403.2 | 5.82% | $ 1,000.0 | $ 455.2 | 5.80% |
| Barclays Bank plc | 1,000.0 | — | — | 1,000.0 | 290.1 | 5.78 |
| Bear Stearns Mortgage Capital Corp. | 500.0 | — | — | 500.0 | 7.5 | 5.77 |
| Asset-backed securities financing: | | | | | | |
| Greenwich Capital Financial Products, Inc. | — | — | — | 500.0 | — | — |
| Total | $ 2,500.0 | $ 403.2 | 5.82% | $ 3,000.0 | $ 752.8 | 5.80% |

At March 31, 2007, the Company was in compliance with all of its debt covenants for all borrowing arrangements and credit facilities.

### *Junior Subordinated Notes*

Junior subordinated notes consist of 30-year notes issued in March and December 2005 to Diana Statutory Trust I, or DST I, and Diana Statutory Trust II, or DST II, respectively, unconsolidated affiliates of the Company formed to issue $2.8 million of the trusts' common securities to the Company and to place $90.0 million of preferred securities privately with unrelated third-party investors. The note balances and related weighted-average interest rates listed by trust were as follows at March 31, 2007 and December 31, 2006 (dollars in thousands):

| | March 31, 2007 | | December 31, 2006 | |
| --- | --- | --- | --- | --- |
| | Borrowings Outstanding | Interest Rate | Borrowings Outstanding | Interest Rate |
| Junior subordinated notes: | | | | |
| DST I | $ 51,550 | 8.16% | $ 51,550 | 8.16% |
| DST II | 41,238 | 9.10 | 41,238 | 9.11 |
| Total | $ 92,788 | 8.58% | $ 92,788 | 8.58% |

The Company pays interest to the trusts quarterly. The DST I notes bear interest at a fixed rate of 8.16% per annum through March 30, 2010 and, thereafter, at a variable rate equal to three-month LIBOR plus 3.75% per annum through maturity. The DST II notes bear interest at a variable rate equal to three-month LIBOR plus 3.75% per annum through maturity. The trusts remit dividends pro rata to the common and preferred trust securities based on the same terms as the junior subordinated notes. The DST I notes and trust securities mature in March 2035 and are redeemable on any interest payment date at the option of the Company in whole, but not in part, on or after March 30, 2010 at the redemption rate of 100% plus accrued and unpaid interest. Prior to March 30, 2010, upon the occurrence of a special event relating to certain federal income tax or investment company events, the Company

16

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

### (Unaudited)

may redeem the DST I notes in whole, but not in part, at the redemption rate of 107.5% plus accrued and unpaid interest. The DST II notes and trust securities mature in December 2035 are redeemable on any interest payment date at the option of the Company in whole, but not in part at the redemption rate of 100% plus accrued and unpaid interest.

### *Margin Lending Facility*

The Company has a margin lending facility with its primary custodian from which the Company may borrow money in connection with the purchase or sale of securities. The terms of the borrowings, including the rate of interest payable, are agreed to with the custodian for each amount borrowed. Borrowings are repayable immediately upon demand by the custodian. No borrowings were outstanding under the margin lending facility at March 31, 2007 and December 31, 2006.

### *Capitalized Financing Costs*

At March 31, 2007 and December 31, 2006, the Company had unamortized capitalized financing costs of $20.7 million and $15.9 million, respectively, related to the Company's borrowings, which were deferred at the issuance date of the related borrowing and are being amortized using the effective yield method over the estimated life of the borrowing.

## NOTE 5—CAPITAL STOCK AND EARNINGS PER SHARE

At March 31, 2007 and December 31, 2006, the Company's charter authorized the issuance of 100,000,000 shares of common stock, par value $0.001 per share, and 10,000,000 shares of preferred stock, par value $0.001 per share. At March 31, 2007 and December 31, 2006, 47,958,510 and 47,808,510 shares of common stock, respectively, were outstanding and no shares of preferred stock were outstanding.

On November 7, 2005, the Company announced that its board of directors had authorized a share repurchase program that permits the Company to repurchase up to 2,000,000 shares of its common stock at prevailing prices through open market transactions subject to the provisions of SEC Rule 10b-18 and in privately negotiated transactions. On February 9, 2006, the Company announced the initiation of an additional share repurchase program to acquire an incremental 3,000,000 shares. Through March 31, 2007, the Company had repurchased 2,594,285 shares at a weighted-average price of $8.00 and was authorized to acquire up to 2,405,715 more common shares.

The Company calculates basic net income per share by dividing net income for the period by the weighted-average shares of its common stock outstanding for that period. Diluted net income per share takes into account the effect of dilutive instruments, such as stock options and unvested restricted common stock, but uses the average share price for the period in determining the number of incremental shares that are to be added to the weighted-average number of shares outstanding.

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

#### (Unaudited)

The following table presents a reconciliation of basic and diluted net income per share for the three months ended March 31, 2007 and 2006:

| | Three Months Ended March 31, | | | |
| | 2007 | | 2006 | |
| | Basic | Diluted | Basic | Diluted |
|---|---|---|---|---|
| Net income (in thousands) | $ 14,387 | $ 14,387 | $ 17,779 | $ 17,779 |
| Weighted-average number of common shares outstanding | 47,316,058 | 47,316,058 | 39,491,786 | 39,491,786 |
| Additional shares due to assumed conversion of dilutive instruments | — | 111,444 | — | 226,766 |
| Adjusted weighted-average number of common shares outstanding | 47,316,058 | 47,427,502 | 39,491,786 | 39,718,552 |
| Net income per share | $ 0.30 | $ 0.30 | $ 0.45 | $ 0.45 |

## NOTE 6—2003 STOCK INCENTIVE PLANS

The Company adopted a 2003 Stock Incentive Plan, effective June 4, 2003, and a 2003 Outside Advisors Stock Incentive Plan, effective June 4, 2003, pursuant to which up to 1,000,000 shares of the Company's common stock are authorized to be awarded at the discretion of the compensation committee of the board of directors. On May 25, 2005, these plans were amended to increase the total number of shares reserved for issuance from 1,000,000 shares to 2,000,000 shares and to set the share limits at 1,850,000 shares for the 2003 Stock Incentive Plan and 150,000 shares for the 2003 Outside Advisors Stock Incentive Plan. The plans provide for the grant of a variety of long-term incentive awards to employees and officers of the Company or individual consultants or advisors who render or have rendered bona fide services as an additional means to attract, motivate, retain and reward eligible persons. These plans provide for the grant of awards that meet the requirements of Section 422 of the Internal Revenue Code, or the Code, of non-qualified stock options, stock appreciation rights, restricted stock, stock units and other stock-based awards and dividend equivalent rights. The maximum term of each grant is determined on the grant date by the compensation committee and may not exceed 10 years. The exercise price and the vesting requirement of each grant are determined on the grant date by the compensation committee. The Company uses historical data to estimate stock option exercises and employee termination in its calculations of stock-based employee compensation expense and expected terms.

The following table illustrates the common stock available for grant at March 31, 2007:

| | 2003 Stock Incentive Plan | 2003 Outside Advisors Stock Incentive Plan | Total |
|---|---|---|---|
| Shares reserved for issuance | 1,850,000 | 150,000 | 2,000,000 |
| Granted | 931,166 | — | 931,166 |
| Forfeited | — | — | — |
| Expired | — | — | — |
| Total available for grant | 918,834 | 150,000 | 1,068,834 |

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

### LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

### (Unaudited)

At March 31, 2007, the Company had outstanding stock options under the plans with expiration dates of 2013. The following table summarizes all stock option transactions during the three months ended March 31, 2007:

|  | 2007 | |
|---|---|---|
|  | Number of Options | Weighted-Average Exercise Price |
| Outstanding, beginning of period | 55,000 | $ 14.82 |
| Granted | — | — |
| Exercised | — | — |
| Forfeited | — | — |
| Outstanding, end of period | 55,000 | $ 14.82 |

The following table summarizes certain information about stock options outstanding at March 31, 2007:

| Range of Exercise Prices | Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|---|
|  | Number of Options | Weighted-Average Remaining Life (in years) | Weighted-Average Exercise Price | Number of Options | Weighted-Average Remaining Life (in years) | Weighted-Average Exercise Price |
| $13.00-$14.00 | 5,000 | 6.6 | $ 13.00 | 5,000 | 6.6 | $ 13.00 |
| $14.01-$15.00 | 50,000 | 6.3 | 15.00 | 50,000 | 6.3 | 15.00 |
| $13.00-$15.00 | 55,000 | | $ 14.82 | 55,000 | | $ 14.82 |

The aggregate intrinsic value of outstanding stock options and exercisable stock options at March 31, 2007 was zero. All outstanding stock options were fully vested at March 31, 2007.

The following table illustrates the changes in common stock awards during the three months ended March 31, 2007:

|  | Number of Common Shares | Weighted-Average Issue Price |
|---|---|---|
| Outstanding, beginning of period | 721,329 | $ 9.13 |
| Issued | 150,000 | 9.71 |
| Repurchased | — | — |
| Outstanding, end of period | 871,329 | $ 9.23 |

The fair value of common stock awards is determined on the grant date using the closing stock price on the NYSE that day.

The following table illustrates the changes in nonvested common stock awards during the three months ended March 31, 2007:

|  | Number of Common Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Nonvested, beginning of the period | 555,923 | $ 9.20 |
| Granted | 150,000 | 9.71 |
| Vested | (133,316) | 8.68 |
| Repurchased | — | — |
| Nonvested, end of the period | 572,607 | $ 9.46 |

Total stock-based employee compensation expense related to common stock awards for the three months ended March 31, 2007 and 2006 was $0.7 million and $1.1 million, respectively. At March 31, 2007, stock-based

19

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

#### (Unaudited)

employee compensation expense of $4.7 million related to nonvested common stock awards is expected to be recognized over a weighted-average period of 1.3 years.

### NOTE 7—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107, *Disclosure About Fair Value of Financial Instruments*, requires disclosure of the fair value of financial instruments for which it is practicable to estimate that value. The fair value of securities is equal to their carrying value presented in the consolidated balance sheet. The fair value of cash and cash equivalents, restricted cash, interest receivable, principal receivable, repurchase agreements, commercial paper, warehouse lending facilities, unsettled securities purchases and accrued interest expense approximates cost at March 31, 2007 and December 31, 2006 due to the short-term nature of these instruments. The carrying value and fair value of the Company's junior subordinated notes was $92.8 million and $91.5 million, respectively, at March 31, 2007. The carrying value and fair value of the Company's junior subordinated notes was $92.8 million and $91.3 million, respectively, at December 31, 2006. The carrying value and fair value of the Company's loans held-for-investment was $5.6 billion and $5.5 billion, respectively, at March 31, 2007. The carrying value and fair value of the Company's loans held-for-investment was $5.6 billion at December 31, 2006. The carrying value and fair value of the Company's mortgage-backed notes was $4.3 billion at March 31, 2007 and $3.9 billion December 31, 2006. The carrying value and fair value of the Company's CDOs was $270.0 million at March 31, 2007. No CDOs were outstanding at December 31, 2006.

### NOTE 8—ACCUMULATED OTHER COMPREHENSIVE INCOME

The following is a summary of the components of accumulated other comprehensive income at March 31, 2007 and December 31, 2006 (in thousands):

|  | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Unrealized holding losses on mortgage-backed securities available-for-sale | $ (13,685) | $ (5,957) |
| Reclassification adjustment for net losses (gains) on mortgage-backed securities available-for-sale included in net income | 15,453 | (993) |
| Impairment losses on mortgage-backed securities | 4 | 7,010 |
| Net unrealized gain on mortgage-backed securities available-for-sale | 1,772 | 60 |
| Net deferred realized and unrealized gains on cash flow hedges | 3,290 | 3,734 |
| Net unrealized losses (gains) on equity securities available-for-sale | (125) | 48 |
| Net unrealized losses on debt securities available-for-sale | (8) |  |
| Accumulated other comprehensive income | $ 4,929 | $ 3,842 |

### NOTE 9—DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

The Company seeks to manage its interest rate risk and credit exposure and protect the Company's liabilities against the effects of major interest rate changes. Such interest rate risk may arise from: (1) the issuance and forecasted rollover and repricing of short-term liabilities with fixed rate cash flows or from liabilities with a contractual variable rate based on LIBOR; (2) the issuance of long-term fixed rate or floating rate debt through securitization activities or other borrowings or (3) the change in value of loan purchase commitments. The Company also seeks to manage its credit risk exposure which may arise from the creditworthiness of the holders of the mortgages underlying its mortgage-related assets. Among other strategies, the Company may use Eurodollar futures contracts, swaption contracts, interest rate swap contracts, credit default swaps, nterest rate cap contracts forward sales of To-be-Announced, or TBA, mortgage-backed securities and other risk-sharing arrangements to manage these risks.

20

Table of Contents

LUMINENT MORTGAGE CAPITAL, INC.

NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

(Unaudited)

The following table is a summary of derivative contracts held at March 31, 2007 and December 31, 2006 (in thousands):

| | Estimated Fair Value | |
| | March 31, 2007 | December 31, 2006 |
| --- | --- | --- |
| Eurodollar futures contracts sold short | $ 740 | $ 149 |
| Interest rate swap contracts | 1,469 | 4,383 |
| Interest rate cap contracts | 1,782 | 1,531 |
| Credit default swaps | 15,852 | 6,958 |
| Forward sales of TBA mortgage-backed securities | 105 | |

*Free Standing Derivatives*

Free standing derivative contracts are carried on the consolidated balance sheet at fair value. Net unrealized gains of $4.7 million and $9.6 million were recognized in other income due to the change in fair value of these contracts during the three months ended March 31, 2007 and 2006, respectively.

The Company realized net gains on free standing derivative contracts of $11.0 million and zero in other income during the three months ended March 31, 2007 and 2006, respectively. Realized net gains include realized gains and losses on derivative contracts and other income and expense on free standing derivatives.

*Cash Flow Hedging Strategies*

Prior to January 1, 2006, the Company entered into derivative contracts that were accounted for under hedge accounting as prescribed by SFAS No. 133. Effective January 1, 2006, the Company discontinued the use of hedge accounting. Under hedge accounting, prior to the end of the specified hedge time period, the effective portion of all contract gains and losses, whether realized or unrealized, was recorded in other comprehensive income or loss. Hedge effectiveness gains included in accumulated other comprehensive income at December 31, 2005 will be amortized during the specified hedge time period. Under hedge accounting, realized gains and losses were reclassified into earnings as an adjustment to interest expense during the specified hedge time period. Realized gains and losses included in accumulated other comprehensive income at December 31, 2005 will be amortized during the specified hedge time period. All changes in value of derivative instruments that had previously been accounted for under hedge accounting are recognized in other income or expense.

During the three months ended March 31, 2007 and 2006, interest expense decreased by $0.1 million and $1.5 million, respectively, due to the amortization of net realized gains on Eurodollar futures contracts.

During the three months ended March 31, 2007 and 2006, interest expense decreased by $0.4 million and $1.6 million due to the amortization of effectiveness gains on Eurodollar futures contracts and interest rate swap contracts.

*Purchase Commitment Derivatives*

The Company may enter into commitments to purchase mortgage loans, or purchase commitments, from the Company's network of originators. Each purchase commitment is evaluated in accordance with SFAS No. 133 to determine whether the purchase commitment meets the definition of a derivative instrument. At March 31, 2007, outstanding purchase commitments with a net unrealized loss of $0.5 million were recorded on the Company's consolidated statement of operations. There were no outstanding purchase commitments at December 31, 2006.

21

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## LUMINENT MORTGAGE CAPITAL, INC.

### NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS – (Continued)

#### (Unaudited)

During the three months ended March 31, 2007 and 2006, net losses of $0.6 million and $1.0 million related to purchase commitment derivatives were recorded in other expense on the Company's consolidated statement of operations.

## NOTE 10—INCOME TAXES

The Company has elected to be taxed as a REIT under the Code. As such, the Company routinely distributes substantially all of the income generated from operations to its stockholders. As long as the Company retains its REIT status, it generally will not be subject to U.S. federal or state corporate taxes on its income to the extent that it distributes its REIT taxable net income to its stockholders.

The Company has a taxable REIT subsidiary that receives management fees in exchange for various advisory services provided in conjunction with the Company's investment strategies. In the first quarter of 2007, this taxable REIT subsidiary is subject to corporate income taxes on its taxable income at a combined federal and state effective tax rate. The same taxable REIT subsidiary was subject to the Pennsylvania Capital Stock and Franchise Tax as well as Philadelphia Gross Receipts Tax and Philadelphia Net Income Tax. The Company also has a taxable REIT subsidiary that purchases mortgage loans and creates securitization entities as a means of securing long-term collateralized financing.

Distributions declared per share were $0.30 and $0.05 for the quarters ended March 31, 2007 and 2006, respectively. All distributions were classified as ordinary income to stockholders for income tax purposes.

## NOTE 11—SUBSEQUENT EVENTS

In May 2007, a securitization entity sponsored by the Company issued $657.0 million of mortgage-backed securities through Luminent Mortgage Trust 2007-2 which are collateralized by $662.1 of mortgage loans. The Company retained $3.9 million of the securities and sold $653.1 million to third parties. The securitization has been accounted for as financings under SFAS No. 140.

Subsequent to March 31, 2007, the Company sold $25.0 million of CDOs which were originally retained at the closing of the CDO issuance. Additionally, $37.3 million of the uninvested cash balance at the closing of the transaction has been invested in mortgage-backed securities which will collateralize the CDO's leaving a remaining uninvested cash balance of $11.6 million as of May 9, 2007.

On April 11, 2007, the Company announced the adoption of a stock repurchase plan in accordance with the guidelines specified under Rule 10b5-1 of the Securities Exchange Act of 1934. Rule 10b5-1 allows a public company to adopt a written, prearranged stock repurchase plan when it does not have material, non-public information in its possession. The adoption of this stock repurchase plan will allow the Company to repurchase shares during periods when it might otherwise be prevented from doing so under insider trading laws or because of self-imposed trading blackout periods. The Company repurchased a total of 2.2 million shares under repurchase programs through May 9, 2007.

On May 7, 2007, Luminent's board of directors approved an authorization to repurchase an additional five million shares of common stock. As of May 9, 2007 the Company is authorized to acquire up to 5.2 million shares of common stock.

22

Table of Contents

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

*The following discussion of our financial condition and results of operations should be read in conjunction with the financial statements and notes to those statements included in Item 1 of this Form 10-Q. This discussion may contain certain forward-looking statements that involve risks and uncertainties. Forward-looking statements are those that are not historical in nature. "Cautionary Note regarding Forward-looking Statements." As a result of many factors, such as those set forth under "Risk Factors" in Item 1A of this Form 10-Q, Item 1A of our 2006 Form 10-K, elsewhere in this Quarterly Report or incorporated by reference herein, our actual results may differ materially from those anticipated in such forward-looking statements.*

## Overview

### Executive Summary

Key metrics of our company as of March 31, 2007 are as follows:

| | |
|---|---|
| Financial performance: | |
| Return on equity | 12.1% |
| Net interest spread | 1.33% |
| Quarterly dividend declared | $0.30 Per share |
| | |
| Mortgage-backed assets: | |
| Percentage of total securitized assets rated AAA | 81.5% |
| Weighted average credit rating of mortgage-backed securities | AA |
| Percentage of total assets that are non-investment grade | 3.0% |
| Asset/liability duration gap | 1 month |
| | |
| Mortgage loans: | |
| Weighted average loan-to-value (1) | 72.8% |
| Weighted average FICO score | 714 |
| Number of loans with FICO scores below 620 | 11 |
| Percentage of loans with FICO scores above 700 | 59.4% |
| Percentage of no documentation loans | 2.3% |
| Percentage owner occupied properties | 86.4% |
| Percentage single family properties | 83.5% |

---

(1)   Including the effect of mortgage insurance

Our primary mission is to provide a secure stream of income for our stockholders based on the steady and reliable payments of residential mortgages. We are a real estate investment trust, or REIT, which, together with our subsidiaries, invests in two core mortgage investment strategies. Under our Residential Mortgage Credit strategy, we invest in mortgage loans purchased from selected high-quality providers within certain established criteria as well as subordinated mortgage-backed securities and other asset-backed securities that have credit ratings below AAA. Under our Spread strategy, we invest primarily in U.S. agency and other highly-rated single-family, adjustable-rate and hybrid adjustable-rate mortgage-backed securities.

Our Residential Mortgage Credit portfolio represents the majority of our overall asset portfolio with investments that are less sensitive to interest rates, and therefore more predictable and sustainable. Our credit strategy seeks to

23

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

structure, acquire and fund mortgage loans that will provide long-term reliable income to our stockholders. We seek to accomplish this goal primarily through the purchase of mortgage loans that we design through selected high quality providers with whom we have long and well-established relationships. As a secondary strategy, we invest in subordinated mortgage-backed securities or other debt securities that have credit ratings below AAA. We do this opportunistically as we discover value and credit arbitrage opportunities in the market. We then securitize those loans and mortgage-backed securities and seek to retain the most valuable tranches of the securitizations. These securitizations reduce our sensitivity to interest rates and help match the income we earn on our mortgage assets and mortgage-backed securities with the cost of our related liabilities. The debt that we incur in these securitizations is non-recourse to us; however, our mortgage loans and mortgage-backed assets are pledged as collateral for the securities we issue. Approximately 96% of the securities in our Spread portfolio consist of residential mortgage-backed securities with interest rates that reset within one month or less and the balance reset within one year.

Using these investment strategies, we seek to acquire mortgage-related assets, finance these purchases in the capital markets and use leverage in order to provide an attractive return on stockholders' equity. We have acquired and may seek to acquire additional assets that we expect will produce competitive returns, taking into consideration the amount and nature of the anticipated returns from the investments, our ability to pledge the investments for secured, collateralized borrowings and the costs associated with financing, managing, securitizing and reserving for these investments.

Recently, the subprime mortgage banking environment has been experiencing considerable strain from rising delinquencies and liquidity pressures and some subprime mortgage lenders have failed. The increased scrutiny of the subprime lending market is one of the factors that have impacted general market conditions as well as perceptions of our business.

24

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

Investors should distinguish our business model from that of a subprime originator. We do not acquire subprime mortgage loans. We are not a direct originator of mortgage loans and therefore we are not subject to "early payment default" claims. We acquire mortgage loans exclusively from well-capitalized originators, who meet our standards for financial and operational quality. We maintain ample liquidity to manage our business and have largely match-funded our balance sheet. During the last year, we have substantially reduced our reliance on short term repurchase agreement funding. As such, we experienced no liquidity strains during the recent market turmoil.

We invest in high-quality residential mortgage loans, AAA-rated and agency-backed mortgage-backed securities and subordinated mortgage-backed securities which have significant structural credit enhancement. At March 31, 2007, 61.5% of our assets consisted of first lien, prime quality residential mortgage loans, with a weighted-average FICO score of 714 and a weighted-average loan-to-value ratio, net of mortgage insurance, of 72.8%. Our AAA-rated and agency-backed mortgage-backed securities portfolio represented 25.3% of our assets at March 31, 2007. This portfolio has virtually no credit risk. Our subordinated mortgage-backed securities portfolio represented 10.7% of our assets at March 31, 2007 and had a weighted-average credit rating of A-. Structured credit enhancements in this portfolio provide us with significant protection against credit loss. Our diversified business model provides us flexibility to allocate capital to our various investment strategies as market conditions change.

We neither directly originate mortgage loans nor directly service mortgage loans. We purchase pools of mortgage loans through our diverse network of well-capitalized origination partners. All of the loans we purchase are underwritten to agreed-upon specifications in conjunction with our selected high-quality originators. In addition, we obtain representations and warranties from each originator to the effect that each loan is underwritten in accordance with the guidelines. An originator who breaches its representations and warranties may be obligated to repurchase loans from us.

Within the loan market, we have focused on prime quality, first lien Alt-A adjustable-rate mortgage loans. In the Alt-A market, borrowers choose the convenience of less than full documentation in exchange for a slightly higher mortgage rate. We diligently review the credit risk associated with each mortgage loan pool we purchase. We employ a comprehensive underwriting process, driven by our experienced personnel. We require mortgage insurance on all loans with loan-to-value ratios in excess of 80% and, in certain pools, we purchase supplemental mortgage insurance down to the 75% loan-to-value ratio level.

Our mortgage loan portfolio has virtually no exposure to the subprime sector, which is currently generating high delinquencies. At March 31, 2007, mortgage loans with FICO scores less than 620, a measure that is generally considered to be an indicator of subprime, represented only 11 loans or 0.1% of our total mortgage loan portfolio. In addition, at March 31, 2007, none of our mortgage loans had loan-to-value ratios, net of mortgage insurance, greater than 80%. "No documentation" loans as a percentage of our total loan portfolio was just 2.3% at March 31, 2007. We believe that our collateral characteristics, as well as our comprehensive underwriting process, provide us with strong protection against credit loss.

The number of seriously delinquent loans in our loan portfolio was just 87 basis points (0.87%) of total loans at March 31, 2007. This percentage is well within our expectations for performance and compares very favorably with industry statistics for prime ARM loans, for which the Mortgage Banker's Association reports a serious delinquency rate of 145 basis points (1.45%) at December 31, 2006. Our credit performance bears no resemblance to subprime performance, for which the Mortgage Banker's Association reports a serious delinquency rate of 916 basis points (9.16%) at December 31, 2006. We evaluate our mortgage loan portfolio for impairment on a quarterly basis, and increase or decrease our allowance for loan losses based on that analysis. Our allowance for loan losses was $8.3 million at March 31, 2007. When foreclosures occur, we believe we will realize modest severities, due to the low weighted-average loan-to-value ratios in our portfolio and to current indications from our ongoing surveillance of property valuations on delinquent loans.

We finance our portfolios of mortgage loans and mortgage-backed securities through the use of repurchase agreements, securitization transactions structured as secured financings, a commercial paper facility, warehouse lending facilities and junior subordinated notes. We manage the levels of the financing liabilities funding our portfolios based on recourse leverage. At March 31, 2007, our recourse leverage ratio, defined as recourse financing

25

Table of Contents

liabilities as a ratio of stockholders' equity plus long-term debt, was 7.1x. We generally seek to maintain an overall borrowing recourse leverage of less than 10 times the amount of our equity and long-term debt. We actively manage our capital efficiency through the types of borrowings, including the non-recourse mortgage-backed notes and collateralized debt obligations issued to finance our securitized mortgage loans and mortgage-backed securities, in order to manage our liquidity and interest rate related risks.

We manage liquidity to ensure that we have the continuing ability to maintain cash flows that are adequate to fund operations and meet commitments on a timely and cost-effective basis. At March 31, 2007, we had unencumbered assets of over $200 million, consisting of unpledged mortgage-backed securities, equity securities, and cash and cash equivalents. We believe that our liquidity level is in excess of that necessary to satisfy our operating requirements and we expect to continue to use diverse funding sources to maintain our financial flexibility.

Our business is affected by the following economic and industry factors that may have a material adverse effect on our financial condition and results of operations:

- interest rate trends and changes in the yield curve;

- the availability of a sufficient supply of mortgage loans and mortgage-backed securities for purchase that meet our standards;

- rates of prepayment on our mortgage loans and the mortgages underlying our mortgage-backed securities;

- continued creditworthiness of the holders of mortgages underlying our mortgage-related assets;

- highly competitive markets for investment opportunities; and

- other market developments.

In addition, several factors relating to our business may also impact our financial condition and results of operations. These factors include:

- credit risk as defined by prepayments, delinquencies and defaults on our mortgage loans and the mortgage loans underlying our mortgage-backed securities;

- overall leverage of our portfolio;

- access to funding and adequate borrowing capacity;

- negative amortization;

- increases in our borrowing costs;

- the ability to use derivatives to mitigate our interest rate, credit risk and prepayment risks;

- the market value of our investments; and

- compliance with REIT requirements and the requirements we must meet to qualify for an exemption under the Investment Company Act of 1940.

Refer to "Risk Factors" in Item 1A of our 2006 Form 10-K for additional discussion regarding these and other risk factors that affect our business. Refer to "Credit Risk" and "Interest Rate Risk" in Item 7A of this Form 10-Q and our 2006 Form 10-K for additional credit risk and interest rate risk discussion.

26

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## Critical Accounting Policies

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America, or GAAP. These accounting principles require us to make some complex and subjective decisions and assessments. Our most critical accounting policies involve decisions and assessments that could significantly affect our reported assets and liabilities, as well as our reported revenues and expenses. We believe that all of the decisions and assessments upon which our consolidated financial statements are based were reasonable at the time made based upon information available to us at that time. See Note 2 to our consolidated financial statements included in Item 8 of our 2006 Form 10-K for a further discussion of our significant accounting policies. Management has identified our most critical accounting policies to be the following:

### Classifications of Investment Securities

Our investment securities are generally classified as available-for-sale and are carried on our consolidated balance sheet at their fair value. The classification of securities as available-for-sale results in changes in fair value being recorded as adjustments to accumulated other comprehensive income or loss, which is a component of stockholders' equity, rather than through results of operations. If our available-for-sale securities were classified as trading securities, our results of operations could experience substantially greater volatility from period-to-period. We hold certain hybrid securities which we have elected in accordance with the Statement of Financial Accounting Standards, or SFAS No. 155, *Accounting for Certain Hybrid Financial Instruments — an Amendment of FASB Statements No. 133 and 140* to account for as trading securities. These securities were not acquired for resale. Changes in the fair value of trading securities are required to be reported in the results of operations and therefore we may experience volatility in our results of operations from period to period.

### Valuations of Mortgage-backed Securities

Our Spread portfolio of mortgage-backed securities has fair values based on estimates provided by independent pricing services and dealers in mortgage-backed securities. Because the price estimates may vary between sources, we make certain judgments and assumptions about the appropriate price to use. Different judgments and assumptions could result in different presentations of value.

We estimate the fair value of our Residential Mortgage Credit portfolio of mortgage-backed securities using internally generated cash flow analysis, available market information and other appropriate valuation methodologies. We believe the estimates we use reflect the market values we may be able to receive should we choose to sell the mortgage-backed securities. Our estimates involve matters of uncertainty, judgment in interpreting relevant market data and are inherently subjective in nature. Many factors are necessary to estimate market values, including, but not limited to, interest rates, prepayment rates, amount and timing of credit losses, supply and demand, liquidity, cash flows and other market factors. We apply these factors to our portfolio as appropriate in order to determine market values.

When the fair value of an available-for-sale security is less than amortized cost, we consider whether there is an other-than-temporary impairment in the value of the security. The determination of other-than-temporary impairment is a subjective process, requiring the use of judgments and assumptions. If we determine an other-than-temporary impairment exists, the cost basis of the security is written down to the then-current fair value, and the unrealized loss is recorded as a reduction of current earnings as if the loss had been realized in the period of impairment.

We consider several factors when evaluating securities for an other-than-temporary impairment, including the length of time and extent to which the market value has been less than the amortized cost, whether the security has been downgraded by a rating agency and our continued intent and ability to hold the security for a period of time sufficient to allow for any anticipated recovery in market value. During the three months ended March 31, 2006, we recognized total impairment losses on mortgage-backed securities in our Spread portfolio of $1.7 million. The

27

Table of Contents

impairment loss recognized in the three months ended March 31, 2006 was due to our decision to reposition our Spread portfolio. We did not intend to hold certain mortgage-backed securities in our Spread portfolio that were at unrealized loss positions for a period of time sufficient to allow for recovery in fair value. We determined that the unrealized losses on these mortgage-backed securities reflected at March 31, 2006 were other-than-temporary impairments as defined in SFAS No. 115, and therefore we recognized impairment losses in our consolidated statement of operations. We also recognized impairment losses of $4 thousand during the three months ended March 31, 2007 on mortgage-backed securities in our Residential Mortgage Credit portfolio due to other-than-temporary impairments. At March 31, 2007, we had gross unrealized losses on our mortgage-backed securities classified as available-for-sale of $8.3 million which, if not recovered, may result in the recognition of future losses.

We evaluate the determination of other-than-temporary impairment at least quarterly. If future evaluations conclude that impairment is other-than-temporary, we may need to realize a loss that would have an impact on income.

### Loans Held-for-Investment

We purchase pools of residential mortgage loans through our network of origination partners. Mortgage loans are designated as held-for-investment as we have the intent and ability to hold them for the foreseeable future, and until maturity or payoff. Mortgage loans that are considered to be held-for-investment are carried at their unpaid principal balances, including unamortized premium or discount and allowance for loan losses.

### Allowance and Provision for Loan Losses

We maintain an allowance for loan losses at a level that we believe is adequate based on an evaluation of known and inherent risks related to our loan investments. When determining the adequacy of our allowance for loan losses, we consider historical and industry loss experience, economic conditions and trends, the estimated fair values of our loans, credit quality trends and other factors that we determine are relevant. In our review of national and local economic trends and conditions we consider, among other factors, national unemployment data, changes in housing appreciation and whether specific geographic areas where we have significant loan concentrations are experiencing adverse economic conditions and events such as natural disasters that may affect the local economy or property values.

To estimate the allowance for loan losses, we first identify impaired loans. Loans purchased with relatively smaller balances and substantially similar characteristics are evaluated collectively for impairment. Seriously delinquent loans with balances greater than $1.0 million are evaluated individually. We consider loans impaired when, based on current information, it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement, including interest payments, or if it is unlikely that the seller will repurchase the loan in situations were we have the contractual right request a repurchase. Impaired loans are carried at the lower of the recorded investment in the loan or the fair value of the collateral less costs to dispose of the property.

Our allowance for loan losses is established using mortgage industry experience and rating agency projections for loans with characteristics that are broadly similar to our portfolio. This analysis begins with actual 60 day or more delinquencies in our portfolio, and projects ultimate default experience (i.e., the rate at which loans will go to liquidation) on those loans based on mortgage industry loan delinquency migration statistics. For all loans showing indications of probable default, we apply a "severity" factor for each loan, again using loss severity projections from a model developed by a major rating agency for loans broadly similar to the loans in our portfolio. We then use our judgment to ensure all relevant factors that could affect our loss levels are considered and would adjust the allowance for loan losses if we believe that an adjustment is warranted. We include the effect of our contractual right to put loans back to sellers in the event of early pay default or fraud. We have established procedures to perform contract enforcement and have been successful in this effort. Over time, as our loan portfolio seasons and generates actual loss experience, we will incorporate our actual loss history for forecasting losses and establishing credit reserves.

28

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

We performed an allowance for loan losses analysis at March 31, 2007 and recorded a $3.5 million provision for the three months ended March 31, 2007.

### Interest Income Recognition

We accrue interest income on our mortgage-backed securities based on the coupon rate and the outstanding principal amount of the underlying mortgages. Premiums and discounts are amortized or accreted as adjustments to interest income over the lives of the securities using the effective yield method adjusted for the effects of estimated prepayments based on SFAS, No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*. If our estimate of prepayments is incorrect, we may be required to make an adjustment to the amortization or accretion of premiums and discounts that would have an impact on our future results of operations. We account for certain of the mortgage-backed securities in our Residential Mortgage Credit portfolio in accordance with Emerging Issues Task Force, or EITF, 99-20, *Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets*. We recognize interest income using the effective yield method. We use the prospective method for adjusting the level yield used to recognize interest income when estimates of future cash flows over the remaining life of the security either increase or decrease. We project cash flows based on management's assumptions for prepayment rates and credit losses using data provided by a third party service provider. Actual economic conditions may produce cash flows that could differ significantly from projected cash flows, and differences could result in an increase or decrease in the yield used to record interest income or could result in impairment losses.

We accrue interest income on our mortgage loans and credit it to income based on the carrying amount and contractual terms or estimated life of the assets using the effective yield method in accordance with SFAS No. 91. We discontinue the accrual of interest on impaired loans when, in management's opinion, the borrower may be unable to meet payments as they become due. Also, we place loans 90 days or more past due on non-accrual status. When we discontinue an interest accrual, we reverse all associated unpaid accrued interest income against current period operating results. We recognize interest income subsequently only to the extent cash payments are received.

### Securitizations

We create securitization entities as a means of securing long-term, non-recourse collateralized financing for our residential mortgage loan portfolio and mortgage-backed securities portfolio and matching the income earned on residential mortgage loans with the cost of related liabilities, otherwise referred to as match funding our balance sheet. Residential mortgage loans or mortgage-backed securities are transferred to a separate bankruptcy-remote legal entity from which private-label multi-class mortgage-backed notes or collateralized debt obligations, or CDO's are issued. On a consolidated basis, we account for securitizations as secured financings as defined by SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, and, therefore, no gain or loss is recorded in connection with the securitizations. Each securitization entity is evaluated in accordance with Financial Accounting Standards Board, or FASB, Interpretation, or FIN, 46(R), *Consolidation of Variable Interest Entities*, and we have determined that we are the primary beneficiary of the securitization entities. As such, the securitization entities are consolidated into our consolidated balance sheet subsequent to securitization. Residential mortgage loans or mortgage-backed notes transferred to securitization entities collateralize the debt issued, and, as a result, those investments are not available to us, our creditors or our stockholders. All discussions relating to securitizations are on a consolidated basis and do not necessarily reflect the separate legal ownership of the loans or mortgage-backed securities by the related bankruptcy-remote legal entity.

### Accounting for Derivative Financial Instruments and Hedging Activities

We may enter into a variety of derivative contracts, including futures contracts, swaption contracts, interest rate swap contracts, interest rate cap contracts, credit default swaps and risk-sharing arrangements as a means of mitigating our interest rate risk on forecasted interest expense as well as to mitigate our credit risk on credit sensitive mortgage-backed securities. Effective January 1, 2006, we discontinued the use of hedge accounting, in accordance with SFAS No. 133. All changes in value of derivative contracts that had previously been accounted for under hedge

29

Table of Contents

accounting are now recorded in other income or expense and could potentially result in increased volatility in our results of operations.

We may enter into commitments to purchase mortgage loans, or purchase commitments, from our network of originators. We evaluate each purchase commitment in accordance with SFAS No. 133 to determine whether the purchase commitment meets the definition of a derivative instrument. Purchase commitments that meet the definition of a derivative instrument are recorded at their estimated fair value on our consolidated balance sheet and any change in fair value of the purchase commitment is recognized in other income or expense. Upon settlement of the loan purchase, the purchase commitment derivative is derecognized and is included in the cost basis of the loans purchased.

### Recent Accounting Pronouncements

The FASB has placed an item on its SFAS No. 140 project agenda relating to the treatment of transactions where mortgage-backed securities purchased from a particular counterparty are financed via a repurchase agreement with the same counterparty. Currently, we record such assets and the related financing gross on our consolidated balance sheet, and the corresponding interest income and interest expense gross on our consolidated statement of operations. Any change in fair value of the security is reported through other comprehensive income or current period income, depending on its classification under SFAS No. 115.

However, in a transaction where the mortgage-backed securities are acquired from and financed under a repurchase agreement with the same counterparty, the acquisition may not qualify as a sale from the seller's perspective under the provisions of SFAS No. 140. In such cases, the seller may be required to continue to consolidate the assets sold to us, based on the seller's continuing involvement with such investments. Depending on the ultimate outcome of the FASB deliberations, we may be precluded from presenting the assets gross on its balance sheet and may instead be required to treat our net investment in such assets as a derivative.

This potential change in accounting treatment does not affect the economics of the transactions but does affect how the transactions would be reported in our consolidated financial statements. Our cash flows, liquidity and ability to pay a dividend would be unchanged, and we expect that REIT taxable income and our qualification as a REIT would not be affected. Also, net equity would not be materially affected.

In February 2006, the FASB issued SFAS No. 155. This Statement provides entities with relief from having to separately determine the fair value of an embedded derivative that would otherwise be required to be bifurcated from its host contract in accordance with SFAS No. 133. The Statement allows an entity to make an irrevocable election to measure such a hybrid financial instrument at fair value in its entirety, with changes in fair value recognized in earnings. The election may be made on an instrument-by-instrument basis and can be made only when a hybrid financial instrument is initially recognized or when certain events occur that constitute a remeasurement (i.e., new basis) event for a previously recognized hybrid financial instrument. An entity must document its election to measure a hybrid financial instrument at fair value, either concurrently or via a pre-existing policy for automatic election. Once the fair value election has been made, that hybrid financial instrument may not be designated as a hedging instrument pursuant to SFAS No. 133. The Statement is effective for all financial instruments acquired, issued or subject to a remeasurement event occurring after the beginning of an entity's first fiscal year that begins after September 15, 2006. In January 2007, the FASB released Statement 133 Implementation Issue No. B40, *Embedded Derivatives: Application of Paragraph 13(b) to Securitized Interests in Prepayable Financial Assets (B40)*. B40 provides a narrow scope exception for certain securitized interests from the tests required under paragraph 13(b) of SFAS No. 133. Those tests are commonly referred to in practice as the "double-double" test. B40 represents the culmination of the FASB staff's consideration of the need for further guidance for securitized interests, following the issuance in February 2006 of SFAS No. 155. B40 is applicable to securitized interests issued after June 30, 2007. We reviewed all securities we purchased on or after January 1, 2007. The adoption of this statement as of January 1, 2007 did not have a material effect on our financial statements however, this review is required to be performed on an ongoing basis. Since the adoption of the standard we purchased certain hybrid securities which require bifurcation. We have elected to carry these securities at fair value as trading securities although these securities were not acquired for resale. See Note 2 to our financial statement

30

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

footnotes. We will recognize changes in fair value of these securities in other income.

In June 2006, the FASB issued FIN, No. 48, *Accounting for Uncertainty in Income Taxes*. FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes*. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. Our adoption of this interpretation did not have a material impact on our financial statements.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*. This Statement allows entities to make an election to record financial assets and liabilities, with limited exceptions, at fair value on the balance sheet, with changes in fair value recorded in earnings. SFAS No. 159 is effective for fiscal years beginning after November 17, 2007. Early adoption of SFAS No. 159 was permitted as of the beginning of the fiscal year ending after November 17, 2007. We elected not to early adopt this statement and we are still evaluating the impact of this Statement on our financial statements.

## Results of Operations

For the three months ended March 31, 2007 and 2006, our net income was $14.4 million, or $0.30 per weighted-average share outstanding (basic and diluted), and $17.8 million, or $0.45 per weighted-average share outstanding (basic and diluted), respectively.

The table below details the components of our net interest spread for the three months ended March 31, 2007 and 2006:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| Weighted-average yield on average earning assets, net of premium amortization or discount accretion | 6.97% | 5.46% |
| Weighted-average cost of financing liabilities | 5.64 | 4.51 |
| Net interest spread | 1.33% | 0.95% |

We define weighted-average yield on average earning assets, net of premium amortization or discount accretion, as total interest income earned divided by the weighted-average amortized cost of our mortgage assets during the period. Weighted-average earning assets during the three months ended March 31, 2007 and 2006 were $8.4 billion and $4.5 billion, respectively.

Total interest income from mortgage assets was $145.6 million and $61.6 million for the three months ended March 31, 2007 and 2006, respectively. The year-over-year increase in interest income is primarily due to the growth of our mortgage loan portfolio and credit sensitive bond portfolio as well as higher yields on our mortgage assets that have resulted from the restructuring and sale of assets in our Spread portfolio and the redeployment of our capital into the higher-yielding assets of our Residential Mortgage Credit portfolio during the first quarter of 2006.

31

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

Interest expense for the three months ended March 31, 2007 and 2006 was as follows (dollars in thousands):

| | Three Months Ended March 31, 2007 | Percentage of Average Financing Liabilities | Three Months Ended March 31, 2006 | Percentage of Average Financing Liabilities |
|---|---|---|---|---|
| Interest expense on mortgage-backed notes | $ 61,044 | 2.99% | $ 13,774 | 1.35% |
| Interest expense on repurchase agreement liabilities | 36,414 | 1.78 | 28,015 | 2.74 |
| Interest expense on commercial paper facility | 9,150 | 0.45 | — | — |
| Interest expense on warehouse lending facilities | 6,868 | 0.34 | 3,201 | 0.31 |
| Interest expense on junior subordinated notes | 1,954 | 0.10 | 1,891 | 0.18 |
| Interest expense on CDOs | 146 | nm | — | — |
| Amortization of net realized gains on futures and interest rate swap contracts | (444) | (0.02) | (1,414) | (0.13) |
| Net interest expense on interest rate swap contracts | — | — | 605 | 0.06 |
| Other | 72 | nm | — | — |
| Total interest expense | $ 115,204 | 5.64% | $ 46,072 | 4.51% |

nm = not meaningful

We define our weighted-average cost of total financing liabilities as total interest expense divided by the weighted-average amount of our financing liabilities during the period, including mortgage-backed notes, CDOs, repurchase agreements, commercial paper, warehouse lending facilities and junior subordinated notes. Interest expense consists of interest payments on our debt and consolidated mortgage-backed notes issued, less the amortization of mortgage-backed securities issuance premiums. Mortgage-backed securities issuance premiums are created when interest-only securities and other mortgage-backed securities are issued at prices greater than their principal value. Weighted-average financing liabilities during the three months ended March 31, 2007 and 2006 were $8.4 billion and $4.1 billion, respectively.

Interest expense for the three months ended March 31, 2007 and 2006 was $115.2 million and $46.1 million, respectively. The increase in interest expense is primarily due to the increase in the balance of the loans held-for-investment and mortgage-backed securities portfolios, as well as an increase in the overall level of interest rates between March 31, 2006 and March 31, 2007, which directly affects our costs of liabilities.

The components of other income and expense for the three months ended March 31, 2007 and 2006 are summarized in the following table (dollars in millions):

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2007 | 2006 |
| Realized gains on derivative instruments, net | $ 10.7 | $ 0.1 |
| Unrealized gains (losses) on derivative instruments, net | 4.2 | 8.6 |
| Net interest income on interest rate swaps | 0.8 | — |
| Other derivative related expenses | (0.4) | — |
| Gains on derivatives, net | 15.3 | 8.7 |
| Other-than-temporary impairment losses | nm | (1.7) |
| Sales of mortgage-backed securities: | | |
| Gains | — | 9.6 |
| Losses | (15.5) | (7.5) |
| Sub-total | (15.4) | 2.1 |
| Other expense | (0.1) | (0.5) |
| Total | $ (0.3) | $ 8.6 |

nm = not meaningful

During the three months ended March 31, 2007, realized losses on the sale of mortgage-backed securities were $15.5 million which were mainly offset by realized and unrealized gains on derivative instruments of $14.9 million. During the three months ended March 31, 2006

32

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

realized gains were $9.6 million and realized losses were $7.5 million recognized on the sale of mortgage-backed securities. Other income for the three months ended March 31, 2007 and 2006 includes other-than-temporary impairment losses of $4 thousand and $1.7 million, respectively. The other-than-temporary impairment loss for the three months ended March 31, 2007 was due to assumption changes on certain Residential Mortgage Credit Securities. The other-than-temporary impairment loss recognized for the three months ended March 31, 2006 was related to certain assets that we did not intend to hold until their maturity or their unrealized losses recovered.

Operating expenses for the three months ended March 31, 2007 and 2006 were $15.2 million and $6.3 million, respectively. The year-over-year increase in operating expenses is primarily due to increased operating expenses that are required to manage our Residential Mortgage Credit strategy. Servicing expense, which is a required expense for all of our mortgage loans held-for-investment, was $6.0 million for the three months ended March 31, 2007 compared to $1.5 million for the three months ended March 31, 2006, and reflects the growth in our mortgage loans held-for-investment portfolio. The provision for loan losses was $3.5 million for the three months ended March 31, 2007, compared to zero for the three months ended March 31, 2006, and reflects the growth and seasoning of our mortgage loans held-for-investment. Salaries and benefits were $3.1 million during the three months ended March 31, 2007, compared to $2.4 million for the three months ended March 31, 2006, and reflects the addition of 20 new employees.

*REIT taxable net income*

We calculate REIT taxable net income according to the requirements of the Code, rather than GAAP. We believe that REIT taxable net income is an important measure of our financial performance because REIT taxable net income, and not GAAP net income, is the basis upon which we make our cash distributions that enable us to maintain our REIT status.

We estimate our REIT taxable net income at certain times during the course of each fiscal year based upon a variety of information from third parties, although we do not receive some of this information before we complete our estimates. As a result, our REIT taxable net income estimates during the course of each fiscal year are subject to adjustments to reflect not only the subsequent receipt of new information as to future events but also the subsequent receipt of information as to past events. Our REIT taxable net income is also subject to changes in the Code, or in the interpretation of the Code, with respect to our business model. REIT taxable net income for each fiscal year does not become final until we file our tax return for that fiscal year.

The following table reconciles our GAAP net income to our estimated REIT taxable net income for the three months ended March 31, 2007 and 2006 (in thousands, except share and per share data):

| | For the Three Months Ended March 31, 2007 | For the Three Months Ended March 31, 2006 |
|---|---|---|
| GAAP net income | $ 14,387 | $ 17,779 |
| Adjustments to GAAP net income: | | |
| Interest income and interest expense, net | (15,304) | (2,220) |
| Impairment losses on mortgage-backed securities | 4 | 1,717 |
| Provision for loan losses | 3,538 | |
| Servicing expense | 5,640 | 1,019 |
| Sales of mortgage-backed securities, net | 15,453 | (2,063) |
| Other, net | (9,439) | (7,905) |
| Net adjustments to GAAP net income | (108) | (9,452) |
| REIT taxable net income | $ 14,279 | $ 8,327 |
| REIT taxable net income per share | $ 0.30 | $ 0.21 |
| Average shares outstanding on dividend record date during the quarter | 48,056,594 | 39,681,445 |

33

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

Estimated undistributed REIT taxable net income for the three months ended March 31, 2007 and 2006 was as follows (dollars in thousands, except per share data):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Undistributed REIT taxable net income, beginning of period | $ 4,429 | $ 3,154 |
| REIT taxable net income earned during period | 14,279 | 8,327 |
| Distributions declared during period, net of dividend equivalent rights on restricted stock | (14,216) | (1,954) |
| Other adjustments | 2,171 | — |
| Undistributed REIT taxable net income, end of period | $ 6,663 | $ 9,527 |
| | | |
| Cash distributions per share declared during period | $ 0.30 | $ 0.05 |
| Percentage of current year REIT taxable net income distributed | 99.6% | 23.5% |

We believe that these presentations of our REIT taxable net income are useful to investors because they are directly related to the distributions we are required to make in order to retain our REIT status. REIT taxable net income entails certain limitations, and by itself is an incomplete measure of our financial performance over any period. As a result, our REIT taxable net income should be considered in addition to, and not as a substitute for, our GAAP-based net income as a measure of our financial performance.

**Financial Condition**

*Mortgage-backed securities*

At March 31, 2007 and December 31, 2006, we held $3.3 billion and $2.9 billion, respectively, of mortgage-backed securities. Our investment strategy includes purchases of credit-sensitive residential mortgage-backed securities and other asset-backed securities that have credit ratings below AAA and purchases of U.S. agency and other AAA-rated single-family adjustable-rate and hybrid adjustable-rate mortgage-backed securities.

34

Table of Contents

The following table presents our mortgage-backed securities at March 31, 2007 and December 31, 2006 classified as either Residential Mortgage Credit portfolio assets or Spread portfolio assets and further classified by type of issuer and/or by rating categories (dollars in thousands):

| | March 31, 2007 | | December 31, 2006 | |
| | Market Value | Percentage of Total Mortgage-backed securities | Market Value | Percentage of Total Mortgage-backed securities |
|---|---|---|---|---|
| **Residential Mortgage Credit Portfolio** | | | | |
| Investment-grade MBS: | | | | |
| AA/Aa rating | $ 192,449 | 5.9% | $ 129,096 | 4.4% |
| A/A rating | 347,163 | 10.7 | 238,623 | 8.1 |
| BBB/Baa rating | 285,580 | 8.8 | 273,359 | 9.3 |
| Total Investment-grade MBS | 825,192 | 25.4 | 641,078 | 21.8 |
| Weighted-average credit rating | A- | | A- | |
| Non-investment-grade MBS: | | | | |
| BB/Ba rating | 129,260 | 4.0 | 145,741 | 5.0 |
| Not rated | 10,731 | 0.3 | 11,196 | 0.4 |
| Total non-investment-grade MBS | 139,991 | 4.3 | 156,937 | 5.4 |
| Weighted-average credit rating (1) | BB | | BB | |
| Total Residential Mortgage Credit portfolio | 965,183 | 29.7 | 798,015 | 27.2 |
| Weighted-average credit rating (1) | A- | | BBB+ | |
| **Spread Portfolio** | | | | |
| Agency MBS | 93,530 | 2.8 | 106,648 | 3.7 |
| AAA/Aaa rating | 2,194,656 | 67.5 | 2,026,275 | 69.1 |
| Total Spread portfolio | 2,288,186 | 70.3 | 2,132,923 | 72.8 |
| Weighted-average credit rating | AAA | | AAA | |
| Total mortgage-backed securities | $ 3,253,369 | 100.0% | $ 2,930,938 | 100.0% |
| Weighted-average credit rating | AA | | AA | |

(1)  Weighted-average credit rating excludes non-rated mortgage-backed securities of $10.7 million and $11.2 million at March 31, 2007 and December 31, 2006, respectively.

*Loans held-for-investment*

At March 31, 2007 and December 31, 2006, our residential mortgage loans held-for-investment totaled $5.6 billion including unamortized premium of $124.8 million and $124.4 million, respectively. Our residential mortgage loans at March 31, 2007 were comprised of $5.0 billion of adjustable-rate and hybrid adjustable-rate mortgage loans that collateralize mortgage-backed notes and $0.4 billion of adjustable-rate and hybrid adjustable-rate mortgage loans pending securitization. Our residential mortgage loans at December 31, 2006 were comprised of $4.7 billion of hybrid adjustable-rate mortgage loans that collateralized mortgage-backed notes and $0.8 billion of adjustable-rate mortgage loans pending securitization. We intend to securitize subsequent acquisitions of loans, maintain those loans as held-for-investment on our consolidated balance sheet and account for the securitizations as financings under SFAS No. 140.

35

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

At March 31, 2007, our residential loans held-for-investment consisted of the following (dollars in thousands):

| Description | Weighted-Average Interest Rate | Weighted-Average Maturity Date | Weighted-Average Months to Reset | Weighted-Average Months to Reset of Loans After Effect of Cost of Funds Hedging (1) | Principal Balance | Principal Amount of Loans Delinquent > 90 days | Loans Delinquent > 90 days as a Percentage of Total Principal | Number of Delinquent Loans | Number of Delinquent Loans as a Percentage of Total Loans |
|---|---|---|---|---|---|---|---|---|---|
| Floating rate mortgage | 8.19% | 2037 | 1 | 1 | $ 3,886,428 | $ 33,604 | 0.62% | 76 | 0.53% |
| Hybrid mortgage | 6.57 | 2036 | 56 | 24 | 1,566,163 | 18,240 | 0.33 | 47 | 0.34 |
| Total | 7.72% | 2037 | 17 | 8 | $ 5,452,591 | $ 51,844 | 0.95% | 123 | 0.87% |

(1)  We attempt to mitigate our interest rate risk by economically hedging the cost of liabilities related to our hybrid residential mortgage loans. Amounts reflect the effect of these hedges on the months to reset of our residential mortgage loans. In addition, the financing for $0.2 billion of our hybrid residential mortgage loans is, like the underlying collateral, fixed for a period of three to five years and then becomes variable based upon the average rates of the underlying loans which will adjust based on LIBOR. The weighted-average period to reset of the debt we use to acquire residential mortgage loans was match funded approximately five months at March 31, 2007.

At December 31, 2006, our residential loans held-for-investment consisted of the following (dollars in thousands):

| Description | Weighted-Average Interest Rate | Weighted-Average Maturity Date | Weighted-Average Months to Reset | Weighted-Average Months to Reset of Loans After Effect of Cost of Funds Hedging (1) | Principal Balance | Principal Amount of Loans Delinquent > 90 days | Loans Delinquent > 90 days as a Percentage of Total Principal | Number of Delinquent Loans | Number of Delinquent Loans as a Percentage of Total Loans |
|---|---|---|---|---|---|---|---|---|---|
| Floating rate mortgage | 8.02% | 2037 | 1 | 1 | $ 4,089,015 | $ 20,830 | 0.38% | 45 | 0.33% |
| Hybrid mortgage | 6.57% | 2036 | 54 | 33 | 1,383,310 | 13,053 | 0.24 | 30 | 0.21% |
| Total | 7.65% | 2037 | 14 | 9 | $ 5,472,325 | $ 33,883 | 0.62% | 75 | 0.54% |

(1)  We attempt to mitigate our interest rate risk by hedging the cost of liabilities related to our hybrid residential mortgage loans. Amounts reflect the effect of these hedges on the months to reset of our residential mortgage loans. In addition, the financing for $0.3 billion of our hybrid residential mortgage loans is, like the underlying collateral, fixed for a period of three to five years then becomes variable based upon the average rates of the underlying loans which will adjust based on LIBOR. The weighted-average period to reset of the debt we use to acquire residential mortgage loans was match funded approximately six months at December 31, 2006.

36

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

The following table summarizes key metrics of our residential mortgage loans held-for-investment at March 31, 2007 (dollars in thousands):

| | |
|---|---|
| Unpaid principal balance | $5,452,591 |
| Number of loans | 14,208 |
| Average loan balance | $     384 |
| Weighted-average coupon rate | 7.72% |
| Weighted-average lifetime cap | 10.73% |
| Weighted-average original term, in months | 375 |
| Weighted-average remaining term, in months | 364 |
| Weighted-average loan-to-value ratio (LTV)(1) | 72.8% |
| Weighted-average FICO score | 714 |
| Number of loans with FICO scores below 620 | 11 |
| Percentage of loans with FICO scores above 700 | 59.4% |
| Percentage of loans with LTV greater than 80% | 8.2% |
| Percentage of loans with LTV greater than 90% | 2.7% |
| Percentage of loans with LTV greater than 80% net of mortgage insurance | 0% |
| Percentage of no documentation loans | 2.3% |
| Percentage of loans originated for refinancing purposes | 57.6% |
| Top five geographic concentrations (% exposure): | |
| California | 54.5% |
| Florida | 11.3% |
| Arizona | 4.0% |
| Virginia | 3.5% |
| Nevada | 3.3% |
| Occupancy status: | |
| Owner occupied | 86.4% |
| Investor | 13.6% |
| Property type: | |
| Single-family | 83.5% |
| Condominium | 10.1% |
| Other residential | 6.4% |
| Collateral type: | |
| Alt A – first lien | 100.0% |

(1)   Including the effect of mortgage insurance

37

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

The following table summarizes key metrics of our residential mortgage loans held-for-investment at December 31, 2006 (dollars in thousands):

| | |
|---|---|
| Unpaid principal balance | $5,472,325 |
| Number of loans | 13,942 |
| Average loan balance | $ 393 |
| Weighted-average coupon rate | 7.65% |
| Weighted-average lifetime cap | 10.64% |
| Weighted-average original term, in months | 375 |
| Weighted-average remaining term, in months | 366 |
| Weighted-average loan-to-value ratio (LTV)(1) | 72.6% |
| Weighted-average FICO score | 713 |
| Number of loans with FICO scores below 620 | 11 |
| Percentage of loans with FICO scores above 700 | 58.5% |
| Percentage of loans with LTV greater than 80% | 6.8% |
| Percentage of loans with LTV greater than 90% | 1.3% |
| Percentage of loans with LTV greater than 80% net of mortgage insurance | 0% |
| Percentage of no documentation loans | 2.5% |
| Percentage of loans originated for refinancing purposes | 58.0% |
| Top five geographic concentrations (% exposure): | |
| California | 57.4% |
| Florida | 8.6% |
| Arizona | 4.1% |
| Virginia | 3.7% |
| Nevada | 3.4% |
| Occupancy status: | |
| Owner occupied | 86.5% |
| Investor | 13.5% |
| Property type: | |
| Single-family | 83.6% |
| Condominium | 9.7% |
| Other residential | 6.7% |
| Collateral type: | |
| Alt A – first lien | 100.0% |

(1)  Including the effect of mortgage insurance

38

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

The following table presents our residential mortgage loan portfolio grouped by the percentages in each of three different documentation types, further stratified by loan-to-value ratios, net of mortgage insurance, and FICO scores at March 31, 2007:

| | <620 | 620-659 | 660-699 | 700-739 | 740+ | Total |
|---|---|---|---|---|---|---|
| | | | **FICO Scores** | | | |
| **Full Documentation:(1)** | | | | | | |
| LTV: | | | | | | |
| <60% | 0.0% | 0.2% | 0.2% | 0.2% | 0.5% | 1.1% |
| 60.01 – 70% | 0.0 | 1.0 | 1.9 | 2.1 | 2.8 | 7.8 |
| 70.01 – 80% | 0.0 | 1.4 | 2.5 | 2.0 | 2.4 | 8.3 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Full Documentation | 0.0% | 2.6% | 4.6% | 4.3% | 5.7% | 17.2% |
| **Reduced Documentation:(2)** | | | | | | |
| LTV: | | | | | | |
| <60% | 0.0% | 0.5% | 1.3% | 1.4% | 2.4% | 5.6% |
| 60.01 – 70% | 0.0 | 2.1 | 10.2 | 9.5 | 8.8 | 30.6 |
| 70.01 – 80% | 0.1 | 3.2 | 15.3 | 13.9 | 11.8 | 44.3 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Reduced Documentation | 0.1% | 5.8% | 26.8% | 24.8% | 23.0% | 80.5% |
| **No Documentation:(3)** | | | | | | |
| LTV: | | | | | | |
| <60% | 0.0% | 0.0% | 0.2% | 0.2% | 0.3% | 0.7% |
| 60.01 – 70% | 0.0 | 0.1 | 0.4 | 0.4 | 0.5 | 1.4 |
| 70.01 – 80% | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total No Documentation | 0.0% | 0.1% | 0.6% | 0.7% | 0.9% | 2.3% |
| **Total Portfolio:** | | | | | | |
| LTV: | | | | | | |
| <60% | 0.0% | 0.7% | 1.7% | 1.8% | 3.2% | 7.4% |
| 60.01 – 70% | 0.0 | 3.2 | 12.5 | 12.0 | 12.1 | 39.8 |
| 70.01 – 80% | 0.1 | 4.6 | 17.8 | 16.0 | 14.3 | 52.8 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Portfolio | 0.1% | 8.5% | 32.0% | 29.8% | 29.6% | 100.0% |

(1)  Full documentation includes verification of the borrower's income, employment, assets and liabilities.

(2)  Reduced documentation, sometimes referred to as Alt-A, includes mortgages that comply with most, but not all, of the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation criteria for a conforming mortgage. Alt-A mortgages are generally high quality, with less than full documentation verified.

(3)  No documentation excludes verification of borrower's income, employment or assets.

39

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

The following table presents our residential mortgage loan portfolio grouped by the percentages in each of three different documentation types, further stratified by loan-to-value ratios, net of mortgage insurance, and FICO scores at December 31, 2006:

| | FICO Scores | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | <620 | 620-659 | 660-699 | 700-739 | 740+ | Total |
| **Full Documentation:(1)** | | | | | | |
| LTV: | | | | | | |
| ≤60% | 0.0% | 0.2% | 0.2% | 0.2% | 0.5% | 1.1% |
| 60.01 – 70% | 0.0 | 0.8 | 1.2 | 1.2 | 1.5 | 4.7 |
| 70.01 – 80% | 0.0 | 1.6 | 3.1 | 2.5 | 3.1 | 10.3 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Full Documentation | 0.0% | 2.6% | 4.5% | 3.9% | 5.1% | 16.1% |
| **Reduced Documentation:(2)** | | | | | | |
| LTV: | | | | | | |
| ≤60% | 0.0% | 0.6% | 1.3% | 1.5% | 2.4% | 5.8% |
| 60.01 – 70% | 0.0 | 2.0 | 7.9 | 7.3 | 6.7 | 23.9 |
| 70.01 – 80% | 0.1 | 3.7 | 18.1 | 16.0 | 13.8 | 51.7 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Reduced Documentation | 0.1% | 6.3% | 27.3% | 24.8% | 22.9% | 81.4% |
| **No Documentation:(3)** | | | | | | |
| LTV: | | | | | | |
| ≤60% | 0.0% | 0.0% | 0.2% | 0.2% | 0.4% | 0.8% |
| 60.01 – 70% | 0.0 | 0.1 | 0.3 | 0.3 | 0.4 | 1.1 |
| 70.01 – 80% | 0.0 | 0.0 | 0.1 | 0.3 | 0.2 | 0.6 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total No Documentation | 0.0% | 0.1% | 0.6% | 0.8% | 1.0% | 2.5% |
| **Total Portfolio:** | | | | | | |
| LTV: | | | | | | |
| ≤60% | 0.0% | 0.8% | 1.7% | 1.9% | 3.3% | 7.7% |
| 60.01 – 70% | 0.0 | 2.9 | 9.4 | 8.8 | 8.6 | 29.7 |
| 70.01 – 80% | 0.1 | 5.3 | 21.3 | 18.8 | 17.1 | 62.6 |
| > 80% | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Portfolio | 0.1% | 9.0% | 32.4% | 29.5% | 29.0% | 100.0% |

(1) Full documentation includes verification of the borrower's income, employment, assets and liabilities.

(2) Reduced documentation, sometimes referred to as Alt-A, includes mortgages that comply with most, but not all, of the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation criteria for a conforming mortgage. Alt-A mortgages are generally high quality, with less than full documentation verified.

(3) No documentation excludes verification of borrower's income, employment or assets.

At March 31, 2007 and December 31, 2006, none of our loans had LTV ratios, net of mortgage insurance, greater than 80%. "No documentation" loans as a percentage of our total loan portfolio were 2.3% and 2.5%, at March 31, 2007 and December 31, 2006, respectively.

At March 31, 2007, 123 of the 14,208 loans, or 87 basis points (0.87%) of our $5.6 billion residential mortgage loan portfolio were 90 days or more delinquent with an aggregate balance of $51.8 million, and were on non-accrual status. At December 31, 2006, 75 of the 13,942 loans, or 0.54%, in our $5.5 billion residential mortgage loan portfolio were 90 days or more delinquent with an aggregate balance of $33.9 million, and were on non-accrual status.

We performed an allowance for loan losses analysis at March 31, 2007 and recorded a $3.5 million provision for loan losses for the three months ended March 31, 2007. Our allowance for loan losses was established using industry experience and rating

40

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

agency projections for loans with characteristics that are broadly similar to our portfolio. This analysis begins with actual 60 day or more delinquencies in our portfolio, and projects ultimate default experience (i.e., the rate at which loans will go to liquidation) on those loans based on industry loan delinquency migration statistics. For all loans showing indications of probable default, we apply a "severity" factor for each loan, again using loss severity projections from a model developed by a major rating agency for loans broadly similar to the loans in our portfolio. We include the effect of our contractual right to put loans back to sellers in the event of early pay default or fraud. We have established procedures to perform contract enforcement and have been successful in this effort. Loans that we believe we will successfully put-back are deducted from our loss provisions. Management then uses judgment to ensure all relevant factors that could affect our loss levels are considered and adjusts the allowance for loan losses if we believe that an adjustment is warranted. This analysis was the basis for our $7.9 million general allocated allowance at March 31, 2007. Seriously delinquent loans with balances greater than $1.0 million are evaluated individually. Such loans are considered impaired when, based on current information, it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement, including interest payments. Impaired loans are carried at the lower of the recorded investment in the loan or the fair value of the collateral less costs to dispose of the property. We recorded a specific reserve for loans meeting these criteria of $0.4 million at March 31, 2007. We did not record an unallocated allowance for loan losses at March 31, 2007 as we did not identify any factors in the portfolio that warranted such an allowance. Usage of the allowance occurs when a loan proceeds through the foreclosure process and becomes real estate owned, or REO. When a loan becomes REO we estimate the specific loss on that loan, if any, based on the expected net proceeds from the final disposition of the property and reduce the allowance for loan losses by that amount. Additionally, the allowance is reduced for any loans that are disposed of at a loss prior to their becoming REO. Usage of the allowance for loan losses for the three months ended March 31, 2007 was $301 thousand. Usage of the allowance for loan losses does not equate to a realized loss for REIT taxable income purposes.

At March 31, 2007, 13 of the residential loans we owned with an outstanding balance of $4.9 million were considered to be real estate owned, or REO, as a result of foreclosure on delinquent loans. The loans have been reclassified from loans to other assets on our balance sheet at the lower of cost or estimated fair value.

We performed an allowance for loan losses analysis at March 31, 2006, and we made a determination that no allowance for loan losses was required for our residential mortgage loan portfolio at March 31, 2006.

### Securitizations

#### Mortgage-Backed Notes

We create securitization entities as a means of securing long-term collateralized financing for our residential mortgage loan portfolio, matching the income earned on residential mortgage loans with the cost of related liabilities, otherwise referred to as "match-funding" our balance sheet. We may use derivative instruments, such as interest rate swaps, to achieve this result. Residential mortgage loans are transferred to a separate bankruptcy-remote legal entity from which private-label multi-class mortgage-backed securities are issued. These mortgage-backed securities are carried at their unpaid principal balances net of any unamortized discount or premium. On a consolidated basis, securitizations are accounted for as secured financings as defined by SFAS No. 140 and, therefore, no gain or loss is recorded in connection with the securitizations. The treatment of securitization transactions can be different for taxation purposes than under GAAP. We evaluate each securitization entity in accordance with FIN 46(R), and we have determined that we are the primary beneficiary of the securitization entities. As such, we consolidate the securitization entities into our consolidated balance sheet subsequent to securitization. Residential mortgage loans transferred to securitization entities collateralize the mortgage-backed securities issued, and, as a result, those investments are not available to us, our creditors or our stockholders. All discussions relating to securitizations are on a consolidated basis and do not necessarily reflect the separate legal ownership of the loans by the related bankruptcy-remote legal entity.

During the three months ended March 31, 2007 and 2006, we issued approximately $0.7 billion and $1.4 billion of mortgage-backed notes, respectively. We retained $15.5 million and $0.1 billion, respectively, of the

41

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

resulting securities for our securitized residential loan portfolio and placed $0.7 billion and $1.3 billion, respectively, with third-party investors. All of the mortgage-backed notes issued were priced with interest indexed to one-month LIBOR.

At March 31, 2007 and December 31, 2006, we had mortgage-backed notes with an outstanding balance of $4.3 billion and $3.9 billion, respectively, and with a weighted-average borrowing rate of 5.56% and 5.60% per annum, respectively. The borrowing rates of the mortgage-backed notes at March 31, 2007 and December 31, 2006 reset monthly based on LIBOR except for $0.2 billion and $0.3 billion, respectively, of notes which, like the underlying loan collateral, are fixed for a period of 3 to 5 years and then become variable based on the average rates of the underlying loans which will adjust based on LIBOR. Unpaid interest on the mortgage-backed notes was $5.0 million and $4.5 million at March 31, 2007 and December 31, 2006, respectively. Net unamortized premium on the mortgage-backed notes was $2.7 million at March 31, 2007 and December 31, 2006. The stated maturities of the mortgage-backed notes at March 31, 2007 were from 2035 to 2047 and, at December 31, 2006, were from 2035 to 2046. At March 31, 2007 and December 31, 2006, residential mortgage loans with an estimated fair value of $4.3 billion and $3.9 billion, respectively, were pledged as collateral for mortgage-backed notes issued.

Each series of mortgage-backed notes that we have issued has consisted of various classes of securities that bear interest at varying spreads to the underlying interest rate index. The maturity of each class of securities is directly affected by the rate of principal repayments on the associated residential mortgage loan collateral. As a result, the actual maturity of each series of mortgage-backed notes may be shorter than its stated maturity.

42

Table of Contents

The following table highlights the securitizations we have completed through March 31, 2007, as of each transaction execution date (dollars in thousands):

| | LUM 2005-1 | LUM 2006-1 | LUM 2006-2 | LUM 2006-3 | LUM 2006-4 | LUM 2006-5 | LUM 2006-6 | LUM 2006-7 | LUM 2007-1 | Total Portfolio |
|---|---|---|---|---|---|---|---|---|---|---|
| Transaction execution date | 11/2/05 | 1/26/06 | 2/23/06 | 4/28/06 | 5/28/06 | 6/29/06 | 9/28/06 | 12/27/06 | 1/25/07 | |
| Loans, unpaid principal balance | $520,568 | $576,122 | $801,474 | $682,535 | $497,220 | $508,789 | $772,732 | $ 799,655 | $706,841 | $5,865,936 |
| Mortgage-backed notes issued to third parties | 500,267 | 536,657 | 746,973 | 654,270 | 376,148 | — | 753,415 | 756,450 | 691,383 | 5,015,563 |
| Debt retained | 20,301 | 39,465 | 54,501 | 28,265 | 121,072 | 508,789 | 19,317 | 43,205 | 15,458 | 850,373 |
| Retained investment grade %(1) | 3.1% | 3.9% | 3.7% | 2.9% | 21.1% | 97.2% | 1.0% | 4.6% | 1.50% | 12.2% |
| Retained non-investment grade %(1) | 0.8% | 3.0% | 3.1% | 1.3% | 3.2% | 2.8% | 1.5% | 0.8% | 0.7% | 1.8% |
| Cost of debt on AAA-rated mortgage-backed notes — spread to LIBOR(2) | 0.27% | 0.28% | 0.22% | 0.23% | 0.21% | 0.21% | 0.22% | 0.19% | 0.16% | 0.22% |

(1)  Retained tranches as a percentage of total mortgage-backed notes issued.

(2)  LUM 2006-3 cost of debt excludes $0.3 billion of AAA mortgage-backed notes which, like the underlying loan collateral, are fixed for three to five years then become variable based upon the average rates of the underlying loans which will adjust based on LIBOR.

43

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

The following table presents the rating categories of the mortgage-backed securities issued in our securitizations completed through March 31, 2007, as of each execution date (dollars in thousands):

| | LUM 2005-1 | LUM 2006-1 | LUM 2006-2 | LUM 2006-3 | LUM 2006-4 | LUM 2006-5 | LUM 2006-6 | LUM 2006-7 | LUM 2007-1 | Total Portfolio |
|---|---|---|---|---|---|---|---|---|---|---|
| Transaction execution date | 11/2/05 | 1/26/06 | 2/23/06 | 4/28/06 | 5/28/06 | 6/29/06 | 9/28/06 | 12/27/06 | 1/25/07 | |
| **Mortgage-backed notes issued to third-party investors** | | | | | | | | | | |
| AAA/Aaa rating | $ 482,307 | $ 517,069 | $ 717,320 | $ 597,700 | $ 376,148 | $ — | $ 712,846 | $ 725,289 | $ 668,844 | $ 4,797,523 |
| AA/Aa rating | 17,960 | 19,588 | 29,653 | 56,570 | — | — | 29,364 | 20,597 | 19,926 | 193,658 |
| A/A rating | — | — | — | — | — | — | 11,205 | 7,923 | 2,613 | 21,741 |
| BBB/Baa rating | — | — | — | — | — | — | — | 2,641 | — | 2,641 |
| Total mortgage-backed notes issued to third-party investors | $ 500,267 | $ 536,657 | $ 746,973 | $ 654,270 | $ 376,148 | $ — | $ 753,415 | $ 756,450 | $ 691,383 | $ 5,015,563 |
| Percentage of total collateral | 96.1% | 93.1% | 93.2% | 95.9% | 75.7% | — | 97.5% | 94.6% | 97.8% | 85.5% |
| **Debt retained** | | | | | | | | | | |
| AAA/Aaa rating | $ — | $ — | $ — | $ — | $ 66,378 | $ 457,910 | $ — | $ 27,153 | $ — | $ 551,441 |
| AA/Aa rating | 6,767 | — | — | — | 18,397 | 21,369 | — | 2,580 | 7,935 | 57,048 |
| A/A rating | 4,165 | 13,251 | 18,434 | 9,852 | 12,430 | 9,667 | 3,864 | 1,358 | 1,513 | 74,534 |
| BBB/Bbb rating | 5,206 | 8,930 | 11,221 | 9,649 | 7,707 | 5,851 | 3,864 | 5,357 | 1,375 | 59,160 |
| BB/Ba rating | 1,301 | 7,202 | 10,419 | 1,879 | 6,215 | 6,614 | 6,954 | — | — | 40,584 |
| B/B rating | — | 5,761 | 8,015 | 1,569 | 5,469 | 3,816 | — | — | — | 24,630 |
| Not rated | — | 4,321 | 6,412 | 1,257 | 4,476 | 3,562 | 4,635 | 6,757 | 4,635 | 36,055 |
| Total mortgage-backed notes retained | 17,439 | 39,465 | 54,501 | 24,206 | 121,072 | 508,789 | 19,317 | 43,205 | 15,458 | 843,452 |
| Overcollateralization | 2,862 | — | — | 4,059 | — | — | — | — | — | 6,921 |
| Total debt retained | $ 20,301 | $ 39,465 | $ 54,501 | $ 28,265 | $ 121,072 | $ 508,789 | $ 19,317 | $ 43,205 | $ 15,458 | $ 850,373 |
| Percentage of total collateral | 3.9% | 6.9% | 6.8% | 4.1% | 24.3% | 100.0% | 2.5% | 5.4% | 2.2% | 14.5% |

44

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

*Collateralized Debt Obligations*

In March 2007, we issued $400.0 million of CDOs from Charles Fort CDO I, Ltd., our qualified REIT subsidiary. The CDOs were in the form of floating-rate pass-through certificates collateralized by $289.1 million of our mortgage-backed securities available-for-sale and $59.1 million of mortgage-backed securities which we retained from prior whole loan securitizations. Of the $400.0 million of CDOs issued, $271.0 million were purchased by third party investors and we retained $129.0 million of certificates including the subordinated certificates, which provide credit support to the certificates issued to third party investors. Subsequent to March 31, 2007, we sold $25.0 million of CDOs which were originally retained at the closing of the CDO issuance. The interest rates on the floating-rate pass-through certificates reset quarterly and are indexed to three-month LIBOR. The entity has an uninvested cash balance at March 31, 2007 of $51.4 million which was used to purchase additional mortgage-backed securities as collateral for the CDOs. Subsequently to the closing of the transaction an additional $37.3 million was invested in mortgage backed assets leaving $14.1 million uninvested at April 30, 2007 (to be updated prior to filing.) As of March 31, 2007, our CDOs had an outstanding balance of $271.0 million, and a weighted average interest rate of 6.44%.

*Asset Repricing Characteristics*

The following table summarizes the repricing characteristics of our mortgage assets by portfolio, and further classified by asset type and frequency of repricing of their coupon rate (dollars in thousands):

| | March 31, 2007 | | December 31, 2006 | |
|---|---|---|---|---|
| | Carrying Value | Portfolio Mix | Carrying Value | Portfolio Mix |
| **Residential Mortgage Credit Portfolio** | | | | |
| ARM residential loans: | | | | |
| Reset 1 month or less | $ 3,886,428 | 44.0% | $ 4,089,015 | 48.0% |
| Reset >1 month but < 12 months | — | | 284 | nm |
| Reset >12 months but < 60 months | 1,216,485 | 13.8 | 1,180,727 | 13.9 |
| Reset > 60 months | 349,678 | 4.0 | 202,299 | 2.4 |
| Unamortized premium | 124,840 | 1.4 | 124,412 | 1.5 |
| Allowance for loan losses | (8,262) | (0.1) | (5,020) | (0.1) |
| Sub-total | 5,569,169 | 63.1 | 5,591,717 | 65.7 |
| ARM residential mortgage-backed securities: | | | | |
| Reset 1 month or less | 868,895 | 9.9 | 796,539 | 9.3 |
| Reset >1 month but < 12 months | 10,895 | 0.1 | — | |
| Reset >12 months but < 60 months | — | | — | |
| Reset > 60 months | — | | — | |
| Sub-total | 879,790 | 10.0 | 796,539 | 9.3 |
| Fixed-rate residential mortgage-backed securities: | 85,393 | 1.0 | 1,476 | nm |
| **Spread Portfolio** | | | | |
| Residential mortgage-backed securities: | | | | |
| Reset 1 month or less | 2,192,657 | 24.8 | 2,024,275 | 23.7 |
| Reset >1 month but < 12 months | 95,529 | 1.1 | 108,648 | 1.3 |
| Reset >12 months but < 60 months | — | | — | |
| Reset > 60 months | — | | — | |
| Sub-total | 2,288,186 | 25.9 | 2,132,923 | 25.0 |
| Total mortgage assets | $ 8,822,538 | 100.0% | $ 8,522,655 | 100.0% |

nm = not meaningful

At March 31, 2007 and December 31, 2006, the weighted-average period to reset of our total mortgage assets was 11 months and 10 months, respectively. We attempt to mitigate our interest rate risk by hedging the cost of liabilities related to our hybrid residential mortgage loans. Our net asset/liability duration gap was approximately one month at March 31, 2007 and December 31, 2006.

45

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

Total mortgage assets had a weighted-average coupon of 7.03% at March 31, 2007 and December 31, 2006.

Our mortgage assets are typically subject to periodic and lifetime interest rate caps. Periodic interest rate caps limit the amount by which the interest rate on a mortgage can increase during any given period. Lifetime interest rate caps limit the amount by which an interest rate can increase through the term of a mortgage. The weighted-average lifetime cap of our mortgage-backed securities was 11.40% and 12.32% at March 31, 2007 and December 31, 2006, respectively. The weighted-average lifetime cap of our loans held-for-investment was 10.73% and 10.64% at March 31, 2007 and December 31, 2006, respectively.

The periodic adjustments to the interest rates of our mortgage assets are based on changes in an objective index. Substantially all of our mortgage assets adjust their interest rates based on: (1) the U.S. Treasury index, or Treasury, which is a monthly or weekly average yield of benchmark U.S. Treasury securities published by the Federal Reserve Board; (2) LIBOR; (3) Moving Treasury Average, or MTA or (4) Cost of Funds Index, or COFI.

The percentages of the mortgage assets in our investment portfolio at March 31, 2007 that were indexed to interest rates are as follows:

|  | LIBOR | Treasury | MTA | COFI |
|---|---|---|---|---|
| Mortgage-backed securities | 98% | 2% | —% | —% |
| Loans held-for-investment | 34 | — | 66 | nm |

The percentages of the mortgages assets in our investment portfolio at December 31, 2006 that were indexed to interest rates is as follows:

|  | LIBOR | Treasury | MTA | COFI |
|---|---|---|---|---|
| Mortgage-backed securities | 98% | 2% | —% | —% |
| Loans held-for-investment | 26 | — | 74 | nm |

nm = not meaningful

The constant payment rate on our total mortgage assets, an annual rate of principal paydowns for our mortgage assets relative to the outstanding principal balance of our total mortgage assets, was 24% and 15% for the three months ended March 31, 2007 and March 31, 2006, respectively. The constant payment rate attempts to predict the percentage of principal that will paydown over the next 12 months based on historical principal paydowns. The principal payment rate cannot be considered an indication of future principal repayment rates because actual changes in market interest rates will have a direct impact on the principal prepayments on the mortgage assets we hold in our portfolio.

**Liquidity and Capital Resources**

At March 31, 2007, the primary source of funds for our loan acquisition and securitization portfolio was $4.3 billion of non-recourse mortgage-backed notes, with a weighted-average borrowing rate of 5.56%. In addition, we had a $500.0 million warehouse lending facility with Bear Stearns Mortgage Capital Corporation that was established in October 2005, a $1.0 billion warehouse lending facility with Greenwich Financial Products, Inc. that was established in January 2006 and a $1.0 billion warehouse lending facility with Barclays Bank plc that was established in July 2006. All three warehouse lending facilities are structured as repurchase agreements. At March 31, 2007 and December 31, 2007, the total outstanding balance on our warehouse lending facilities was $0.4 billion and $0.8 billion, respectively.

The residential mortgage loans we acquire are initially financed with our warehouse lending facilities, with the intention of ultimately securitizing the loans and financing them permanently through the issuance of non-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

recourse mortgage-backed notes. Proceeds from our securitizations are used to pay down the outstanding balance of our warehouse lending facilities. We match the income that we earn on our mortgage loans, plus the benefit of any hedging activities, with the cost of the liabilities related to our mortgage loans, a process known as "match-funding" our balance sheet. In order to facilitate the securitization and permanent financing of our mortgage loans, we generally create subordinated certificates, which also provides a specified amount of credit enhancement, that we intend to retain on our balance sheet.

Certain mortgage loans that we purchase permit negative amortization. A negative amortization provision in a mortgage allows the borrower to defer payment of a portion or all of the monthly interest accrued on the mortgage and to add the deferred interest amount to the mortgage's principal balance. As a result, during periods of negative amortization, the principal balances of negatively amortizing mortgages will increase and their weighted-average lives will extend. Our mortgage loans generally can experience negative amortization to a maximum amount of 110-125% of the original mortgage loan balance. As a result, given the relatively low average loan-to-value ratio of 72.8%, net of mortgage insurance, on our portfolio at March 31, 2007, we believe that our portfolio would still have a significant homeowners' equity cushion even if all negatively-amortizing loans reached their maximum permitted amount of negative amortization.

We have structured all of our negatively amortizing mortgage loans into various securitizations and have retained ownership in these securitizations in part or whole in the form of mortgage-backed securities. These securitization structures effectively prevent the disbursement of deferred interest which arises from negative amortization. Deferred interest increases the bond balances of the securitization structure and is not disbursed from the structure.

Securitization structures allocate the principal payments and prepayments on mortgage loans, including loans with negative amortization features. To date, prepayments on our mortgage loans with negative amortization have been sufficient to offset negative amortization such that all our securitization structures have made all their required payments to bondholders.

A reconciliation of the cash flows on our residential mortgage loans that have negatively amortizing loans and the mortgage-backed notes backed by those residential mortgage loans during the quarter ended March 31, 2007 was as follows (dollars in thousands):

| | |
|---|---:|
| Principal payments received on residential mortgage loans | $ 404,531 |
| Principal distributed to mortgage-backed note holders(1) | (364,740) |
| Principal receipts used for interest payments on mortgage-backed notes | 39,791 |
| Interest cash receipts on residential mortgage loans for interest and other fee income, net of servicing and other reimbursements | 47,825 |
| Interest payments to mortgage-backed note holders(1) | (87,616) |
| Interest payments on mortgage-backed notes in excess of interest cash receipts | (39,791) |
| Net cash flow | $ — |

(1)  Amount includes principal and interest distributed on bonds we retained.

Based on our projections of estimated prepayments on negatively amortizing loans, we believe that our securitizations will continue to support required payments to the holders of the mortgage-backed notes we issue.

The primary source of funds used to finance our mortgage-backed securities at March 31, 2007 consisted of repurchase agreements totaling $2.9 billion with a weighted-average current borrowing rate of 5.42%. We expect to continue to borrow funds for our mortgage-backed securities through repurchase agreements. At March 31, 2007, we had established 21 borrowing arrangements with various investment banking firms and other lenders, 14 of which were in use on March 31, 2007. Increases in short-term interest rates could negatively impact the valuation of our mortgage-backed securities that we are financing with repurchase agreements, which could limit our future borrowing ability or cause our repurchase agreement counterparties to initiate margin calls. Amounts due upon maturity of our repurchase agreements will be funded primarily through the rollover/reissuance of repurchase agreements and monthly principal and interest payments received on our mortgage-backed securities. During the

47

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

three months ended March 31, 2007, we experienced margin calls from certain repurchase agreement counterparties on some of our bonds and were not able to refinance some of our bonds that rolled over during the period at the same funding levels that we had previously. Although these changes reduce our leverage ratios and funds available to reinvest, we had sufficient liquidity to satisfy these margin calls. As of March 31, 2007, we had over $200 million of unencumbered assets on our balance sheet.

We also established a $500 million warehouse lending facility with Greenwich Capital Financial Products, Inc. in September 2006 to provide short-term financing of our mortgage-backed assets until these assets were permanently financed with CDOs. This facility was terminated in March 2007 concurrently with the permanent financing of the assets with CDOs.

In August 2006, we established a $1.0 billion commercial paper facility to finance our purchases of agency and AAA-rated mortgage-backed securities through a subsidiary we called Luminent Star Funding I. Luminent Star Funding I is a single-seller commercial paper program that provides a financing alternative to repurchase agreement financing by issuing asset-backed secured liquidity notes that are rated by the rating agencies Standard & Poor's and Moody's. At March 31, 2007, the outstanding balance on the commercial paper facility was $0.6 billion at a weighted-average borrowing rate of 5.36%.

In September 2006, we entered into a $435 million term repurchase agreement with Barclays Capital. We are using the facility to acquire AAA-rated mortgage-backed securities. The facility has a term of up to two years and is expected to decrease our liquidity risk by reducing our reliance on short-term repurchase agreement financing.

The following table describes the private-label, non-recourse multi-class mortgage-backed notes that were issued to provide permanent funding of our residential mortgage loans in the quarter ended March 31, 2007, as of the transaction execution date (in thousands):

|  | LUM 2007-1 |
| --- | --- |
| Transaction execution date | 1/25/07 |
| Loans, unpaid principal balance | $706,841 |
| Mortgage-backed notes issued to third parties | 691,383 |
| Debt retained | $ 15,458 |

At March 31, 2007, we had mortgage-backed notes totaling $4.3 billion with a weighted-average borrowing rate of 5.56%. The borrowing rates of the mortgage-backed notes reset monthly based on one-month LIBOR with the exception of $0.2 billion of non-retained mortgage-backed notes that, like the underlying loan collateral, are fixed for a period of 3 to 5 and years then become variable based on the average rates of the underlying loans which will adjust based on LIBOR.

We have a margin lending facility with our primary custodian from which we may borrow money in connection with the purchase or sale of securities. The terms of our borrowings, including the rate of interest payable, are agreed to with the custodian for each amount borrowed. Borrowings are repayable upon demand by the custodian. No borrowings were outstanding under the margin lending facility at March 31, 2007 or December 31, 2006.

In 2005, we completed two trust preferred security offerings in the aggregate amount of $90.0 million, providing long-term financing for our balance sheet. We received proceeds, net of debt issuance costs, from the preferred securities offerings in the amount of $87.2 million.

We manage the levels of the financing liabilities funding our portfolios based on recourse leverage. At March 31, 2007, our recourse leverage ratio, defined as recourse financing liabilities as a ratio of stockholders' equity plus long-term debt, was 7.1x. We generally seek to maintain an overall borrowing recourse leverage of less than 10 times the amount of our equity and long-term debt. We actively manage our capital efficiency through our liability structure, including the non-recourse mortgage-backed notes and CDOs issued to finance our securitized

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

loans-held-for investment and mortgage-backed securities, in order to manage our liquidity and interest rate related risks.

For liquidity, we also rely on cash flows from operations, primarily monthly principal and interest payments to be received on our mortgage-backed securities and mortgage loans, as well as any primary securities offerings authorized by our board of directors.

On May 9, 2007, we paid a cash distribution of $0.30 per share to our stockholders of record on April 11, 2007. This distribution is a taxable dividend and is not considered a return of capital. We did not distribute an estimated $4.4 million of our REIT taxable net income for the year ended December 31, 2006. We intend to declare a spillback distribution during 2007 after we finalize our tax return for the year ended December 31, 2006.

We believe that equity capital, combined with our cash flows from operations, securitizations and the utilization of borrowings, will be sufficient to enable us to meet anticipated liquidity requirements. If our cash resources are at any time insufficient to satisfy our liquidity requirements, we may be required to liquidate mortgage-related assets or sell debt or additional equity securities. If required, the sale of mortgage-related assets at prices lower than the carrying value of such assets could result in losses and reduced income.

We have a shelf registration statement on Form S-3 that was declared effective by the SEC on January 21, 2005. Under this shelf registration statement, we may offer and sell any combination of common stock, preferred stock, warrants to purchase common stock, preferred stock or debt securities in one or more offerings up to total proceeds of $500.0 million. Each time we offer to sell securities, a supplement to the prospectus will be provided containing specific information about the terms of that offering. On February 7, 2005, we entered into a Controlled Equity Offering Sales Agreement with Cantor Fitzgerald & Co., or Cantor Fitzgerald, through which we may sell common stock or preferred stock from time to time through Cantor Fitzgerald acting as agent and/or principal in privately negotiated and/or at-the-market transactions under this shelf registration statement. During the year ended December 31, 2006, we sold approximately 1.7 million shares of our common stock pursuant to this agreement resulting in net proceeds of approximately $17.2 million. In addition, on October 13, 2006, we issued 6.9 million shares of our common stock at $10.25 per share as a result of completing a public offering pursuant to this shelf registration statement. At December 31, 2006, total proceeds of up to $380.5 million remain available to us to offer and sell under this shelf registration statement.

We also have a shelf registration statement on Form S-3 with respect to our Direct Stock Purchase and Dividend Reinvestment Plan, or the Plan, which was declared effective by the SEC on June 28, 2005. The Plan offers stockholders, or persons who agree to become stockholders, the option to purchase shares of our common stock and/or to automatically reinvest all or a portion of their quarterly dividends in our shares. Through March 31, 2007, we issued no new shares of common stock through the Plan.

In November 2005, we announced a stock repurchase program permitting us to acquire up to 2,000,000 shares of our common stock. In February 2006, we announced an additional stock repurchase program to acquire an incremental 3,000,000 shares. During the year ended December 31, 2006, we repurchased a total of 1,919,235 shares at a weighted-average price of $8.22 per share. From the inception of our repurchase program through December 31, 2006, we have repurchased a total of 2,594,285 shares at a weighted-average price of $8.00 per share. We will, at our discretion, purchase shares at prevailing prices through open market transactions subject to the provisions of SEC Rule 10b-18 and in privately negotiated transactions. No shares were repurchased during the quarter ended March 31, 2007. On April 11, 2007, we announced the adoption of a stock repurchase plan in accordance with guidelines specified under Rule 10b5-1 of the Securities Exchange Act of 1934. Rule 10b5-1 allows a public company to adopt a written, prearranged stock repurchase plan when it does not have material, non-public information in its possession. The adoption of this stock repurchase plan will allow us to repurchase shares during periods when we otherwise might be prevented from doing so under insider trading laws or because of self-imposed trading blackout periods. On May 7, 2007, our board of directors approved an authorization to repurchase an additional 5,000,000 shares of common stock. We repurchased a total of 2,194,900 shares under repurchase programs through May 9, 2007.

In July 2006, we announced that our $2.5 billion securitization shelf registration statement filed on Form S-3

49

Table of Contents

was declared effective by the SEC. Under this shelf registration statement, we may administer our own securitizations by offering securities collateralized by loans we acquire. Each time we offer to sell securities, a supplement to the prospectus will be provided containing specific information about the terms of that offering. Both LUM 2006-6 and LUM 2006-7 securitizations were completed under this shelf registration statement. At December 31, 2006, total proceeds of up to $0.9 billion remained available to us to offer and sell under this shelf registration statement. In January 2007, our $0.7 billion securitization LUM 2007-1 was completed under this shelf registration statement. Amendment No. 1 to this shelf registration statement for an additional $2.5 billion was declared effective by the SEC on February 28, 2007.

We may increase our capital resources by making additional offerings of equity and debt securities, possibly including classes of preferred stock, common stock, medium-term notes, collateralized mortgage obligations and senior or subordinated notes. Such financings will depend on market conditions for raising capital and for the investment of any net proceeds from such capital raises. All debt securities, other borrowings and classes of preferred stock will be senior to our common stock if we were to liquidate.

## Inflation

Virtually all of our assets and liabilities are financial in nature. As a result, interest rates and other factors influence our performance far more so than inflation does. Changes in interest rates do not necessarily correlate with inflation rates or changes in inflation rates. Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States, and our distributions are determined by our board of directors primarily based on our REIT taxable net income as calculated pursuant to the Code; in each case, our activities and balance sheet are measured with reference to historical cost and/or fair market value without considering inflation.

## Contractual Obligations and Commitments

The table below summarizes our contractual obligations at March 31, 2007. The table excludes unamortized discounts and premiums as well as accrued interest payable, and derivative contracts because those contracts do not have fixed and determinable payments:

| (in millions) | Total | Less than 1 year | 1 – 3 years | 3 – 5 years | More than 5 years |
|---|---|---|---|---|---|
| Mortgage-backed notes (1) | $ 4,270.9 | $ 992.7 | $ 1,975.1 | $ 1,205.8 | $ 97.3 |
| Repurchase agreements | 2,880.7 | 2,572.9 | 307.8 | — | — |
| Warehouse lending facilities | 403.2 | 403.2 | — | — | — |
| Commercial paper | 621.8 | 621.8 | — | — | — |
| CDOs (1) | 271.0 | 0.5 | 48.5 | 128.3 | 93.7 |
| Junior subordinated notes | 92.8 | — | — | — | 92.8 |
| Facilities leases | 1.0 | 0.2 | 0.4 | 0.3 | 0.1 |
| Total | $ 8,541.4 | $ 4,591.3 | $ 2,331.8 | $ 1,334.4 | $ 283.9 |

(1)  The mortgage-backed notes and CDOs have stated maturities through 2047; however, the expected maturity is subject to change based on the prepayments and loan losses of the underlying mortgage loans or mortgage-backed securities. In addition, we may exercise a redemption option and thereby effect termination and early retirement of the debt. The payments represented reflect our assumptions for prepayment and credit losses at March 31, 2007 and assume we will exercise our redemption option.

## Off-Balance Sheet Arrangements

In 2005, we completed two trust preferred securities offerings in the aggregate amount of $90.0 million. We received proceeds, net of debt issuance costs, from the preferred securities offerings in the amount of $87.2 million. We believe that none of the commitments of these unconsolidated special purpose entities expose us to any greater loss than is already reflected on our consolidated balance sheet. See Note 4 to our consolidated financial

50

Table of Contents

statements in Item 1 of this Form 10-Q for further discussion about the preferred securities of subsidiary trusts and junior subordinated notes.

Item 3. Quantitative and Qualitative Disclosures About Market Risk.

The primary components of our market risk are credit risk and interest rate risk as described below. While we do not seek to avoid risk completely, we do seek to assume risk that can be quantified from historical experience, to manage that risk, to earn sufficient compensation to justify taking those risks and to maintain capital levels consistent with the risks we undertake or to which we are exposed.

## Credit Risk

We are subject to credit risk in connection with our investments in residential mortgage loans and credit sensitive mortgage-backed securities and other asset-backed securities rated below AAA. The credit risk related to these investments pertains to the ability and willingness of the borrowers to pay, which is assessed before credit is granted or renewed and periodically reviewed throughout the loan or security term. We believe that loan credit quality is primarily determined by the borrowers' credit profiles and loan characteristics.

We use a comprehensive credit review process. Our analysis of loans includes borrower profiles, as well as valuation and appraisal data. Our resources include sophisticated industry and rating agency software. We also outsource underwriting services to review higher risk loans, either due to borrower credit profiles or collateral valuation issues. In addition to statistical sampling techniques, we create adverse credit and valuation samples, which we individually review. We reject loans that fail to conform to our standards. We accept only those loans that meet our careful underwriting criteria.

Once we own a loan, our surveillance process includes ongoing analysis through our proprietary data warehouse and servicer files. We are proactive in our analysis of payment behavior and in loss mitigation through our servicing relationships.

We are also subject to credit risk in connection with our investments in mortgage-backed securities in our Spread portfolio, which is mitigated by holding securities that are either guaranteed by government or government-sponsored agencies or have credit ratings of AAA.

### Concentration Risk

Inadequate diversification of our loan portfolio, such as geographic regions, may result in losses. As part of our underwriting process, we diversify the geographic concentration risk exposure in our portfolios.

## Interest Rate Risk

We are subject to interest rate risk in connection with our investments in residential mortgage loans, adjustable-rate, hybrid adjustable-rate and fixed-rate mortgage-backed securities and our related debt obligations, which include mortgage-backed notes, warehouse lending facilities, derivative contracts and repurchase agreements.

### Effect on Net Interest Income

We finance our mortgage loans held-for-investment through a combination of warehouse lending facilities initially, and non-recourse mortgage-backed notes following the securitization of our loans. Our mortgage loan assets consist of a combination of adjustable-rate mortgage loans and hybrid adjustable-rate mortgage loans. The interest rates on our warehouse lending facilities and non-recourse mortgage-backed notes generally reset on a monthly basis. In general, we use derivative contracts to match-fund the cost of our related borrowings with the income that we expect to earn from our hybrid adjustable-rate mortgage loans that currently have fixed coupon rates. If our hedging activities are effective, over a variety of interest rate scenarios the change in income from our

51

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

mortgage loans held-for-investment, plus the benefit or cost of our related hedging activities, will generally offset the change in the cost of our related borrowings such that the net interest spread from our mortgage loans will remain substantially unchanged.

We finance our adjustable-rate, hybrid adjustable-rate and fixed-rate mortgage-backed securities with short-term borrowings under repurchase agreements. During periods of rising interest rates, the borrowing costs associated with hybrid-adjustable rate (during the fixed-rate component of such securities) and fixed-rate mortgage-backed securities tend to increase while the income earned on such hybrid adjustable-rate and fixed-rate mortgage-backed securities may remain substantially unchanged. This effect results in a narrowing of the net interest spread between the related assets and borrowings with respect to our hybrid adjustable-rate and fixed-rate mortgage-backed securities and may even result in losses. With respect to our adjustable-rate mortgage-backed securities, during a period of rising interest rates the adjustable coupon rates on our adjustable-rate mortgage-backed securities would increase along with the increase in their related borrowing costs such that the net interest spread on these assets would remain substantially unchanged.

As a means to mitigate the negative impact of a rising interest rate environment on the net interest spread of our hybrid adjustable-rate and fixed-rate mortgage-backed securities, we may enter into derivative contracts, such as Eurodollar futures contracts, interest rate swap contracts and interest rate cap contracts. Hedging techniques are based, in part, on assumed levels of prepayments of the hybrid adjustable-rate and fixed-rate mortgage-backed securities that are being hedged. If actual prepayments are slower or faster than assumed, the life of the hybrid adjustable-rate and fixed-rate mortgage-backed securities being hedged will be longer or shorter, which could reduce the effectiveness of any hedging strategies that we may utilize and may result in losses on such transactions. Hedging strategies involving the use of derivative securities are highly complex and may produce volatile returns.

All of our hedging activities are also limited by the asset and sources-of-income requirements applicable to us as a REIT.

*Extension Risk*

Hybrid adjustable-rate mortgage loans and hybrid adjustable-rate mortgage-backed securities have interest rates that are fixed for the first few years of the mortgage loan or mortgage-backed security — typically three, five, seven or 10 years — and thereafter their interest rates reset periodically. At March 31, 2007, 18.2% of our total mortgage assets were comprised of hybrid adjustable-rate mortgage loans and we held no hybrid adjustable-rate mortgage-backed securities. We compute the projected weighted-average life of our hybrid adjustable-rate mortgage loans and mortgage-backed securities based on the market's assumptions regarding the rate at which the borrowers will prepay our hybrid adjustable-rate mortgage loans and the mortgage loans underlying our hybrid adjustable-rate mortgage-backed securities. During a period of interest rate increases, prepayment rates on our hybrid adjustable-rate mortgage loans and the mortgage loans underlying our hybrid adjustable-rate mortgage-backed securities may decrease and cause the weighted-average life of our hybrid adjustable-rate mortgage loans and hybrid adjustable-rate mortgage-backed securities to lengthen. During a period of interest rate decreases, prepayment rates on our hybrid adjustable-rate mortgage loans and the mortgage loans underlying our hybrid adjustable-rate mortgage-backed securities may increase and cause the weighted-average life of our hybrid adjustable-rate mortgage loans and hybrid adjustable-rate mortgage-backed securities to shorten. The possibility that our hybrid adjustable-rate mortgage loans and hybrid adjustable-rate mortgage-backed securities may lengthen due to slower prepayment activity is commonly known as "extension risk." See Prepayment Risk below.

When we acquire hybrid adjustable-rate mortgage loans or hybrid adjustable-rate mortgage-backed securities, and finance them with borrowings, we may, but are not required to, enter into derivative contracts to effectively fix, or hedge, our borrowing costs for a period close to the anticipated weighted-average life of the fixed-rate portion of the related hybrid adjustable-rate mortgage loan or hybrid adjustable-rate mortgage-backed security. This hedging strategy is designed to protect us from rising interest rates because the borrowing costs are fixed for the duration of the fixed-rate portion of the related hybrid adjustable-rate mortgage loan or hybrid adjustable-rate mortgage-backed security. Depending upon the type of derivative contract that we use to hedge these borrowing costs however, extension risk related to the hybrid adjustable-rate mortgage loans or hybrid adjustable-rate

52

Table of Contents

mortgage-backed securities being hedged may cause a mismatch with the hedging instruments and negatively impact the desired result from our hedging activities. In extreme situations, we may be forced to sell assets and incur losses to maintain adequate liquidity.

Certain mortgage loans that we purchase directly and certain mortgage loans collateralizing mortgage-backed securities that we purchase permit negative amortization. A negative amortization provision in a mortgage loan allows the borrower to defer payment of a portion or all of the monthly interest accrued on the mortgage loan and to add the deferred interest amount to the principal balance of the mortgage loan. As a result, during periods of negative amortization, the principal balances of negatively amortizing mortgage loans will increase and their weighted-average lives will extend.

### Interest Rate Cap Risk

We also invest in residential mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities that are based on mortgages that are typically subject to periodic and lifetime interest rate caps. These interest rate caps limit the amount by which the coupon rate of these mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities may change during any given period.

However, the borrowing costs related to our mortgage assets are not subject to similar restrictions. Therefore, in a period of increasing interest rates, interest rate costs on the borrowings for our mortgage assets could increase without the limitation of interest rate caps, while the corresponding increase in coupon rates on our residential mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities could be limited by interest rate caps. This problem will be magnified to the extent that we acquire mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities that are not based on mortgages that are fully-indexed.

In addition, our residential mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities may be subject to periodic payment caps that result in some portion of the interest being deferred and added to the principal outstanding. The presence of these payment caps could result in our receipt of less cash income on our residential mortgage loans and adjustable-rate and hybrid adjustable-rate mortgage-backed securities than we need in order to pay the interest cost on our related borrowings. These factors could lower our net interest income or cause a net loss during periods of rising interest rates, which would negatively impact our financial condition, cash flows and results of operations.

We may purchase a variety of hedging instruments to mitigate these risks.

### Prepayment Risk

Prepayments are the full or partial unscheduled repayment of principal prior to the original term to maturity of a loan. Prepayment rates for mortgage loans and mortgage loans underlying mortgage-backed securities generally increase when prevailing interest rates fall below the market rate existing when the mortgages were originated. Prepayment rates on adjustable-rate and hybrid adjustable-rate mortgage-backed securities generally increase when the difference between long-term and short-term interest rates declines or becomes negative. Prepayments of mortgage-backed securities could harm our results of operations in several ways. Some of our adjustable-rate mortgage loans and the mortgage loans underlying our adjustable-rate mortgage-backed securities may bear initial "teaser" interest rates that are lower than their "fully-indexed" rate, which refers to the applicable index rates plus a margin. In the event that we owned such an adjustable-rate mortgage loan or adjustable-rate mortgage-backed security and it is prepaid prior to or soon after the time of adjustment to a fully-indexed rate, then we would have held such loan or security while it was less profitable and lost the opportunity to receive interest at the fully-indexed rate over the expected life of the mortgage loan or adjustable-rate mortgage-backed security. In addition, we currently own mortgage loans and mortgage-backed securities that were purchased at a premium. The prepayment of such mortgage loans and mortgage-backed securities at a rate faster than anticipated would result in a write-off of any remaining capitalized premium amount and a consequent reduction of our net interest income by such amount. Finally, in the event that we are unable to acquire new mortgage loans and mortgage-backed securities to replace the

53

Table of Contents

prepaid mortgage loans and mortgage-backed securities, our financial condition, cash flow and results of operations could be negatively impacted. At March 31, 2007, 61% of our mortgage loans contained prepayment penalty provisions. Generally, mortgage loans with prepayment penalty provisions are less likely to prepay than mortgage loans without prepayment penalty provisions.

### Risk Management

To the extent consistent with maintaining our status as a REIT, we seek to manage our interest rate risk exposure to protect our portfolio of mortgage-backed securities and related debt against the effects of major interest rate changes. We generally seek to manage our interest rate risk by:

- monitoring and adjusting, if necessary, the reset index and interest rate related to our mortgage-backed securities and our borrowings;

- attempting to structure our borrowing agreements to have a range of different maturities, terms, amortizations and interest rate adjustment periods;

- using derivatives, financial futures, swaps, options, caps, floors and forward sales to adjust the interest rate sensitivity of our mortgage-backed securities and our borrowings; and

- actively managing, on an aggregate basis, the interest rate indices, interest rate adjustment periods and gross reset margins of our mortgage-backed securities and the interest rate indices and adjustment periods of our borrowings.

We primarily assess our interest rate risk by estimating the duration of our assets, liabilities and hedging instruments. Duration essentially measures the market price volatility of financial instruments as interest rates change. We generally calculate duration using various financial models and empirical data. Different models and methodologies can produce different duration numbers for the same financial instruments. We reduce our sensitivity to interest rates by matching the income we earn on our mortgage assets with the cost of our related liabilities. We also engage in various hedging activities designed to match the terms of our assets and liabilities more closely. In general, we manage our net asset/liability duration gap to less than six months. Our net asset/liability duration gap is defined as the estimated maturity or repricing of our mortgage assets less the estimated maturity or repricing of our borrowings and derivative instruments. The closer the net asset/liability duration gap is to zero, the less impact interest rate changes will have on the market value of our portfolio and net interest income. A positive net asset/liability duration gap indicates that in a period of rising interest rates the market value of our portfolio and net interest income would rise. A negative net asset/liability duration gap will generate opposite results. Our net asset/liability duration gap was approximately one month at March 31, 2007.

Item 4. Controls and Procedures.

### Conclusion Regarding Disclosure Controls and Procedures

At March 31, 2007, our principal executive officer and our principal financial officer have performed an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Exchange Act, and concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and our disclosure controls and procedures are also effective to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, to allow timely decisions regarding required disclosure.

54

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

### *Changes in Internal Control Over Financial Reporting*

There were no material changes in our internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act) that occurred during the first quarter of our fiscal year ending December 31, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

55

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

PART II

OTHER INFORMATION

Item 1. Legal Proceedings.

At March 31, 2007, no legal proceedings were pending to which we were party or of which any of our properties were subject.

Item 1A. Risk Factors

For additional risk factor information about us, please refer to Item 1A of our Form 10-K for the year ended December 31, 2006, which is incorporated herein by reference.

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

None

Item 3. Defaults Upon Senior Notes.

None.

Item 4. Submission of Matters to a Vote of Security Holders.

None

Item 5. Other Information.

On May 7, 2007, our board of directors appointed S. Trezevant Moore, Jr. as our Chief Executive Officer effective May 10, 2007. Mr. Moore succeeds Gail P. Seneca, who continues as our Chairman of the Board.

Mr. Moore has served as our President and Chief Operating Officer since March 2005 and as a member of our board of directors since November 2005. For five years prior to joining us in March 2005, Mr. Moore was the executive vice president of capital markets for Radian Guaranty Inc. Prior to his service at Radian, Mr. Moore held several senior level positions in the mortgage industry, including First Union National Bank from 1977 to 2000, Nationsbanc Capital Markets from 1994 to 1997, Citicorp Securities from 1989 to 1994 and First Boston from 1984 to 1989. Mr. Moore is a director of Donegal Group Inc.

Effective May 10, 2007, we entered into an amended and restated employment agreement with Ms. Seneca with a term that continues until December 31, 2008. Under the agreement, Ms. Seneca is entitled to receive an annual base salary of $300,000 and on January 1, 2008, a restricted stock award of 50,000 shares or our common stock, which will vest in two installments commencing January 1, 2009, unless and earlier acceleration of vesting occurs as specified in the agreement. The agreement is filed with this 10-Q as an exhibit, and terms of the agreement are incorporated by reference into this item 5.

Item 6. Exhibits.

The exhibits listed on the Exhibit Index (following the Signatures section of this report) are included, or incorporated by reference, in this Form 10-Q.

56

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LUMINENT MORTGAGE CAPITAL, INC.

By:     /s/ S. TREZEVANT MOORE
        S. Trezevant Moore
        Chief Executive Officer
        (Principal Executive Officer)

Date:   May 10, 2007

By:     /s/ CHRISTOPHER J. ZYDA
        Christopher J. Zyda
        Chief Financial Officer
        (Principal Financial and Accounting Officer)

Date:   May 10, 2007
57

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Table of Contents

## EXHIBIT INDEX

Pursuant to Item 601(a) (2) of Regulation S-K, this exhibit index immediately precedes any exhibits filed herewith.

The following exhibits are included, or incorporated by reference, in this Form 10-Q and are numbered in accordance with Item 601 of Regulation S-K.

| Exhibit Number | Description |
|---|---|
| 10.1* | Amended and Restated Employment Agreement effective as of May 10, 2007 between the Registrant and Gail P. Seneca. |
| 31.1* | Certification of S. Trezevant Moore, Chief Executive Officer of the Registrant, pursuant to Rule 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Christopher J. Zyda, Chief Financial Officer of the Registrant, pursuant to Rule 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of S. Trezevant Moore, Chief Executive Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Christopher J. Zyda, Chief Financial Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

*Filed herewith.

58

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Exhibit 10.1

AMENDED AND RESTATED
EMPLOYMENT AGREEMENT

AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement") dated as of May 7, 2007 between Luminent Mortgage Capital, Inc., a Maryland corporation having its principal place of business at 101 California Street, Suite 1350, San Francisco, California 94111 (the "Employer") and Gail P. Seneca, whose address is P.O. Box 1018, Inverness, California 94937 (the "Executive").

WITNESSETH:

WHEREAS, the Employer and the Executive wish to amend and restate the employment agreement dated as of December 20, 2005 between the Employer and the Executive; and

WHEREAS, the Employer and the Executive are entering into this Agreement to set forth and confirm their respective rights and obligations with respect to the Executive's continued employment by the Employer;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, the Employer and the Executive, intending to be legally bound hereby, mutually agree as follows:

1. Employment and Term.

(a) Effective as of May 10, 2007 (the "Effective Date"), the Employer shall continue to employ the Executive, and the Executive shall continue to be employed by the Employer, as the Chairman of the Board (the "Position") of the Employer, in accordance with the terms and subject to the conditions set forth in this Agreement for a term (the "Term") that shall commence on the Effective Date and, as provided in and subject to paragraphs 1(b), 1(c), 1(d) and 1(e), shall continue until December 31, 2008.

(b) Unless otherwise provided in this Agreement or agreed by the Employer and the Executive, all of the terms and conditions of this Agreement shall continue in full force and effect throughout the Term and, with respect to those terms and conditions that apply after the Term, after the Term.

(c) Notwithstanding paragraph 1(b), the Employer, by action of its board of directors (the "Board") and effective as specified in a written notice thereof to the Executive in accordance with the terms of this Agreement, shall have the right to terminate the Executive's

employment under this Agreement at any time during the Term, for Cause (as defined in this Agreement) or other than for Cause or on account of the Executive's death or Permanent Disability (as defined in this Agreement), subject to the provisions of this paragraph 1.

    (i) "Cause" shall mean (A) the Executive's willful and continued failure substantially to perform her material duties with the Employer as set forth in this Agreement, or the commission by the Executive of any activities constituting a violation or breach under any material federal, state or local law or regulation applicable to the activities of the Employer, in each case, after written notice thereof from the Employer to the Executive and a reasonable opportunity for the Executive to cease such failure, breach or violation in all material respects, (B) fraud, breach of fiduciary duty, dishonesty, misappropriation or other actions that cause intentional material damage to the property or business of the Employer by the Executive, (C) the Executive's repeated absences from work such that she is unable to perform her duties hereunder in all material respects other than for physical or mental impairment or illness which the Executive fails to cure after written notice or (D) the Executive's admission or conviction of, or plea of nolo contendere to, any felony or any other crime that, in the reasonable judgment of the Board, has a material adverse effect on the Executive's ability to carry out her obligations under this Agreement. Notwithstanding the foregoing, the Employer may not terminate the Executive's employment under this Agreement for Cause unless the Executive is given (A) written notice, in accordance with the by-laws of the Employer, of a special meeting of the Board to consider the termination of the Executive's employment under this Agreement for Cause and (B) the opportunity for the Executive to address such special meeting.

    (ii) "Permanent Disability" shall mean a physical or mental disability such that the Executive is substantially unable to perform the duties of the Position and the nonperformance of such duties has continued for a period of 240 consecutive days, provided, however, that in order to terminate the Executive's employment under this Agreement on account of the Executive's Permanent Disability, the Employer must provide the Executive with written notice of the Board's good faith determination to terminate the Executive's employment under this Agreement for reason of the Executive's Permanent Disability not less than 30 days prior to such termination, which notice shall specify the date of termination. Until the specified effective date of termination by reason of the Executive's Permanent Disability, the Executive shall continue to receive compensation at the rates set forth in paragraph 3. No termination of the Executive's employment under this Agreement because of the Executive's Permanent Disability shall impair any rights of the Executive under any disability insurance policy maintained by the Employer at the commencement of the aforesaid 240-day period.

    (d) The Executive shall have the right to terminate her employment under this Agreement at any time during the Term for Good Reason or without Good Reason, or in

-2-

the event a Change of Control occurs, all as specified in a written notice thereof to the Employer in accordance with the terms of this Agreement. As used herein:

(i) "Good Reason" shall mean (A) the Executive's Position or the scope of the Executive's authority, duties or responsibilities as described in this Agreement are materially diminished without the Executive's written consent, excluding for this purpose any action that was not taken by the Employer in bad faith and that is remedied by the Employer promptly following written notice thereof from the Executive to the Employer; (B) a material breach by Employer of its obligations to the Executive under this Agreement, which breach is not cured in all material respects to the reasonable satisfaction of the Executive within 30 days (except in the case of a payment default for which the cure period shall be 10 days), in each case following written notice thereof from the Executive to the Employer or (C) any termination of the Executive's employment under this Agreement without Cause.

(ii) As used herein, "Change of Control" shall mean (A) the acquisition of shares of the Employer by any "person" or "group" (as such terms are used in Rule 13d-3 under the Securities Exchange Act of 1934 as now or hereafter amended) in a transaction or series of transactions that result in such person or group directly or indirectly becoming the beneficial owner of 25% or more of the Employer's Common Stock after the date of this Agreement, (B) the consummation of a merger or other business combination after which the holders of voting capital stock of the Employer do not collectively own 60% or more of the voting capital stock of the entity surviving such merger or other business combination, (C) the sale, lease, exchange or other transfer in a transaction or series of transactions of all or substantially all of the assets of the Employer, but excluding therefrom the sale and reinvestment of the Employer's investment portfolio or (D) as the result of or in connection with any cash tender offer or exchange offer, merger or other business combination, sale of assets or contested election of directors or any combination of the foregoing transactions (a "Transaction"), the persons who constituted a majority of the members of the Board on the date of this Agreement and persons whose election as members of the Board was approved by such members then still in office or whose election was previously so approved after the date of this Agreement, but before the event that constitutes a Change of Control, no longer constitute such a majority of the members of the Board then in office. A Transaction constituting a Change in Control shall only be deemed to have occurred upon the closing of the Transaction.

(e) (i) If the Employer terminates the Executive's employment under this Agreement for any reason other than Cause and said termination occurs as of a date that is within 270 days preceding or within 180 days after the consummation of a Change of Control (such 270-day period or such 180-period being referred to in this Agreement as a "Change of Control Period"), (B) this Agreement is terminated as a result of the death or disability of the Executive effective as of a date within a Change of Control Period, (C) the Executive

-3-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

terminates her employment under this Agreement for Good Reason effective as of a date within a Change of Control Period or (D) the Executive terminates her employment under this Agreement within 180 days after the consummation of a Change of Control, the Employer shall pay to the Executive or her Estate promptly after the event giving rise to such payment occurs an amount equal to the sum of (x)(1) the Executive's Base Salary (as defined in this Agreement) accrued through the date the termination of the Executive's employment under this Agreement is effective and (2) any amount in respect of excise taxes required to be paid to the Executive pursuant to paragraphs 1(f) or 1(g), with such payments, rights and benefits described in clauses (x)(1) and (x)(2) being collectively referred to in this Agreement as the "Accrued Obligations," (y) an amount equal to the aggregate premium that would be payable by the Executive to maintain in effect throughout the period (the "Subsequent Period") from the date of the termination of the Executive's employment under this Agreement through the remainder of the Term (assuming no increase in insurance premium rates) the same medical, health, disability and life insurance provided by the Employer immediately prior to the date of such termination (the "Benefit Obligations") and (z) $1,000,000.

(ii) If (A) the Employer terminates the Executive's employment under this Agreement for any reason other than for Cause effective as of a date that is not within a Change of Control Period or (B) the Executive terminates her employment under this Agreement for Good Reason effective as of a date that is not within a Change of Control Period, the Employer shall pay to the Executive promptly after the event giving rise to such payment occurs an amount equal to the sum of (x) (1) the Accrued Obligations, (y) the Benefit Obligations and (z) the Executive's annual Base Salary as of the effective date of termination of the Executive's employment for the Subsequent Period.

(iii) If (A) the Employer terminates the Executive's employment under this Agreement for Cause, (B) the Executive terminates her employment under this Agreement for any reason other than Good Reason, her death or the Executive's Permanent Disability or (C) this Agreement is terminated by the Employer as a result of the death or Permanent Disability of the Executive, the sole obligation of the Employer shall be to pay the Accrued Obligations to the Executive or her estate.

(f) In the event that the independent public accountants of the Employer or the Internal Revenue Service determines that any payment, coverage or benefit provided to the Executive pursuant to this Agreement is subject to the excise tax imposed by Sections 280G and 4999 of the Internal Revenue Code of 1986, as amended (the "Code") or any successor provision thereof or any interest or penalties incurred by the Executive with respect to such excise tax, the Employer, within 30 days thereafter, shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amount payable under this paragraph

-4-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

1(f), upon the receipt of the payments provided for by this Agreement be no less advantageous to the Executive than the net after tax position to the Executive that would have been obtained had Sections 280G and 4999 of the Code not been applicable to such payment, coverage or benefits. Except as otherwise provided in this Agreement, all determinations to be made under this paragraph 1(f) shall be made by tax counsel whose selection shall be reasonably acceptable to the Executive and the Employer and whose fees and costs shall be paid for by the Employer.

(g) In the event that the independent public accountants of the Employer or the Internal Revenue Service determines that any payment, coverage or benefit due or owing to the Executive pursuant to this Agreement is subject to the excise tax imposed by Section 409A of the Code or any successor provision thereof or any interest or penalties, including interest imposed under Section 409A(1)(B)(i)(I) of the Code, incurred by the Executive as a result of the application of such provision, the Employer, within 30 days thereafter, shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts paid under this paragraph 1(g), being no less advantageous to the Executive than the net after tax position to the Executive that would have been obtained had Section 409A of the Code not been applicable to such payment, coverage or benefits. Except as otherwise provided in this Agreement, all determinations to be made under this paragraph 1(g) shall be made by tax counsel whose selection shall be reasonably acceptable to the Executive and the Employer and whose fees and costs shall be paid for by the Employer.

(h) Any notice of termination of the employment of the Executive under this Agreement by the Employer to the Executive or by the Executive to the Employer shall be given in accordance with the provisions of paragraph 9.

(i) The Employer agrees to reimburse the Executive for the reasonable fees and expenses of the Executive's attorneys and for court and related costs in any proceeding to enforce the provisions of this Agreement in which the Executive is successful on the merits.

2. Duties of the Executive. Subject to the ultimate control and discretion of the Board of the Employer, the Executive shall serve in the Position and perform all duties and services commensurate with the Position. Throughout the Term, the Executive shall perform all duties reasonably assigned or delegated to her under the by-laws of the Employer or from time to time by the Board consistent with the Position. Except for travel normally incidental and reasonably necessary to the business of the Employer and the duties of the Executive under this Agreement, the duties of the Executive shall be performed in the greater San Francisco, California metropolitan area. The Executive shall be free to engage in any other business activities during the Term provided that such business activities do not materially impair her performance of the duties of the Position.

-5-

3. <u>Compensation</u>. For all services to be rendered by the Executive under this Agreement:

(a) <u>Base Salary</u>. The Employer shall pay the Executive a base salary (the "Base Salary") at an annual rate of $300,000, plus such other compensation as may, from time to time, be determined by the Employer. At the end of each fiscal year of the Employer, the Employer shall review the amount of the Executive's Base Salary, and shall increase such Base Salary for the following year to such amount as the Board may determine in its discretion. Such Base Salary and other compensation shall be payable in accordance with the Employer's normal payroll practices as in effect from time to time.

(b) <u>Restricted Stock Award</u>. Effective as of January 1, 2008, the Employer shall make a restricted stock award to the Executive of 50,000 shares (the "Award") of the Employer's Common Stock (the "Shares"). The Award shall be evidenced by a Restricted Stock Award Agreement between the Employer and the Executive in substantially the form thereof currently in use by the Employer. The Award and the Restricted Stock Award Agreement shall have the following other principal terms:

(i) the Shares under the Award shall become vested, and remain vested from and after the Effective Date, in three cumulative installments as follows:

(A) the first installment, consisting of one-half of the Shares, shall become vested from and after December 31, 2008; and

(B) the second installment, consisting of an additional one-half of the Shares, shall become vested from and after December 31, 2009.

(ii) the Shares under the Award shall become vested pursuant to paragraphs 3(b)(i)(A) and (B) regardless of whether this Agreement extends beyond the Term;

(iii) the Shares, and any other shares of the Employer's Common Stock held under prior or subsequent restricted stock awards made to the Executive by the Employer, shall become immediately vested in full and shall remain vested in the event of (A) a Change of Control (as defined herein), (B) a termination of the employment of the Executive by the Employer under this Agreement without Cause or (C) a termination of the employment of the Executive under this Agreement by the Executive for Good Reason;

(iv) any unvested Shares shall revert to the Employer immediately in the event of (A) a termination of the employment of the Executive under this Agreement by the Employer for Cause or (B) a termination of the employment of the Executive under this Agreement by the Executive without Good Reason; and

-6-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

(v) The Executive shall have the right by notice to the Employer to require that the Employer purchase from the Executive that number of vested shares of the Employer's Common Stock at a price per share equal to the average closing price of the Employer's Common Stock on the New York Stock Exchange for the 20 days preceding the Executive's notice of purchase, as is necessary to provide the Executive with sufficient funds to pay applicable federal and state income taxes resulting from the vesting of Shares under the Awards, subject to the prior approval by the Compensation Committee of the Employer's Board of Directors of the price per share at the time of each such purchase.

(c) The Executive shall be entitled to continue to receive all of the employee fringe benefits currently received from the Employer as well as any other employee fringe benefits the Employer makes available to its other executive officers, subject to the terms and conditions of the applicable benefit plans.

(d) The Employer shall provide the Executive with office space and administrative support at its offices during the Term.

4. Expenses. The Employer shall promptly reimburse the Executive for (a) all reasonable expenses paid or incurred by the Executive in connection with the performance of the Executive's duties and responsibilities under this Agreement, upon presentation of expense vouchers or other appropriate documentation therefor and (b) all reasonable professional expenses, such as licenses and dues and professional educational expenses, paid or incurred by the Executive during the Term.

5. Indemnification. Notwithstanding anything in the Employer's certificate of incorporation or its by-laws to the contrary, the Executive shall at all times during her employment by the Employer, and thereafter, be indemnified by the Employer to the fullest extent permitted by applicable law for any matter in any way relating to the Executive's affiliation with the Employer and its subsidiaries.

6. Confidential Information. The Executive understands that, in the course of her employment by the Employer, the Executive will receive confidential information concerning the business of the Employer and that the Employer desires to protect. The Executive agrees that she will not at any time during or after the period of her employment by the Employer reveal to anyone outside the Employer, except as required by law, or use for her own benefit, any such information that has been designated as confidential by the Employer or understood by the Executive to be confidential without specific written authorization by the Employer. Upon termination of this Agreement, and upon the request of the Employer, the Executive shall promptly deliver to the Employer any and all written materials, records and documents, including all copies thereof, made by the Executive or coming into her possession during the Term and retained by the Executive containing or concerning confidential information of the Employer and all other written materials furnished to and retained by the

-7-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

Executive by the Employer for her use during the Term, including all copies thereof, whether of a confidential nature or otherwise.

7. Entire Agreement; Amendment. This Agreement and any Restricted Stock Award Agreements between the parties contain the entire agreement between the Employer and the Executive with respect to the subject matter hereof, and may not be amended, waived, changed, modified or discharged except by an instrument in writing executed by the Employer and the Executive.

8. Assignability. The services of the Executive under this Agreement are personal in nature, and neither this Agreement nor the rights or obligations of the Employer under this Agreement may be assigned by the Employer, whether by operation of law or otherwise, without the Executive's prior written consent. This Agreement shall be binding upon, and inure to the benefit of, the Employer and its permitted successors and assigns under this Agreement. This Agreement shall not be assignable by the Executive, but shall inure to the benefit of the Executive's heirs, executors, administrators and legal representatives.

9. Notice. Any notice that may be given under this Agreement shall be in writing and be deemed given when hand delivered and acknowledged or, if mailed, one day after mailing by registered or certified mail, return receipt requested, or if delivered by an overnight delivery service, one day after the notice is delivered to such service, to either the Employer or the Executive at their respective addresses stated above, or at such other address as the Executive or the Employer may by similar notice designate.

10. Specific Performance. The Employer and the Executive agree that irreparable damage would occur in the event that any of the provisions of paragraph 6 were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of paragraph 6 and to enforce specifically the terms and provisions of paragraph 6, this being in addition to any other remedy to which any party is entitled at law or in equity.

11. No Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any person or entity other than the parties (and the Executive's heirs, executors, administrators and legal representatives and the permitted transferees of the Shares) any rights or remedies of any nature under or by reason of this Agreement.

12. Successor Liability. The Employer shall require any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Employer to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Employer would be required to perform it if no such succession had taken place.

-8-

13. <u>Mitigation</u>. The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this Agreement be reduced by any compensation earned by the Executive as the result of employment by another employer or by retirement benefits payable after the termination of this Agreement.

14. <u>Waiver of Breach</u>. The failure at any time to enforce or exercise any right under any of the provisions of this Agreement or to require at any time performance by the other parties of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement or any part hereof, or the right of any party hereafter to enforce or exercise its rights under each and every provision in accordance with the terms of this Agreement.

15. <u>No Attachment</u>. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge or hypothecation or to execution, attachment, levy or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; provided, however, that nothing in this paragraph 15 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or her estate and their assigning any rights under this Agreement to the person or persons entitled hereto.

16. <u>Severability</u>. The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision hereof shall in no way affect the validity or enforceability of any other provision, or any part thereof, but this Agreement shall be construed as if such invalid or unenforceable term, phrase, clause, paragraph, restriction, covenant, agreement or other provision had never been contained in this Agreement unless the deletion of such term, phrase, clause, paragraph, restriction, covenant, agreement or other provision would result in such a material change as to cause the covenants and agreements contained in this Agreement to be unreasonable or would materially and adversely frustrate the objectives of the Employer and the Executive as expressed in this Agreement.

17. <u>Survival of Benefits</u>. Any provision of this Agreement that provides a benefit to the Executive and that by the express terms hereof does not terminate upon the expiration of the Term shall survive the expiration of the Term and shall remain binding upon the Employer until such time as such benefits are paid in full to the Executive or her estate.

18. <u>Construction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California, without giving effect to principles of conflict of laws. All headings in this Agreement have been inserted solely for convenience of reference only, are not to be considered a part of this Agreement and shall not affect the interpretation of any of the provisions of this Agreement.

-9-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

LUMINENT MORTGAGE CAPITAL, INC.

By: _____

S. Trezevant Moore,
Jr., President and Chief Operating Officer


_____

Gail P. Seneca

-10-

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

**EXHIBIT 31.1**

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
## PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, S. Trezevant Moore, certify that:

1.  I have reviewed this Form 10-Q of Luminent Mortgage Capital, Inc. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: May 10, 2007

By:   /s/ S. TREZEVANT MOORE
      S. Trezevant Moore
      Chief Executive officer
      (Principal Executive Officer)

Source: LUMINENT MORTGAGE CA, 10-Q, May 10, 2007

EXHIBIT 31.2

## CERTIFICATION OF THE CHIEF FINANCIAL OFFICER
## PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Christopher J. Zyda, certify that:

1.  I have reviewed this Form 10-Q of Luminent Mortgage Capital, Inc. (the "Registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: May 10, 2007

By:    /s/ CHRISTOPHER J. ZYDA
       Christopher J. Zyda
       Senior Vice President and Chief Financial
       Officer
       (Principal Financial and Accounting Officer)

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Luminent Mortgage Capital, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, S. Trezevant Moore Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.  The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 10, 2007


By:    /s/ S. TREZEVANT MOORE
       S. Trezevant Moore
       Chief Executive Officer
       (Principal Executive Officer)


A signed original of this written statement required by Section 906 has been provided to Luminent Mortgage Capital, Inc. and will be retained by Luminent Mortgage Capital, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
## PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Luminent Mortgage Capital, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Christopher J. Zyda, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.  The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 10, 2007

By:  /s/ CHRISTOPHER J. ZYDA
     Christopher J. Zyda
     Senior Vice President and Chief Financial
     Officer
     (Principal Financial and Accounting Officer)

A signed original of this written statement required by Section 906 has been provided to Luminent Mortgage Capital, Inc. and will be retained by Luminent Mortgage Capital, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Created by 10KWizard    www.10KWizard.com