# EXHIBIT 5



Q1 2007 Luminent Mortgage Capital Earnings Conference Call - Final

8,193 words
10 May 2007
Voxant FD (FAIR DISCLOSURE) WIRE
English
© Voxant Inc. All rights reserved.

OPERATOR: Good day, ladies and gentlemen, and welcome to the first-quarter Luminent Mortgage Capital earnings conference call. My name is Frances and I will be your operator for today.

At this time, all participants are in listen-only mode. We will conduct a question-and-answer session toward the end of this conference. (OPERATOR INSTRUCTIONS). As a reminder, this conference is being recorded for replay purposes.

I would now like to turn the call over to Ms. Karen Chang, Controller. Please proceed.

KAREN CHANG, CONTROLLER, LUMINENT MORTGAGE CAPITAL: Ladies and gentlemen, thank you for standing by. Good morning and welcome to Luminent Mortgage Capital's first-quarter 2007 earnings results conference call. I am Karen Chang, Luminent's Controller. Joining me this morning are Gail Seneca, our Chairman of the Board of Directors, Trez Moore, our Chief Executive Officer, and Christopher Zyda, our Chief Financial Officer.

At this time, all participants are in a listen-only mode. A question and answer session will follow management's prepared remarks. We're taping this call and it will be available for replay on our Web site and by telephone through May 24, 2007.

Before our presentation starts, please allow me to read an important legal notice. Some of the statements that we will make on this conference call will be forward-looking statements within the meaning of the federal Securities laws. Forward-looking statements convey Luminent's current expectations or forecasts of future events. All statements during today's call, other than statements of historical fact, are forward-looking statements. These forward-looking statements include, among other things, statements about the impact of the flattening of or changes in the yield curve on Luminent's investment strategies; Luminent's ability to obtain or renew sufficient funding to maintain its leverage strategies; continued creditworthiness of the holders of mortgages underlying Luminent's mortgage related assets and volatility in the timing an amount of Luminent's cash distribution. Any or all of Luminent's forward-looking statements on today's call may turn out to be inaccurate. They may be affected by inaccurate assumptions Luminent might make or by known or unknown risks or uncertainties, including the risks we describe in the reports that we file from time to time with the Securities and Exchange Commission. You should not rely unduly on those forward-looking statements, which speak only as of today's call. Unless required by the federal Securities laws, Luminent undertakes no obligation to update publicly or revise any forward-looking statements to reflect new information or future events.

Now, I would like to turn the conference call over to Gail Seneca.

GAIL SENECA, CHAIRMAN OF THE BOARD, LUMINENT MORTGAGE CAPITAL: Thank you, Karen, and thanks to all of you for joining us on Luminent Mortgage Capital's first-quarter 2007 earnings conference call.

We are very pleased to report another strong quarter, especially in light of the difficult conditions in the mortgage market. We again earned a solid dividend and protected our book value. Credit performance remains strong and demonstrably better than that of our peers. Prospects for our company are bright as loan pricing has softened, credit spreads have widened and we have remained liquid well positioned to deploy capital with potential returns above our investment hurdle.

I am also pleased to announce the promotion of Trez Moore who has been serving of our President and Chief Operating Officer for more than two years to the position of Chief Executive Officer. Our board promotes Trez with complete confidence in his leadership and operational ability. I remain Chairman of the Board of Directors and I look forward to years of rewarding involvement with Luminent and its exceptional management team. Trez Moore, our CEO, will take the call from here.

TREZ MOORE, CEO, LUMINENT MORTGAGE CAPITAL: Thank you, Gail. We're pleased to report another

strong quarter. Some headlines are we continue to enjoy solid credit performance, realizing delinquencies well below industry averages and virtually no credit losses. We generated record net interest income of $30.4 million, up 94% year-over-year. Our REIT taxable net income per share of $0.30 grew by 43% year-over-year. We declared a $0.30 quarterly dividend for the third quarter in a row. We protected and grew our book value to 9$.87 per share. Preservation and growth of book value is a testament to the high quality of our portfolio and success of our investment management and risk disciplines.

We executed our ninth prime quality whole loan securitization, achieving our best pricing to date of 16.5 basis points over LIBOR for the AAA tranches. In early May, we executed another deal on similarly strong terms. We've issued our first collateralized debt obligation, or CDO, in the amount of $400 million. Through this CDO, we secured long-term non-recourse match book and highly capital efficient financing for a portion of our credit sensitive bond portfolio, thereby immunizing us of the economic impact of mark-to-market on this portfolio. Complete the CDO was an important milestone for us in that CDOs are a profitable asset management platform for Luminent. We generated a return on equity for the quarter of 12.1%

With our stock trading at a significant discount to book value, we believe that Luminent today represents a tremendous value proposition for investors. In recent weeks, we have been repurchasing our common stock and at least six of our officers and directors have also purchased common stock during our last open trading window. Luminent is well positioned to continue to deliver strong results.

Luminent's business is asset management, not mortgage loan origination. Luminent does not originate loans and as a result, we do not have the risks of a loan originator. We're the end investor and therefore, we do not have the loan repurchase risk that is affecting loan originators in today's environment. In fact, loan repurchases benefit our business, not hurt it, because we can put back loans to our originators. We also do not have to worry about declining gain-on-sale margins that result from lower loan value. We repurchase our loans based on investment opportunity and we're not beholden to volume targets.

Finally (technical difficulty) employees, we do not have a large fixed cost infrastructure negatively impacting our earnings. We're nimble and our model is highly scalable. Our commitment to credit quality is (inaudible). We know no sub-prime loans whatsoever. 93% of our securitized assets have a credit rating of A or higher. 87% of our securitized assets are rated AA or higher and 82% of our securitized assets are rated AAA or higher. Only 3% of our total assets carry non investment-grade credit ratings and less than 60 basis points represent first loss exposure. We have no first loss exposure to sub-prime credit.

We believe that our high quality investment management business model will continue to distinguish itself through solid performance over time. During the first quarter, we grew our assets to 9.1 billion, up 95% year-over-year and 5% from the fourth quarter. Given the mortgage market turbulence, we chose to grow our assets more slowly during the first quarter. We believed, correctly, that the passage of time would provide us with higher return investment opportunities for our stockholders and this has now come to pass.

So let me highlight some key observations on our mortgage assets at March 31. We maintained a high credit quality and enjoyed solid credit performance. The well-publicized troubles in the sub-prime market did not spread to our high quality prime loan portfolio. Prime quality whole loans comprised 62% of our total assets. Our loans have an average FICO score of 714, an average loan-to-value ratio of 72.8% net of mortgage insurance, an average principal balance of $384,000 and are made overwhelmingly to homeowners, not investors. These loans are permanently financed through match funded non-recourse securitization structures. Over the past year, we have increased the average FICO score on our loan portfolio from 706 to 714.

In addition, on our prime quality whole loan portfolio, we hold a total of $1.5 billion of mortgage insurance. 1.2 billion of this amount is mortgage insurance that we've purchased to cover loan-to-value ratios of 75.0% to 80.0%. This is well in excess of the amount typically provided by traditional borrower paid insurance which is greater than 80% loan to value. Over the past year, we have reduced our effective loan-to-value ratio from 76% to 73%.

AAA rated (inaudible) agency mortgage-backed securities were 25% of our total assets. We grew the spread portfolio in the first quarter by 23% year-over-year as we identified attractive return opportunities. All of these securities reset within 12 months or less. This portfolio is financed with a combination of Luminent commercial (technical difficulty) paper, committed repurchase agreement facilities and short-term repurchase agreement lines. There is no credit risk and virtually no interest rate risk in these assets.

Credit sensitive mortgage-backed securities were 11% of our total assets with an average credit quality of A-. In this portfolio, we hold virtually no residuals or first loss tranches. None of these bonds have been downgraded nor are any on watch to be downgraded by the rating agencies. We have effectively hedged this portfolio using single-name credit defaults, as well as market industries which reference mortgage credit. At quarter end, much of this portfolio was permanently financed through our CDO.

Now, let me provide a bit more detail. First, on our $5.6 billion loan portfolio, most of which was securitized

2008 Factiva, Inc. All rights reserved.    02

as of March 2007, represented 62% of our assets. Our first-quarter securitization, LUM 2007-1, is illustrative of the strong and improving quality of our assets and the success of our deals in the market. This $707 million deal exhibited the following characteristics -- 100% first Lien; 719 average FICO score; 72.1% loan-to-value ratio, net of mortgage insurance. We secure private mortgage insurance on all loans with loan-to-value ratios of 75% or greater, not 80% as is industry practice. 83% were owner-occupied and (technical difficulty) $[73,000] average loan principal balance.

Our most recent deal, LUM 2007-2, exhibited even stronger credit statistics with an average FICO score of 746 and 66.1% loan-to-value ratio, net of mortgage insurance. Capital market reception for our securitizations has been consistently excellent with our first-quarter transaction, LUM 2007-1, pricing at LIBOR plus 16.5 basis points for the AAA tranches, our best pricing to date. Our loans are higher quality than the overall Alt-A market. We have stronger borrowers with an average FICO score of 714, fewer investor loans and lower loan-to-value ratios at 72.8% net of mortgage insurance.

Our underwriting process is comprehensive and exhaustive. We underwrite every loan and reject loans which fail to meet our credit criteria. We independently validate property values on each and every loan that we buy. This disciplined approach has resulted in lower delinquencies than industry averages and lower loss severities. Overall, the combination of strong borrowers and comprehensive underwriting has resulted in better credit performance than the market, even when we adjust for loan age. The outcomes of the Luminent credit process are lower delinquencies, lower severities and lower overall losses than the market as a whole.

Next, our 2.3 billion agency and AAA-rated portfolio, which represented 25% of assets as of quarter end. This portfolio has no credit risk nor any meaningful interest rate risk. We have reduced interest rate sensitivity through asset selection of floating-rate securities and extensive hedging. Marginal opportunities in this sector are attractive.

Last, our smallest portfolio of $965 million of non AAA rated mortgage-backed securities which represented 11% of assets at quarter end -- overall this portfolio is rated A-. Structured credit enhancements in this portfolio provide us with approximately 7.5% protection before we release any credit loss. We have no sub-prime first loss exposure nor any noninvestment grade sub-prime exposure in this portfolio. We have hedged this portfolio with the use of credit default swaps, which have protected as well during the credit spread (technical difficulty) of the first quarter. With the assurance of our (technical difficulty) million dollar CDO at the end of March, a significant proportion of this portfolio is now financed on a match funded non-recourse basis. This permanent financing removes the economic risk of mark-to-market on these assets.

We are extremely pleased to be able to issue a CDO in March at the height of investor concern about the mortgage market. Our CDO is not a sub-prime transaction. It exhibits much higher credit quality than a typical CDO (technical difficulty) 72% of the underlying collateral for the mortgage-backed securities in our CDO consist of prime quality assets.

Our weighted average credit rating is higher than the typical mezzanine CDO and we have a higher proportion of Tier-1 issuers than a typical mezzanine CDO. We selectively retain certain tranches within the capital structure and have subsequently redistributed bonds into the market as spreads have tightened over the past few weeks.

Based on the strength of execution of our first CDO, we've been engaged to serve as a third-party manager (technical difficulty) some CDOs which were unable to fully ramp and price during the difficult first quarter. We will assume no credit risk in these deals and we will earn fee income. Our asset management expertise should continue to afford us the opportunity to grow fee income as CAVO managers.

Our credit performance is sound. Delinquencies are starting to level off. Serious delinquencies in our loan portfolio were just 87 basis points of total loans at quarter end. This is well within our expectations for loan performance and compares very favorably with industry statistics for prime ARM loans. Adjusting for loans that we know will be repurchased by originators at full value, our serious delinquency ratio drops about half the industry average for prime ARM loans.

Whether considering the performance of high-pay option loans, Luminent's credit performance is better than industry averages at comparable loan ages.

Luminent's credit performance bears no resemblance to sub-prime performance for which the Mortgage Bankers Association reports a series delinquency rate of excess of 9%. This is vast difference in Luminent credit performance from sub-prime is predictable. Limit borrowers have superior credit histories and are far less dependent on home price appreciation for serial refinancing. The performance of prime quality borrowers, such as the Luminent borrower, is more aligned with economic conditions, particularly employment. The current strength in national employment conditions suggest that Luminent's credit performance should remain sound.

2008 Factiva, Inc. All rights reserved.

Our vigilance with regard to credit continues. For example, in our recent securitizations, we purchased additional mortgage insurance down to an effective loan-to-value ratio of 65% on loans with loan-to-value ratios between 75 and 80. Furthermore, collateral (inaudible) securitization exhibited higher FICO scores than our overall performance. (technical difficulty) so continuously fine-tune our comprehensive credit management techniques.

In underwriting, we focused on identifying layered risks and then on gaining the maximum utility from our sophisticated risk management software tools. To date, our performance demonstrates the efficacy of our credit analysis and the way in which it helps us to construct our portfolio to minimize risk. For example, we are underexposed to geographic areas which are exhibiting stress. Our overall delinquency experience is much better than that of comparable loan collateral and our credit performance continues to improve as we upgrade our tools and processes.

We also manage our credit process through contract enforcement. We are aggressively pursuing all seller representations and warranties with our well-capitalized originators. We've been very successful in putting back loans to originators and realizing full value. We actively manage credit through risk life. We oversee all loan servicing on a loan-by-loan basis with sophisticated software and we work diligently with servicors to resolve delinquencies. We identify weak performers early and we're not reluctant to recognize problems and take action. For example, in the first quarter, we sold bonds at a loss for this reason. At the same time, we upgraded the average credit rating of our credit sensitive portfolio from BBB to A- quarter-over-quarter.

Recent market turmoil has provided us with a host of productive opportunities. Now that the mortgage market is starting to stabilize, we're taking advantage of these opportunities to invest our capital. We will not compromise our credit quality standards, however. Within our risk profile, we now see return opportunities that will exceed our investment hurdle by a healthy margin. The rapid consolidation in the mortgage market has also generated opportunities to attract our most valuable asset, people. Last month, for example, we welcomed a very talented Chief Investment Officer, Dmitrios Papatheoharis, CFA, a veteran of the mortgage asset management business.

I will now turn the call over to Christopher Zyda, our Chief Financial Officer, who will provide some additional information about our first quarter.

CHRISTOPHER ZYDA, CFO, **LUMINENT MORTGAGE** CAPITAL: Thanks, Trez, and congratulations on your well deserved promotion.

In our first quarter, we generated estimated REIT taxable net income of $14.3 million or $0.30 per share. GAAP net income for the first quarter was $14.4 million or $0.30 per share. Our GAAP return on average stockholders equity was 12.1% for the first quarter. Our REIT taxable return on equity was 12.0% for the first quarter. We estimate that, as of March 31, we had $7 6.million of undistributed REIT taxable net income or possibly $0.14 per share outstanding. This includes the impact of approximately $2.2 million in upward adjustments to our 2006 taxable income. We anticipate that we can maintain our $0.30 dividend this quarter.

Our total assets were $9.1 billion at quarter end. The weighted average coupon on mortgage assets at quarter end was 7.03%. The weighted average yield on average earning assets for the quarter was 6.97%. The weighted average cost of average financing liabilities for the quarter (technical difficulty) 5.64%. Net interest spread for the quarter was 1.33%. Our net interest spread declined modestly in Q1 because of faster prepayment activity in our loan portfolio, as well as our slower acquisition of new assets as we anticipated better investment opportunities which have now come to pass. Our 1.33% net interest spread is 38 basis points higher than our Q1 2006 net interest spread thereby trending up significantly year-over-year.

Our interest rate sensitivity remains virtually 0. 90% of our mortgage assets reset monthly after the effective cost of funds hedges.

Commercial paper liabilities were 7% of our total liabilities at quarter end. We're extremely pleased that our commercial paper program Luminent Star Funding One, has been so well-received by investors with an average cost of commercial paper of LIBOR minus 2 basis points.

We continue to improve our capital efficiency. Capital market transactions, such as loan securitizations and CDOs, allow us to match fund our balance sheet with long-term non mark-to-market nonrecourse financing. Our recourse leverage ratio was just 7.1 times at March 2007 and has since declined to approximately 6.0 times after the completion of Luminent 2007-2

We maintain solid liquidity. Unencumbered assets were over $200 million at quarter end. We have experienced no difficulties in financing our positions throughout the recent period of market turbulence.

Our book value was $9.80 per share at quarter end, up from $9.86 in the fourth quarter. During the quarter, the mark-to-market on our $2.3 billion (technical difficulty) our credit hedges more than offset this deterioration. We increased our loan loss provision by $3.5 billion in the first quarter, which takes our overall

2008 Factiva, Inc. All rights reserved.

loan loss reserve to $8.3 million. Our loan loss reserve at March 31 was 15.9% of our serious delinquencies. Adjusting for loans that we know will be repurchased by originators, our loan loss reserve at March 31 was 21.6% of our serious delinquencies. We are appropriately and adequately reserved for our loan losses at March 31. Our loan loss reserve is a function of actual loan characteristics, including loan age, borrower and collateral quality and delinquencies. Luminent's loan age is roughly one year, a lower number than that of the overall industry.

Luminent loan quality is strong with an average FICO score of 714 and effective (technical difficulty) 72.8 loan-to-value ratio and 0 sub-prime exposure. In addition, as an asset manager and not an originator, we have the ability to put back nonperforming loans to originators. Originators typically carry hefty loan loss provisions precisely in order to fund this put-back activity of which Luminent is a beneficiary.

Finally, our conservative effective 72.8% loan-to-value ratio mean that our actual severities are likely to be lower than the industry averages. As our loans continue to season and age, our loan loss reserve will increase. When actual losses do occur, we believe that we will realize modest severities well below industry averages due to our 72.8% average loan-to-value ratio and to current indications from our ongoing surveillance of property valuations on our delinquent loans. On the loan losses, we have realized to date the severities were significantly below the expected industry severity for comparable loans. We are appropriately and adequately reserved for loan losses.

Between March 30 am May 9, we repurchased almost 2.2 million shares of our common stock at an average price of $8.17 per share, a 17% discount to our first-quarter book value. This represents nearly 5% of our shares outstanding as of December 31. On May 7, our Board of Directors approved a 5 million share increase in our stock repurchase authorization. We now have the ability to repurchase over 5.2 million shares of our common stock.

We continue to generate operating expense efficiencies. Our fixed operating expense ratio for the first quarter was 23 basis points of assets.

Let me now return the call to Trez for some concluding remarks.

TREZ MOORE: Thanks, Chris. We were very pleased with our first-quarter performance. We are confident in our ability to manage through this credit cycle as our senior managers have done for 30 years in the mortgage market. We were cautious in deploying capital as the market gyrated. Now, as assets have priced and the mortgage market is beginning to stabilize, we see improved opportunities for return and are well positioned to benefit from them. This should enable us to sustain our dividend and provide strong long-term returns for our shareholders.

I would also add my and our Board's sincerest thanks to Gail for founding an leading this company for the past four years. I look forward to continuing to benefit from her superb mentoring and counsel as the chairman of the Board of our Directors.

Operator, we're now ready to take some questions.

OPERATOR: (OPERATOR INSTRUCTIONS). Stephen Laws, Deutsche Bank.

STEPHEN LAWS, ANALYST, DEUTSCHE BANK: Thanks for taking my questions. Chris, could you maybe talk about the portfolio growth? I know, in your prepared remarks, you mentioned faster prepays and slower acquisitions as you look further out this year at more attractive opportunities to make acquisitions. Can you talk about maybe how that has trended in the first six weeks of the second quarter and how we should look at that portfolio growth through the rest of the year?

TREZ MOORE: Thanks, Steve. I will take the answers, Trez. We've been reasonably active since the end of the quarter in acquiring good quality loans and we fully expect to do not only one deal in the quarter but two. So we are reasonably confident that we will be able to step-up the pace a bit in this quarter.

STEPHEN LAWS: Great. Then from an expense base, was the Q1 run rate kind of a good level to look at or kind of given the slowdown in the acquisition side, should we maybe expect expenses to trend a little higher in the second quarter?

CHRISTOPHER ZYDA: Steve, obviously there is a certain amount of variable component to our expenses, such as servicing and due diligence and things like that. On the more fixed cost basis, as we have said in prior quarters, we do anticipate that our salaries and benefits will increase to a run rate of approximately 3.5 million a quarter over the course of the year as we fill out our hiring plan.

STEPHEN LAWS: Great. I guess, finally, can you maybe talk about how you guys or how the Board has instructed you to look at the share repurchase? Clearly, from my rough calculations, just the buyback since

the end of the quarter has pushed book value to around a little over $10.30 per share. Can you talk about (technical difficulty) and kind of what levels you look at buying back stock versus investing in the business?

CHRISTOPHER ZYDA: Sure. Well, the way that we look at repurchases is, number one, we want to make sure that we have enough liquidity to run the business. Then in addition to that, we want to make sure that we are repurchasing stock at levels when the return on equity from doing that is competitive and hopefully meaningfully higher than the return on equities that we can obtain from other investments that we're looking at. That is the way that we have framed our particular stock repurchase program.

STEPHEN LAWS: Great. Thanks for taking my questions.

OPERATOR: Bose George, KBW.

BOSE GEORGE, ANALYST, KEEFE BRUYETTE WOODS: Good morning. I had a question on the credit sensitive portfolio. As you said, it's up 100 (indiscernible) it's 67 million. The credit rating is getting better on that. I was wondering. Are you -- by moving up the spectrum, are you getting pressured on your yields or just with the spread widening, are you able to move up the spectrum and get better yields as well?

TREZ MOORE: It's the latter. It is a good time to be buying bonds.

BOSE GEORGE: Great. Then just a question about the reclassification of the MBS -- did you reclassify that because it was other than temporarily impaired? I mean, could you have just left it in OCI?

TREZ MOORE: Are you talking about the OCI table?

BOSE GEORGE: No, the 15 million that went through your income statement.

TREZ MOORE: Right. That is an actual sale.

BOSE GEORGE: So those were sold during the quarter?

TREZ MOORE: Our thought process is to sell incipient problems rather than just mark them.

BOSE GEORGE: Okay, great. Thanks a lot.

OPERATOR: Andrew Wessel, J.P. Morgan.

ANDREW WESSEL, ANALYST, J.P. MORGAN: Hi, guys. Good afternoon. I guess I had a couple of questions. I'll start with the CDO side. In terms -- I'm just looking at the breakdown of the deal. The (inaudible) the 17 million I guess of equity, is that -- did you guys sell that or how was that treated?

TREZ MOORE: We retained that.

ANDREW WESSEL: Within that, there's -- I mean, the way I read it in the press release, 26% sub-prime, 34% mid-prime. When you say no first loss exposure to sub-prime, do you mean no first loss after hedges? I don't understand how those two line up for you. If you have 26% of sub-prime collateral in that CDO and 70 million of the equity?

TREZ MOORE: First of all, the context and where we said no sub-prime was no sub-prime loans. Second of all, obviously there is a little bit of sub-prime in this deal but the bonds that we have purchased are significantly better than the marketplace as a whole.

ANDREW WESSEL: Okay. Moving onto the loan portfolio, I guess the first thing on loss provisions, you say you're looking at everything, reserving for collateral and everything else. Does that mean you're assuming some level of negative HPA in some of those regions where the loans are?

TREZ MOORE: Sure. Our national expectation is actually negative and has been for some period of time.

ANDREW WESSEL: Great. So there's no change there.

Then just in the loan portfolio itself, you're talking about prime, I guess prime loans versus ALT-A, which has been the talk since I guess you started the business. Are you no longer buying that stated income, stated asset loans or are you talking about on just a FICO store score quality or how us that defined?

06

2008 Factiva, Inc. All rights reserved.

TREZ MOORE: We consider the loans that we buy to be prime. They do typically have stated income but verified assets. So the no-doc portion of our portfolio is I believe less than 3% of our total. So it is a very small proportion indeed.

ANDREW WESSEL: Great, thank you very much.

OPERATOR: Jim Fowler, JMP Securities.

JIM FOWLER, ANALYST, JMP SECURITIES: Good morning. Congratulations, Trez and Gail, on your promotions, well, one promotion, I guess. I wanted to ask you just a couple of questions. I think you gave enough information to back into this number. I just wanted to ask it directly. Only the 87 basis points of delinquency, what would that -- what do you expect that basis point to be once the repurchases has concluded, approximately?

TREZ MOORE: In the mid 70s. I do not remember the precise number. Chris, do you have that?

CHRISTOPHER ZYDA: I don't have that one right at my fingertips, Jim. I would definitely e-mail you (multiple speakers) but it's definitely in the 70s.

TREZ MOORE: Somewhere between 74 and 77. I don't remember the precise number.

JIM FOWLER: Now, I suspect you do not want to talk specifically about some of your counterparties but let's just say that late '05 and early '06, a lot of your purchases, by looking at your collateral, was from a very large lender in Southern California. I am wondering two things about that. One is, I'm wondering how much you're continuing to purchase from them. I notice some of your recent collateral has been from a smaller lender but well known in Southern California. I am wondering if that is true and if you have discontinued any purchases from the large lender and also if a preponderance of that delinquency is related to the loans from that lender and if you expect to have a successful resolution from that lender specifically?

TREZ MOORE: I think we can answer most of that question. Obviously, we will not hit every point. With respect to our counterparties, we enjoy good relationships with virtually everybody that we have done business with. So to the extent that perhaps our purchases from any one counterparty are not big enough to sort of hit the radar screen is perhaps more a question of relative pricing than any specific unhappiness that we have with the institution. So, it is a risk-reward question, Jim, rather than a we don't like them kind of scenario. Good for them if they can get better prices from somebody else.

With respect to delinquencies from individual originators and servicors, we do not really comment on that as a matter of policy.

JIM FOWLER: Just a follow-up, is it fair, though, to say that a reasonable (technical difficulty) of the current delinquency is in -- across a particular lender or two and that might not be collateral that we will see going forward?

TREZ MOORE: Let me answer it this way, then -- it is a well-known fact that the older loans will have a higher delinquency percentage in there because there is obviously a very well-defined time aspect to loans going delinquent. To the extent that we happen to be somewhat more represented in any particular counterparty in the early parts of our development, then, yes, those counterparties will have higher delinquencies as a proportion of our whole than other institutions from whom we have bought more recently. But I don't think you can then conclude that we will not continue to buy from those institutions. You can only conclude that we were unable to settle on a price that was good for them and good for us. So, it is equally possible that the institutions you are thinking got better pricing elsewhere.

JIM FOWLER: One last question (inaudible) if you look at the markets today or most recently with your recent acquisitions and matched financings versus, say, six months ago, what do you think the difference in marginal ROEs are today versus where they were at, say, some of their tighter levels?

TREZ MOORE: It's a couple of points. We're definitely trying to [enculcate] a happy, smiley face here. We are reasonably bullish as to our opportunities.

JIM FOWLER: Great, thank you very much.

CHRISTOPHER ZYDA: Jim, just to conclude the earlier question, we have now looked up that number, so the 87 basis point number would decrease to 78 basis points.

JIM FOWLER: Great, thank you very much, Chris.

2008 Factiva, Inc. All rights reserved.

OPERATOR: Omayaho Okusanya, UBS.

OMAYAHO OKUSANYA, ANALYST, UBS: Good afternoon. Chris, congratulations on the new position. I just had a couple of questions around it. I'm just curious what precipitated the change and also if you're planning to make any significant changes in regards to strategy for the Company versus when Gail was CEO.

GAIL SENECA: I will take the question about the succession that we have done. Personally, I am interested, at this point, in a more strategic and advisory capacity than a day-to-day one. This has been the case for awhile. So at the Board level, we have been planning this management succession for quite some time. Trez, obviously, is ideal in terms of his capacity and background to manage the Company as its currently structured and with its current strategy. That is the strategy with which we will continue for the foreseeable future.

OMAYAHO OKUSANYA: Thank you.

OPERATOR: Leo Harmon, Fiduciary.

LEO HARMON, ANALYST, FIDUCIARY: Hi, good morning. I may be barking up the wrong tree here, but can you talk a little bit about reset risk and the underlying collateral, particularly on some of the pay option stuff? Is this related to some of the reasons why you guys saw accelerated prepayment in the quarter?

TREZ MOORE: Let me answer those two questions in reverse order, if you don't mind. With respect to prepayments being a little higher, we're fully expected and them priced for them. Our bread-and-butter pay options ARM was a loan which had a one-year prepayment penalty. And then obviously after the expiration of a year, you would expect an we indeed did see prepayments spike thereafter because that was what the (inaudible) was looking for is one year or a two-year type of financing. So our prepayments have gone up there quite a bit.

With respect to reset risk, we have a portfolio with a low loan-to-value ratio, so even if you assume that the loans reset at maximum, which is 115% of the balance, our neg (inaudible) portfolio COTV net of mortgage insurance is 77 and if it goes up to the 115 number, it is about 81 to 82 LTV. So we are very well protected against any sort of issues that are driven by negative (inaudible) and reset on those kinds of things.

LEO HARMON: What about rate shock in the underlying portfolio? Where are you now and where do rates go on a fully indexed basis kind of in aggregate?

TREZ MOORE: Some 60+% of our portfolio is already fully indexed at the rate which is the pay options ARMs. With respect to the balance, it is primarily 5-1 hybrids will a little bit of 7-1s and 10-1s. So the reset time on those loans are somewhere between 2011 and 2015. We feel that is sufficiently out in the future to be not of major concern at this juncture. Frankly, given the credit quality, we fully expect the mortgagors either to be able to refinance at the time or make the higher payments if that is indeed the case.

LEO HARMON: On your last couple of securitization deals, did (inaudible) pricing look like it was okay? Were there any additional credit enhancements or over-collateralizations that you all had to take in order to get those deals done?

TREZ MOORE: No. We did, as a matter for our own benefit, obtain private mortgage insurance on loan-to-values between 75 and 80, but that was not dictated by the market. That was dictated by our risk management techniques.

LEO HARMON: Did you all have to take any larger part of the subordinate pieces of those deals?

TREZ MOORE: No. The bonds that we wanted to sell distributed easily and efficiently in the market. We were very happy with the execution of both of 071 and 07\2.

LEO HARMON: The last question. You all talked about the credit sensitive portfolio. Can you go through separately and talk about what the mark-down was in that portfolio and what the corresponding mark-up was from the CDS hedges and is that gain in CDS included in the gain from derivatives?

TREZ MOORE: First of all, we do not disclose individual marks an individual bonds or even by sector. But what it should be noted is that we had an extensive program of safeguarding our credit sensitive bonds with hedges primarily in the CDS area. The net effect between the two was to not only safeguard our book value but actually raise it ever so slightly. So I think you can conclude that we were well hedged during the market turmoil of the first quarter.

LEO HARMON: Are those marks on the income statement the mark-up on that hedged derivative or

2008 Factiva, Inc. All rights reserved.

because they netted out, there is no mark from the CDS on the income statement?

CHRISTOPHER ZYDA: No, the hedging performance goes through our income statement. Then the price changes on our mortgage-backed securities that we own goes through other comprehensive income for the most part.

LEO HARMON: Thank you.

OPERATOR: Paul Lloyd, Snyder Capital.

PAUL LLOYD, ANALYST, SNYDER CAPITAL: Good morning, good afternoon all. Things are going well, regulations. This is kind of a follow-up to that last question, just if you could help me size IN my mind or conceptualize the trade-off between the [NBS] recognized losses and the derivatives gains. Are they pretty much paired up? Again, I will be honest. I was kind of lost as you were going through the mechanics, Chris, on your side of the CDO, so kind of a couple of things together.

TREZ MOORE: Let me address the first half of the question and then Chris will take the second. With respect to specific actions we did, we have a very strong surveillance function here and we had situations obviously in which a few bonds started to deteriorate quickly out of the gate as soon as bought them can. Perhaps different than other institutions, our general solution to issues that are deteriorating is we sell them and then lift hedges that we have put into the market to defray precisely that event rather than to mark them down and hope things will get better. So we did that to the tune of $15 million in the first quarter. I am happy to report that we do not have anything that I would expect to occur in the near-term future that what generates some more kind of numbers.

PAUL LLOYD: Okay, so indeed the fact that those numbers are right in line with each other is no coincidence?

TREZ MOORE: Yes, no, we lifted hedges to offset the loss on the sale.

PAUL LLOYD: Then, Chris, on the CDO mark? .

CHRISTOPHER ZYDA: The CDO mark?

PAUL LLOYD: You were just talking about it. I'm sorry. At the end of the last answer you gave, you were talking about the geography of what went on in the quarter. Something went through equity. I'm (multiple speakers).

CHRISTOPHER ZYDA: Sure, so all of the mortgage-backed securities that we own, any changes in the market price from one period to the next are flowed through other comprehensive income in the equity portion of the balance sheet as opposed to going through the income statement, which is where our hedge is.

(multiple speakers)

PAUL LLOYD: Oh, is that all you were saying? Okay I'm sorry.

CHRISTOPHER ZYDA: That's all I was saying.

PAUL LLOYD: I thought there was more to it.

CHRISTOPHER ZYDA: Right, that's it.

PAUL LLOYD: Okay, banks.

OPERATOR: Hemant Hirani, Litchfield Capital.

HEMANT HIRANI, ANALYST, LITCHFIELD CAPITAL: Trez, congrats on your new operation and actually, congratulations to the other members for such a strong quarter.

TREZ MOORE: Thank you. We're very pleased with our quarter.

HEMANT HIRANI: I'm just wondering. CDS swaps being disclosed in other assets value of about 16 million. I'm pretty much sure the face value would be much higher. Can you disclose that and can you just guide us like what those CDS are kind of protecting us against right now like what tranches?

09

2008 Factiva, Inc. All rights reserved.

TREZ MOORE: We do not disclose the nominal size and we have not in any of our hedges ever. I can, however, give you guidance around generally how we hedge, which is we use two specific ways; one is a credit default swap on individual bonds and those would be bonds that we like but we are a little perhaps concerned about for whatever reason and we engage typically with a street firm to write us protection via and (technical difficulty) the contract on that specific bond. We have a number of those in our portfolio currently.

We also, from time to time, short one of the ABX indices; there's three of them with a number of different tranches in them. We are very active in that area indeed and have enjoyed some very good results from that as an overall hedge, although obviously the correlation between the indices which frankly we don't have any bonds that belong to the indice and our own positions are less correlated than a CDS on a specific bond that we own.

HEMANT HIRANI: One other thing, I don't know if I heard it right. You said you've been able to kind of manage certain CDOs which originated by other parties. Can you give us like and idea like what kind of fees would you generally collect, what kind (inaudible) that because in that, you're not deploying your equally capital but you're deploying your human capital and intelligence? So maybe something?

TREZ MOORE: There you go and we will forego any humor on that. Typically, CDOs obtain a fee of around 10 to 15 basis points paid before the bondholders get any of their distributions and then another 10 basis points are so at the bottom of the capital structure assuming that the investment-grade rated pieces are getting paid as well. So think 10 to 15 on the top and 10 or so at the bottom. So, it is a very nice income for us indeed and as you indicated with virtually no risk on our part.

HEMANT HIRANI: Thank you.

OPERATOR: Jonathan Shafter, Boston Providence.

JONATHAN SHAFTER, ANALYST, BOSTON PROVIDENCE: I guess, with the concluding question, I'll give you the concluding congratulations. Excellent quarter.

Just following up on that last question, the asset management -- and I apologize if this was already stated -- buy if we're looking at about 10 basis points of fees, what is the approximate size of these deals? How might we think about it? Is this a line of business that you will be looking to expand going forward or is this sort of a one-off opportunity that you can just incorporate into your existing infrastructure?

TREZ MOORE: It is actually sort of both. First of all, the sum total of the fees typically is 20 to 25 basis points per deal and your typical CDO is anywhere from 250 million to $500 million in assets pretty much on a static basis for a substantial period of time. So, I would not call them wildly lucrative but there's certainly very solid and desirable revenue to get. We fully wish and expect to drive more of our revenue generating activities toward these fee-based scenarios. We are very much looking forward to and devoting infrastructure to making that a larger proportion of our revenues as a whole.

The good news is, because we are doing a lot of investing for our own account, the additional investment in infrastructure is actually relatively slight. We can just reuse the same people and systems and things of that nature to manage other people's capital as we have managed our own. So we think this is a very exciting and desirable fact for us.

JONATHAN SHAFTER: You mentioned -- sorry, I believe it was three CDOs, two or three CD)s that you were going to be getting as external managers on?

TREZ MOORE: We are not going to disclose exactly what we are getting or who we are getting it with because CDOs, as you may know, are actually done as private placements. The legal community would have a cow if I started talking about them.

JONATHAN SHAFTER: But as sort of an order of magnitude in terms of, later this year and into next year, the amount of assets and the fees that you will be receiving -- I'm not sure whether you're getting a pass-through as a secondary manager. I mean it would actually be meaningful on a per-share basis and not that we should be incorporating into the valuation, it's not just a couple pennies here and a couple of pennies there?

TREZ MOORE: Yes. Obviously, in the second quarter, we would expect it to be a relatively slight number but over time, we are very much excited about the opportunity and hope and expect that it will be meaningful portion of our revenues.

JONATHAN SHAFTER: Looking out to 2008, I mean, this is actually going to be a fairly meaningful revenue

driver.

TREZ MOORE: We're hoping to. That is our goal.

JONATHAN SHAFTER: Great quarter again guys, thank you. Gail, thanks a lot for all you have done so far in building this company. You deserve a congratulations too.

GAIL SENECA: Thank you, Jon.

TREZ MOORE: I would like to add my congratulations to Gail for a well-deserved change into a more advisory role. With that, we will thank all of you for joining us and we will speak to you next quarter if not before. Operator, I think we're done.

OPERATOR: Thank you for your participation in today's conference. This concludes the presentation. You may now disconnect and have a good day.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

Document FNDW000020070517e35a002uu

2008 Factiva, Inc. All rights reserved.