MICHAEL L. RUGEN (Bar No. 85578)
DANIEL J. DUNNE (admitted *pro hac vice*)
JOSHUA HILL (Bar No. 250842)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1 (415) 772-6000
Facsimile: +1 (415) 772-6268
    Michael.Rugen@hellerehrman.com
    Daniel.Dunne@hellerehrman.com
    Joshua.Hill@hellerehrman.com

*Attorneys for Defendants Luminent Mortgage*
*Capital, Inc., S. Trezevant Moore, Jr.,*
*Christopher J. Zyda, and Gail Seneca*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE LUMINENT MORTGAGE CAPITAL, INC. SECURITIES LITIGATION, | Case No.: C-07-04073 PJH |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
| This Document Relates To: ALL ACTIONS | Date:        July 2, 2008 Time:        9:00 a.m. Trial Date:   None Set |
| | The Honorable Phyllis J. Hamilton |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE** that on July 2, 2008, at 9:00 a.m., in the United States District

Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco,

California, before the Honorable Phyllis J. Hamilton in Courtroom 3, Defendants Luminent

Mortgage Capital, Inc., S. Trezevant Moore, Jr., Gail Seneca, and Christopher J. Zyda will and

hereby do move the Court for an order dismissing with prejudice the Consolidated Class Action

Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the

Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4 *et seq*. (the "Reform Act").

This Motion is made on the following grounds:

1. Plaintiff fails to state a claim against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder because:

   (a) Plaintiff fails to adequately plead facts establishing a "strong inference" of scienter as required by the Reform Act, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), and Rule 9(b);

   (b) Plaintiff fails to adequately plead loss causation as required by the Reform Act, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), and Rule 9(b);

   (c) Plaintiff fails to plead with particularity a material misstatement or omission as required by the Reform Act and Rule 9(b);

   (d) Defendants' forward-looking statements are protected by the safe harbor provision of the Reform Act; and

   (e) Defendants' statements of opinion or corporate optimism are not actionable under the Exchange Act and Rule 10b-5.

2. Plaintiff fails to state a claim against Defendants under Section 20(a) of the Exchange Act because:

   (a) Plaintiff fails to adequately plead a primary violation of the securities laws; and

   (b) Plaintiff fails to adequately plead that Defendants exercised actual power or control over the primary violator.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities and documents appended thereto, the Request for Judicial Notice and exhibits attached thereto, all pleadings and papers on file in this action, and such additional evidence and authority as may be offered at or before the time of oral argument on this Motion.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

1    March 31, 2008                          Respectfully submitted,

2

3                                            HELLER EHRMAN LLP

4

5                                            By: _____ /s/ Michael L. Rugen _____

6                                                        MICHAEL L. RUGEN

7                                            *Attorneys for Defendants Luminent Mortgage Capital,*

8                                            *Inc., S. Trezevant Moore, Jr., Gail Seneca and*
                                             *Christopher J. Zyda*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

MICHAEL L. RUGEN (Bar No. 85578)
DANIEL J. DUNNE (admitted *pro hac vice*)
JOSHUA HILL (Bar No. 250842)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: +1 (415) 772-6000
Facsimile: +1 (415) 772-6268
    Michael.Rugen@hellerehrman.com
    Daniel.Dunne@hellerehrman.com
    Joshua.Hill@hellerehrman.com

*Attorneys for Defendants Luminent Mortgage
Capital, Inc., S. Trezevant Moore, Jr.,
Christopher J. Zyda, and Gail Seneca*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE LUMINENT MORTGAGE CAPITAL, INC. SECURITIES LITIGATION, | Case No.: C-07-04073 PJH |
| This Document Relates To:<br>ALL ACTIONS | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br>Date:      July 2, 2008<br>Time:      9:00 a.m.<br>Trial Date:   None Set<br><br>The Honorable Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page**

I.   Introduction ........................................................................................... 1

II.  Statement of Facts ................................................................................. 4

    A.   The Mortgage-Backed Securities Business.................................... 4

    B.   Luminent's Business ..................................................................... 6

        1.   The Spread Portfolio ........................................................... 6

        2.   The Mortgage Loan Portfolio ............................................. 7

        3.   The Credit Sensitive Portfolio............................................. 7

        4.   Luminent's Leverage Strategy ............................................ 7

        5.   Luminent's Liquidity Cushion And Hedging Activities.................... 8

    C.   Luminent Reports Strong Performance Despite Turmoil In
The Mortgage Industry And Insiders Continue To Buy Shares.................... 9

    D.   An Unprecedented Global Credit Crisis Forces Luminent to
Suspend Its Dividend .................................................................. 10

    E.   Plaintiff's Allegations ................................................................ 13

III. Argument.............................................................................................. 14

    A.   Plaintiff Has Failed To Plead With Particularity Facts Giving
Rise To A Strong Inference That Defendants Acted
Knowingly, Intentionally Or With Deliberate Recklessness ...................... 16

        1.   Plaintiff Fails To Raise A Cogent And Compelling
Inference Of Scienter, And Defendants' Stock
Purchases Negate Any Such Inference ............................................. 16

        2.   Plaintiff's Specific Attempts To Allege Facts
Demonstrating Scienter Fall Far Short Of The Mark ...................... 18

            a.   Plaintiff's Allegations Regarding Margin Calls Do
Not Raise A Strong Inference Of Scienter............................. 18

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

b.   Plaintiff's Vague Allegations About A Bond
Write-Down Do Not Create A Strong Inference Of
Scienter......................................................................... 19

c.   Plaintiff's Reliance On Events Occurring After
August 6 To Demonstrate Scienter Amount To
Impermissible Pleading Of Fraud By Hindsight.................. 20

B.   Plaintiff Has Failed To Plead The Loss Causation Element Of
Its Claims............................................................................. 20

C.   Luminent's Forward-Looking Statements Are Protected By
The Reform Act's Statutory Safe Harbor.................................... 24

1.   Luminent's Forward-Looking Statements Were
Clearly Identified And Accompanied By Cautionary
Language ........................................................................ 25

2.   Plaintiff Has Not Pled Facts Demonstrating That
Defendants Had Actual Knowledge That The
Forward-Looking Statements Were False When Made.................. 26

D.   Luminent's Optimistic Assertions Are Not Actionable ............................. 27

E.   As For The Few Allegedly Misleading Statements Of Fact –
As Opposed To Forward-Looking Statements And Opinions
– The Complaint Fails To Specify The Reasons They Were
Misleading. ........................................................................ 28

1.   Plaintiff Fails To Plead Facts Demonstrating That
Luminent's Statements Regarding Its Hedging
Activities Were False ........................................................ 29

2.   Plaintiff Fails To Show That Statements Regarding
"Residuals" And "First Loss" Tranches Were False ...................... 30

a.   The Pleadings From The HSBC Lawsuit Do Not
Contradict Mr. Moore's May 10 Statements ........................ 30

b.   The Pleadings From The Merrill Lynch Lawsuit
Do Not Contradict Mr. Moore's May 10
Statements ................................................................ 32

c.   Plaintiff Has Not Pled That The May 10
Statements Were Material.................................................. 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     d. Luminent's Second Quarter Write-Down Does Not Indicate A Material Misstatement Or Omission ................................................................................. 33

  F. Plaintiff Fails To State A Claim Under Section 10(b), So Its Section 20(a) Claim Must Fail As Well ...................................................... 34

IV. Conclusion ........................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

CASES

*Binder v. Gillespie*
  184 F.3d 1059 (9th Cir. 1999) ..................................................................... 14

*Coble v. Broadvision, Inc.*
  NO. C01-1969 CRB, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) ......................... 27

*Dura Pharmaceuticals, Inc. v. Broudo*
  544 U.S. 336 (2005) .............................................................. 20, 21

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*
  353 F.3d 1125 (9th Cir. 2004) .................................................. 24, 26

*Ernst & Ernst v. Hochfelder*
  425 U.S. 185 (1976) ............................................................... 16

*Gompper v. VISX, Inc.*
  298 F.3d 893 (9th Cir. 2002) ...................................................... 20

*In re Copper Mountain Sec. Litig.*
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................ 24, 26, 27

*In re Credit Acceptance Corp. Sec. Litig.*
  50 F. Supp. 2d 662 (E.D. Mich. 1999) ................................................ 17

*In re Cylink Sec. Litig.*
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................... 28

*In Re Daou Sys., Inc. Sec. Litig.*
  411 F.3d 1006 (9th Cir. 2005) ...................................................... 21

*In re Digital Island Sec. Litig.*
  223 F. Supp. 2d 546 (D. Del. 2002) ................................................. 34

*In re ESS Tech., Inc. Sec. Litig.*
  No. C-02-04497 RMW, 2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) ......................... 28

*In re Glenfed Sec. Litig.*
  42 F.3d 1541 (9th Cir. 1994) ....................................................... 14

*In re Hansen Nat. Corp. Sec. Litig.*
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................. 34

*In re Leapfrog Enters., Inc. Sec. Litig.*
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................ 23, 30

*In re Silicon Graphics, Inc. Sec. Litig.*
  183 F.3d 970 (9th Cir. 1999) .................................................. 4, 16, 20, 28

*In re Software Publ'g Sec. Litig.*
  NO. C 93-20246 RMW (PVT), 1994 WL 261365 (N.D. Cal. Feb. 2, 1994)................ 27

*In re Splash Tech. Holdings, Inc. Sec. Litig.*
  160 F. Supp. 2d 1059 (N.D. Cal. 2001)................................................... 24, 25

*In re Sun Healthcare Group, Inc. Sec. Litig.*
  181 F. Supp. 2d 1283 (D.N.M. 2002)........................................................ 16

*In re Vantive Corp. Sec. Litig.*
  283 F.3d 1079 (9th Cir. 2002) .................................................. 17, 20, 28

*In re Westinghouse Sec. Litig.*
  90 F.3d 696 (3d Cir. 1996) ..................................................................... 32

*In re Wet Seal, Inc. Sec. Litig.*
  518 F. Supp. 2d 1148 (C.D. Cal. 2007)..................................................... 16

*In re Worlds of Wonder Sec. Litig.*
  35 F.3d 1407 (9th Cir. 1994) .................................................................. 17

*Lentell v. Merrill Lynch & Co.*
  396 F.3d 161 (2d Cir. 2005) ................................................................... 21

*Lipton v. Pathogenesis Corp.*
  284 F.3d 1027 (9th Cir. 2002) ................................................................ 34

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*
  320 F.3d 920 (9th Cir. 2003) .................................................................. 34

*Plevy v. Haggerty*
  38 F. Supp. 2d 816 (C.D. Cal. 1998)........................................................ 29

*Powell v. Idacorp, Inc.*
  Case No. CIV 04-249-S-EJL, Case No. 04-322-S-EJL, 2007 U.S. Dist. LEXIS
  36834 (D. Idaho May 21, 2007) ............................................................. 21

*Ronconi v. Larkin*
  253 F.3d 423 (9th Cir. 2001) .................................................................. 28

*Schuster v. Symmetricon, Inc.*
  No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ........................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  127 S. Ct. 2499 (2007) ............................................................. 14, 16, 17

*Tripp v. IndyMac Fin., Inc.*
  No, CV07-1635-GW(VBRx), 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ............. 17

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*
  No. C-05 5369 PJH, 2006 U.S. Dist. LEXIS 69488 (N.D. Cal. Sept. 18, 2006) .......... 21

*Wenger v. Lumisys, Inc.*
  2 F. Supp. 2d 1231 (N.D. Cal. 1998)........................................................ 25

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

*Yourish v. California Amplifier*
  191 F.3d 983 (9th Cir. 1999) ........................................................................... 28

**RULES**

Fed. R. Civ. P.
  9(b) ............................................................................................................. passim
  12(b)(6) ............................................................................................................ 4

**STATUTES**

15 U.S.C.
  §§ 78j(b) ......................................................................................................... 34
  § 78t(a) ............................................................................................................ 34
  §§ 78u-4 et seq. ........................................................................................... passim
  § 78u-4(b)(1)(B) ........................................................................................ 14, 28
  § 78u-4(b)(2) .................................................................................................. 16
  § 78u-4(b)(3)(A) ............................................................................................ 14
  § 78u-4(b)(4) .................................................................................................. 20
  § 78u5(c) ......................................................................................................... 24

Defendants Luminent Mortgage Capital, Inc. ("Luminent" or the "Company") and S. Trezevant ("Trez") Moore, Jr., Christopher J. Zyda, and Gail Seneca (the "Individual Defendants") (collectively, "Defendants"), submit this memorandum in support of their Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint" or "CC") filed by lead plaintiff Southern Improvement Company ("Plaintiff").

## I.    INTRODUCTION

Luminent is a publicly traded real estate investment trust, or REIT, which invests in high-quality residential mortgages and mortgage-backed securities.  Luminent does not originate its own mortgage loans, nor does the company invest to any significant degree in so-called "subprime" instruments.  Yet Luminent has been swept up – along with much of the world's financial sector – in the unprecedented credit crisis triggered by the recent collapse of the subprime market.  Stripped of its rhetoric and conclusory allegations, the Complaint alleges that Luminent and its top officers committed securities fraud simply because they failed to predict that worldwide credit crisis and the negative effect it would have on Luminent's business.  But Plaintiff's theory suffers from several independently fatal flaws.

First, Plaintiff has not come close to alleging scienter.  Under the Private Securities Law Reform Act (the "Reform Act"), a complaint must "state ***with particularity*** facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind."  The Complaint is chock-full of adjectives, adverbs and bald conclusions, but conspicuously devoid of particularized ***facts*** raising a strong inference that defendants knew their statements about Luminent's liquidity and prospects for success would be swamped by the worldwide credit crisis.

The Supreme Court recently held that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).  Here, Plaintiff's allegation that Defendants acted with intent to defraud is

1

1   not even logical, let alone as compelling as the opposing inference.  Plaintiff does not allege any

2   pending stock offering or other transaction which might have motivated Luminent management to

3   inflate the price of the Company's shares.  Nor does the Complaint allege – as plaintiffs often do in

4   such cases – that the Individual Defendants engaged in insider trading, selling their shares at prices

5   artificially inflated by their alleged misstatements.  On the contrary, the Individual Defendants each

6   purchased additional shares of Luminent stock at the very time, according to Plaintiff, they knew

7   the Company's prospects were declining.  Those purchases plainly demonstrate that the inference

8   of scienter that Plaintiff seeks to draw is far less compelling than the opposite inference – that the

9   top officers of Luminent made those predictions and optimistic statements because they believed

10  them to be true.

11

12          Second, Plaintiff's claims must be dismissed for failure to plead the required element of loss

13  causation.  The Supreme Court recently reaffirmed that a Section 10(b) plaintiff must plead that the

14  investment losses it seeks to recover were caused by the defendants' alleged misrepresentations or

15  omissions, and not by other causes.  Here, Plaintiff has utterly failed to allege such facts.  In fact,

16  Plaintiff's own allegations demonstrate that the decline in the price of Luminent shares was caused

17  not by any disclosures about alleged misrepresentations by Defendants, but by the sudden and

18  unprecedented panic that swept the world's credit markets during the first week of August 2007.

19  The Complaint must be dismissed for that reason as well.

20

21          Third, Defendants' forward-looking statements are not actionable.  The essence of

22  Plaintiff's claim is that the Defendants ***wrongly predicted*** that Luminent would be able to withstand

23  the financial turmoil initiated by the subprime crisis.  But the Reform Act provides a safe harbor for

24  precisely this type of forward-looking statement.  That safe harbor requires dismissal of a fraud

25  claim unless the complaint ***both*** (i) alleges a misstatement that was not identified as forward-

26  looking and not accompanied by sufficient cautionary language about associated risks; ***and*** (ii)

2

alleges that the maker of the statement actually knew the statement was false and misleading when made.  The Complaint fails to satisfy either prong of that test.

Fourth, many of Defendants' alleged misstatements amount to "vague . . . run-of-the-mill corporate optimism on which no reasonable investor would rely."  Statements such as "Luminent is uniquely positioned to prosper," or "[w]e believe that our high quality investment management business model will continue to distinguish itself" are opinions — not statements of fact — and simply are not actionable.

Finally, the Complaint does allege a small handful of allegedly misleading factual statements – as opposed to forward-looking statements or opinions – but Plaintiff utterly fails to plead facts sufficient to demonstrate their falsity.  Under the Reform Act, Plaintiff must specify why each alleged misstatement was misleading, and Rule 9(b) requires that such allegations be stated with particularity.  This Complaint alleges none of the typical indicia of falsity, such as a public restatement of previously issued financial statements, a whistleblower, or contemporaneous internal documents that tell a different story.  At times, Plaintiff adopts a pleading style heavily criticized by the Ninth Circuit, doing "little more than copy[ing] verbatim language from [Luminent's] public filings, and then proclaim at more or less regular intervals that the statements were false."  At others, Plaintiff quotes selectively from disclosures about one class of assets, then contrasts that statement with information about an entirely different type of asset, to create the appearance of falsity.  Stripped of such sleight-of-hand, the Complaint does not plead specific facts demonstrating falsity.

In the end, the most compelling inference to be drawn from the Complaint is that Luminent shareholders suffered investment losses not because of any fraud by Defendants, but because the Company fell prey to the same unexpected and unprecedented credit crisis that drove hundreds of

3

similar companies into bankruptcy, destroyed Bear Stearns, decimated major banks in Germany and Great Britain, and continues to ripple throughout the world economy today. Try as it may, Plaintiff cannot transmute Defendants' "failure" to predict that once-in-a-lifetime crisis into an actionable claim for securities fraud.

## II.    STATEMENT OF FACTS

### A.    The Mortgage-Backed Securities Business

The news has been filled in recent months with stories about "sub-prime loans" and "mortgage-backed securities," yet those terms are rarely defined. For that reason, we start with a basic explanation of the industry in which Luminent operated throughout the purported class period – mortgage-backed securities or "MBS."

Assume that Homebuyer A gets a mortgage loan from Lender X. Depending upon the qualifications of Homebuyer A and the terms of his or her agreement with Lender X, that loan would fall into one of the following categories:

- Prime loans are generally those made to borrowers' with FICO[1] credit scores above 680.

- Mid-prime loans are generally those with borrowers' FICO credit scores between 620 and 680.

- Sub-prime loans are generally those with borrowers' FICO credit scores below 620. (RJN Ex. 4 at 25.)[2]

- Alt-A loans are made to "borrowers [who] choose the convenience of less than full documentation in exchange for a slightly higher mortgage rate." (CC ¶ 35; RJN Ex. 2 at

---

[1] A FICO score is a credit score derived from the credit model developed by Fair Isaac Corporation. A higher FICO score indicates better credit.

[2] Under the incorporation by reference doctrine, a court may consider on a Rule 12(b)(6) motion documents "'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (internal citation omitted). Defendants have submitted a Request for Judicial Notion ("RJN") describing Exhibits 1 through 16 as documents that are incorporated by reference in the Complaint.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

2.)

Lender X may choose to hold Homebuyer A's mortgage in its portfolio (*i.e.*, simply collect the interest and principal payments over the life of the loan) or, more typically, to sell that loan to a third party, Company Y, which could be a governmental, quasi-governmental, or private entity.

Company Y typically "pools" that mortgage loan with similar loans it has originated or purchased, then issues a new set of "mortgage-backed securities" or "bonds," using that pool of loans as security.[3] This process of creating a new series of securities from a pool of mortgage loans is referred to as "securitization," and the resulting instruments are called "mortgage-backed securities" or "MBS." Typically, Company Y (the "issuer") divides the expected income stream of interest and principal payments from that pool of loans into "tranches," based on the order of priority for receiving payment, then issues bonds (or MBS) corresponding with each tranche. The bonds secured by the top tranche generally entitle their holder to first claim on any payments received on account of the underlying loans; thus, those bonds have the least credit risk and, for that reason, pay holders the lowest interest rate. At the other end of the risk spectrum, holders of the "residual" or "first loss" tranches have the lowest priority claim to payments received from the underlying pool, carry the most risk, and pay the highest interest rate.

If homeowners default on the underlying mortgage loans, the amounts of defaulted payments are deducted first from amounts owing to holders of the residual or first-loss piece. If the defaulted payments exceed the amount due on the residual tranche, the defaults are deducted from payments due to the next-highest rated tranche, and so on. (CC ¶ 76.) Thus, holders of bonds secured by the residual tranches will lose their entire investment before the next-highest tranche suffers any loss at all. Conversely, each higher-rated tranche will suffer no loss whatsoever until all of the tranches below it have been wiped out entirely. For that reason, bonds secured by the top tranche are considered the safest investment, and normally carry a "AAA" credit rating. Bonds secured by the residual tranche are the riskiest, are often retained by the issuer rather than sold to

---

[3] Some large loan originators, such as Washington Mutual and Countrywide, pool their own loans and issue their own mortgage-backed securities.

third parties, and generally carry no rating at all.[4]  A security is said to be "investment grade" if it carries a relatively low risk of default and/or maintains a credit rating of at least BBB-.[5]

## B.    Luminent's Business

Luminent fully disclosed all aspects of its business to the investing public.  Throughout the purported class period, Luminent had its headquarters in San Francisco and invested in high-quality residential mortgages and mortgage-backed securities.[6]  (CC ¶ 14; RJN Ex. 5 at 2.)  Luminent did not originate any of its own mortgage loans.  Prior to August 2007, Luminent had historically paid dividends in excess of 10%.[7]  Luminent's investments generally fell into three categories, described in the following sections.

### 1.    The Spread Portfolio

Luminent disclosed that its Spread Portfolio consisted of investments in MBS issued by the quasi-governmental agency Fannie Mae and privately-issued MBS with AAA credit ratings. Luminent made money on its Spread Portfolio by borrowing at lower, short-term rates and investing the proceeds in longer-term, higher-interest investments – that is, by taking advantage of "the spread" between short-term and long-term interest rates.  (CC ¶¶ 31, 36; RJN Ex. 2 at 3.)  The high-quality MBS in the Spread Portfolio presented little credit risk, but were susceptible to interest rate risk.  (CC ¶ 32.)  If the short-term interest rates at which the Company borrowed rose, it was less likely to profit on the spread between those rates and the rates it earned on the bonds it purchased.  As of March 31, 2007, the Spread Portfolio was worth approximately $2.2 billion. (RJN Ex. 4 at 35.)

---

[4] The issuer petitions a ratings service such as Standard & Poor's or Moody's to assign credit ratings to the various classes.  Credit ratings are grades assigned to securities as a measure of their credit quality.  "AAA" is the highest credit rating under the Standard & Poor's ("S&P") and Fitch scales.  Moody's publicizes a similar credit rating scale.  When discussing credit ratings, this brief references the S&P scale.

[5] Alternatively, non-investment grade MBS have credit ratings below BBB- and are considered speculative investments.

[6] On September 25, 2007, the Company announced that, as part of its consolidation efforts, its headquarters in San Francisco would be closed and relocated to Philadelphia.  (CC ¶ 131.)

[7] As a REIT, Luminent is required to pay to its stockholders as annual dividends at least ninety percent of its "REIT taxable income."  (RJN Ex. 2 at 13.)

6

### 2.    The Mortgage Loan Portfolio

Luminent also acquired mortgage loans from originators, which it then pooled as collateral for Luminent-sponsored MBS.  (CC ¶ 34; RJN Ex. 2 at 11.)  Luminent disclosed that it purchased primarily "Alt-A" loans, and virtually no subprime loans.  (CC ¶ 60; RJN Ex. 2 at 2.)  The weighted average FICO score for Luminent's mortgage loans was 714, and Luminent held only eleven loans, or .01% of the mortgage loan portfolio, with FICO scores below the sub-prime threshold of 620. (CC ¶ 60; RJN Ex. 4 at 23.)  As of March 2007, Luminent's mortgage loan portfolio totaled approximately $5.5 billion.  (RJN Ex. 4 at 2.)

### 3.    The Credit Sensitive Portfolio

As it fully disclosed, Luminent's Credit Sensitive Portfolio held MBS with credit ratings below AAA.  (CC ¶¶ 34-37; RJN Ex. 2 at 3.)  Luminent's Credit Sensitive Portfolio offered greater returns in exchange for slightly more risk than the Spread Portfolio.  (RJN Ex. 2 at 36.)  The Credit Sensitive Portfolio is most relevant here, as plaintiff alleges that Luminent made several misrepresentations about the risks in that portfolio.[8] (CC ¶¶ 76, 90, 102, 110.)  As of May 10, 2007, none of the securities in the Credit Sensitive Portfolio "ha[d] been downgraded nor [were] any on watch to be downgraded by ratings agencies."  (CC ¶ 72; RJN Ex. 5 at 2.)  The weighted average credit rating was A- (CC ¶ 67; RJN Ex. 4 at 25), the Portfolio represented approximately ten percent of Luminent's total portfolio, and was worth approximately $1 billion (CC ¶ 39; RJN Ex. 4 at 1, 35).

### 4.    Luminent's Leverage Strategy

Securities rated A or higher typically do not offer high rates of return.  Luminent disclosed that it employed leverage to enhance those rates of return.  In other words, Luminent borrowed large amounts that it then used to purchase loans and bonds.  At all relevant times, Luminent disclosed to investors the indispensability of access to borrowed capital: "The success of our business strategies depends upon our ability to obtain various types of financing sufficient to

---

[8] The CC includes allegations regarding two specific MBS holdings.  *See* Section III.E.2, *infra*.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

purchase residential mortgage loans and mortgage-backed securities to allow us to execute our growth strategies." (RJN Ex. 2 at 19.) Luminent's borrowings took three primary forms.

Luminent utilized repurchase agreements or "repos" – short term lending agreements, in which the Company actually sold collateral to the lender and simultaneously agreed to repurchase the collateral at a set price (the original price plus interest) on a specified date (typically 30 days later). (CC ¶ 41.) The amounts repo lenders were willing to lend were based on the market value of the collateral. Thus, if the value of the collateral declined before repayment, resulting in under-collateralization, the counterparty/lender could issue a "margin call." When faced with a margin call, Luminent was required to tender additional security, or to repurchase the original collateral. (CC ¶ 42.) Luminent fully disclosed that: "Substantially all of our borrowing agreements require us to deposit additional collateral in the event the market value of existing collateral declines, which may require us to sell assets to reduce our borrowings." (RJN Ex. 2 at 8; 63.) As of year-end 2006, Luminent had repurchase agreements with a total outstanding balance of approximately $2.7 billion. (RJN Ex. 2 at 94.)

Luminent also disclosed that it raised funds by issuing asset-backed commercial paper, which consisted of short-term notes backed by collateral. Commercial paper typically required repayment in 30, 60 or 90 days. At the end of a term, Luminent typically "rolled over" its commercial paper – that is, Luminent paid off the maturing notes with new notes for the same amount. As of year-end 2006, Luminent had approximately $600 million in commercial paper borrowings. (RJN Ex. 2 at 4.) Finally, Luminent issued its own MBS, collateralized by the mortgage loans it acquired and pooled. (CC ¶ 47.) As of December 31, 2006, the outstanding balance on MBS issued by Luminent was $3.9 billion.

### 5. Luminent's Liquidity Cushion And Hedging Activities

Luminent fully disclosed that, in order to fund its day-to-day operations and meet immediate cash requirements, it maintained a liquidity cushion, consisting of cash and highly liquid, unencumbered assets. (CC ¶ 59; RJN Ex. 2 at 3.) These funds were also used to satisfy margin calls. (RJN Ex. 4 at 48.) The Company disclosed that, as of March 31, 2007, that liquidity cushion

amounted to $200 million (RJN Ex. 4 at 26.)

Luminent disclosed that it used various "hedging" strategies to mitigate the risks inherent in its investments. For example, Luminent hedged interest rate risk by purchasing investment vehicles which moved countercyclically with interest rates. Luminent explicitly warned investors that "[o]ur hedging activities might mitigate our interest rate and credit risks, but cannot completely eliminate these risks." (RJN Ex. 2 at 22.)

### C.     Luminent Reports Strong Performance Despite Turmoil In The Mortgage Industry And Insiders Continue To Buy Shares

Despite the developing subprime crisis, 2006 was a strong year for Luminent. (CC ¶¶ 58-60; RJN Ex. 2.) The Company paid a cash dividend of nearly $1 per share. (RJN Ex. 1 at 7.) The independent research analysts covering Luminent echoed the Company's belief that it was well-positioned to avoid the developing problems in the subprime industry. (CC ¶¶ 54-56.) UBS noted that delinquencies in Luminent's portfolio were "less than half the industry average." (RJN Ex. 14 at 1.)[9] However, echoing media reports Plaintiff quotes in the Complaint, the Company warned on May 10, 2007: "The increased scrutiny of the subprime lending market is one of the factors that have impacted general market conditions as well as perceptions of our business." (RJN Ex. 4 at 24.)

In the first quarter of 2007, the Company continued to report solid performance and paid a 30¢ per share dividend, although it acknowledged the deterioration in the subprime market. (CC ¶¶ 63, 67; RJN Ex. 4 at 24, 49.) The Company stressed that its mortgage loan portfolio was concentrated in Alt-A investments – higher quality loans that were not experiencing the troubles plaguing the subprime industry. (CC ¶¶ 64, 67; RJN Ex. 4 at 25.) An analyst observed that "[i]nvestor demand for alt-A paper remain[ed] strong," and "issuance of alt-A securities hit a record

---

[9] The Wall Street Journal has compiled an online database tracking the effects of the meltdown on the industry, which lists more than 80 subprime lenders that have closed, been sold, filed for bankruptcy, or exited the subprime business since the end of 2006 (available at *http://online.wsj.com/public/resources/documents/info-subprimeloans0706-sort.html#*).

9

of $104.8 billion in the fourth quarter [of 2006]."[10] Nonetheless, Luminent fully disclosed that:

> Our risk of loss is dependent upon the performance of the residential mortgage loans that we purchase directly, as well as upon the performance of the residential mortgage loans underlying the mortgage-backed securities that we purchase or securitize and retain. . . .  To the extent that the value of the property underlying our residential mortgage loans or mortgage-backed securities decreases, our security could be impaired and we could expect greater credit losses.

(RJN Ex. 2 at 16.)

Tellingly, Luminent's officers and directors – including the three individual defendants – purchased the Company's stock during the second quarter of 2007.  (RJN Ex. 5 at 2.)[11]  **Plaintiff does not allege that a single Luminent insider sold shares from January 1, 2007 through the end of the purported class period.**

The Company issued a press release on June 27, 2007, announcing that it would increase its cash dividend to 32¢ per share for the second quarter of 2007.  (CC ¶ 100; RJN Ex. 6 at 1.)  On July 30, 2007, Luminent believed it still had sufficient liquidity, and reaffirmed its plans to pay the second quarter dividend.  (CC ¶ 108; RJN Ex. 8 at 1.)

### D.  An Unprecedented Global Credit Crisis Forces Luminent to Suspend Its Dividend

Then, in early August, an unprecedented panic swept the global credit markets.  As Alan Greenspan put it, "[v]irtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt. . . ." Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J. (Dec. 12, 2007) (RJN Ex. 25 at 1.)  Luminent itself disclosed on August 6 that, "since August 3, 2007, the mortgage industry, and the financing methods that the mortgage industry relies upon, have deteriorated significantly and in an unprecedented fashion." (RJN Ex. 9 at 6.)  As even Plaintiff

---

[10] Harry Terris, *Alt-A Tremors*, Am. Banker (Feb. 22, 2007) (RJN Ex. 15 at 1); *see also* Richard Beales, et al., *Subprime Fears Lift Treasuries*, Fin. Times (Feb. 27, 2007) (noting that analysts doubted that subprime would affect other securities) (RJN Ex. 16 at 1).

[11] Gail Seneca, Luminent's founder and board chair, purchased 10,000 shares on April 11, 2007.  (RJN Ex. 17.)  Trez Moore, its CEO, purchased 1,000 shares on April 12, 2007 and another 1,000 shares on June 21, 2007.  (RJN Exs. 18 & 19.)  Chris Zyda, the CFO, purchased 10,000 shares on June 12, 2007.  (RJN Ex. 20.)  Another member of the Board of Directors purchased 40,000 shares during the last weeks of June.  (RJN Ex. 21, 22.)

10

concedes, JPMorgan described the events of early August as a ***"perfect storm of market forces."*** (CC ¶ 121 (emphasis added).)

In August, investors and lenders suddenly shunned all debt that relied on any residential mortgage collateral – even collateral which, like Luminent's, had no relationship to subprime loans and very high credit ratings. These events caused the asset-backed commercial paper ("ABCP") markets to dry up entirely and, despite its minimal subprime exposure, Luminent lost access to a key source of funding. (RJN Ex. 12 at 8.) The Reserve Bank of Australia summarized the market deterioration as follows:

> The period since the peak in ABCP outstanding in late July/early August 2007 has been one of ***considerable turbulence in financial markets***. As has been well documented elsewhere, the trigger for this current episode of volatility was the ***collapse of investor confidence in securities backed by US sub-prime mortgage debt, which led to a general reassessment of the risks involved with structured credit markets.*** The ABCP market has been one of the most affected. ***Uncertainty over exposure to the US sub-prime market has resulted in many investors becoming unwilling to roll over ABCP or only doing so at shorter maturities and significantly higher spreads.[12]***

Likewise, a U.S. Department of Treasury official noted:

> ***In early August, this uncertainty [in the RMBS market] began to spread to the asset-backed commercial paper market, typically a very liquid market.*** The uncertainty surrounding the health of the assets underlying commercial paper (especially asset-backed commercial paper, which represents approximately 55% of the commercial paper market) compelled investors to shorten the terms to maturity that they were willing to purchase and, ***in some cases, even to decline to buy such paper altogether.[13]***

---

[12] Susan Black, *The Asset-Backed Commercial Paper Market*, Australia Reserve Bank Bulletin (Jan. 2008). (RJN Ex. 24 at 5) (emphasis added).)

[13] Testimony of Robert K. Steel, Undersecretary for Domestic Finance, U.S. Department of Treasury, Before House Committee on Financial Services (Sept. 5, 2007). (RJN Ex. 23 at 3 (emphasis added).)

This Federal Reserve graph shows the dizzying drop in demand for ABCP in August 2007:[14]



As a result of unprecedented panic, on August 6 the commercial paper market in Europe failed to open. Suddenly, investors fled all mortgage-backed lending, in reaction to credit stresses in the subprime mortgage market and their potential to infect even AAA-rated instruments. As a result of this unprecedented freezing of the credit markets, Luminent found itself on August 6 with approximately $168 million of commercial paper due and owing, but no buyers for the new notes it would normally use to replace expiring ABCP contracts. (CC ¶ 118.) Luminent's inability to roll over its commercial paper led it to announce on August 6:

> Effectively, the secondary market for mortgage loans and mortgage-backed securities has seized up. As a result, Luminent is simultaneously experiencing a significant increase in margin calls on its highest quality assets and a decrease on the financing advance rates provided by its lenders.

---

[14] Federal Reserve Bank of Dallas, Economic Letter – Insights from the Federal Reserve Bank of Dallas (Dec. 2007) (available at http://www.dallasfed.org/research/eclett/2007/el0712.html).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

(RJN Ex. 9 at 6.)  Luminent suspended payment of its second quarter dividend, extended the maturity of certain outstanding commercial paper, cancelled its scheduled second quarter earnings release, and delayed the filing of its 10-Q.  (CC ¶ 123.)  In the aftermath, Luminent's stock price declined by seventy-five percent.  (CC ¶ 128.)

In earlier SEC filings, Luminent had cautioned investors of the risk of such a scenario:

A margin call requires us to post more collateral or cash with our counterparties in support of our financing or hedging activities. We face the risk that we might not be able to meet our debt service obligations or margin calls and, to the extent that we cannot, we might be forced to liquidate some or all of our assets at disadvantageous prices that would adversely impact our results of operations and financial condition.

(RJN Ex. 2 at 20.)

So large and unexpected was the worldwide liquidity crisis that the European Central Bank announced in early August that it was injecting billions of Euros into the market, in order to restore calm; it continued the injections into September.  The U.S. Federal Reserve joined in during the second week of August.[15]  The overall rescue operation was the largest  single infusion of liquidity in history, surpassing a similar operation by market regulators after the tragedy of September 11, 2001.[16]

**E.     Plaintiff's Allegations**

Against this backdrop of unprecedented market turbulence, Plaintiff now sues Luminent, its former CEO and Board Chair Gail Seneca, its current CEO Trez Moore, and its former CFO Christopher Zyda, for alleged violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10B-5 (CC ¶ 10).  The central premise of the Complaint is that Defendants intentionally or with deliberate recklessness misrepresented the quality of Luminent's asset portfolio, the adequacy of its liquidity reserves to meet future requirements, and the certainty of its second-quarter dividend.  (CC ¶¶ 76, 90, 102,

---

[15] Eric Dash, *The Fed's Sudden Action Eases a Logjam in Corporate Borrowing*, N.Y. Times (Aug. 18, 2007).  (RJN Ex. 26 at 1.)

[16] Tom Buerkle, *Spenders of Last Resort*, Institutional Investor (Jan. 2008).  (RJN Ex. 27 at 1.)

13

110.)  Plaintiff contends that Defendants' misleading statements lead to a bullish article on

Luminent, published in *Barron's* on June 25, 2007, and persisted until JP Morgan issued an analyst

report on August 6, 2007, casting doubt on Luminent's ability to survive the credit crisis.  (CC

¶¶ 98, 121.)  Thus, the alleged class period begins June 25, 2007 and ends August 6, 2007.

## III.    ARGUMENT

To state a claim under Section 10(b), a plaintiff must allege: "(1) a misrepresentation or

omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5)

that proximately cause[d] the alleged loss."  *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.

1999).  In addition, Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened

pleading standard on claims sounding in fraud: "In all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity."  *In re Glenfed Sec.*

*Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994).

Plaintiff's claims are subject to additional pleading requirements imposed by the Reform

Act, which Congress intended to curb "nuisance filings, targeting of deep-pocket defendants,

vexatious discovery requests and manipulation by class action lawyers."  *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 (2007) (internal citations omitted).  Among others, the

Reform Act requires that a securities fraud complaint "specify each statement alleged to have been

misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-

4(b)(1)(B).  If the Reform Act's pleading requirements are not met, "the court **shall**, on the motion

of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

Plaintiff has failed to state particularized facts raising a strong inference of scienter, and has

failed to plead facts demonstrating loss causation.  Each of those failures standing alone dooms the

entire Complaint.  In addition, Plaintiff's allegations of false statements can be catalogued into four

categories (*see* Appendix A for specific challenges),[17] each of which suffers from multiple other

---

[17] The Complaint fails to indicate clearly which of the quoted statements by Defendants are
alleged to be misleading.  For that reason, enclosed herewith as Appendix A is a compilation of
alleged misstatements, which identifies each alleged misstatement, notes the source of the alleged
misstatement, and summarizes the applicable argument(s).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

deficiencies that also require dismissal:

1.    Statements About Liquidity.  Plaintiff alleges that Defendants made a number of misstatements about Luminent's liquidity.  But Luminent fully disclosed the size of its liquidity cushion at all relevant times—$200 million in cash and liquid assets as of December 31, 2006 and March 31, 2007—and Plaintiff does not allege that any such factual statement was false at the time it was made.  Instead, Plaintiff claims that Defendants falsely assured the market that the Company's liquidity cushion would be sufficient to meet future market developments.  But such predictions about future operations and market conditions are classic "forward-looking statements" and, to maintain a claim based on them, Plaintiff must overcome the Reform Act's explicit safe harbor, by showing that Defendants had "actual knowledge" of their falsity.  This Plaintiff has utterly failed to do.  Moreover, many of those statements about liquidity were also inactionable statements of opinion or general optimism.

2.    Statements About Asset Quality.  Plaintiff alleges that Defendants misrepresented that Luminent's higher quality mortgage assets were well-positioned to avoid the turmoil roiling subprime markets.  The Complaint does not adequately allege facts demonstrating that any statement about the quality of Luminent's assets was false.  Instead, Plaintiff repeatedly quotes disclosures about one set of assets (*e.g.*, the mortgage loan portfolio), then contrasts it with later disclosures about an entirely different set of assets (*e.g.*, bonds in the Credit Sensitive Portfolio), seeking to create a misleading impression of falsity.  Plaintiff's mixing of apples and oranges obviously cannot support an inference of falsity.  Additionally, Plaintiff has failed to allege that the few bonds in question were material to Luminent's balance sheet, which reflected billions in total assets.[18]

3.    Statements About Credit Risk.  Plaintiff alleges that Luminent made factual misrepresentations about whether certain portfolios (mortgage loans, AAA-rated and agency-

---

[18] Luminent's total assets were $8.6 billion as of year-end 2006.  (CC ¶ 38.)  However, since Plaintiff alleges that statements made on May 10, 2007 were false and misleading, and those statements were referring to Luminent's performance in the first quarter of 2007, it matters that Luminent's total assets were $9 billion for the quarter ending March 31, 2007.  (RJN Ex. 4 at 2.)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

bonds) had credit risk, but fails to allege that these portfolios ever suffered credit related losses (in contrast to the Credit Sensitive Portfolio of MBS bonds rated less than AAA).

4.    General Statements Of Opinion And Optimism.  Plaintiff also attacks numerous statements of opinion and corporate optimism, but courts routinely hold that such generalized statements are not actionable as a matter of law.

**A.    Plaintiff Has Failed To Plead With Particularity Facts Giving Rise To A Strong Inference That Defendants Acted Knowingly, Intentionally Or With Deliberate Recklessness**

To establish liability under Section 10(b), Plaintiff must plead that Defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976).  Under the Reform Act, a complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(emphasis added).  "In order to plead 'with particularity', [Plaintiff] must provide all the facts forming the basis for [its] belief in great detail." *Silicon Graphics*, 183 F.3d at 983.

The Supreme Court recently held that "the inference of scienter must be "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S. Ct. at 2510.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

**1.    Plaintiff Fails To Raise A Cogent And Compelling Inference Of Scienter, And Defendants' Stock Purchases Negate Any Such Inference**

As an initial matter, Plaintiff offers no coherent theory of motive.  While "the absence of a motive allegation is not fatal," the Supreme Court in *Tellabs* affirmed the well-established rule that "personal financial gain may weigh heavily in favor of a scienter inference." *Id.* at 2511; *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177-1178 (C.D. Cal. 2007) ("[T]he lack of any tangible, personal benefit here further weighs against the Officer Defendants having scienter."); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002) (finding

16

"it particularly noteworthy that they have utterly failed to present a logical motive for Defendants' alleged fraud").

Plaintiff does not allege – because it cannot – that Defendants sought personal financial gain from their alleged fraud, such as from insider stock sales. *E.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994).[19]  In fact, ***the Individual Defendants were actively purchasing Luminent stock*** at the very same time Plaintiff alleges they were artificially inflating its price. There can be no reasonable inference of scienter where there is "undisputed evidence that defendants were actually harmed by their alleged fraud." *Schuster v. Symmetricon, Inc.*, No. C9420024RMW, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000) (insiders held their stock and purchased new options at supposedly inflated prices, negating any inference of scienter).  Faced with far less compelling facts than those presented here, the Ninth Circuit concluded that no reasonable jury could find scienter where defendants "sold only a minuscule fraction of their holdings . . . and ended up reaping the same large losses as did Plaintiffs." *Worlds of Wonder*, 35 F.3d at 1425.[20]

The Supreme Court held in *Tellabs* that, in determining whether scienter has been adequately pled, "court must consider plausible nonculpable explanations for the defendant's conduct."  127 S. Ct. at 2510.  Here, the most "plausible nonculpable explanation" is that Defendants acted with a good faith belief in Luminent's prospects, and ***they put their money where their mouths were***.  That explanation is "at least as compelling" as Plaintiff's nonsensical assertion – that Defendants intentionally inflated the price of Luminent shares, then purchased those shares for their own accounts, at the inflated prices!

---

[19] Nor have Plaintiffs alleged that there was a pending stock offering or potential transaction that motivated Luminent to make intentionally false statements about the security of its liquidity or the strength of its portfolios. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1096-97 (9th Cir. 2002) (recognizing that in some cases corporation transactions could give rise to an inference of scienter).

[20] *See also Tripp v. IndyMac Fin., Inc.*, No, CV07-1635-GW(VBRx), 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) ("[T]he individual Defendants retained such a large percentage of their stock that an inference of scienter is functionally negated."); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) (finding that CFO's failure to sell any shares undermined inference of scienter).

17

**2.    Plaintiff's Specific Attempts To Allege Facts Demonstrating Scienter Fall Far Short Of The Mark**

Though the Complaint is ambiguous, it appears to allege three factual bases for concluding that Defendants acted intentionally or with deliberate recklessness in making their alleged misstatements: (1) a single margin call that occurred before August 2007; (2) an isolated write-down in the value of certain MBS; and (3) events occurring on or after August 6, 2007.[21] (CC ¶ 110.) None of these bases comes close to carrying Plaintiff's burden.

**a.    Plaintiff's Allegations Regarding Margin Calls Do Not Raise A Strong Inference Of Scienter**

The Complaint alleges that "[c]ontrary to defendants' representations about the Company's ample liquidity and secure dividend, in fact Luminent had been liquidating a significant part of its MBS portfolio in July 2007 to satisfy multiple margin calls from at least eight lenders." (CC ¶ 111.) But Plaintiff's allegations are conspicuously short on details regarding the timing and amount of the alleged margin calls.

The Complaint cites a retrospective presentation made by the Company in November 2007, which stated that Luminent had sold MBS at a loss of approximately $114 million in "July/August 2007." (*Id.*) But the generality of that quoted time frame renders Plaintiff's allegation meaningless. The sudden and disastrous market developments which caused Plaintiff's stock to lose much of its value had occurred and been fully disclosed by August 6. By that time, everyone knew that Luminent had insufficient liquidity to deal with the dramatically changed market circumstances, so events occurring after that date are irrelevant to Plaintiff's scienter argument.[22]

Plaintiff alleges specific facts demonstrating only ***one margin call*** prior to the market

---

[21] As discussed below, Plaintiffs allegations concerning Luminent's third-quarter hedging activities have no relation to the June 27 and July 30 alleged misstatements. *See* Section III.E.1 *infra*.

[22] Moreover, in quoting Luminent's disclosure about its liquidation of securities, Plaintiff omits a key portion of that disclosure, which places the events in temporal context. Luminent stated that it had liquidated securities because, "*[s]ince August 7, 2007,* eight of the Company's repo lenders declared the Company in default . . . .*" (RJN Ex. 11 at 7.) The omitted portion of that disclosure plainly undercuts that inference that Plaintiff seeks to draw – that Luminent was selling off significant portions of its portfolio well before August 6.

18

disruptions of early August – a July 10, 2007 margin call of $500,224.42, which was promptly satisfied the next day.  (CC ¶ 113.)  Plaintiff does not explain – nor can it – how a single margin call, immediately satisfied by the Company, can be said to demonstrate that Defendants knew that some or all of their prior statements were materially misleading.

Plaintiff also alleges that Luminent subsequently received margin calls on August 2 (a Thursday), August 3 (a Friday), and August 6 (a Monday), totaling more than $35 million.  (CC ¶¶ 114-117.)  But the fact is that Luminent wasted no time in announcing on Monday, August 6 that it was "experiencing a significant increase in margin calls" and would suspend its divided payment. (CC ¶ 123.)  Plaintiff does not and cannot explain how those margin calls demonstrate that Defendants had the requisite scienter at some earlier point in time, or why Defendants had some duty to make an even quicker public disclosure of these new developments.

In short, Plaintiff alleges facts demonstrating only one margin call in July, which was immediately satisfied by Luminent – facts plainly insufficient to raise a strong inference that Defendants knew or consciously disregarded that any of their statements were false.

### b. Plaintiff's Vague Allegations About A Bond Write-Down Do Not Create A Strong Inference Of Scienter

The Complaint alleges that, when Luminent announced its second quarter financial results on September 26, 2007, it disclosed that it had written down the value of certain bonds by $14.4 million.  (CC ¶¶ 103-104.)[23]  Plaintiff seems to imply that Luminent actually made that write-down at some earlier date, and that the write-down apparently put Defendants on notice that their prior statements about Luminent's future prospects were materially misleading.  (CC ¶¶ 103-04.)  ***But Plaintiff fails to allege a single fact to support that bald conclusion:*** no allegation of a date on which the write-down decision was allegedly made; no suggestion of who within the company actually made that decision; no facts that might support a finding that any Individual Defendant knew about that write-down before it was announced publicly.

---

[23] Although Plaintiffs allege the write-down was $14.4 million, it was actually $14.1 million.  (RJN Ex. 4 at 11.)

19

In fact, companies typically make their accounting decisions – including any necessary write-downs of assets – as they prepare their quarterly financial statements. Here, because of the dramatic market developments of early August and their disastrous effect on its business, Luminent delayed the release of its second quarter financial statements until September 26, 2007 – nearly two months after the full ramifications of Luminent's predicament had been fully disclosed. (RJN Ex. 11.) Plaintiff has alleged absolutely no facts from which a reasonable jury could conclude that Luminent made or recognized the need to make this particular write-down at some earlier time, let alone before August 7.

In short, Luminent's September 27 announcement of a $14.4 million write-down cannot logically support any inference – let alone a strong inference -- that Defendants acted with scienter.

> **c.** **Plaintiff's Reliance On Events Occurring After August 6 To Demonstrate Scienter Amount To Impermissible Pleading Of Fraud By Hindsight**

Plaintiff points to Luminent's suspension of its dividend on August 6, as well as any number of other announcements made on or after that date, and essentially alleges that Defendants "must have known" about those facts at some earlier date. (*E.g.*, CC ¶¶ 102.) But this is nothing more than a classic – and impermissible – attempt to plead "fraud by hindsight." *See Silicon Graphics*, 183 F.3d at 988 ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'"); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) ("Congress's basic purpose . . . [was] to eliminate abusive opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight."); *Vantive Corp.*, 283 F.3d at 1084-85. Use of such hindsight is especially inappropriate where, as here, even Plaintiff admits that dramatic intervening events occurred between the alleged misstatement and the subsequent event which allegedly proves scienter.

### B. Plaintiff Has Failed To Plead The Loss Causation Element Of Its Claims

Under Section 10(b), Plaintiff bears the burden of proving that the act or omission of the defendant . . . caused the loss for which plaintiff seeks to recover damages. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *see also* 15 U.S.C. § 78u-4(b)(4). When, as here, "'plaintiff's

20

loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a Plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).

In order to plead this loss causation element adequately, Plaintiff must allege: (1) that it paid an artificially inflated price for its Luminent stock; and (2) that the stock price fell "after the truth became known" regarding the Company's misrepresentations.  *Dura*, 544 U.S. at 347.  After *Dura*, courts have routinely held that investors cannot recover under Section 10(b) for a stock price decline unless that decline was caused by a disclosure of the "truth" about the defendants' alleged misrepresentations.  *See In Re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026 (9th Cir. 2005) ("[I]f the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages.").  In *Lentell*, the Second Circuit held that "loss causation has to do with the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the 'harm actually suffered', a fraud claim will not lie."  396 F.3d at 174 (quotations and citations omitted).  Courts in the Ninth Circuit and elsewhere routinely dismiss complaints at the pleading stage for failure to plead facts demonstrating loss causation.  *See, e.g.*, *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, No. C-05 5369 PJH, 2006 U.S. Dist. LEXIS 69488, at *37-38 (N.D. Cal. Sept. 18, 2006); *Powell v. Idacorp, Inc.*, Case No. CIV 04-249-S-EJL, Case No. 04-322-S-EJL, 2007 U.S. Dist. LEXIS 36834, at *11-12 (D. Idaho May 21, 2007).

Here, the Complaint contains a section apparently addressed to loss causation, entitled "The Truth Begins To Emerge" (CC ¶¶ 121, *et seq.*).  But Plaintiff's allegations fall far short of carrying its burden.  First, it should be noted that, by the time Plaintiff alleges that "the truth" began to be

21

disclosed to the market – August 6, 2007 – Luminent stock had already lost 36% of the value it had at the start of the purported class period.[24]  Thus, even accepting Plaintiff's loss causation allegations at face value, 36% of its investment losses during the purported class period occurred before any corrective disclosures had been made, and cannot be recovered as a matter of law.

More importantly, ***Plaintiff fails to allege any corrective disclosure whatsoever***, which revealed "the truth" about Defendants' alleged misstatements and omissions.  On the contrary, all of the "corrective disclosures" alleged by Plaintiff were analyst reports and other public statements discussing ***the sudden and severe market developments of early August***, which had a devastating effect on Luminent's business.  For example, the August 6, 2007 JP Morgan report, which Plaintiff identifies as the first indicator of "the truth," described the ***"perfect storm of market forces"*** affecting Luminent, stating that ***"all aspects of the mortgage market have been changing dramatically on a daily basis***, and [Luminent's] liquidity could become an issue should this trend continue." Following that report about the dramatic market changes, Luminent stock fell by 30%. (CC ¶¶ 121-22) (emphasis added).)

Plaintiff also cites a press release issued by Luminent after the markets closed on August 6. Like the JP Morgan report, that press release did not disclose any "truths" about previously misstated or omitted facts.  Rather, Luminent described the same rapid deterioration in the market, and announced that those market forces necessitated the cancelling of its second-quarter dividend:

> since August 3, 2007, ***the mortgage industry and the financing methods that the mortgage industry relies upon, have deteriorated significantly and in an unprecedented fashion.  Effectively, the secondary market for mortgage loans and mortgage-backed securities has seized up.***  As a result, Luminent is experiencing a significant increase in margin calls on its highest quality assets and a decrease on the financing advance rates provided by its lenders.

(CC ¶ 123) (emphasis added).)

---

[24] On June 27, two days after the start of the purported class period, Luminent shares were trading at $ 9.90 (CC ¶ 100).  Plaintiff alleges that "the truth beg[an] to emerge" on August 6, 2007, with the issuance of a JPMorgan analyst report (CC ¶ 121).  But, by the close of trading on August 3, the prior business day, Luminent's stock price had already fallen to $6.33 (CC ¶ 122).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

Plaintiff correctly alleges that "[a]nalysts reacted swiftly and negatively" (CC ¶ 124), but those subsequent analyst reports also focused not on any new revelations about alleged misstatements by Luminent, but on the disastrous market developments of early August and their effect on the Company.

- A Deutsche Bank report stated: "*As a result of the significant and rapid market deterioration*, we expect Luminent to liquidate assets to meet margin calls." (*Id.* (emphasis added).)

- A second JP Morgan report, issued on August 7, stated: "It is clear that the *drastic spread widening in mortgages, especially high grade bonds*, caused significant margin call activity *over the course of the last five trading days*." (CC ¶ 127 (emphasis added).)

- Luminent issued another press release on August 7, which again referenced *"the sudden and extraordinary disruptions in the secondary and national real estate markets"* and reported that *"because the financing methods the mortgage industry normally relies upon have deteriorated in an unprecedented fashion,* [Luminent] has experienced a significant increase in margin calls on its highest quality assets, *especially since August 3*, and a decrease on the financing advance rates provided by its lenders.*"* (CC ¶ 128 (emphasis added).)

Investor reaction to these disclosures about market developments and their effect on Luminent's business pushed the Company's stock down by 75% on August 7. (CC ¶ 129.)

In short, Plainitff's own allegations demonstrate that "the truth" that "beg[an] to emerge" on August 6, 2007, was not the truth about any alleged misrepresentations by Defendants – because there had been none – but the truth about the sudden and severe market developments of early August, and their devastating impact on Luminent's business. Plaintiff's own allegations plainly demonstrate that their investment losses were caused by those market developments, not by "any disclosing events 'revealing' any previous misstatement or concealed 'truths.'" *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1041 (N.D. Cal. 2007). Plaintiff has failed to allege

facts demonstrating loss causation, and the Complaint should be dismissed for that reason as well.[25]

### C.    Luminent's Forward-Looking Statements Are Protected By The Reform Act's Statutory Safe Harbor

Plaintiff alleges that Defendants made numerous false and misleading statements about Luminent's future prospects.  In fact, reduced to its essence, the Complaint alleges that Defendants failed to predict the unprecedented market disruptions that occurred in early August, and the disastrous effects those market developments would have on Luminent's business.

But the Reform Act contains a safe-harbor provision, which precludes a finding of liability on the basis of such "forward-looking" statements.  The safe harbor applies in two instances: 1) where the statement is identified as forward-looking and is accompanied by cautionary statements identifying factors that could cause results to differ materially from those predicted; *or* 2) where plaintiff fails to plead and prove that Defendant knew the forward-looking statement was false at the time it was made.  15 U.S.C. § 78u5(c).  Dismissal is required if *either prong* is satisfied.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1068 (N.D. Cal. 2001).  The purpose of the safe harbor is to encourage companies to disclose forward-looking information to investors.  *Id.* (citing H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995)).[26]

Statements made with present-tense verbs are nevertheless treated as forward-looking if "the truth or falsity of the statement cannot be discerned until some point in time after the statement is

---

[25] With respect to certain of the alleged misstatements, Plaintiff does not even attempt to plead loss causation.  Plaintiff alleges that the truth regarding Luminent's hedging activities and the $14.4 million write-down was revealed in the third-quarter 10-Q, filed September 26, 2007 (CC ¶ 110) and that the truth about its Credit Sensitive Portfolio was disclosed in pleadings filed in the HSBC and Merrill Lynch cases, which commenced on October 18, 2007 and December 24, 2007, respectively (CC ¶¶ 92, 95).  But Plaintiff does not allege that any decline in the price of Luminent shares accompanied those alleged curative disclosures.

[26] The Reform Act's safe harbor is the statutory complement to the "bespeaks caution" doctrine, which "provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (citing 15 U.S.C. § 78u5(c)) (other citations omitted); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 866 (N.D. Cal. 2004) (describing both doctrines).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

made." *Id.*  Here, for example, Plaintiff claims that statements about the sufficiency of Luminent's liquidity (*e.g.*, "We maintain ample liquidity to manage our business") were false and misleading. (CC ¶ 60.)  Yet Luminent regularly disclosed the precise amount of its liquidity cushion (*e.g.*, as of March 31, 2007, liquidity totaled $200 million (CC ¶ 65)), and Plaintiff does not allege that those factual statements were false or misleading.  Nor does Plaintiff allege that Luminent's liquidity cushion was inadequate to manage the Company's then-current business, at any time prior to early August.  What Plaintiff does allege is that Luminent's liquidity cushion proved insufficient to deal with the disastrous consequences flowing from the unprecedented market disruptions of early August.  In other words, ***Plaintiff alleges that Luminent failed to correctly predict the adequacy of its liquidity cushion to cover future developments.***  (*e.g.,* CC ¶ 102.)  Thus, even though Luminent's allegedly misleading statement was phrased in the present tense ("We maintain ample liquidity"), the truth of that statement – as interpreted by Plaintiff – could not be "discerned until some point in time after the statement [was] made," *Splash*, 160 F. Supp. 2d at 1068, so it must be treated as a forward-looking statement, entitled to protection of the Reform Act's safe harbor.

### 1.     Luminent's Forward-Looking Statements Were Clearly Identified And Accompanied By Cautionary Language

Generally, Plaintiff alleges that Defendants made misleading forward-looking statements regarding Luminent's liquidity, credit risks, business model and future performance.[27]  Plaintiff's allegations of misleading statements revolve around the same general theme – Defendants predicted that Luminent would not succumb to the ongoing problems in the mortgage-backed securities business.  (*e.g.,* CC ¶ 83.)  But each of Luminent's press releases, earnings statements, transcripts, and annual statement included a statement that the documents "contain forward-looking statements" and that all statements "other than statements of historical fact are forward looking."[28]  Luminent

---

[27] *See* CC ¶ 83 (RJN Ex. 1); CC ¶ 59 (RJN Ex. 2); CC ¶¶ 66-70 (RJN Ex. 4); CC ¶¶ 71-76 (RJN Ex. 5); CC ¶¶ 61-65 (RJN Ex. 3); CC ¶¶ 100-01 (RJN Ex. 6); CC ¶¶ 105-07 (RJN Ex. 7); CC ¶¶ 108-09 (RJN Ex. 8).  See Appendix A for more detailed information.

[28] *See* RJN Ex. 1 at 9; RJN Ex. 2 at ii; RJN Ex. 4 at ii; RJN Ex. 5 at 1; RJN Ex. 3 at 9; RJN Ex. 6 at 1; RJN Ex. 7 at 8; RJN Ex. 8 at 7-8.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

also cautioned that investors should not "rely unduly on those forward-looking statements."[29] Luminent was scrupulous about warning investors of the risks and uncertainties affecting its business.[30]

Every one of the allegedly false, forward-looking statements was accompanied by adequate cautionary statements, identifying factors that might cause actual results to differ from the Company's projections.[31]  Indeed, in the first press release cited in the Complaint,[32] Luminent warned that its forward-looking statements were contingent on its "ability to obtain or renew sufficient funding to maintain its leverage strategies" and the "continued creditworthiness of the holders of mortgages underlying Luminent's mortgage-related assets," among other risks.[33]  (RJN Ex. 1 at 9.)

Because each of the forward-looking statements identified in Appendix A was accompanied by adequate cautionary language, the first prong of the Reform Act's safe harbor clearly applies, and all claims based on those forward-looking statements should therefore be dismissed.

### 2.    Plaintiff Has Not Pled Facts Demonstrating That Defendants Had Actual Knowledge That The Forward-Looking Statements Were False When Made

As demonstrated above, Plaintiff has not come close to carrying its burden to plead specific

---

[29] *See* RJN Ex. 1 at 9; RJN Ex. 2 at ii; RJN Ex. 4 at ii; RJN Ex. 5 at 1; RJN Ex. 3 at 9; RJN Ex. 6 at 1; RJN Ex. 7 at 8; RJN Ex. 8 at 7-8.

[30] The Reform Act "does not require a listing of all factors that might make the results different from those forecasted.  Instead, the warning must only mention important factors of similar significance to those actually realized."  *Copper Mountain*, 311 F. Supp. 2d at 882. Cautionary language must accompany forward-looking statements, but it need not be included immediately before or immediately after the forward-looking statement.  *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1242 (N.D. Cal. 1998).

[31] The allegedly false forward-looking statements are identified in Appendix A, Nos. 5, 6, 7, 9, 11, 13, 15, 17, 20, 21, 23, 25, 27, 28, 29, 33, 36, 39, 40, 41, 42, 45, and 46, as are the cautionary disclosures related to each.

[32] CC ¶ 51.

[33] Like the written disclosures, Luminent's conference call was also accompanied by a contemporaneous press release and the filing of the Company's first-quarter 10-Q, both of which adequately disclosed potential credit, interest, and liquidity risks.  *Clorox Co.*, 353 F.3d at 1133 (holding that PSLRA safe harbor applies where oral forward-looking statements are accompanied by cautionary statements in a company's "'readily available written documents'").

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

1  facts giving rise to a strong inference that defendants acted intentionally or with deliberate

2  recklessness in making any of the misstatements alleged in the Complaint.  Plaintiff obviously fails

3  then to satisfy the even higher scienter standard imposed by the Reform Act safe harbor for

4  forward-looking statements – to plead facts demonstrating that defendants **actually knew** their

5  statements were false.  Therefore, the second prong of the safe harbor also applies, and claims

6  based on those forward-looking statements should be dismissed for that independent reason as well.

7      **D.    Luminent's Optimistic Assertions Are Not Actionable**

8      Plaintiff points to several general statements of optimism by Luminent as actionably false

9  and misleading, for example:

10  • "Luminent is uniquely positioned to prosper in a challenging mortgage market."  (CC ¶ 52.)

11  • "Our solid first quarter results reflect Luminent's asset management skill and effective risk

12  management."  (CC ¶ 62.)

13  • "We believe that our high quality investment management business model will continue to

14  distinguish itself through solid performance over time."  (CC ¶ 72.)

15  These alleged misstatements – and the others listed in Appendix A[34] – are not actionable as

16  a matter of law, because they "are vague and constitute run-of-the-mill corporate optimism on

17  which no reasonable investor would rely."  *Copper Mountain*, 311 F. Supp. 2d at 869.  "Vague and

18  indefinite opinions" are not subject to objective verification, and are therefore not actionable,

19  because "they are considered immaterial and [are] discounted by the market."  *Id.* at 868; *see also*

20  *Coble v. Broadvision, Inc.*, NO. C01-1969 CRB, 2002 WL 31093589, at *1 (N.D. Cal. Sept. 11,

21  2002) (statement that company was "very well positioned . . . to thrive and emerge an even a

22  stronger player" not actionable); *In re Software Publ'g Sec. Litig.*, NO. C 93-20246 RMW (PVT),

23  1994 WL 261365, at *5 (N.D. Cal. Feb. 2, 1994) (assertion "[o]ver the next year, we expect market

24  conditions to be extremely competitive, but we believe we are prepared for the challenge" not

25  actionable).

26

27      [34] The nonactionable statements of corporate optimism are identified in Nos. 1, 2, 3, 13, 14,

28  16, 18, and 31 of Appendix A.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

Many of Defendants' alleged misstatements clearly amounted to harmless statements of corporate optimism, and claims based upon them must be dismissed.

### E.    As For The Few Allegedly Misleading Statements Of Fact – As Opposed To Forward-Looking Statements And Opinions – The Complaint Fails To Specify The Reasons They Were Misleading.

Plaintiff fails to adequately plead another essential element of its securities fraud claim – the falsity of Defendants' statements. Under the Reform Act, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see* Fed. R. Civ. P. 9(b) ("circumstances constituting fraud or mistake shall be stated with particularity"). Allegations must show that the statements were false or misleading at the time they were made. *See Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001). "Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'" *Silicon Graphics*, 183 F.3d at 988. Thus, an allegation that relies solely on hindsight fails to plead falsity with the required specificity. *Vantive Corp.*, 283 F.3d at 1085.

The Complaint does not allege the typical proof of falsity, such as a restatement of previously published financial statements, *e.g.*, *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that . . . statements were restated at all" is sufficient to establish falsity at the pleading stage), or contradictory statements by confidential witnesses, *e.g.*, *In re ESS Tech., Inc. Sec. Litig.*, No. C-02-04497 RMW, 2004 WL 3030058, at *3-*7 (N.D. Cal. Dec. 1, 2004) (relying on the statements of various confidential witnesses to establish falsity). Plaintiff seems to have engaged in the pleading style criticized in *Yourish v. California Amplifier* -- they "have done little more than copy verbatim language from [Luminent's] public filings, and then proclaim at more or less regular intervals that the statements were false." 191 F.3d 983, 995 (9th Cir. 1999) (quotation omitted).

Plaintiff appears to allege three categories of factual statements (as opposed to forward-looking statements or opinions) that were false and misleading: (1) alleged exaggerations about the

28

sufficiency of Luminent's hedging activities; (2) alleged mischaracterizations regarding certain assets in the credit sensitive portfolio; and (3) alleged failure to disclose quickly enough a second-quarter write-down.[35]  But each category of allegation fails to meet the pleading standards of the Reform Act, as explained below and in Appendix A.[36]

### 1.    Plaintiff Fails To Plead Facts Demonstrating That Luminent's Statements Regarding Its Hedging Activities Were False

The Complaint alleges that Luminent falsely "emphasized [on July 30] 'that during the quarter ended June 30, 2007, the strong performance of Luminent's credit hedges more than offset the income statement and balance sheet impact of mark-to-market pricing and certain impairment charges related to its credit sensitive assets.'" (CC ¶ 109 (emphasis removed).)  Plaintiff alleges that this statement was misleading because Luminent did not disclose there were "widespread reductions in values" in the Spread Portfolio and that the Spread Portfolio was "unhedged." Plaintiff asserts that the falsity of those statements is demonstrated by the fact that the Company reported a large loss in the third quarter of 2007.  (CC ¶ 110(c).)  Plaintiff's allegations are not only insufficiently pleaded, they are utterly illogical.

Defendants' allegedly misleading statement asserted only that Luminent's hedging gains more than offset losses "to its *credit sensitive* assets."  (CC ¶ 109 (emphasis added).)  Thus, the Company's later disclosure that its *Spread Portfolio* had suffered large, unhedged losses says absolutely nothing about the truth or falsity of the original statement.  *The two statements are*

---

[35] The Class Period begins on June 25, 2007, the date *Barron's* published an interview of Arnie Schneider, the founder and Chief Investment Officer of Schneider Capital Management.  (CC ¶ 98.)  The article, titled "Staying Out of Trouble," reported that Mr. Schneider had selected Luminent as one of his favorite stock picks.  (CC ¶ 98.)  Plaintiff alleges that Mr. Schneider's bullish analysis and conclusions were based upon misleading information released by Luminent. However, the well-established rule in this Circuit is that where third parties make forecasts, defendants are not liable unless they "put their imprimatur" on the projections.  *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 823 (C.D. Cal. 1998) ("The [complaint] does not allege that [the company] put its imprimatur on any of the analyst projections.").  Plaintiff has failed to allege any facts to show that the statements clearly originated from Luminent and were merely reported by Mr. Schneider.

[36] The statements which Plaintiff has not adequately alleged were false at the time they were made are identified in Nos. 2, 4, 8, 10, 12, 19, 22, 24, 26, 30, 32, 34, 35, 37, 38, 47, and 48 of Appendix A.

1   *logically unrelated.*  As discussed above, the Spread Portfolio and the Credit Sensitive Portfolio

2   were entirely separate categories of investments, reflecting entirely different strategies.  *See* Section

3   II.B., *supra* at 6 - 7.  Luminent's public disclosures made that distinction plain (*e.g.*, RJN Ex. 2 at 5-

4   7.), and the Complaint clearly demonstrates that even Plaintiff understands the difference (*Compare*

5   CC ¶¶ 30-33, *with* CC ¶¶ 36-40).

6       Plaintiff further asserts that Luminent's report for the quarter ending September 30, 2007, of

7   **third quarter 2007** losses somehow demonstrates that its July 30 statement about the **second**

8   **quarter** performance of Luminent's hedges was misleading.  This argument too is nonsensical, as it

9   fails to account for the temporal distinction between the two quarters.  *See, e.g.*, *LeapFrog Enters.,*

10  *Inc.*, 527 F. Supp. 2d at 1043-1044 (specificity requires specific reference to time).

11          **2.      Plaintiff Fails To Show That Statements Regarding "Residuals" And**
            **"First Loss" Tranches Were False**
12

13      Plaintiff alleges that, during a May 10, 2007 investor conference call, Defendant Trez

14  Moore made false and misleading statements about the Credit Sensitive Portfolio by asserting that

15  Luminent had "no subprime first loss exposure nor any noninvestment grade subprime exposure,"

16  and "virtually no residual interest tranches." (CC ¶ 90.)  Plaintiff then asserts that certain

17  allegations made in lawsuits filed by Luminent against HSBC Securities and Merrill Lynch

18  Mortgage Investors somehow prove the falsity of those May 10 statements.  (CC ¶¶ 92-95.)  Again,

19  Plaintiff seeks to blur the clear distinctions between different types of mortgage assets.  In fact, the

20  pleadings in the lawsuits quoted in Plaintiff's complaint actually contradict rather than support

21  Plaintiff's allegations.

22          **a.      The Pleadings From The HSBC Lawsuit Do Not Contradict**
            **Mr. Moore's May 10 Statements**
23

24      Plaintiff first refers to allegations in a lawsuit Luminent filed against HSBC.  Plaintiff

25  alleges that eight of nine bonds held by Luminent "were collateralized by 'so-called subprime

26  mortgages,'" (CC ¶ 94 (emphasis removed)), and argues that this somehow demonstrates falsity.

27  But Plaintiff mischaracterizes the allegedly false May 10 statements.  Defendants never said that

28  they owned **no** securities backed by subprime mortgages.  To the contrary, Luminent had always

---

30

1   informed investors that it owned some securities backed in part by subprime loans.  For example, in

2   the 2006 10-K, quoted in the Complaint, Luminent disclosed that:

3           We invest in some mortgage-backed securities backed by mid-prime
            or sub-prime residential mortgage loans which are subject to higher
4           delinquency, foreclosure and credit loss rates than the prime
            residential mortgages loan we purchase.
5

6   (RJN Ex. 2 at 18.)

7           Mr. Moore made two more limited, and entirely accurate, statements on May 10.  First, he

8   stated that the Company had "no subprime *first loss* exposure."  Nothing in the HSBC pleadings, or

9   in Plaintiff's Complaint, suggests that the bonds financed by HSBC were *first loss* or residual

10  tranches.  *See supra* at 72.  Second, Mr. Moore stated on May 10 that Luminent had no

11  "*noninvestment grade* subprime exposure" – a term indicating MBS with ratings below BBB-.[37]

12  Plaintiff also does not and cannot allege that the HSBC bonds were "*noninvestment grade*."  Thus,

13  the HSBC pleadings do not call into question the truth of Defendants' May 10 statements.

14          As to the so-called "NIM Bond" – the  last of the nine HSBC bonds – Plaintiff expressly

15  admits that it "was *not* backed directly by subprime mortgage loans."  (CC ¶ 94 at sub-¶ 75

16  (emphasis added).)  Thus the Complaint itself defeats any contention that the NIM Bond constituted

17  "*subprime* first loss exposure."[38]  Moreover, the Complaint does not even allege that Luminent

18  owned the NIM bond on May 10, when Mr. Moore made the allegedly misleading statement.

19  Plaintiff alleges only that "the 'NIM Bond' was financed on or before *July 23, 2007*."  (CC ¶ 93.)

20  Thus, Plaintiff's own allegations refute any inference that the May 10 statement was rendered false

21  by ownership of the NIM Bond.

22

23

24  _____

25          [37] *See* Section II.A., *supra* at 6.
            [38] The Complaint only alleges that the NIM Bond was *collateralized* by residual interests in
26  other RMBS; it does not allege that this bond was itself a residual or first loss interest in the
    securitization.  This is a crucial distinction, because the alleged misstatement's reference to "first
27  loss exposure" refers to Luminent's interest in the MBS, not the nature of the collateral.  In fact,
    Luminent owned the highest-rated, A- tranche of the NIM Bond (RJN Ex. 13 at ¶ 21.), which by
28  definition cannot be the residual or first loss tranche.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

### b. The Pleadings From The Merrill Lynch Lawsuit Do Not Contradict Mr. Moore's May 10 Statements

Plaintiff next cites an allegation in the lawsuit between Luminent and Merrill Lynch, to the effect that Luminent owned the most junior (*i.e.*, residual or first-loss) tranches of Merrill Lynch-issued bonds. (CC ¶¶ 95-96.) Plaintiff again argues that this allegation contradicts the May 10 statement that the Company owned "no subprime first loss exposure." But this syllogism suffers from the same flaw discussed in the prior section. The Merrill Lynch pleading demonstrates that Luminent owned some first-loss tranches, but not that it had ***subprime*** first loss exposure. Thus, nothing in that pleading calls into question the truth of Mr. Moore's limited statement.

### c. Plaintiff Has Not Pled That The May 10 Statements Were Material

Even if one concluded that Mr. Moore's statements were false or misleading, Plaintiff has failed to allege they were material. Other facts pled in the Complaint demonstrate that these statements could not possibly be material. There were nine HSBC bonds allegedly worth a total of $39 million, and only one of these nine was the challenged NIM bond, which constituted an undisclosed fraction of the total. (CC ¶ 92.) Likewise, there were multiple Merrill Lynch bonds allegedly worth $26 million, and only one of these was the alleged "residual" – the "C" bond, the value of which is not alleged. (CC ¶ 95.) Plaintiff fails to allege either the values of the bonds, or that the values of those isolated investments were material in comparison to ***Luminent's $9 billion in total assets.*** (RJN Ex. 4 at 2.)[39] Given that the value of the entire HSBC and Merrill Lynch transactions was $65 million, or substantially less than 1% of Luminent's total assets, the combined values of these allegedly "exposed" assets could not possibly have been material to investors. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (holding an allegation not actionable where misclassified assets were barely 1% of total assets and thus immaterial).

Moreover, Luminent stated that it owned "virtually no residual interest tranches." (CC ¶ 90.)

---

[39] Because the allegedly misleading statements relate to the nature of assets owned and thus exposed to declines in market value from roiling in the subprime markets, the relevant measure of materiality is the percentage of total assets that were composed of "first loss" or "residual" interests.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

1   Obviously implicit in that statement was the fact that Luminent owned *some* such interests, but not

2   large amounts.  Plaintiff's failure to allege the value of these two alleged "residual" assets in

3   relation to Luminent's total asset value of $9 billion also constitutes a failure to show that the May

4   10 statement was materially false.

5          d.      **Luminent's Second Quarter Write-Down Does Not Indicate A
6                  Material Misstatement Or Omission**

7          As discussed above, in the scienter section, the Complaint alleges that, when Luminent

8   announced its second quarter financial results on September 26, 2007, it disclosed that it had

9   written down the value of certain bonds by $14.4 million.  (CC ¶¶ 103-104.)[40]  Plaintiff seems to

10  suggest that Luminent actually made – or perhaps that the Company should have made – that write-

11  down at some earlier date, and that its "failure" to disclose the write-down until it released its

12  second quarter results constituted a material omission.  (*Id.*)  But, as also stated above, ***Plaintiff***

13  ***fails to allege a single fact to support that bald conclusion:*** No allegation of a date on which the

14  write-down decision was (or should have been) made; nothing about the reasons why the write-

15  down should have been made or disclosed earlier; no suggestion of who within the company

16  actually made (or should have made) that decision.  Plaintiff has alleged absolutely no facts even

17  hinting that Luminent made – or should have made – this write-down at some earlier time.

18         Even if Plaintiff had alleged facts from which a reasonable trier of fact could conclude that

19  Luminent had decided to make that write down before it completed its June 30, 2007 financial

20  statements,  Plaintiff can point to no legal duty on Luminent's part to disclose that accounting

21  decision before issuing its quarterly financials.  Securities and Exchange Commission rules and

22  generally accepted accounting principles both contemplate that a company will issue financial

23  statements on a quarterly basis, reflecting its financial condition and performance as a whole.  No

24  legal precept supports Plaintiff's assertion that a company must disclose each separate accounting

25  decision, as soon as that decision is reached.  Such a rule would make for piecemeal, confusing and

26  ultimately meaningless financial disclosures, as the materiality of any particular accounting

27  ───────────────
         [40] Although Plaintiffs allege the write-down was $14.4 million, it was actually $14.1
28  million.  (RJN Ex. 4 at 11.)

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

1    adjustment cannot be evaluated outside the context of the financial statements as a whole.

2            In short, Plaintiff alleges no facts sufficient to support a finding that Luminent should have

3    recognized that write-down at some earlier date, and that its "failure" to do so amounted to a

4    material, fraudulent omission.

5    **F.    Plaintiff Fails To State A Claim Under Section 10(b), So Its Section 20(a) Claim
         Must Fail As Well**

6

7            The Complaint also seeks to hold the Individual Defendants liable as "controlling persons"

8    under Section 20(a) of the Exchange Act.  (CC ¶¶ 146-149.)  "Section 20(a) provides joint and

9    several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding

10   of good faith and lack of inducement."  *No. 84 Employer-Teamster Joint Council Pension Trust*

11   *Fund v. Am. West*, 320 F.3d 920, 945 (9th Cir. 2003); 15 U.S.C. § 78t(a).  In order to plead control

12   person liability, a plaintiff must allege (1) a primary violation of the securities laws and (2) "that the

13   defendant exercised actual power or control over the primary violator."  *Am. West*, 320 F.3d at 945

14   (internal quotations omitted).  As the complaint does not adequately allege a primary violation

15   under Section 10(b), for the numerous reasons set forth above, the claim for control person liability

16   under Section 20(a) must be dismissed.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15

17   (9th Cir. 2002).

18           Moreover, Plaintiff fails to plead that the Individual Defendants exercised the requisite

19   control for a claim under Section 20(a) of the Exchange Act.  Plaintiff alleges that "[b]y virtue of

20   their business expertise, high-level positions, and their ownership, and participation in and/or

21   awareness to the Company's operations, accounting policies, and methods and/or intimate

22   knowledge of the financial statements . . . , the Individual Defendants had the power to influence

23   and control . . . the decision-making of the Company. . . ."  Based on virtually identical language,

24   the court in *Hansen* held that "this boilerplate allegation is insufficient to state a claim for control

25   person liability."  *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007)

26   (quoting *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002), *aff'd* 357 F.3d

27   322 (3d Cir. 2004) ("[E]ven a CEO is not automatically a 'controlling person' under Section

28

34

1 | 20(a).")).

2 | **IV.    CONCLUSION**

3 | For all of the foregoing reasons, the Complaint should be dismissed in its entirety.

4 | March 31, 2008                         Respectfully submitted,

5 |

6 |                                        HELLER EHRMAN LLP

7 |

8 |                                        By: _____ /s/ Michael L. Rugen _____
                                                        MICHAEL L. RUGEN

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

**APPENDIX A**

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 1 | "Luminent is uniquely positioned to prosper in a challenging mortgage environment." (CC ¶¶ 3, 52, 83.) | RJN Ex. 1 at 7. | Nonactionable opinion and statement of corporate optimism. Luminent disclosed factual information for investors to make their own evaluation of Luminent's relative market strengths and weaknesses. |
| 2 | "Our model is neither volume driven nor sub prime focused. We manage mortgage assets and employ risk disciplines that ensure high credit quality and minimize interest rate sensitivity." (CC ¶ 52.) | RJN Ex. 1 at 7. | Plaintiff's allegations are not pled with particularity that the statements about business methods utilized were false or misleading at the time they were made.<br><br>Nonactionable opinion and statement of corporate optimism. Luminent disclosed factual information for investors to make their own evaluation of Luminent's relative market strengths and weaknesses. |
| 3 | "We look forward to another year of delivering strong returns to our investors." (CC ¶ 52.) | RJN Ex. 1 at 7. | Nonactionable opinion and statement of corporate optimism. Forward-looking statement. |

1

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 4 | "Luminent maintains a strong capital position and modest leverage. Cash and unencumbered assets were in excess of $200 million at December 31, 2006. Luminent's recourse leverage ratio of stockholders' equity plus long-term debt, was 7.4x at December 31, 2006. During the fourth quarter, Luminent improved its capital efficiency by launching a single-seller commercial paper program, Luminent Star Funding I. Luminent intends to issue CDOs in 2007 which will further improve its capital efficiency.<br><br>Luminent's funding strategy exhibits diversification, low borrowing costs, and extensive reliance on non-recourse matched-funded financing. Repurchase agreement financing declined to just 33% of total liabilities at December 31, 2006, down from 87% at December 31, 2005." (CC ¶ 53.) | RJN Ex. 1 at 8. | Plaintiff's allegations are not pled with particularity that any of the statements of fact were false or misleading at the time they were made. |
| | 5 | "We have designed our liquidity management policy to maintain an adequate capital base sufficient to provide required liquidity to respond to the effect under our borrowing arrangements of interest rate movements and changes in the market value of our mortgage-related assets." (CC ¶ 59.) | RJN Ex. 2 at 8. | Forward-looking statement – regarding future interest rate movements and changes in market values--accompanied by adequate cautionary language. See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. |
| | 6 | ". . . our liquidity level is in excess of that necessary to satisfy our operating requirements . . . ." (CC ¶ 59.) | RJN Ex. 2 at 3 ("We believe that our liquidity level is in excess of that necessary to satisfy our operating requirements and we expect to continue to use diverse funding sources to maintain our financial flexibility."). | Forward-looking statement accompanied by adequate cautionary language. See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that they were false when made.. |

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 7 | ". . . current financing and operating cash flow is sufficient to fund our business for the foreseeable future." (CC ¶ 59.) | RJN Ex. 2 at 40. | Forward-looking statement accompanied by adequate cautionary language. See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. |
| | 8 | "Investors should distinguish our business model from that of a subprime originator. We do not acquire subprime mortgage loans." (CC¶¶ 3, 60, 83.) | RJN Ex. 2 at 1, 36. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. Plaintiff never alleges that Luminent originated subprime mortgages.<br><br>Nonactionable opinion. Luminent disclosed sufficient factual information for investors to make their own evaluation as to Luminent's position in the mortgage market. |
| | 9 | "We maintain ample liquidity to manage our business and have largely match-funded our balance sheet." (CC ¶ 60, 83.) | RJN Ex. 2 at 1, 37. | Forward-looking statement accompanied by adequate cautionary language. See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that statements about match-funding were false when made. |
| | 10 | "As such, we experienced no liquidity strains during the recent market turmoil." (CC ¶ 60.) | RJN Ex. 2 at 1, 37. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 11 | "This portfolio has virtually no credit risk."  (CC ¶ 60.) | RJN Ex. 2 at 1, 37 ("Our AAA-rated and agency-backed mortgage-backed securities portfolio represented 25% of our assets at December 31, 2006.  This portfolio has virtually no credit risk.") | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Plaintiff has not alleged that the subject of this statement—AAA rated and agency backed MBS—ever suffered credit-related declines in value. |
| 12 | "Our mortgage loan portfolio has virtually no exposure to the subprime sector which is currently generating high delinquencies."  (CC ¶ 60.) | RJN Ex. 2 at 2, 37. | Plaintiff's allegations are not pled with particularity that the statements about the *mortgage loan portfolio* were false or misleading at the time they were made.<br><br>Nonactionable statement of opinion.  Luminent disclosed the percentage of its mortgage loans, ".01%," that were subprime loans. |
| 13 | "We believe that our collateral characteristics, as well as our comprehensive underwriting process, provide us with strong protection against credit loss."  (CC ¶ 60.) | RJN Ex. 2 at 2, 37. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that they were false when made. No allegation of deficiencies in underwriting.<br><br>Nonactionable statement of opinion ("belief") and corporate optimism. |
| 14 | "Our solid first quarter results reflect Luminent's asset management skills and effective risk management . . . ." (CC ¶ 62.) | RJN Ex. 3 at 7. | Nonactionable statement of opinion and corporate optimism. |

4

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 15 | ". . . our dividend will remain strong." (CC ¶ 62.) | RJN Ex. 3 at 7. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 3 at 9; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. |
| | 16 | "Luminent is performing well in this challenging mortgage market."  (CC ¶ 63.) | RJN Ex. 3 at 7. | Nonactionable statement of opinion and corporate optimism.  Luminent disclosed factual information that investors could use to evaluate its performance in the market.

Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| | 17 | "As the market struggles, our investment opportunities increase." (CC ¶¶ 63, 89.) | RJN Ex. 3 at 7. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 3 at 9; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that the statements were false or misleading at the time they were made.

Nonactionable statement of opinion and corporate optimism.  Luminent disclosed factual information that investors could use to evaluate its investment opportunities in the market. |

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 18 | "Luminent's profile is ideal for the current environment." (¶¶ 64, 89.) | RJN Ex. 3 at 7. | Nonactionable statement of opinion and corporate optimism. Luminent disclosed factual information that investors could use to evaluate its profile in the market. |
| 19 | "We own no subprime loans." (CC ¶ 64.) | RJN Ex. 3 at 7. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| 20 | "We have safeguarded our liquidity. . . ." (CC ¶¶ 64, 89.) | RJN Ex. 3 at 7. | Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Statement about "safeguarding" liquidity is too vague to be actionable. Underlying facts about liquidity were disclosed to investors in financial statements. |
| 21 | "Luminent has ample liquidity to finance its investments, and successfully executed two major financing transactions . . . during the first quarter despite market dislocations." (CC ¶ 65.) | RJN Ex. 3 at 8. | Forward-looking statement accompanied by adequate cautionary language. See RJN Ex. 3 at 9; RJN Ex. 2 at 5, 18, 20, 64, 65. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| 22 | "Investors should distinguish our business model from that of a subprime originator. We do not acquire subprime mortgage loans." (CC ¶ 67.) | RJN Ex. 4 at 25. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 23 | "We maintain ample liquidity to manage our business and have largely match-funded our balance sheet."  (CC ¶ 67.) | RJN Ex. 4 at 25. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 4 at 26; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. |
| | 24 | "As such, we experienced no liquidity strains during the recent market turmoil."  (CC ¶ 67.) | RJN Ex. 4 at 25. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| | 25 | "This portfolio has virtually no credit risk."  (CC ¶ 67.) | RJN Ex. 4 at 25 ("Our AAA-rated and agency-backed mortgage-backed securities portfolio represented 25% of our assets at December 31, 2006.  This portfolio has virtually no credit risk."). | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 4 at 26; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.  Plaintiff has not alleged that the subject of this statement—AAA rated and agency backed MBS—ever suffered credit-related declines in value. |
| | 26 | "Our mortgage loan portfolio has virtually no exposure to the subprime sector, which is currently generating high delinquencies."  (CC ¶ 67.) | RJN Ex. 4 at 25. | Plaintiff's allegations are not pled with particularity that the statements about mortgage loans were false or misleading at the time they were made.  Nonactionable statement of opinion.  Luminent disclosed the percentage of its mortgage loans, ".01%," that were subprime loans. |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 27 | "We believe that our collateral characteristics, as well as our comprehensive underwriting process, provide us with strong protection against credit loss."  (CC ¶ 67.) | RJN Ex. 4 at 25. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 4 at 26; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that they were false when made.  No allegation of deficiencies in underwriting. Nonactionable statement of opinion ("belief") and corporate optimism. |
| | 28 | "We manage liquidity to ensure that we have the continuing ability to maintain cash flows that are adequate to fund operations and meet commitments on a timely and cost-effective basis."  (CC ¶ 68.) | RJN Ex. 4 at 26. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 4 at 26; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. Nonactionable statement of opinion ("belief") and corporate optimism. |
| | 29 | "We believe that our liquidity level is in excess of that necessary to satisfy our operating requirements and we expect to continue to use diverse funding sources to maintain our financial flexibility."  (CC ¶ 68.) | RJN Ex. 4 at 26. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 4 at 26; RJN Ex. 2 at 5, 18, 20, 64, 65.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made. Plaintiff has not alleged that statements about use of diverse funding sources were false when made. Nonactionable opinion ("belief") and statement of corporate optimism. |

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 30 | "At March 31, 2007, our principal executive officer and our principal officer have performed an evaluation of the effectiveness of our disclosure controls and procedures . . . and concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and our disclosure controls and procedures are also effective to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, to allow timely decisions regarding disclosure."  (CC ¶ 69.) | RJN Ex. 4 at 54. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| | 31 | "We believe that our high quality investment management business model will continue to distinguish itself through solid performance over time."  (CC ¶ 72.) | RJN Ex. 5 at 2. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 5 at 1; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Nonactionable statement of opinion and corporate optimism. |
| | 32 | "The well-publicized troubles in the subprime market did not spread to our high quality prime loan portfolio."  (CC ¶¶ 72, 89.) | RJN Ex. 5 at 2. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |

9

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 33 | "We grew the Spread portfolio in the first quarter by 23% year-over-year as we identified attractive return opportunities . . . There is no credit risk and virtually no interest rate risk in these assets."  (CC ¶ 72.) | RJN Ex. 5 at 2. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 5 at 1; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26.  Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Plaintiff has not alleged that the Spread Portfolio suffered losses due to credit or interest rate risks. |
| | 34 | "Credit sensitive mortgage-based securities were 11% of total assets with an average credit quality of A-.  In this portfolio, we hold virtually no residuals or first loss tranches.  None of these bonds have been downgraded nor are any on watch to be downgraded by ratings agencies."  (CC ¶¶ 72, 90.) | RJN Ex. 5 at 2. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made.<br><br>Plaintiff has not pled that the HSBC NIM bond and Merrill Lynch "residual" bond were material to the Company's credit sensitive portfolio and total assets. |
| | 35 | "We have no subprime first loss exposure nor any noninvestment grade subprime exposure in this portfolio."  (CC ¶¶  72, 90.) | RJN Ex. 5 at 3. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made.<br><br>Plaintiff has not pled that the HSBC NIM bond and Merrill Lynch "residual" bond were material to the Company's credit sensitive portfolio and total assets. |

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 36 | "We maintain solid liquidity."  (CC ¶ 73.) | RJN Ex. 5 at 4. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 5 at 1; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that the statements were false or misleading at the time they were made. |
| 37 | "Unencumbered assets were over $200 million at quarter end.  We have experienced no difficulties in financing our positions throughout the recent period of market turbulence."  (CC ¶ 73.) | RJN Ex. 5 at 4. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| 38 | ". . . our process is to sell incipient problems rather than mark them." (CC ¶ 74.) | RJN Ex. 5 at 6. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| 39 | ". . . we had situations obviously in which a few bonds started to deteriorate quickly out of the gate as soon as [we] bought them.  Perhaps different than other institutions, our general solution to issues that are deteriorating is we sell them and then lift hedges that we have put into the market to defray precisely that event rather than to mark them down and hope things will get better.  So we did that to the tune of $15 million in the first quarter.  I am happy to report that we do not have anything that I would expect to occur in the near-term future . . ."  (CC ¶ 75.) | RJN Ex. 5 at 9. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 5 at 1; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that the statements were false or misleading at the time they were made. |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA
IN SUPPORT THEREOF: C-07-04073 PJH

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 40 | ". . . our disciplined and high quality investment strategy has allowed us to increase our dividend to our shareholders by nearly 7% during a period of unprecedented turmoil in the mortgage industry. . . ."  (CC ¶¶ 3, 101.) | RJN Ex. 6 at 1. | Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that the statements were false or misleading at the time they were made.. |
| 41 | "Our recently completed convertible bond offering has provided us with more than ample liquidity to invest in today's market conditions."  (CC ¶¶ 3, 4, 101, 102, 110.) | RJN Ex. 6 at 1. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 6 at 1-2; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made, or that the statements were false or misleading at the time they were made.<br><br>Statements about "ample liquidity" were nonactionable statements of opinion or corporate optimism. |
| 42 | ". . . we expect that our new, higher, dividend will be easily sustainable in the near future."  (CC ¶¶ 4, 101, 102, 110.) | RJN Ex. 6 at 1. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 6 at 1-2; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made.<br><br>Statements whether dividends were sustainable were nonactionable statements of opinion or corporate optimism. |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED COMPLAINT AND MPA IN SUPPORT THEREOF: C-07-04073 PJH

| | | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|---|
| | 43 | Luminent failed to disclose that it had marked down the value of its portfolio by $14.4 million due to higher than expected losses resulting from increasing delinquency and default rates on mortgage loans securing the MBS portfolio. (CC ¶¶ 103, 104, 110.) | Not applicable. | No allegation that this write-down occurred before end of class period.<br><br>No duty to disclose write-downs prior to filing of Form 10-Q.<br><br>Plaintiff has not alleged that the $14.4 million was material, and have not alleged loss causation. |
| | 44 | Plaintiffs allege that despite acknowledging a major disruption in market conditions, Luminent made false or misleading statements that its "loans and MBS were still a safe and secure investment." (CC ¶ 107.) | RJN Ex. 7. | Plaintiff fails to satisfy the Reform Act's threshold requirement to specify which statements in the newsletter were false or misleading.<br><br>Nonactionable statements of opinion or corporate optimism. Investors were required to make their own evaluation of the safety of mortgage-related assets in current market environment. |
| | 45 | "second quarter dividend payment of $0.32 per share, payable to stockholders on August 8, 2007, is secure and will not be canceled." (CC ¶¶ 4, 108, 110.) | RJN Ex. 8 at 7. | Forward-looking statement accompanied by adequate cautionary language. See RJN Ex. 8 at 7-8; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants had actual knowledge these statements were false at the time they were made. |

| | ALLEGED MISSTATEMENT | SOURCE | RESPONSE |
|---|---|---|---|
| 46 | ". . . in full compliance with all its financial covenants . . . It had ample liquidity to manage its business." (CC ¶ 108.) | RJN Ex. 8 at 7. | Forward-looking statement accompanied by adequate cautionary language.  See RJN Ex. 8 at 7-8; RJN Ex. 2 at 5, 18, 20, 64, 65; RJN Ex. 4 at 26. Plaintiff's allegations are not pled with particularity that Defendants knew these statements were false at the time they were made or that statements were false or misleading at the time they were made.. |
| 47 | ". . . disciplined and sophisticated hedging program for the interest rate and credit risks in its portfolio using Eurodollar futures, interest rate swaps, swaptions, interest rate caps, and by shorting various portions of the ABX indices as well as employing single-name credit default swaps." (CC ¶¶ 3, 109, 110.) | RJN Ex. 8 at 7. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |
| 48 | ". . . during the quarter ended June 30, 2007, the strong performance of Luminent's credit hedges more than offset the income statement and balance sheet impact mark-to-market pricing and certain impairment charges related to its credit sensitive assets."  (CC ¶¶ 3, 109, 110.) | RJN Ex. 8 at 7. | Plaintiff's allegations are not pled with particularity that the statements were false or misleading at the time they were made. |