1  Joseph J. Tabacco, Jr. (SBN 75484)
   E-mail: jtabacco@bermanesq.com
2  Nicole Lavallee (SBN 165755)
   E-mail: nlavallee@bermanesq.com
3  **BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**
   425 California Street, Suite 2100
4  San Francisco, California 94104
   Telephone: (415) 433-3200
5  Facsimile: (415) 433-6382

6  *Local Counsel*

7  Richard W. Cohen (admitted *pro hac vice*)
   E-mail: rcohen@lowey.com
8  Barbara J. Hart (admitted *pro hac vice*)
   E-mail: bhart@lowey.com
9  David C. Harrison (admitted *pro hac vice*)
   E-mail: dharrison@lowey.com
10 **LOWEY DANNENBERG COHEN & HART, P.C.**
   One North Broadway, Suite 509
11 White Plains, New York 10601-2310
   Telephone: (914) 997-0500
12 Facsimile: (914) 997-0035

13 *Lead Counsel for Plaintiff*
   *and the Putative Class*

14

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17

18 | IN RE LUMINENT MORTGAGE CAPITAL, INC. SECURITIES LITIGATION | C 07-04073 PJH |
19 |  |  |
20 |  | **LEAD PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
21 | This Document Relates To: |  |
22 | ALL ACTIONS |  |
23

24

25

26

27

28 Lead Plaintiff's Request For Judicial Notice In Opposition to Defendants' Motion to Dismiss
   the Consolidated Complaint  [C 07-04073-PJH]

1    Lead Plaintiff respectfully requests the Court take judicial notice of the documents described

2    below in connection with lead plaintiff's opposition to defendants' motion to dismiss the

3    consolidated class action complaint ('Complaint'). True and correct copies of these documents are

4    attached hereto as Exhibits A through L.

5    The Court may take judicial notice of matters of public record to the extent permitted by Rule

6    201 of the Federal Rules of Evidence. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir.

7    2001). Rule 201(b) provides that courts may take judicial notice of documents that are "not subject

8    to reasonable dispute" because they are "(1) generally known within the territorial jurisdiction of the

9    trial court, or (2) capable of accurate and ready determination by resort to resources whose accuracy

10   cannot reasonably be questioned." Documents may only be judicially noticed if they are relevant to

11   the matter at hand. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal.

12   2003) (judicial notice of facts allowed if "sufficiently relevant" to the allegations of the complaint).

13   The following documents are all relevant to the allegations of the Complaint:

14

15

| Exhibit | Description |
|---------|-------------|
| A | A true and correct copy of an excerpt from Luminent's Quarterly Report for the Period Ending March 31, 2008 on Form 10-Q, pp. 36-37, as filed with the SEC on May 19, 2008 |
| B | A true and correct copy of an excerpt from Luminent's 2007 Annual Report on Form 10-K, p. 36, as filed with the SEC on March 28, 2008 |
| C | A true and correct copy of Wang, Grace, "Behind Wall Street's Subprime Fear Index," available at: http://money.cnn.com/galleries/2007/news/0711/gallery.abx_index/index.html |
| D | True and correct copies of charts reflecting the historical prices of the ABX Index as obtained from www.markit.com, a financial information website. |
| E | A true and correct copy of Deborah Lynn Blumberg and Anusha Shrivastava, "Subprime Woes Still a Worry — Investor Caution Boosts Treasurys; ABX Index Drops, " THE WALL STREET JOURNAL, July 17, 2007 |

16

17

18

19

20

21

22

23

24

25

26

27

28

| Exhibit | Description |
|---------|-------------|
| F | A true and correct copy of First Amended Complaint in *Luminent Mortgage Capital v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 5423 (E.D. Pa.) filed January 23, 2008 |
| G | A true and correct copy of Letter dated September 21, 2007 from O'Shea to Winchester re: Luminent Mortgage Capital, Inc. Mortgage Loan Asset-Backed Certificates (Series 2005-A6) |
| H | A true and correct copy of Complaint in *Luminent Mortgage Capital v. Barclays Capital, Inc.*, 07 Civ. 10275 (S.D.N.Y.) filed November 12, 2007 |
| I | A true and correct copy of HSBC's Amended Answer and Counterclaim in *Luminent Mortgage Capital, Inc. v. HSBC Securities (USA), Inc.*, No. 07 Civ. 9340 (S.D.N.Y) filed February 25, 2008 |
| J | A true and correct copy of Moody's Investors Service, "Financial Guarantors' Subprime Risks: From RMRS to ABA CDOs," September 2007 |
| K | A true and correct copy of Keith Krasney, "Legal Structure of net Interest Margin Securities," THE JOURNAL OF STRUCTURED FINANCE, Spring 2007 |
| L | A true and correct copy of a Bloomberg chart and supporting data comparing the movement of the closing price of Luminent common stock with the movement of market and industry indices at the end of the Class Period |

## I.     THE COURT SHOULD TAKE JUDICIAL NOTICE OF DOCUMENTS FILED WITH THE SEC AND WHICH CONTAIN ADMISSIONS BY THE DEFENDANTS RELEVANT TO THE ALLEGATIONS OF THE COMPLAINT

Exhibit A is excerpts from Luminent's Quarterly Report for the Period Ending March 31, 2008 on Form 10-Q, and Exhibit B is excerpts from Luminent's 2007 Annual Report on Form 10-K. These documents were filed with the Securities and Exchange Commission ("SEC") on May 19, 2008 on March 28, 2008, respectively.  Documents filed with the SEC are routinely granted judicial notice in the Ninth Circuit to the extent that such filings contain admissions by defendants that are relevant to allegations contained in a complaint.  *See, e.g.,  Benhabib v. Hughes Elecs. Corp.*, No. CV 04-0095CASVBKX, 2007 WL 4144940, at *5, n.11 (C.D. Cal. Mar. 30, 2007) ("[T]he Court may take judicial notice of the SEC 10-K statements, as they are readily available and verifiable to the Court through the SEC's website, and the statements are party admissions, and are therefore an exception to the hearsay rule.").

## II.    THE COURT MAY TAKE JUDICIAL NOTICE OF HISTORICAL STOCK PRICES AND OTHER INDEX DATA

Exhibit C is an explanation of the ABX Index from CNNMoney.com.  Exhibit D is various charts reflecting the historical prices of the ABX Index as obtained from www.markit.com, a financial information website.[1]  Exhibit E is an explanation of the movement of the ABX Index during the Class Period.  And Exhibit L is a chart comparing the movement of the closing price of Luminent's common stock as compared to the movement of the S&P 500 Index and the Bloomberg Mortgage REIT Index during the period between August 2, 2007 and August 9, 2007.    This information was obtained from the Bloomberg.com database.  The Court may take judicial notice of these historical stock prices and market index information. *See In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1218-19 (E.D. Wash. 2005) (judicial notice of Dow Jones Utility Average) (collecting cases); *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) (judicial notice of NASDAQ composite index).

## II.    THE COURT MAY TAKE JUDICIAL NOTICE OF DOCUMENTS FILED IN OTHER COURT PROCEEDINGS WHICH CONTAIN DEFENDANTS' ADMISSIONS REGARDING MATTERS ALLEGED IN THE COMPLAINT

Exhibits F, G and I are pleadings filed by Luminent in connection with three litigations it has commenced against various lenders regarding what it alleges to be excessive margin calls.  Exhibit H is a letter from Luminent's counsel to one of those lenders, Merrill Lynch, a copy of which was filed as an exhibit by Merrill Lynch in connection with its motion to dismiss Luminent's complaint. All of these pleadings and exhibits are court records which contain admissions concerning events which are central to the allegations of the Complaint herein and are thus appropriate for judicial

---

[1]  "Working in conjunction with a consortium of key asset-backed security trading desks, Markit acts as administration, calculation, and marketing agent for Markit ABX.HE. Under this broad remit, Markit will provide a number of services and functions to facilitate the transparency, liquidity and standardisation of [the ABX] benchmark index." *See* http://www.markit.com/information/products/category/indices/abx/about_abx.html.

1   notice.  Indeed, the Ninth Circuit has repeatedly held that court filings in separate actions which

2   contain relevant admissions by a party to the instant litigation are admissible under Rule 201 (judicial

3   notice) and Rule 801 (hearsay exceptions) of the Federal Rules of Evidence.  *See MGIC Indem. Corp.*

4   *v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of allegations made by

5   defendant in papers it filed in another action); *Mullis v. U.S. Bankruptcy Ct/ for Dist. of Nevada*, 828

6   F.2d 1385, n.9 (9th Cir. 1987) (taking judicial notice of pleadings on file in an underlying bankruptcy

7   case); *see also Paul Frank Indus., Inc. v. Sunich*, 502 F. Supp. 2d 1094, 1096, n.1, (C.D. Cal.

8   2007)("Under Federal Rule of Evidence 201(c), the Court in its discretion takes judicial notice of the

9   admissions filed in the previous cases litigated between [the parties]."); *Compana, LLC v. Aetna, Inc.*,

10  No. C05-0277RSL,  2006 WL 1319456, at *2 (W.D. Wash. May 12, 2006 ) (taking judicial notice

11  of pleadings filed by plaintiff in another litigation because it was relevant and  "as part of the public

12  record, [the court] finds it admissible as party admissions." ).

13  **IV.    THE COURT MAY TAKE JUDICIAL NOTICE**
    **OF PUBLISHED ARTICLES**

14

15  Plaintiffs respectfully requests the Court's consideration of plaintiff's Exhibits J and K, which

16  are published articles describing various subprime market securities and the forces affecting such

17  securities during the Class Period.  The information contained in these articles is provided by way of

18  explanation regarding certain components of Luminent's investment portfolio.  *U.S. v. W.R. Grace*,

19  504 F.3d 745. 766 (9th Cir. 2007); *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458-59 (9th Cir. 1995)

20  (judicial notice taken of report of layoffs which concerned matter generally known in Southern

21  California and subject to accurate and ready determination);  *Heliotrope Gen., Inc. v. Ford Motor Co.,*

22  189 F.3d 981, n.18  (9th Cir. 1999) ("We take judicial notice that the market was aware of the

23  information contained in news articles submitted by the defendants.").

24  / / /

25  / / /

26  / / /

27

28  Lead Plaintiff's Request For Judicial Notice In Opposition to Defendants' Motion to Dismiss
    the Consolidated Complaint  [C 07-04073-PJH]

    4

1    For the foregoing reasons, plaintiff respectfully requests the Court grant judicial notice of

2    Exhibits A through L as attached hereto.

3    Date:    June 5, 2008

4    **BERMAN DeVALERIO PEASE**
     **TABACCO BURT & PUCILLO**

6    By: _____/s/_____
                 NICOLE LAVALLEE

8    JOSEPH J. TABACCO, JR.
     425 California Street, Suite 2100
     San Francisco, California  94104
9    Telephone: 415-433-3200

10   *Local Counsel*

11   RICHARD W. COHEN
     BARBARA J. HART
12   DAVID C. HARRISON
     **LOWEY DANNENBERG COHEN**
13   **& HART, P.C.**
     One North Broadway
14   White Plains, New York  10601-1714
     Telephone: 914-997-0500

15
16   *Lead Counsel for Plaintiff and the Putative Class*

17
18
19
20
21
22
23
24
25
26
27

28   LEAD PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
     THE CONSOLIDATED COMPLAINT  [C 07-04073-PJH]
     5

# EXHIBIT A

e10vq
10sQ 1 w57859e10vq.htm 10-Q
Case 3:07-cv-04073-PJH    Document 149    Filed 06/05/2008    Page 8 of 141 Page 1 of 69

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-Q

(Mark One)

☑ **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

for the quarterly period ended March 31, 2008

**OR**

☐ **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

for the transition period from        to

Commission File Number: 000-31828

---

# LUMINENT MORTGAGE CAPITAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | **06-1694835** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2005 Market Street, 21st Floor, Philadelphia, PA** | **19103** |
| (Address of principal executive offices) | (Zip Code) |

**(215) 564-5900**
(Registrant's telephone number, including area code)
(Former name, former address and former fiscal year, if changed since last report)

---

Indicate by check mark whether registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐.

Indicate by check mark whether registrant is a large accelerated filer, an accelerated filer, or a non- accelerated filer. See definition of "accelerated filer and large accelerated filer" as defined in Rule 12b-2 of the Exchange Act. (Check one)

Large accelerated filer ☐        Accelerated filer ☑        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐.    No ☑.

The number of shares of common stock outstanding on April 30, 2008 was 43,283,339.

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

*The following discussion of our financial condition and results of operations should be read in conjunction with the financial statements and notes to those statements included in Item 1 of this Form 10-Q. This discussion may contain certain forward-looking statements that involve risks and uncertainties. Forward-looking statements are those that are not historical in nature. See "Cautionary Note Regarding Forward-Looking Statements." As a result of many factors, such as those set forth under "Risk Factors" in Item 1A of this Form 10-Q, Item 1A of our Form 10-K for the year ended December 31, 2007, elsewhere in this Form 10-Q or incorporated by reference herein, our actual results may differ materially from those anticipated in such forward-looking statements.*

## Overview

### *Business Conditions and Going Concern*

Our consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the discharge of liabilities in the normal course of business for the foreseeable future. As we announced on August 6, 2007, the mortgage industry and the financing methods the industry has historically relied upon deteriorated significantly and in an unprecedented fashion. Effectively, the secondary market for many fixed income securities especially mortgage-backed securities closed, and, as a result, we simultaneously experienced a significant increase in margin calls from our repurchase agreement counterparties, or repurchase agreement lenders, and a decrease in the amount of financing our lenders would provide on a given amount of collateral. Prices for even the highest quality AAA-rated bonds dropped precipitously. These events resulted in a rapid and significant loss of liquidity forcing us to sell investment assets at significant losses and write down investments held in our portfolio to reflect reductions in the fair value of the investments. As of March 31, 2008, we had a stockholders' equity deficit of $223.2 million because of these losses, and these events caused substantial doubt about our ability to continue as a going concern for a reasonable period of time.

Beginning in August 2007, we entered into a number of financing transactions with Arco Capital Corporation Ltd., or Arco, and issued a warrant to Arco enabling it to acquire a 51% economic interest in us. Currently, we are continuing to shift financing from short-term arrangements that are subject to margin to long-term financing and financing provided by related parties. As of March 31, 2008, we had $182.3 million of short-term financing remaining with non-related parties.

Our main source of liquidity is monthly principal and interest payments from our loans and mortgage-backed securities investments. These monthly cash receipts are used to pay contractual principal and interest payments on debt as well as to pay expenses required to support our operations.

On March 28, 2008, we announced our intention, subject to stockholder's approval, to restructure from a corporation qualified as a REIT to a publicly-traded partnership, or PTP. The PTP structure would permit us to offer fee-based services including credit-risk management services, asset management advisory services and sub-manager services without the restrictive asset and income rules to which companies qualified as a REIT must adhere. An additional advantage of this structure is the flexibility it would provide related to income distribution in that management would have more discretion to conserve capital or distribute capital to stockholders than is allowed under REIT requirements. In anticipation of the conversion to this structure, we are actively marketing our services, including the formation of a joint venture to perform credit risk management services. We believe that over time fee-based income will provide a more significant source of income for us.

Our longer-term strategy is focused on returning to profitability. Our strategy includes both new investments in mortgages and mortgage-backed securities as well as new business initiatives. We believe our existing credit management infrastructure is readily adaptable to asset management, particularly in three areas:

- First, we are offering our services as an advisor to holders of existing mortgage-backed securities or whole loan positions to provide forensic underwriting, loss mitigation oversight and surveillance services. We currently perform these functions in conjunction with managing our

36

loan and mortgage-backed securities portfolios and can readily provide these services to third parties.

- Second, we intend to seek, through one or more taxable corporate subsidiaries, asset management engagements from institutional investors seeking to profit from the current turmoil in the mortgage-backed securities market. We will earn a management fee for these services and will invest our client funds with the same investment philosophy as we invest our own capital. Our credit underwriting, loss mitigation, surveillance and information technology systems have recently been upgraded to accommodate any reasonably expected increase in volume.

- Finally, we expect to serve as a sub-manager on investment funds. Our business plan includes opportunities in domestic markets as well as expansion to non-U.S. markets. We believe the current market environment provides significant opportunities for us to develop these new services, which would be closely aligned with our current expertise.

We can provide no assurance that further market disruption will not occur or that we will be able to successfully execute our business or liquidity plans discussed herein.

We did not declare or pay all of the required distributions of REIT taxable income for 2007 necessary to maintain our qualification as a REIT. We are considering alternatives related to the payment of our required distribution of our REIT taxable income and other issues related to our current qualification as a REIT. See Note 11 to our March 31, 2008 consolidated financial statements included elsewhere in this Form 10-Q for additional information on the status of our REIT qualification.

The NYSE delisted our common stock effective May 2, 2008 due to our inability to meet the stock price and capitalization requirements for continued listing on the exchange. Subsequent to the delisting by the NYSE, our stock began to be quoted on the Over-the-Counter, or OTC, Bulletin Board under the symbol "LUMC".

### Exposure to Subprime Mortgage Loans

The subprime mortgage banking environment has been experiencing considerable strain from rising delinquencies and liquidity pressures and some subprime mortgage lenders have failed. The increased scrutiny of the subprime lending market is one of the factors that have impacted general market conditions as well as perceptions of our business. Our credit underwriting standards have been structured to limit our exposure to the types of loans and investments that are currently experiencing high foreclosure and loss rates. We believe our mortgage loan portfolio has virtually no exposure to loans with FICO scores of less than 620 which are generally considered to be subprime loans. At March 31, 2008, we had eight loans with a contractual balance of $3.3 million out of a total of 10,077 loans with FICO scores below the subprime threshold of 620. One of these eight loans for $0.3 million was seriously delinquent.

Our mortgage-backed securities portfolio as of March 31, 2008 includes securities with a fair value of $56.4 million, or 1.5% of our total assets, that were classified as subprime. Securities with a fair value of $49.2 million, or 1.3%, are included in a trust that is permanently financed by collateralized debt obligations, or CDOs. We determine the credit quality classification of securities in this portfolio based on the assignment from a third-party service provider. In this portfolio as of March 31, 2008, the weighted-average credit rating of our subprime mortgage-backed securities was BBB. The weighted-average life of these securities is 5.7 years. One security with a fair value of $0.2 million was a first loss security which absorbs losses from defaulted loans collateralizing the security prior to the remaining securities in the securitization that have higher credit ratings. We recorded losses in the fair value of securities of $80.2 million for the three months ended March 31, 2008, which includes $44.5 million of losses on subprime securities.

## Critical Accounting Policies

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, or GAAP. These accounting principles require us to make some complex

EXHIBIT B

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

**(Mark One)**

☑    **Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the fiscal year ended December 31, 2007

☐    **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the transition period from _____ to _____.

Commission file number 001-31828

# LUMINENT MORTGAGE CAPITAL, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | 06-1694835 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Commerce Square, 21st Floor, 2005 Market Street, Philadelphia, PA** | 19103 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (215) 564-5900

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.001 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in a definitive proxy or information statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☑    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter. $351,976,128

The number of shares of our common stock outstanding on February 29, 2008 was 43,283,339.

### DOCUMENTS INCORPORATED BY REFERENCE

None

**Table of Contents**

Within the loan market, we have focused on acquiring prime quality, first lien Alt-A adjustable-rate mortgage loans. In the Alt-A market, borrowers choose the convenience of less than full documentation in exchange for a slightly higher mortgage rate. We neither directly originate mortgage loans nor directly service mortgage loans. We purchase pools of mortgage loans from our diverse network of well-capitalized origination providers. We employ a comprehensive underwriting process, driven by our experienced personnel, to review the credit risk associated with each mortgage loan pool we purchase. We require mortgage insurance on all loans with loan-to-value ratios in excess of 80%, and subsequent to July 2007, we purchased supplemental mortgage insurance down to a 75% loan-to-value ratio. In addition, we obtain representations and warranties from each originator to the effect that each loan is underwritten in accordance with the agreed-upon guidelines. An originator who breaches its representations and warranties may be obligated to repurchase loans from us.

We have also acquired mortgage loans that permit negative amortization. A negative amortization provision in a mortgage allows the borrower to defer payment of a portion or all of the monthly interest accrued on the mortgage and to add the deferred interest amount to the mortgage's principal balance. As a result, during periods of negative amortization, the principal balances of negatively amortizing mortgages will increase and their weighted-average lives will extend. Our mortgage loans generally can experience negative amortization ranging from 110-125% of the original mortgage loan balance. As a result, given the relatively low average loan-to-value ratio of 71.8%, net of mortgage insurance, on our portfolio at December 31, 2007, we believe that our portfolio would still have a homeowners' equity cushion even if all negatively-amortizing loans reached their maximum permitted amount of negative amortization. Our securitization structures allow the reallocation of principal prepayments on mortgage loans to be used for interest payments on the debt issued in the securitization trusts. To date, prepayments on securitized loans have been sufficient to offset negative amortization such that all our securitization structures have made their required payments to bond holders.

*Exposure to Subprime Mortgage Loans*

The subprime mortgage banking environment has been experiencing considerable strain from rising delinquencies and liquidity pressures and some subprime mortgage lenders have failed. The increased scrutiny of the subprime lending market is one of the factors that have impacted general market conditions as well as perceptions of our business. Our credit underwriting standards have been structured to limit our exposure to the types of loans and investments that are currently experiencing high foreclosure and loss rates. Our mortgage loan portfolio has virtually no exposure to loans with FICO scores of less than 620 which are generally considered to be subprime loans. At December 31, 2007, we had eight loans out of a total of 10,491 loans with FICO scores below the subprime threshold of 620. None of these loans were seriously delinquent.

Our mortgage-backed securities portfolio as of December 31, 2007 includes securities with a fair value of $139.8 million, or 3.0% of our mortgage-backed assets that were classified as subprime. Securities with a fair value of $76.9 million, or 1.6%, are included in a trust that is permanently financed by collateralized debt obligations, or CDO's. We determine the credit quality classification of securities in this portfolio based on the assignment from a third-party service provider. In this portfolio as of December 31, 2007, the weighted-average credit rating of our subprime mortgage-backed securities was BBB. The weighted-average life of these securities is 5.8 years. One security in the principal amount of $0.2 million was a first loss security which absorbs losses from defaulted loans collateralizing the security prior to the remaining securities in the securitization that have higher credit ratings. We recorded impairment losses of $481.6 million for the year ended December 31, 2007, which includes impairments on subprime securities.

**Critical Accounting Policies**

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, or GAAP. These accounting principles require us to make some complex and subjective decisions and assessments. Our most critical accounting policies involve decisions and assessments that could significantly affect our reported assets and liabilities, as well as our reported revenues and expenses. We believe that all of the decisions and assessments upon which our consolidated financial statements are based were reasonable at the time made based upon information available to us at that time. See Note 2 to our December 31, 2007 consolidated financial statements included elsewhere in this Form 10-K for a further discussion of our significant accounting policies. Management has identified our most critical accounting policies to be the following:

*Interest Income Recognition*

We account for interest income on our investments using the effective yield method. For investments purchased at par, the effective yield is the contractual coupon rate on the investment. We recognize unamortized premiums and discounts on mortgage-

36

EXHIBIT C

FedEx Express, always the easy answer.    FedEx Express. Learn more ▸

  

Symbol [ Get Quote ] Keyword [ Search ]

Subscribe to Fortune
Free Trial
Magazine Customer Service

Home  Business News  Markets  Personal Finance  Real Estate  Technology  Small Business  Luxury  Fortune        My Portfolio    CNN.com

## Behind Wall Street's subprime fear index

The formerly obscure ABX index has become a closely watched gauge of just how bad the market for subprime securities is getting.

By Grace Wong, CNNMoney.com staff writer

FedEx Express    Learn more ▸

Whether white marble or toy marbles, FedEx can deliver it.

[ ◂ BACK ]  [ NEXT ▸ ] g the ABX

At a time when almost nothing about subprime securities seems certain, the ABX index is a key point of reference for investors navigating the world of risky mortgage debt.

The ABX, launched in January 2007, serves as a benchmark of the market for securities backed by home loans issued to borrowers with weak credit.

"Creating visibility and transparency was a goal of the index, but not everyone knew it would be so closely followed," said Ben Logan, a managing director at Markit Group, a London-based company that specializes in credit derivative pricing and administers the index.

Underlying the mortgage mess has been the fact that "no one knows what subprime securities are really worth," said Barry Ritholtz, director of equity research for New York-based FusionIQ, a quantitative research and asset management firm.

**Wall Street playing with more funny money**



ABX-HE-BBB- 07-1

Sponsored Links

Alternative to Open Back Surgery
The World Leader of Arthroscopic Procedures for Back and Neck Conditions

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.

Low Cost Car Insurance
Lower your car insurance rates today. Compare quotes!

Sales Management Courses
Master Closing Skills, Negotiation and More - 100% Online. Free Info!

Buy a link here



The ABX | Hedging a bet | What's in a name | More drama | On the horizon

Sponsored Links

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

Equifax - Official Site
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order
www.equifax.com

Refinance Now at 5.2% FIXED!
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!
www.FetchARate.com

SPECIAL OFFER:

GET A FREE TRIAL ISSUE!    Money

 

Name [ ]
Address [ ]
City [ ]
State/Pr [ ]
Zip/Postal [ ]
E-mail [ ]
[ Continue ]  Privacy Policy

Buy a link here

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy

Home  Portfolio  Calculators  Contact Us  Newsletters  Podcasts  RSS  Mobile  Widgets  Press Center  Site Map  User Preferences
Advertise with Us  Magazine Customer Service  Download Fortune Lists  Reprints  Career Opportunities  Special Sections  Conferences  Business Leader Council

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET.
* : Times reflect local markets trading time. † - Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Disclaimer
Copyright © 2008 BigCharts Inc. All rights reserved. Please see our Terms of Use. MarketWatch, the MarketWatch logo, and BigCharts are registered trademarks of MarketWatch, Inc. Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET. Intraday data provided by Interactive Data Real-Time Services and subject to the Terms of Use. Historical, current end-of-day data, and splits data provided by Interactive Data Pricing and Reference Data. Fundamental data provided by Hemscott. SEC Filings data provided by Edgar Online Inc. Earnings data provided by FactSet CallStreet, LLC.


FedEx Express handles more than 28.5 million pounds of shipments daily.


# CNNMoney.com
A Service of CNN, Fortune & Money

| Symbol | Get Quote | Keyword | | Search |

Subscribe to Money
Free Trial
Magazine Customer Service

Home | Business News | Markets | Personal Finance | Real Estate | Technology | Small Business | Luxury | Fortune | My Portfolio | CNN.com

## Behind Wall Street's subprime fear index

The formerly obscure ABX index has become a closely watched gauge of just how bad the market for subprime securities is getting.

By Grace Wong, CNNMoney.com staff writer


< BACK | NEXT > works

The ABX tracks the performance of a basket of credit default swaps based on U.S. subprime home loans. Credit default swaps, which are like insurance contracts, allow buyers and sellers to trade risk.

In the case of the ABX, these financial instruments allow traders and investors to take positions on subprime securities without actually holding them.

The index is by no means perfect - traders use credit default swaps as a betting tool, which can skew prices - and it doesn't reflect the true value of the underlying securities. But it does offer a gauge of the demand for them. A decline in the ABX suggests that the securities have become more risky and that investors have lost confidence in them.

**Vultures eyeing mortgage corpse**

### INVESTMENT BANKS INVOLVED IN THE CREATION OF THE ABX.

| | |
| --- | --- |
| ABN AMRO | Goldman Sachs |
| Bank of America | JPMorgan |
| Barclays Capital | Lehman Brothers |
| Bear Stearns | Merrill Lynch |
| BNP Paribas | Morgan Stanley |
| Citigroup | RBS Greenwich |
| Credit Suisse | UBS |
| Deutsche Bank | Wachovia |

SOURCE: MARKIT GROUP


FedEx Express handles more than 28.5 million pounds of shipments daily.

Sponsored Links

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.

Equifax - Official Site
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order

Refinance Now at 5.2% FIXED!
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!

Mortgage Rates at 5.2% FIXED!
200,000 mortgage for under $708/mo. Lower your payment. No SSN reqd

Buy a link here



| The ABX | ABX Hedging a bet | ABX What's in a name | More drama | ? On the horizon |

Sponsored Links

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

Equifax - Official Site
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order
www.equifax.com

Refinance Now at 5.2% FIXED!
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!
www.FetchARate.com

Buy a link here

SPECIAL OFFER:

GET A FREE TRIAL ISSUE!


Money

| Name | |
| Address | |
| City | |
| State/Pr | |
| Zip/Postal | |
| E-mail | |

Continue   Privacy Policy

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy

Home | Portfolio | Calculators | Contact Us | Newsletters | Podcasts | RSS | Mobile | Widgets | Press Center | Site Map | User Preferences
Advertise with Us | Magazine Customer Service | Download Fortune Lists | Reprints | Career Opportunities | Special Sections | Conferences | Business Leader Council

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET.
*: Time reflects local markets trading time. † - Intraday data is delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Disclaimer
Copyright © 2008 BigCharts.com Inc. All rights reserved. Please see our Terms of Use.MarketWatch, the MarketWatch logo, and BigCharts are registered trademarks of MarketWatch, Inc.Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET. Intraday data provided by Interactive Data Real-Time Services and subject to the Terms of Use.Historical, current end-of-day data, and splits data provided by Interactive Data Pricing and Reference Data.Fundamental data provided by Hemscott.SEC Filings data provided by Edgar Online Inc. Earnings data provided by FactSet CallStreet, LLC.

Earn 10,000 Starpoints™ with your first purchase - enough for up to 3 free nights
Earn 1 Starpoint for virtually every dollar you spend
Earn Free Night Awards with no blackout dates
Get a decision in 60 seconds    Apply Now    OPEN


**CNNMoney.com**
A Service of CNN, Fortune & Money

| Symbol | Get Quote | Keyword | Search |

Subscribe to Money
Free Trial
Magazine Customer Service

Home   Business News   Markets   Personal Finance   Real Estate   Technology   Small Business   Luxury   Fortune        My Portfolio   CNN.com

## Behind Wall Street's subprime fear index

The formerly obscure ABX index has become a closely watched gauge of just how bad the market for subprime securities is getting.

*By Grace Wong, CNNMoney.com staff writer*

‹ BACK    NEXT ›    the ABX

The ABX has five separate indices based on the rating of the underlying subprime securities, ranging from AAA to BBB-minus. A new series is issued every six months to reflect the 20 largest current deals.

For instance, the inelegantly-named ABX-HE-A 07-2 tracks bonds with a rating of BBB issued in the first half of 2007.

The index prices are updated by Markit at www.markit.com.

**Credit crunch, Act 2**



Underlying assets of this index are made up of home equity loans.

Mortgage bonds tracked by this index have a rating of A.

**ABX-HE-A 07-2**

Identifies this as an asset-backed index.

Tracks bonds issued in the previous six months, or the first half of 2007.



we are not

**Sponsored Links**

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.

**Equifax - Official Site**
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order

**Refinance Now at 5.2% FIXED!**
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!

**Mortgage Rates at 5.2% FIXED!**
200,000 mortgage for under $708/mo. Lower your payment. No SSN reqd

Buy a link here



| The ABX | ABX Hedging a bet | ABX What's in a name | More drama | ? On the horizon |

**Sponsored Links**

**Refinance at 5.25% Fixed**
$250,000 Mortgage for $886/mo. Compare up to 4 Free Quotes!
www.QuotesHound.com

**Low Cost Car Insurance**
Lower your car insurance rates today. Compare quotes!
www.AutoInsure.org

**Sales & Sales Management**
Learn From the Experts at University of San Francisco - 100% Online!
www.USanFranOnline.com

**SPECIAL OFFER:**

**GET A FREE TRIAL ISSUE!**



Money
RETIRE RICH

| Name | |
| Address | |
| City | |
| State/Pr | |
| Zip/Postal | |
| E-mail | |

Continue    Privacy Policy

Buy a link here

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy

Home   Portfolio   Calculators   Contact Us   Newsletters   Podcasts   RSS   Mobile   Widgets   Press Center   Site Map   User Preferences
Advertise with Us   Magazine Customer Service   Download Fortune Lists   Reprints   Career Opportunities   Special Sections   Conferences   Business Leader
Council

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET.
* : Time reflects local markets trading time. † : Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Disclaimer
Copyright © 2008 BigCharts.com Inc. All rights reserved. Please see our Terms of Use.MarketWatch, the MarketWatch logo, and BigCharts are registered trademarks of MarketWatch,
Inc.Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET. Intraday data provided by Interactive Data Real-Time Services and subject to the
Terms of Use.Historical, current end-of-day data, and splits data provided by Interactive Data Pricing and Reference Data.Fundamental data provided by Hemscott.SEC Filings data
provided by Edgar Online Inc..Earnings data provided by FactSet CallStreet, LLC.

Earn 10,000 Starpoints with your first purchase – enough for up to 3 free nights
Earn 1 Starpoint for virtually every dollar you spend
Earn Free Night Awards with no blackout dates
Get a decision in 60 seconds    Apply Now    OPEN



**CNNMoney.com**
A Service of CNN, Fortune & Money

| Symbol | Get Quote | Keyword | | Search |

Subscribe to Money
Free Trial
Magazine Customer Service

Home    Business News    Markets    Personal Finance    Real Estate    Technology    Small Business    Luxury    Fortune          My Portfolio    CNN.com

## Behind Wall Street's subprime fear index

The formerly obscure ABX index has become a closely watched gauge of just how bad the market for subprime securities is getting.

*By Grace Wong, CNNMoney.com staff writer*

Find Your Graduating Class



I graduated in:
1998
1988
1978
1968
1958

classmates.com

◄ BACK    NEXT ►    4 of 5



The part of the ABX linked to the riskiest subprime bonds has fallen about 67 percent since the mortgage wipeout began in the summer. Now subprime fears are spreading to segments of the market once considered ultra-safe.

For example, AAA-rated mortgage-backed debt has tumbled on the ABX in the last month, reflecting concerns that even those bond holders higher up in the capital structure - those who get paid first - may also suffer losses.

Citigroup CEO Gary Crittenden referred to the decline in the AAA index when the financial services giant announced on Nov. 5 it would write down as much as $11 billion in the fourth quarter.

"Now the best way to kind of get an outside perspective on this is to look at the ABX indices, which have dropped dramatically since the end of September," Crittenden said.

**More trouble ahead for credit markets**

Sponsored Links

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.

Equifax - Official Site
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order

Refinance Now at 5.2% FIXED!
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!

Mortgage Rates at 5.2% FIXED!
200,000 mortgage for under $708/mo. Lower your payment. No SSN reqd

Buy a link here



The ABX    Hedging a bet    What's in a name    More drama    On the horizon

Sponsored Links

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

Equifax - Official Site
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order
www.equifax.com

Refinance Now at 5.2% FIXED!
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!
www.FetchARate.com

Buy a link here

SPECIAL OFFER:

GET A FREE TRIAL ISSUE!



Money

| Name |
| Address |
| City |
| State/Pr |
| Zip/Postal |
| E-mail |
| Continue |  Privacy Policy

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy

Home    Portfolio    Calculators    Contact Us    Newsletters    Podcasts    RSS    Mobile    Widgets    Press Center    Site Map    User Preferences
Advertise with Us    Magazine Customer Service    Download Fortune Lists    Reprints    Career Opportunities    Special Sections    Conferences    Business Leader Council

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET.
*: Time reflects local markets trading time. † : Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Disclaimer
Copyright © 2008 BigCharts.com. All rights reserved. Please see our Terms of Use.MarketWatch, the MarketWatch logo, and BigCharts are registered trademarks of MarketWatch, Inc.Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET. Intraday data provided by Interactive Data Real-Time Services and subject to the Terms of Use.Historical, current end-of-day data, and splits data provided by Interactive Data Pricing and Reference Data.Fundamental data provided by Hemscott.SEC Filings data provided by Edgar Online Inc.Earnings data provided by FactSet CallStreet, LLC.



**CNNMoney.com**™
A Service of CNN, Fortune & Money

| Symbol | Get Quote | Keyword | Search |

Subscribe to Fortune for $4.95
Free Trial
Magazine Customer Service

Home    Business News    Markets    Personal Finance    Real Estate    Technology    Small Business    Luxury    Fortune                My Portfolio    CNN.com

## Behind Wall Street's subprime fear index

The formerly obscure ABX index has become a closely watched gauge of just how bad the market for subprime securities is getting.

*By Grace Wong, CNNMoney.com staff writer*


I graduated in

AL AK AZ AR CA CO CT DE DC
FL GA HI ID IL IN IA KS KY
LA ME MD MA MI MN MS MO MT
NE NV NH NJ NM NY NC ND OH
OK OR PA RI SC SD TN TX UT
VT VA WA WV WI WY

classmates.com·

◀ BACK    NEXT ▶   re 5 of 5

The next series of the ABX is slated for January. But since subprime securitization has practically dried up since the summer, there is some uncertainty over whether a series will be issued next year.

"As it stands now, there aren't 20 bonds that would qualify to be in the next index - and it doesn't look like there are that many more that are going to be issued," Dan Castro, managing director at GSC Group, said.

Even if the ABX starts to track fewer - or smaller - deals, some market participants say the index is already becoming irrelevant now that the surge in subprime lending has ended.

**Wall Street's money machine breaks down**

### Some of the requirements for deals to be included in the index

• Minimum deal size of $500 million
• No more than four deals with the same originator
• Must be rated by Moody's and Standard & Poor's

SOURCE: MARKIT GROUP



| The ABX | Hedging a bet | What's in a name | More drama | On the horizon |

**Sponsored Links**

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

**Equifax - Official Site**
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order
www.equifax.com

**Refinance Now at 5.2% FIXED!**
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!
www.FetchARate.com

Buy a link here

**Sponsored Links**

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.

**Equifax - Official Site**
Get a Free Credit Report with Equifax 3-in-1 Monitoring Order

**Refinance Now at 5.2% FIXED!**
$200,000 mortgage under $599/mo. No SSN req. Compare 4 FREE quotes!

**Mortgage Rates at 5.2% FIXED!**
200,000 mortgage for under $708/mo. Lower your payment. No SSN reqd

Buy a link here

**SPECIAL OFFER:**

GET A FREE TRIAL ISSUE!



**Money**

| Name |
| Address |
| City |
| State/Pr |
| Zip/Postal |
| E-mail |

Continue    Privacy Policy

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET.
* : Time reflects local markets trading time. † : Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Disclaimer
Copyright © 2008 BigCharts Inc. All rights reserved. Please see our Terms of Use. MarketWatch, the MarketWatch logo, and BigCharts are registered trademarks of MarketWatch, Inc.Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET.Intraday data provided by Interactive Data Real-Time Services and subject to the Terms of Use.Historical, current end-of-day data, and splits data provided by Interactive Data Pricing and Reference Data.Fundamental data provided by Hemscott.SEC Filings data provided by Edgar Online Inc.Earnings data provided by FactSet CallStreet, LLC.

# EXHIBIT D

## *Triple A*

### *Loans Issued July 1, 2006 through December 31, 2006*



### *Loans Issued January 1, 2006 though June 30, 2006*



*Double A*

**Loans Issued July 1, 2006 through December 31, 2006**



**Loans Issued January 1, 2006 though June 30, 2006**



### A Tranche

**Loans Issued July 1, 2006 through December 31, 2006**



**Loans Issued January 1, 2007 though June 30, 2007**



EXHIBIT E



## THE WALL STREET JOURNAL.

Credit Markets
**Subprime Woes Still a Worry --- Investor Caution Boosts Treasurys; ABX Index Drops**

By Deborah Lynn Blumberg and Anusha Shrivastava
787 words
17 July 2007
The Wall Street Journal
C6
English
(Copyright (c) 2007, Dow Jones & Company, Inc.)

A record low on a closely watched derivative index that measures risk of home loans made to borrowers with patchy credit histories pushed U.S. Treasurys sharply higher as investors sought a haven for their funds.

A lack of economic data meant there was little to distract investors, but concerns continue to deepen that subprime woes will spread further to the far corners of the credit markets.

The riskiest, BBB-minus slice of the subprime derivative index, known as the **ABX**.HE 07-1, hit a record low of 45 cents in yesterday's trade, according to Alex Pritchartt, a trader at UBS. The index, which stood at 49 cents late Friday, edged back up to 46 cents in heavy afternoon trade, but the mood in the market remained dour.

"People are panicked," Mr. Pritchartt said, noting that there was no specific news driving the declines.

The **ABX** index, which contains slices of risk ranging from the safest AAA-rating to the riskiest BBB-minus, is renewed every six months and measures the credit risk of select loans originated in the prior six-month period. The current index is influenced by mortgages originated in the last six months of 2006 when lending standards were especially lax.

The decline in the BBB-minus portion of the index encouraged some investors to snap up U.S. Treasurys, pushing the 10-year benchmark note back toward the key psychological level of 5%.

Some investors fear the drag of subprime mortgages will eventually hurt the broader economy and other asset classes not directly linked to such loans. Those concerns have boosted Treasurys on and off for the past month.

Treasurys yesterday were "at the feet of subprime," said William O'Donnell, rates strategist at UBS. The market's reaction is surprising, however, said Mr. O'Donnell, who thought investors had already "come to grips" with a declining index. "But I guess people are still on tenterhooks" about anything subprime related, he said.

It isn't just the closely watched BBB-minus tranche of the **ABX** index that is suffering under growing subprime concerns. Andrew Lahde, managing partner of Lahde Capital Management, a hedge fund in Santa Monica, Calif., pointed out that the A tranche is trading at about 70 cents on the dollar, compared with 90 cents on the dollar just a month ago. Mr. Lahde has positioned for declines in the index. "I think people are betting on a **bloodbath**," Mr. Lahde said, adding that he is surprised the higher tranches are "coming unglued" already.

The 10-year Treasury note should trade between 4.98% to 5.21%, Mr. O'Donnell said, noting that subprime could be less of a driver for bonds in the coming days given the key inflation data on tap and ahead of Federal Reserve Chairman Ben Bernanke's midweek address to Congress.

Mr. Bernanke will deliver his semiannual monetary policy report, formerly known as the "Humphrey Hawkins" address, to the House Financial Services Committee tomorrow morning, followed by a Senate address Thursday. While strategists are expecting few surprises from the testimony, with Mr. Bernanke continuing to point to inflation as the No. 1 risk, Humphrey Hawkins days have been some of the most volatile trading days for Treasurys, leaving investors on guard.

And given the market's focus, anything the Fed chairman says about the subprime market will especially

2008 Factiva, Inc. All rights reserved.

perk up investor ears and trading.

The benchmark 10-year note was up 1/2 point, or $5 per $1,000 face value, at 95 27/32. Its yield fell to 5.043% from 5.107% Friday, as yields move inversely to prices. The 30-year bond was up 31/32 point at 94 9/32 to yield 5.127%, down from 5.195%.

```
                          AUCTION RESULTS

    Here are the details of the Treasury auction of weekly bills. All bids are
awarded at a single price at the market-clearing yield. Rates are determined
by the difference between that price and the face value.

                              13-Week                 26-Week

    Applications ................  $39,914,495,000     $35,180,608,000
    Accepted bids ...............  $16,000,278,000     $15,000,023,000
    Accepted noncomp ............   $1,904,495,000      $1,871,608,000
    Accepted frgn non ...........     $100,000,000        $275,000,000
    Auction price (Rate) ........ 98.776556(4.840%)   97.540472(4.865%)
    Coupon equivalent ...........           4.982%              5.071%
    Bids at market yield ........          50.15%              59.42%
    Cusip number ................       912795A68           912795C33

    Both issues are dated July 19. The 13-week bills mature Oct. 18, 2007, and
the 26-week bills mature Jan. 17, 2008.
```

License this article from Dow Jones Reprint Service

Document J000000020070717e37h0002k

2008 Factiva, Inc. All rights reserved.

EXHIBIT F

**ABRAMSON & DENENBERG, P.C.**
**BY: ALAN E. DENENBERG, ESQUIRE**
**1200 WALNUT STREET**
**6TH FLOOR**
**PHILADELPHIA, PA 19107**
**(215) 546-1345**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

```
------------------------------------------------------------- x
LUMINENT MORTGAGE CAPITAL, INC.; and   :
MERCURY MORTGAGE FINANCE               :
STATUTORY TRUST,                       :
                                       :
                Plaintiffs,            :   Civ. A. No.  07-5423
                                       :   ECF CASE
        v.                             :
                                       :   Jury Trial Demanded
                                       :
MERRILL LYNCH & CO., INC.; MERRILL     :
LYNCH, PIERCE, FENNER & SMITH          :
INCORPORATED; MERRILL LYNCH            :
MORTGAGE INVESTORS, INC.; MERRILL      :
LYNCH MORTGAGE LENDING, INC.;          :
MERRILL LYNCH MORTGAGE HOLDINGS,       :
INC.; MERRILL LYNCH MORTGAGE CAPITAL   :
INC. and MERRILL LYNCH MORTGAGE        :
INVESTORS TRUST, SERIES 2005-A6,       :
                                       :
                Defendants.            :
                                       :
------------------------------------------------------------- x
```

## FIRST AMENDED COMPLAINT

Plaintiffs LUMINENT MORTGAGE CAPITAL, INC. and MERCURY MORTGAGE

FINANCE STATUTORY TRUST (collectively, "Luminent" or "Plaintiff"), by and through their

undersigned attorneys, as and for their First Amended Complaint against Defendants MERRILL

LYNCH & CO., INC. ("Merrill Lynch"); MERRILL LYNCH, PIERCE, FENNER & SMITH

INCORPORATED ("MLPFS"); MERRILL LYNCH MORTGAGE INVESTORS, INC.

("Merrill Mortgage"); MERRILL LYNCH MORTGAGE LENDING, INC. ("Merrill Lending");

MERRILL LYNCH MORTGAGE HOLDINGS, INC. ("Merrill Holdings"); MERRILL LYNCH

MORTGAGE CAPITAL INC. ("Merrill Capital") and MERRILL LYNCH MORTGAGE

INVESTORS TRUST, SERIES 2005-A6 ("Merrill Trust," and collectively with Merrill Lynch,

MLPFS, Merrill Mortgage, Merrill Lending, Merrill Holdings and Merrill Capital, herein

"Merrill" or "Defendants"), hereby allege as follows:

## PARTIES

1.      Plaintiff Luminent is a Maryland corporation having its principal place of
business in Philadelphia, Pennsylvania at One Commerce Square, 2005 Market Street. Prior to
about December 31, 2007, its principal place of business was at 101 California Street in San
Francisco, California 94111.

2.      Plaintiff Mercury is a Maryland Business Trust that is a subsidiary of Luminent
having its principal place of business in Philadelphia, Pennsylvania at One Commerce Square,
2005 Market Street. Prior to about December 31, 2007, its principal place of business was at 101
California Street in San Francisco, California 94111.

3.      Upon information and belief, Defendant Merrill Lynch is a Delaware corporation
having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York,
New York 10080.

4.      Upon information and belief, Defendant MLPFS is a Delaware corporation
having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York,
New York 10080.

5.      Upon information and belief, Defendant Merrill Mortgage is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

6.      Upon information and belief, Defendant Merrill Lending is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

7.      Upon information and belief, Defendant Merrill Holdings is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

8.      Upon information and belief, Defendant Merrill Capital is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

9.      Upon information and belief, Defendant Merrill Trust is a trust fund formed in August 2005 by Merrill Mortgage, whose corpus is located in Minneapolis, Minnesota and held by U.S. Bancorp, successor to Wachovia Bank, National Association as trustee with respect to such assets, and/or by Wells Fargo Bank, N.A. ("Wells Fargo") as the trustee's custodial agent.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1331 and § 1367.  In addition, there is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.  Therefore, the Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

11.    Venue is proper pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## NATURE OF THE ACTION

12.    This action arises out of Defendants' issuance and sale to Plaintiff of certain subordinate classes of securities known as "Mortgage Loan Asset-Backed Certificates, Series 2005-A6." Defendants misrepresented, and failed to disclose, material information relating to securities they offered and sold to Plaintiff, entitling Plaintiff to rescission and/or monetary damages.

## COMMON ALLEGATIONS

13.    Luminent and Mercury are real estate investment trusts that purchased the securities that are the subject of this complaint.

14.    Upon information and belief, Merrill Lynch is (and was at all relevant times) a company that, through its subsidiaries, is engaged in the business of, *inter alia,* underwriting and/or issuing securities, and was at all relevant times a controlling person within the meaning of Section 20 of the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to the other Defendants in this action.

15.    Upon information and belief, MLPFS is (and was at all relevant times) a registered broker-dealer engaged in the business of underwriting and/or issuing securities, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

4

16.     Upon information and belief, Merrill Mortgage is (and was at all relevant times) engaged in the business of, *inter alia*, purchasing from lenders residential mortgage loans, and securitizing them, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

17.     Upon information and belief, Merrill Lending is (and was at all relevant times) engaged in the business of, *inter alia*, purchasing from lenders residential mortgage loans, and securitizing them, and a subsidiary of Merrill Lynch and Merrill Capital whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

18.     Upon information and belief, Merrill Holdings is (and was at all relevant times) engaged in the business of purchasing residential mortgage loans, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

19.     Upon information and belief, Merrill Capital is (and was at all relevant times) engaged in the business of purchasing residential mortgage loans, a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch, and a controlling person within the meaning of Section 20 of the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to Merrill Lending.

20.     Upon information and belief, Merrill Trust is a trust formed by Merrill Mortgage and an issuer of certain "mortgage loan asset-backed" securities that are the subject of this complaint.

21.     Each of the Defendants was involved in the solicitation and/or sale of the securities that are the subject of this complaint and acted for its own financial benefit, or for the benefit of the actual seller, with respect to those securities.  Alternatively, the information and documents necessary to determine the precise involvement of each defendant is particularly

within the knowledge and/or possession of the Defendants. In addition, upon information and

belief, each of Merrill Lynch, MLPFS, Merrill Mortgage, Merrill Lending, Merrill Holdings and

Merrill Capital was at all relevant times a controlling person within the meaning of Section 20 of

the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to

Merrill Trust.

### A.    Defendants' Mortgage Backed Certificates.

22.    In or about August of 2005, Merrill Mortgage caused the formation of Merrill

Trust for the purpose of issuing and selling approximately $1 billion of certain mortgage-related

securities (or "mortgage pass-through certificates") known as "Mortgage Loan Asset-Backed

Certificates, Series 2005-A6" (herein, the "Certificates").

23.    Merrill Trust was formed, and its Certificates were issued, pursuant to a Pooling

and Servicing Agreement, dated as of August 1, 2005, among Merrill Mortgage (as "Depositor"

of certain mortgage loans), Wachovia Bank, National Association (as trustee), and Wells Fargo

(as "Master Servicer and Securities Administrator").

24.    By investing in the Certificates, investors would effectively purchase a beneficial

ownership interest in a pool of certain mortgage loans (herein, the "Mortgage Loans") that

Merrill Trust acquired and then securitized, and that Merrill Lynch (acting through its

underwriting arm, MLPFS) then purchased, as underwriter, and resold to investors.

25.    Merrill Trust acquired the Mortgage Loans via Merrill Mortgage, which acquired

them from Merrill Lending. Merrill Lending acquired approximately 78.26% of the Mortgage

Loans from GreenPoint Mortgage Funding Inc. ("GreenPoint"), approximately 18.76% of the

Mortgage Loans from Impac Funding Corporation ("Impac"), and approximately 2.98% of the

Mortgage Loans from Wells Fargo. However, the loans from GreenPoint and Impac were

initially acquired by, respectively, Merrill Holdings and Merrill Capital, which then transferred them to Merrill Lending pursuant to two agreements, each an "Assignment, Assumption and Recognition Agreement" dated August 30, 2005.

26.     The issued Certificates consisted of fourteen different classes, three of which were junior in payment priority and/or had a different source of payment as compared to the other 11 classes.    Those three junior classes, the securities primarily at issue in this matter, were designated "Class B-3," "Class C," and "Class P" (herein, collectively, the "Junior Certificates"). (The remaining, more senior, classes were designated "Class I-A-1," "Class I-A-2," "Class II-A-1," "Class II-A-2," "Class II-A-3," "Class II-A-4" (collectively, the "Class A" Certificates"), "Class M-1," "Class M-2," "Class B-1," "Class B-2," and "Class R.")

27.     The various classes of Certificates had different levels of seniority, and thus, had different priority among them regarding payment of distributions of monies received on the Mortgage Loans (*i.e.*, the principal and interest paid by the homeowners on the underlying Mortgage Loans), and regarding the allocation among them of losses suffered on the Mortgage Loans.  Distributions to holders of the Certificates resembled a cascade, or "waterfall," in which the most senior Certificates received payments before the next most senior class received payment, and so on.

28. .    The general priority among the Certificates was as follows: Classes A and R; M-1; M-2; B-1; B-2 and B-3.  Thus, holders of the Class B-3 were not entitled to receive any amounts received on the Mortgage Loans until the (eleven) more senior holders were paid.

29.     The Class C Certificates were junior to the Class B-3 Certificates.  Moreover, the Class C Certificates represented a "residual" interest in the Mortgage Loans, as the holders of that class of Certificates were entitled to be paid only from the so-called "excess cash-flow"

resulting from that pool of loans. The "excess cash-flow" was the amount of interest received on the Mortgage Loans that remained after more senior holders were paid the interest owed to them and certain losses (delinquencies and foreclosure losses/shortfalls) are accounted/compensated for.

30. Investors in the Class P Certificates, on the other hand, were not entitled to any of the interest payment amounts received on the Mortgage Loans, as they (and only they) were instead entitled to receive any "prepayment penalties" incurred by homeowners upon paying off all or a substantial portion of a loan in advance of the expiration of the prepayment penalty term.

31. The Junior Certificates were issued simultaneously with, and as an integral part of a public offering of, the other Certificates which were publicly offered and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August 26, 2005.

**B.    Characteristics of the Mortgage Loans Relevant to Investors in the Junior Certificates.**

32. Because the Mortgage Loans represented Merrill Trust's sole assets, certain characteristics of those loans were crucial to potential investors. Furthermore, because the Junior Certificates had lesser priority with respect to payment of distributions and, in the case of the Class C and P holders, a more limited revenue source, those securities represented a concomitantly riskier investment and those material characteristics took on even greater importance for potential investors.

33. Certain of the characteristics of the Mortgage Loans material to potential investors in the Junior Certificates included the purpose of the Mortgage Loans; the type of properties being mortgaged; the original interest rates owed on the Mortgage Loans; the margin rates earned on the Mortgage Loans; and a Mortgage Loan homeowner's "FICO" score ("Fair Isaac's Credit Risk Score") used in the consumer finance business.

34.    All of these characteristics were material because they were factors predicting the likelihood of a homeowner prepaying, defaulting, or becoming delinquent on mortgage loan obligations, and therefore speak to the value and risks associated with the Mortgage Loans (*i.e.*, the issuer's sole asset).

35.    Furthermore, for potential investors in the Class C and P Certificates, the Mortgage Loans' prepayment penalty terms were material as well.  Prepayment penalties are penalties imposed by a lender on a homeowner when all (or a substantial portion) of the principal owed on the mortgage loan is paid off in advance of the loan's prepayment penalty expiration date.

36.    Those penalties can be of the "hard" or "soft" variety.  In general, so-called "hard" prepayment penalties are penalties imposed by a lender on a homeowner regardless of the reason for the advance payment.  By contrast, "soft" penalty provisions allow the homeowner to avoid a penalty when a prepayment is the result of the homeowner's sale of their property.

37.    As regards the Class P Certificates, the ability and potential for receiving prepayment penalties on the Mortgage Loans was an especially important term in deciding whether to invest, given that prepayment penalties are the only source of a return on an investment for Class P holders.

38.    Moreover, although Class P holders alone were entitled to receive prepayment penalties, the Mortgage Loans' prepayment penalty terms were also important to an investor (like Plaintiff) who considered investing in Class C Certificates as well.  That is because Class C and P Certificates act as a hedge against each other, and are therefore interdependent.

39.    Specifically, because the Class C Certificates represent, in effect, "residual" interests in the excess cash-flow yielded by the Mortgage Loans, the amount of funds received

by Class C holders is sensitive to the amount of prepayments made on the Mortgage Loans. The greater the prepayment activity, the smaller the pool of the Mortgage Loans remaining and available to generate the excess cash-flow needed to pay Class C holders; the lower the prepayment activity, the more excess cash that is available for them. Conversely, unlike the holders of Class C Certificates, the holders of Class P Certificates benefit from heavy prepayment activity because they, as the class entitled to prepayment penalties, would be entitled to more cash – provided that prepayment penalties are being incurred and paid by the homeowner.

40.    Thus, for one who invests in both the Class P Certificates and the Class C Certificates, the prepayment penalty revenues gained on the Class P Certificates in the event prepayment activity is high (and penalties are incurred) offset the reduction in the residual cash-flow on the Class C Certificates (and vice-versa in a low prepayment scenario).

41.    As a consequence of the fact that the Class C and P Certificates act as a hedge against each other, if one of these classes prove defective, that necessarily renders the other defective, and undermines the initial decision to purchase all of the Junior Certificates (which were offered as a "3 pack"). Defendants knew this as it is commonly understood in the market that those type of classes of securities act as a hedge against each other.

42.    Even aside from the fact that the Class C and P Certificates act as a hedge against each other, both classes would suffer in the event the pool of Mortgage Loans was heavily weighted towards penalties that are "soft." In general, if the portfolio of Mortgage Loans has a larger proportion of soft penalties, prepayments on those loans will come in faster than they would if the penalties were of the "hard" variety (because homeowners who are able to prepay without penalty are more likely to do so); there will be fewer penalties to be collected for the

10

benefit of Class P holders (because "soft" penalties are less likely to result in a penalty than "hard" penalties); and less excess cash-flow for the benefit of the Class C holders (because prepayment reduces the overall amount of interest paid by homeowners on the pool of Mortgage Loans by reducing the number of loans comprising the asset pool).

43.    As a result, in a loan portfolio weighted heavily toward "soft" penalties, an investor (like Plaintiff) in both the Class P and Class C Certificates would simultaneously (i) receive less excess cash on the Class C investment, and (ii) receive less offsetting cash (in the form of prepayment penalties) on the Class P investment. In other words, for such an investor, the predominance of "soft" penalties on the Mortgage Loans is a losing proposition on both investments, and therefore the need for accurate disclosure concerning the percentage of portfolio loans featuring "soft" prepayment penalties is crucial.

44.    In sum, the difference between "hard" and "soft" prepayment penalties is highly material to a potential purchaser of the Class C and P Certificates, as "soft" penalty terms result in higher risk and less return.

45.    Moreover, the quality of the due diligence examination conducted with respect to the Mortgage Loans by an underwriter and/or issuer of the Certificates is also critical to investors. That is because the Mortgage Loans represent the issuer's sole assets, and potential investors do not have access to the underlying loan files and other documentation from which it can determine for itself the quality and material characteristics of those assets. Rather, the potential investor must rely exclusively on the issuer and underwriter for accurate information concerning the characteristics and quality of the underlying Mortgage Loans.

**C.    Defendants' Representations Regarding The Terms of the Mortgage Loans.**

46.    In or about July 2005, Keith Tomao, a salesperson in Merrill's San Francisco office, contacted Trezevant Moore, Plaintiff's CEO, to offer the Junior Certificates as a "3 pack." Mr. Moore expressed interest in learning more about the Certificates.

47.    Thereafter, Tomao sent Mr. Moore various materials regarding the Certificates by interstate mail and wire, including but not limited to a term sheet (sent on or about August 20, 2005); a "deal tape" that consisted of an Excel spreadsheet that described important characteristics of the Mortgage Loans (sent on or about July 26, 2005); a document containing a matrix that described (on a state-by-state basis) the prepayment penalty terms of the Mortgage Loans acquired from GreenPoint (the "Prepayment Matrix") (sent on or about July 26, 2005); and a document authored by Impac Funding Corporation that provided a "detailed explanation" of the prepayment terms of the Mortgage Loans (the "Impac Detailed Explanation").

48.    Merrill's deal tape listed the approximately 3,200 Mortgage Loans in the pool in numerical order by "Loan Number" and contained 62 categories of information for each of the individual loans comprising the pool of Mortgage Loans.  Thus, the deal tape contained literally tens of thousands of specific factual representations concerning the loans in the pool underlying the Certificates.

*Representations Regarding Prepayment Penalty Provisions.*

49.    Among the categories of information listed on the deal tape for each loan were three that related to prepayment penalty terms – one column of data that disclosed the so-called "Prepayment Penalty Code" for each loan; another that disclosed the "Prepayment Penalty Months"; and a third that disclosed the state in which the mortgaged property was located.

50.    The "Prepayment Penalty Code" and Prepayment Penalty Months" columns indicated if there was a prepayment penalty associated with a particular mortgage loan, and if so, the number of years or months during which the applicable prepayment penalty would apply to that loan.

51.    In the course of evaluating a potential investment in the Junior Certificates, and for the reasons outlined above, Plaintiff was obviously interested in determining the distribution of hard and soft prepayment penalties amongst the loans in the pool that featured prepayment penalties.

52.    Accordingly, on August 15, 2005, Plaintiff's Assistant Portfolio Manager, Zheng Wang, asked Defendants' Keith Tomao how Plaintiff could derive that information.

53.    In response, on or about August 15, 2005 Defendants' Keith Tomao advised Mr. Wang that the deal tape disclosed which of the loans in the pool featured prepayment penalties, and further disclosed the state of origination of each loan.  Mr. Tomao went on to explain that the Prepayment Matrix showed the types of prepayment penalties permitted by each jurisdiction.  He further represented that all loans on the deal tape featuring prepayment penalties had "hard" penalties, unless the Prepayment Matrix specifically stated that such penalties were not permitted in the jurisdiction where the loan originated.

54.    For example, the Prepayment Matrix indicated that hard prepayment penalties were permissible in California.  Thus, according to Tomao, if the deal tape indicated that a particular loan originated from California and featured a prepayment penalty, Plaintiff could rest assured that the prepayment penalty was of the "hard" variety.

55.    The Prepayment Matrix showed that the vast majority of jurisdictions permitted hard prepayment penalties, as did the Impac Detailed Explanation.  Thus, through the foregoing

representations, as well as the information contained in the deal tape, the Prepayment Matrix, and the Impac Detailed Explanation, Defendants represented to Plaintiff that the Mortgage Loans having prepayment penalties primarily had "hard" prepayment penalties.

### *Representations Regarding Other Material Terms of the Mortgage Loans*

56.    In addition to the information regarding prepayment penalties, the deal tape also contained information regarding other material terms of the Mortgage Loans, including the types of properties secured by the Mortgage Loans; the Mortgage Loans' "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.

57.    As indicated above, these other terms are material to a potential investor because they are factors in trying to predict the likelihood of a homeowner prepaying, defaulting, or becoming delinquent on his/her mortgage loan obligations, and consequently, to determine the value and risks associated with the Mortgage Loans (*i.e.*, the issuer's sole asset).

### *Representations Regarding Due Diligence.*

58.    Moreover, prior to Plaintiff's purchase of the Junior Certificates, Mr. Moore had multiple conversations with Tomao regarding the nature and quality of the loans underlying the Certificates, and the level of due diligence performed on the loans.  During those conversations, which occurred in or about August 2005, Tomao represented that the Mortgage Loans were "Alternate-A" (or "Alt-A") loans, which involve prime quality collateral, are well above subprime quality, and are generally made to borrowers with strong FICO credit scores.

59.    On or about August 2005, Tomao further represented to Mr. Moore that Merrill had performed due diligence on the loan portfolio consistent with industry custom, standards, and practice, including a review of a large sample of the documentation underlying the loans,

and a detailed statistical analysis to ensure that the quality of the loans was consistent with the expected yields.

60.    Tomao further represented that Merrill's due diligence had confirmed and had been sufficient to confirm that the representations regarding the Mortgage Loans contained on the deal tape were accurate (prepayment terms, FICO scores, interest rates, property types, etc.); that the Mortgage Loans met the lenders' underwriting criteria; and that the Mortgage Loans were of Alt-A quality.

61.    Moreover, even absent Defendants' explicit representations regarding due diligence, the nature and quality of due diligence performed by underwriters and issuers on the loans underlying mortgage-backed securities was generally understood in the industry. Therefore, Plaintiff would have been entitled to assume that Merrill performed due diligence of that nature and quality unless expressly advised to the contrary by Defendants.

62.    Based on and in reliance upon the myriad representations contained in the deal tape, the term sheet, the Prepayment Matrix and the Impac Detailed Explanation, as well as the representations by Tomao concerning the quality of the loans and the due diligence performed on the loan portfolio, Plaintiff acquired the Junior Certificates on August 30, 2005.

**D.    Plaintiff Discovers Merrill's Misrepresentations.**

63.    In early April of 2007 (between April 1, 2007 and April 13, 2007), Plaintiff received a sampling of approximately 80 loan files from Defendants concerning the Mortgage Loans.  The loan files contained actual documentation underlying the loans in the pool (as opposed to the mere summary information contained in the deal tape provided by Merrill prior to Plaintiff's purchase of the Certificates).

64.    Plaintiff, through Robert Mason, Vice President of Transaction Management, and Leonard Daskus, Assistant Vice President of Credit Analysis, conducted a review of those loan files in April of 2007, and compared the information in them to the information on the deal tape concerning the very same loans. Plaintiff further compared the information on the deal tape to the information on remittance reports that Plaintiff had received from Wells Fargo on a monthly basis after purchasing the Junior Certificates. Those remittance reports showed the monthly activity for each of the approximately 3,200 Mortgage Loans in the pool.

65.    Plaintiff's review of the loan files revealed the falsity of the oral and written representations made by Merrill prior to Plaintiff's purchase of the Junior Certificates as aforesaid.

### Misrepresentations Regarding Prepayment Penalty Terms

66.    For example, as noted above, prior to Plaintiff's purchase of the Junior Certificates, the deal tape in conjunction with the Prepayment Matrix had indicated (as per Merrill's explicit representations and interpretation) that the Mortgage Loans in the pool containing prepayment penalty provisions predominantly featured "hard" penalties.

67.    But Plaintiff's comparison of the deal tape with the sampling of loan files revealed the opposite – that the prepayment penalties were predominantly of the "soft" variety. Specifically, the following loans in the sample were found to have "soft" prepayment penalties, despite Merrill's pre-sale representation that those loans featured "hard" prepayment penalty provisions:

| Month/Year | Loan | State | Penalty |
|---|---|---|---|
| July 2006 | 87093316 | CA | 3 YEAR PREPAYMENT PENALTY |
| August 206 | 87120879 | WA | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86595329 | CO | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86658739 | MI | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86805017 | IN | 2 YEAR PREPAYMENT PENALTY |
| September 2006 | 86981453 | FL | 3 YEAR PREPAYMENT PENALTY |
| September 2006 | 87027363 | OR | 3 YEAR PREPAYMENT PENALTY |

16

| September 2006 | 87092292 | OR | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 86218922 | TX | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 86396447 | NV | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 86883030 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 87090767 | OR | 3 YEAR PREPAYMENT PENALTY |
| November 2006 | 86375045 | CO | 3 YEAR PREPAYMENT PENALTY |
| November 2006 | 86800067 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2006 | 86868742 | UT | 3 YEAR PREPAYMENT PENALTY |
| December 2006 | 86886777 | CA | 3 YEAR PREPAYMENT PENALTY |
| July 2006 | 86784998 | CA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86311974 | CA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86477783 | FL | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86517729 | TX | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86930047 | UT | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86936242 | WA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86938172 | OR | 3 YEAR PREPAYMENT PENALTY |
| September 2005 | 86341534 | AZ | 3 YEAR PREPAYMENT PENALTY |
| September 2005 | 86990363 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2005 | 86835766 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2005 | 86943008 | WA | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 86869187 | CO | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 87054284 | FL | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 202401758 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2005 | 86443488 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2005 | 86686599 | PA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86056256 | IN | 2 YEAR PREPAYMENT PENALTY |
| January 2006 | 86263332 | CA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86465531 | FL | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86891330 | OR | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86939006 | CA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 87051744 | FL | 3 YEAR PREPAYMENT PENALTY |
| February 2006 | 202332250 | KY | 3 YEAR PREPAYMENT PENALTY |
| March 2006 | 86896891 | WA | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 86125135 | TX | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 86952009 | UT | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 700073661 | FL | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86229051 | CA | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86347218 | OR | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86458429 | AZ | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86525938 | AZ | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86877495 | UT | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 202219796 | AZ | 3 YEAR PREPAYMENT PENALTY |

68.     As explained above, the difference between "hard" and "soft" prepayment penalties was highly material to Plaintiff as a potential purchaser of the Class C and P Certificates, because "soft" penalty terms result in higher risk and less return.

69.     Moreover, the types of misrepresentations regarding the Mortgage Loans' prepayment terms were not limited to the "hard" versus "soft" issue. The deal tape Merrill

provided before Plaintiff purchased the Junior Certificates also misrepresented the time period in which a penalty would apply.

70.    For example, the deal tape Merrill provided before Plaintiff acquired the Junior Certificates specified that, for Mortgage Loan number 202400677, the penalty term was three years.  However, the actual loan documentation indicated that the penalty term was merely 12 months.  A shorter prepayment period on a mortgage loan is material to an investor in the Class C and P Certificates as it decreases the likelihood of a prepayment penalty being incurred (which is detrimental to the Class P holder) and increases the likelihood of that loan being paid off early (which is detrimental to the Class C holder).  Other examples include the following Mortgage Loans:

| Month/Year | Loan No. | State | Purported  Penalty Term | Actual  Penalty Term |
|---|---|---|---|---|
| October 2006 | 202390829 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |
| July 2006 | 202329942 | CA | 3 YEAR PREPAYMENT PENALTY | 12 months |
| July 2006 | 202389417 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |
| April 2006 | 202133583 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |

71.    In addition, many loans that Merrill had represented to have prepayment provisions were found to have no prepayment riders at all, as follows:

| Month/Year | Loan No. | State | Purported Penalty | Actual Documented Penalty |
|---|---|---|---|---|
| August 2006 | 87045647 | AZ | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| November 2006 | 202413076 | NV | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| March 2006 | 86927688 | VA | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| May 20006 | 86836079 | DE | 3 YEAR PREPAYMENT PENALTY | No penalty rider |

### *Misrepresentations Regarding Other Material Terms of the Mortgage Loans.*

72.    Worse still, Defendants' misrepresentations regarding the Mortgage Loans were not limited to those assets' prepayment penalty terms.  The deal tape Defendants provided to Plaintiff when pitching the Junior Certificates also contained false and misleading information

regarding various other material characteristics of the Mortgage Loans that Plaintiff relied upon, including: the types of properties secured by the Mortgage Loans; the borrowers' "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.  For example:

a)      The deal tape Merrill provided before Plaintiff purchased the Junior Certificates represented that, for Mortgage Loan number "700080237," the "property type" was a single family residence, whereas the monthly remittance reports subsequently provided by Wells Fargo indicated that the property was a condominium.  The type of property underlying a mortgage loan was material to investors in the Junior Certificates because owners of certain property types are more likely to default on their payment obligations under a mortgage loan than others (*i.e.*, an owner of a condominium unit is more likely to treat the property as a mere investment, and default, than an owner of a single family residence, who has more incentive to protect their home);

b)      As another example, with respect to the so-called "FICO" rating, the deal tape Merrill provided before Plaintiff purchased the Junior Certificates represented that, for Mortgage Loan number "141517482," the homeowner's score was 627, whereas the monthly remittance reports subsequently provided by Wells Fargo indicates a score of 593.  A homeowner's "FICO" score was material to investors in the Junior Certificates as a lower score increases the likelihood that a payment default will occur with respect to that homeowner's mortgage loan;

c)      Similarly, Defendants' deal tape represented that, for Mortgage Loan number "87053856," the original rate owed on the Mortgage was 6.625%, whereas

19

the monthly remittance reports provided by Wells Fargo indicated that the original rate was 6.875%. The interest rate owed on an underlying a mortgage loan is material to investors in the Junior Certificates as higher interest rate terms are more likely to result in a payment default or a refinancing for a lower interest rate;

      d)    And, Defendants' deal tape represented that the purpose of Mortgage Loans bearing numbers "86417391," "86810967" and "86966298" was "Refinance Rate-Term" (which means the borrower received better rate/payment terms under the subject loan), while the monthly remittance reports from Wells Fargo indicated that the purpose of those loans was "cashout refinance" (which signifies that a borrower had simply extracted equity, in the form of cash, from the mortgage property). The purpose of an underlying mortgage loan was material to investors in the Junior Certificates because owners who have refinanced for the purpose of receiving a better interest rate are less likely to default than those who refinanced merely for the purpose of extracting equity (cash) from their property, and the homeowners who did not merely extract equity from the property have more equity remaining in their property available upon foreclosure (or to borrow against to prevent a default and foreclosure); and

      e)    Furthermore, with respect to the margin rates relating to the Mortgage Loans, Defendants' deal tape represented that Mortgage Loan number "202127817" had a margin rate of 2.75%, whereas the monthly remittance reports subsequently provided by Wells Fargo disclosed that the margin rate was merely 2.25%. The margin rate relating to a mortgage loan was material to investors in the Class C Certificates because lower margin rates imply lesser amounts of interest received on

the Mortgage Loans which can become excess cash-flow (for the benefit of Class C holders).

*Misrepresentations Regarding Due Diligence.*

73.    Viewed in retrospect, it is now further clear that Merrill's representations regarding the quality of the loans in the portfolio and the level of due diligence it performed on those loans were also false.

74.    Specifically, in evaluating whether to invest in the Junior Certificates, Plaintiff considered and relied upon standard metrics concerning the underlying loans, such as Loan-to-Value ratios; FICO scores; loan amounts; the purpose of the real property serving as collateral (primary residence, second home, etc.); and the property type (condominium, single family home, etc.). Plaintiff also relied on Merrill's due diligence on the Mortgage Loans to ensure that those loans actually met the lenders' underwriting criteria (*i.e.*, that the borrower's financial profile actually met the lender's purported minimum standards for extending a mortgage loan) and otherwise satisfied the standard criteria for "Alt-A" quality loans regarding, *inter alia*, the appraisal of the collateral; the amount of assets held by the borrower; the borrower's employment history, income, and debt ratio; and the location of the real property.

75.    The deal tape Merrill provided to Plaintiff before Plaintiff purchased the Junior Certificates contained all of the foregoing information for each of the approximately 3,200 loans in the pool.  It is that information on the deal tape, *inter alia*, that Plaintiff used and relied upon in developing its financial models for predicting the future performance of the loan portfolio, and thus determining whether the Junior Certificates were an advisable investment.

76.    Of course, if the information on the deal tape and other information provided by Defendants was materially inaccurate, Plaintiff's entire calculus regarding the desirability of the Junior Certificates would be rendered inaccurate and useless.

77.    Here, a review of the performance of the loan portfolio over time demonstrates an unusually high rate of early payment defaults, as well as unusually high rates of delinquencies.

78.    In that regard, the default rate has been at approximately 15% of the original aggregate principal amount of the Mortgage Loans – an extraordinarily high rate for loans that are supposed to be "Alt-A" loans.  And, as of November 2007, the delinquency rate stands at approximately 15% of the current aggregate principal amount of the mortgage loans.

79.    Based on Plaintiff's industry knowledge and expertise, those rates are wholly inconsistent with Alt-A quality loans originated during the relevant time period, regardless of current market and economic conditions.

80.    The foregoing facts create the exceptionally strong inference that a substantial portion of the Mortgage Loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans; that the characteristics of the portfolio as a whole did not comport with the information provided in the deal tape and the term sheet; that, for a substantial portion of the Mortgage Loans, the specific information on the deal tape concerning the material terms of those loans was false; and that (contrary to Merrill's representations) the due diligence performed on the Mortgage Loans was insufficient to confirm that the quality of the loans was consistent with Merrill's representations to Plaintiff prior to Plaintiff's acquisition of the Junior Certificates, or that the information on the deal tape was materially accurate.

81.    In other words, the early payment default and delinquency rates referenced above prove that the material information referenced above in the deal tape had to have been materially

false. Moreover, that performance is so poor that any competent, industry-accepted level of due diligence on the underlying loans would have detected the inaccuracies.

82.     Indeed, industry custom and practice dictates that issuers and underwriters of mortgage-backed securities take a statistically representative sample of the underlying loan pool, and review the loan documentation for that sample to ensure that the representations made by the borrower to the lender to obtain the loan are accurate (*i.e.*, verify employment, income, liquid assets, appraisal, etc.), and that the lenders' underwriting criteria have actually been satisfied for each of the loans in the sample.

83.     In this case, based on Plaintiff's long experience in the industry and knowledge of industry custom and practice, the due diligence performed by Merrill prior to issuing the Certificates simply could not have met industry standards, nor could it have been in compliance with Merrill's pre-sale representations to Plaintiff. That non-compliance is proved by the demonstrated inaccuracies uncovered during Plaintiff's sample review of the documents received in April 2007 (referenced above), the inaccuracies revealed by Plaintiff's comparison of information in Defendants' deal tape with the information that appeared in the monthly remittance reports subsequently provided by Wells Fargo, as well as the poor historical performance of the loan portfolio (particularly with respect to early payment defaults and delinquency rates).

84.     In fact, the Class B-3 Certificates have now been put on a "negative watch" by Standard & Poor's – the only rating agency that rates those securities.

85.     Merrill's inadequate diligence efforts regarding the Mortgage Loans is not an aberration. A December 7, 2007 article in the *New York Times* noted that New York's Attorney

General has issued a subpoenas to certain investment banks, including Merrill, "seeking information about the packaging and selling of subprime mortgages" and noting that,

> Nevertheless, the loans that many banks packaged are proving to be increasingly toxic. Almost a quarter of the subprime loans that were transformed into securities by Deutsche Bank, Barclays and Morgan Stanley last year are already in default, according to Bloomberg.    About a fifth of the loans backing securities underwritten by Merrill Lynch are in trouble.
>
> Data from another firm that tracks mortgage securities, Lewtan Technologies, shows similar trends. The banks declined to comment on the default rates.
>
> ***The data raises questions about how closely Wall Street banks scrutinized these loans, many of them made at low teaser rates that will reset next year to higher levels.*** (emphasis added).

86.    Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to a sample of the Mortgage Loans in April of 2007.  On September 21, 2007, Plaintiff's counsel transmitted a letter to Defendants demanding rescission of the Certificates.

## FIRST CAUSE OF ACTION
### Violation of Sections 10(b) of the Securities and Exchange Act of 1934, Rule 10b-5 Promulgated Thereunder, and Section 20 of the Securities and Exchange Act of 1934

87.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 86 as if set forth fully herein.

88.    Each of the Junior Certificates is a "security" within the meaning of the Securities Exchange Act of 1934.

89.    The sale of the Junior Certificates by Defendants to Plaintiff was a "sale" of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 77j.

90.     The amount of payments received on, and the resulting value of, the Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

91.     In connection with their offer and sale of the Junior Certificates, Defendants knowingly or, at a bare minimum, recklessly misrepresented the composition of the pool of Mortgage Loans by representing (through the deal tape, the Prepayment Matrix, the Impac Detailed Explanation and Merrill's oral representations regarding those documents as aforesaid) that the Mortgage Loans having prepayment penalties had predominantly "hard" prepayment penalty terms, and by providing false and misleading information regarding various other material characteristics of the individual Mortgage Loans as aforesaid, including but not limited to the terms and existence of prepayment penalties on individual loans; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.

92.     Defendants also falsely represented that they had conducted adequate due diligence regarding the Mortgage Loans, and concealed and failed to disclose that they had not conducted due diligence on the Mortgage Loans in conformance with that required by standard industry custom and practice.

93.     The following facts pleaded above give rise to a strong inference that Defendants made the foregoing misrepresentations and omissions with scienter:

a)      Because of their positions as creator of Merrill Trust, acquirer and depositor of the Mortgage Loans and issuer and underwriter of the Certificates, Defendants, to the exclusion of Plaintiff, had access to full and accurate information concerning all of the approximately 3,200 Mortgage Loans in the pool;

25

b)      Defendants had full and exclusive control over the nature and quality of the due diligence;

c)      The sheer volume and severity of the discrepancies between the deal tape and the approximately 80 sample loans files reviewed by Plaintiff in April 2007, as well as between the deal tape and the monthly remittance reports, establishes that those discrepancies could not have occurred in absence of at least recklessness with respect to the accuracy of Defendants' representations and omissions to Plaintiff; and

d)      The poor historical performance of the Mortgage Loans, particularly in terms of early payment defaults and delinquency rates, establishes that those discrepancies could not have occurred in the absence of at least recklessness with respect to the accuracy of Defendants' representations and omissions to Plaintiff.

94.      Moreover, Defendants had both motive and opportunity to defraud Plaintiff. Issuers of mortgage-backed securities such as Merrill seek to sell subordinated tranches to third-party investors because they are in the business of monetizing their investments in the underlying assets as quickly as possible, and thereby realizing the certainty of a return.  Moreover, if Merrill could not sell the Junior Certificates, it would have been compelled to hold those Certificates for their own account.  Such a scenario would not only have exposed Merrill to the risk associated with the most subordinate tranches of the Certificates, but also entities such as Merrill have great difficulty booking subordinate mortgage-backed securities due to internal risk management policies and related concerns.  For those reasons, Defendants had a motive to defraud and induce Plaintiff into acquiring the Junior Certificates by misrepresenting the nature and quality of the underlying assets, as well as by misrepresenting and concealing the nature and quality of the due diligence they had performed on the Mortgage Loans.

95.    Defendants also had the clear opportunity to defraud Plaintiff in that they had full access to the original documentation underlying the Junior Certificates, and the contractual right to review that documentation to the complete exclusion of Plaintiff.  Therefore, Defendants were able to misrepresent the nature and quality of their due diligence and the underlying loans with impunity.

96.    In sum, Defendants' need to attract and induce investors in the Junior Certificates, and Plaintiff's inability to review for itself the non-public files relating to the Mortgage Loans (and thereby discover Merrill's various misrepresentations regarding the Mortgage Loans and their due diligence), provided the motive and opportunity to defraud Plaintiff.

97.    For the reasons stated above, Defendants' misrepresentations and omissions regarding the Mortgage Loans and their due diligence were material, as no reasonable investor would purchase the "3 pack" of the Junior Certificates had it known the truth about the Mortgage Loans' true characteristics and the truth about Defendants' inadequate due diligence efforts with respect to those assets.

98.    Plaintiff relied on all of Defendants' aforesaid representations and omissions. Moreover, Plaintiff's reliance was justified as it did not have access to the underlying loan documentation prior to acquiring the Junior Certificates, and no right or ability to supervise Defendants' due diligence regarding the Mortgage Loans, and was therefore in no position to uncover Defendants' fraud.

99.    Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to a sample of the Mortgage Loans in April of 2007.

100.    Defendants accomplished their fraudulent conduct by use of the interstate mails and wires.

101.    Defendants' misrepresentations and omissions constitute fraudulent and deceptive activity in connection with the sale of securities.

102.    By virtue of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) in that Defendants, by the use of means and instrumentalities of interstate commerce, knowingly or recklessly made material misrepresentations and omissions that were false and misleading in light of the circumstances in which they were made, and employed devices schemes and artifices to defraud, and/or engaged in acts and practices and a course of business that operated as a fraud and deceit upon Plaintiff in connection with their sale of securities.  In addition, under Section 20 of the Securities Exchange Act of 1934, Defendants (other than Merrill Trust) are liable for such violations as controlling persons.

103.    Plaintiff has suffered substantial damages as a result of Defendants' violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and is entitled to rescission and/or damages thereunder.

## SECOND CAUSE OF ACTION
### Violations of Section 12(a)(2) and 15 of the Securities Act of 1933

104.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 103 as if set forth fully herein.

105.    Each of the Junior Certificates is a "security" within the meaning of the Securities Act of 1933.

28

106. The amount of payments received on, and the resulting value of, the Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

107. The Junior Certificates were purchased by Plaintiff from Defendants and were issued simultaneously with, and as an integral part of a public offering of, the other Certificates which were publicly offered and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August 26, 2005, and the aforementioned term sheet (which itself constituted a prospectus). In addition, the deal tape was also written material which, upon information and belief, was circulated to potential investors (including Plaintiff) and constituted a prospectus.

108. In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

109. For the reasons described above, Defendants' representations and omissions were material, false and misleading, and were made by use of means and/or instruments of transportation; and/or communication in interstate commerce or of the mails; and/or of by means of a prospectus or oral communication.

110. Plaintiff was not aware of the false and misleading nature of Defendants' representations and omissions when it purchased the Junior Certificates.

111.    Defendants' untrue statements and omissions of material fact in connection with the offer and sale of the Junior Certificates represent violations of Section 12(a)(2) of the Securities Act of 1933.  In addition, under Section 15 of the Securities Act of 1933, Defendants (other than Merrill Trust) are liable for such violations as controlling persons.

112.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has suffered substantial damage and is entitled to rescission and/or damages.  Plaintiff hereby tenders the Junior Certificates to Defendants upon return of the consideration paid plus interest (less any distributions received by Plaintiff while holding such securities).

### THIRD CAUSE OF ACTION
### Fraud/Deceit

113.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 112 as if set forth fully herein.

114.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

115.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

30

116.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations and omitted material facts.

117.    Defendants made their false statements and material omissions knowing that they were false and misleading, and/or with reckless disregard as to whether those statements and omissions were false and misleading, and with the intent of inducing Plaintiff to rely on them and purchase the Junior Certificates.

118.    In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon Defendants' misrepresentations and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, and the truth about Defendants' inadequate due diligence efforts with respect to those assets, it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

119.    As a direct and proximate result of Defendants' fraud/deceit, Plaintiff has suffered damages.

## FOURTH CAUSE OF ACTION
### Violation of Pennsylvania Securities Act of 1972

120.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 119 as if set forth fully herein.

121.    Each of the Junior Certificates is a "security" within the meaning of the Pennsylvania Securities Act of 1972.

122.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

31

123.    Defendants offered and sold the Junior Certificates to Plaintiff in Philadelphia, Pennsylvania – the city and state where Plaintiff had (and still has) operations and where its employees, Trezevant Moore and Zheng Wang, were working at the time of Defendants' offer and sale of the Junior Certificates to Luminent.

124.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation and failure to disclose) of the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

125.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.

126.    Defendants' offer and sale of the certificates by means of untrue statements of material fact and failure to disclose material facts, with Plaintiff not knowing of the untruths and omitted material facts, represent violations of Section 1-401 and/or 1-403 of the Pennsylvania Securities Act of 1972, which have directly and proximately caused Plaintiff substantial damage for which Defendants are liable to Plaintiff under Sections 1-501 and/or 1-503 of that statute,

entitling Plaintiff to a return of the consideration paid for the Junior Certificates, together with interest at the legal rate from date of payment (less any distributions received by Plaintiff while holding such securities), and/or damages.

127.    Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to the Mortgage Loans in April of 2007.

## FIFTH CAUSE OF ACTION
### Violation of California Corporate Securities Law of 1968, Sections 25400 and 25401

128.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 127 as if set forth fully herein.

129.    Each of the Junior Certificates is a "security" within the meaning of the California Corporate Securities Law of 1968.

130.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

131.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation

and failure to disclose) the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans..

132.    For the reasons described above, Defendants' representations and omissions were material, false and misleading; Plaintiff was not aware of the false and misleading nature of those representations and omitted material facts; and Defendant knew, and/or had reasonable ground to believe, that their representations and omissions were material, false and misleading.  At a minimum, Defendants were negligent in making those material, false and misleading representations and omissions.

133.    Defendants' initial offer, and their oral and written representations, concerning the Junior Certificates emanated from San Francisco, California, where a Merrill representative (Keith Tomao) was located, and the effects of Defendants' material and false representations were felt in California, where Plaintiff's principal place of business was located prior to about December 31, 2007.

134.    Thus, Defendants' untrue statements of material fact and omissions, and/or materially aiding or assisting in such misrepresentations and omissions, represent violations of Sections 25400 and 25401 of the California Corporate Securities Law of 1968, which has directly and proximately caused Plaintiff substantial damage and entitles Plaintiff to rescission and/or damages under Sections 25500, 25501, 25504 and/or 25504.1 of that statute.

**SIXTH CAUSE OF ACTION**
**Violation of California Corporate Securities Law of 1968, Section 25401**

135.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 134 as if set forth fully herein.

136.    Each of the Junior Certificates is a "security" within the meaning of the California Corporate Securities Law of 1968.

137.   The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

138.   In addition, the amount of payments received on, and the resulting value of, the Junior Certificates also depend on the rights of holders of such securities, and a critical inducement for Plaintiff's purchase of the "3 pack" of Junior Certificates was Defendants' representations that Plaintiff, as holder of the Class C Certificates, would have so-called "special foreclosure rights" relating to the Mortgage Loans.

139.   In general, special foreclosure rights permit a holder of such rights to, *inter alia*, block foreclosures on defaulted mortgage loans and be actively involved in the mitigation of losses relating to such loans.  More specifically, the holder of such rights is provided the right to receive advance notice of anticipated foreclosure proceedings and to purchase those defaulted mortgage loans before the servicer of such loans commences a foreclosure proceeding. Requesting special foreclosure rights is a standard procedure for Luminent and other REITs that consider purchasing residual interests in a pool of mortgage loans (such as the Class C Certificates), and Plaintiff would not have considered purchasing the Junior Certificates without such rights.

140.   Accordingly, prior to purchasing the Junior Certificates, Trezevant Moore spoke with Keith Tomao and advised him that, absent special foreclosure rights, Plaintiff would not consider purchasing the Junior Certificates.

141.   Defendants agreed and represented that such rights would be provided to Plaintiff, as holder of the Class C Certificates, in the Pooling and Servicing Agreement.  Specifically, Defendants' term sheet represented that:

A Servicer will not commence foreclosure proceedings with respect to a mortgage loan unless (i) no later than five business days prior to such commencement, it notifies the Master Servicer of its intention to do so, and (ii) the majority holder of the Class C Certificates, either directly or through the Master Servicer, does not, within such period, affirmatively object to such action. If the majority holder of the Class C Certificates timely and affirmatively objects to such action, then it will instruct the Master Servicer to hire three appraisal firms, identified in the related servicing agreements to compute the fair value of the mortgaged property relating to the related mortgage loan utilizing the Fannie Mae Form 2055 Exterior-Only Inspection Residential Appraisal Report (each such appraisal firm computation, a "Fair Value Price"), in each case no later than 30 days from the date of such holder's objection. The holder of the Class C Certificates will, no later than 5 days after the expiration of such 30-day period, purchase (and deliver to the related Servicer the purchase price for) such mortgage loan and the related mortgaged property at an amount equal to the highest of the three Fair Value Prices determined by such appraisal firms. . .

142.    Furthermore, the term sheet indicated that Plaintiff, as Class C holder, would also have the same "special foreclosure rights" quoted above in the event that a loan's servicer determined not to proceed with a foreclosure, but to take some other action with respect to a loan that was delinquent by 60 days or more. (The Prospectus Supplement contains the same language regarding the special foreclosure rights of the majority holder of the Class C certificates.)

143.    Defendants' representations that Plaintiff would have "special foreclosure rights" as holder of the Class C Certificates were false. In fact, no such rights were included for the Class C holder in the Pooling and Servicing Agreement, and/or Plaintiff has not been accorded those rights.

144.    Specifically, although the pool of Mortgage Loans has already suffered approximately 135 foreclosures, Plaintiff has not been provided advance notice of any foreclosure proceedings or otherwise been afforded the opportunity to block a single foreclosure proceeding (and mitigate losses suffered therefrom).

145.    Special foreclosure rights are obviously highly material to a potential investor like Plaintiff who specifically bargains for such rights and for whom such rights were a prerequisite to purchasing any of the Junior Certificates. They are very important as they enable a holder to, *inter alia*, protect its investment by mitigating losses relating to defaulted losses on the Mortgage Loans.

146.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation and failure to disclose) the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented (and/or materially aided or assisted in the misrepresentation) that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

147.    For the reasons described above, Defendants' representations and omissions were material, false and misleading; Defendants intended to induce Plaintiff to rely on them; Plaintiff was not aware of the false and misleading nature of those representations and did rely on them; and Defendants were at a minimum negligent in making those representations and omissions.

148.    Defendants' initial offer, and their oral and written representations, concerning the Junior Certificates emanated from San Francisco, California, where a Merrill representative (Keith Tomao) was located, and the effects of Defendants' material and false representations were felt in California, where Plaintiff's principal place of business was located prior to about December 31, 2007.

149.    Thus, Defendants' untrue statements of material fact and omissions, and/or materially aiding or assisting in such misrepresentations and omissions, represent violations of Section 25401 of the California Corporate Securities Law of 1968, which has directly and proximately caused Plaintiff substantial damage and entitles Plaintiff to rescission and/or damages under Sections 25501, 25504 and/or 25504.1 of that statute.

## SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation

150.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 149 as if set forth fully herein.

151.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities, as well as on the existence of special foreclosure rights.

152.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented

38

and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

153.    In connection with their offer and sale of the Junior Certificates, Defendants had a duty to communicate accurate information regarding those securities.

154.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.  Moreover, Defendants ought to have known that its representations were false and they were at least negligent with respect to the accuracy of the foregoing misrepresentations and omissions.

155.    Defendants had no reasonable grounds for believing that the material misstatements it made regarding the nature and characteristics of the Mortgage Loans were true, that its due diligence on the Mortgage Loans was adequate, or that the Class C holders were accorded, or would be accorded, special foreclosure rights.

156.    Defendant intended that Plaintiff rely on its misrepresentations and, in deciding to purchase the Junior Certificates, Plaintiff justifiably did so and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, and the truth about Defendants' inadequate due diligence efforts with respect to those assets, it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

157.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered damages.

## EIGHTH CAUSE OF ACTION
### Innocent Misrepresentation

158.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 157 as if set forth fully herein.

159.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities, as well as on the existence of special foreclosure rights.

160.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

161.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.

162.    In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon Defendants' representations and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, the truth about Defendants' inadequate due diligence efforts with respect to those

assets, and the truth about the lack of special foreclosure rights, it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

163.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered damages.

**NINTH CAUSE OF ACTION**
**Breach of Contract**

164.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 163 as if set forth fully herein.

165.    Plaintiff entered into a purchase agreement with Defendants pursuant to which Defendants agreed that, in exchange for payment of approximately $26,000,000, they would sell and deliver to Plaintiff securities (i) representing a beneficial ownership in a trust whose assets would have certain material characteristics – that is, that they would consist of a pool of approximately 3,200 residential mortgage loans whose prepayment penalties were predominantly "hard" prepayment penalty terms, and which had other characteristics (including those relating to the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans) that would match those represented in the deal tape they had provided to Plaintiff before it decided to invest, and that those mortgage loans would consist of "Alt-A" quality loans that would be subject to an adequate due diligence examination consistent with industry custom, practice, and standards and (ii) which would include a class of certificates – the Class C Certificates – that would have special foreclosure rights.

166.    Defendants breached that agreement by delivering (i) securities that represent a beneficial ownership in a trust that acquired residential mortgage loans whose prepayment

41

penalty terms are predominantly "soft" prepayment penalty terms; whose terms did not match many of those in the deal tape they had provided; and which were not subjected to a due diligence examination that was adequate and consistent with industry custom, practice, and standards, and (ii) Class C Certificates without the bargained-for special foreclosure rights.

167.   Defendants' breach was substantial and went to the essence of the contract inasmuch as (i) prepayment penalties are the only source of payment on the Class P Certificates, and there will be less prepayment penalties incurred on the Mortgage Loans (and paid to the holders of the Class P Certificates) if those penalties are of the "soft" variety; (ii) the lack of "hard" prepayment penalty terms relating to the Mortgage Loans would also result in more Mortgage Loans being paid off early and, consequently, a reduction in the residual amounts of interest payments available to pay holders of the Class C Certificates; (iii) the other misrepresented characteristics of the mortgage loans substantially impacted the desirability of the Junior Certificates as aforesaid; (iv) the lack of adequate due diligence masked the fact that the Mortgage Loans were of far lesser quality than represented by Defendants; (v) Plaintiff specially bargained for special foreclosure rights for the Class C Certificates and would not have purchased the Junior Certificates absent those rights, particularly since those rights are essential to mitigating potential losses, and (vi) Plaintiff would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack") had it known that the underlying Mortgage Loans would primarily have "soft" prepayment penalty terms and had it known of the misrepresentations regarding the other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the

Mortgage Loans); had it known that sufficient due diligence had not been conducted on the underlying loans; or had it known that the Class C Certificates would not have special foreclosure rights.

168.   As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer damages.

**TENTH CAUSE OF ACTION**
**Rescission**

169.   Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 168 as if set forth fully herein.

170.   In connection with their offer and sale of the Junior Certificates, Defendants represented, and thereby caused Plaintiff to believe that, the pool of Mortgage Loans underlying those securities consisted of mortgage loans whose prepayment penalty terms were predominantly "hard" prepayment penalty terms; that those Mortgage Loans had certain other material characteristics (including characteristics regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); that the Mortgage Loans were subjected to a due diligence examination adequate to confirm the quality of those assets; and that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

171.   In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon the belief (caused by Defendants' representations and omissions) that the Mortgage Loans consisted of mortgage loans whose prepayment penalty terms were predominantly "hard" prepayment penalty terms; that they would have those other characteristics represented by Defendants

regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings, the original interest rates owed on the Mortgage Loans, the margin relating to the Mortgage Loans, and the purpose of the Mortgage Loans; that Defendants conducted adequate due diligence on the Mortgage Loans consistent with industry custom, practice, and standards; and that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

172.    Plaintiff did not agree or consent to the purchase of (A) securities from Defendants whose underlying assets were a pool of Mortgage Loans (i) whose prepayment penalty terms were predominantly "soft" prepayment penalty terms; (ii) whose other characteristics (regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans) were different from those represented by Defendants; and (iii) that were not subjected to adequate due diligence consistent with industry custom, practice, and standards, or (B)  a "3 pack" of securities which lacked any special foreclosure rights.

173.    Plaintiff's agreement to purchase the "3 pack" of Junior Certificates was therefore the result of a mistake of fact caused by Defendants that went to the essence of the contract.

174.    As a result, Plaintiff is entitled to rescission of the agreement to purchase the Junior Certificates under, *inter alia*, Pennsylvania law and/or California Civil Code, § 1689.

## JURY DEMAND

Plaintiff demands a trial by jury.

## RELIEF SOUGHT

WHEREFORE, Plaintiff demands relief as follows:

(i)     Rescission of the agreement of the purchase and sale of the Junior Certificates;

(ii)    Compensatory damages in an amount to be proved at trial;

(iii)   Punitive damages;

(iv)    Attorney's fees and costs of suit; and

(v)     Such other and further relief as the Court may deem just and appropriate.


Dated:      Philadelphia, Pennsylvania
            January 23, 2008

                        **ABRAMSON & DENENBERG, P.C.**


            **BY:**     _____/s/_____
                        **ALAN E. DENENBERG, ESQUIRE**
                        **ATTORNEYS FOR PLAINTIFFS**


            *Of counsel:*

                Sean F. O'Shea
                Michael E. Petrella
                **O'SHEA PARTNERS LLP**
                90 Park Avenue, 20th Floor
                New York, NY 10016
                Tel:  (212) 682-4426
                Fax:  (212) 682-4437

                *Attorneys for Plaintiffs*

EXHIBIT G

# O'SHEA PARTNERS LLP

90 PARK AVENUE
20th FLOOR
NEW YORK, NEW YORK 10016

SEAN F. O'SHEA
MICHAEL E. PETRELLA
——
HARLAN J. PROTASS
MARC D. FEINGOLD
JONATHAN R. ALTSCHULER
MAUREEN MORAN
JULIE O'SHEA

(212) 682-4426
Fax (212) 682-4437
www.osheapartners.com

September 21, 2007

Mr. John Winchester
Merrill Lynch International
4 World Financial Center
10th Floor
New York, New York  10080

Re:    Luminent Mortgage Capital, Inc.
       Mortgage Loan Asset-Backed Certificates (Series 2005-A6)

Mr. Winchester:

This firm represents Luminent Mortgage Capital, Inc. ("Luminent") with regard to certain Mortgage Loan Asset-Backed Certificates (Series 2005-A6) offered and sold by Merrill Lynch and purchased by Luminent for approximately $26 million on or about August 26, 2005. In a related transaction, Luminent sold the Class B-3, C, and P Certificates back to Merrill pursuant to the Master Repurchase Agreement between the parties dated August 30, 2005. In recent months, Merrill has demanded approximately $8 million in margin payments from Luminent to cover a perceived shortfall in the value of the Merrill Certificates. We write to address certain misrepresentations and material omissions made by Merrill in connection with the marketing and sale of the Merrill Certificates to Luminent – problems that were brought to Merrill's attention in advance of and during a meeting between Luminent and Merrill in New York earlier this year, and that render Merrill's $8 million demand plainly improper.

Luminent's independent investigation has revealed that, as of December 2006, approximately one third of the portfolio loans had been paid in full, and yet, according to Merrill's disclosures, approximately one third of those same loans were subject to pre-payment penalties. That distribution, of course, raised red flags at Luminent, as one would obviously expect a larger proportion of the pre-paid loans to be those *not* subject to prepayment penalties. Further audit and investigation revealed that many loans originally represented by Merrill to feature prepayment penalties in fact had none, and in other instances, loans with prepayment penalties were in fact pre-paid, and yet no funds were remitted to Luminent in accordance with its rights as the holder of the Class P Certificates.

Moreover, the audit referenced above also revealed that a substantial number of the portfolio loans had terms materially different from those represented by Merrill prior to the sale of the Certificates. For example, loans represented to have a first position lien on the underlying property were found to have subordinate positions; interest rates were found to be materially different than represented; and homes represented to be primary residences were in fact second homes or investment properties. In addition, as you are aware, because the Class B-3, C, and P Certificates are interdependent, and essentially hedge against one another, the existence of even just one defective Class necessarily renders the others defective, and undermines the initial decision to purchase them all.

We are currently investigating other discrepancies and misrepresentations in connection with this Merrill offering. These foregoing misrepresentations and disclosures alone, however, are unquestionably material, and have resulted in millions of dollars in losses to Luminent. Moreover, they are grounds to rescind Luminent's purchase of the Certificates under state and federal securities laws, as well as the common law. Accordingly, while Luminent remains amenable to further discussions regarding the Certificates, it hereby demands that Merrill Lynch return the parties to the *status quo ante* by immediately tendering back the $26 million purchase price on the Certificates, less the amount of principal and interest previously remitted to Luminent on the Certificates, and accept return of the Certificates. We also demand a copy of all disclosure documents distributed by Merrill in connection with the Certificates.

Regards,

Sean F. O'Shea

cc:    Mr. Greg Hausner (Wells Fargo Bank, N.A.)
       Mr. Rob Muller (Wachovia Bank, National Association)

EXHIBIT H

Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'07 CIV 10275**

------------------------------------------------------------ x

LUMINENT MORTGAGE CAPITAL, INC.;        :
MINERVA MORTGAGE FINANCE               :
CORPORATION; MERCURY MORTGAGE          :
FINANCE STATUTORY TRUST; and SATURN    :
PORTFOLIO MANAGEMENT, INC.,            :    Civ. A. No.
                                       :    ECF CASE
            Plaintiffs,                :
                                       :    Jury Trial Demanded
       v.                              :
                                       :
                                       :
BARCLAYS CAPITAL INC.,                 :
                                       :
            Defendant.                 :
                                       :

------------------------------------------------------------ x

## COMPLAINT

Plaintiffs LUMINENT MORTGAGE CAPITAL, INC. ("Luminent"), MINERVA

MORTGAGE FINANCE CORPORATION ("Minerva"), MERCURY MORTGAGE FINANCE

STATUTORY TRUST ("Mercury") and SATURN PORTFOLIO MANAGEMENT, INC.

("Saturn," and collectively with Luminent, Minerva, and Mercury, "Plaintiffs"), by and through

their undersigned attorneys, as and for their Complaint against Defendant BARCLAYS

CAPITAL INC. ("Barclays" or "Defendant"), hereby allege as follows:

### PARTIES

1.      Plaintiff Luminent is a Maryland corporation having its principal place of

business at 101 California Street in San Francisco, California 94111.

2.      Plaintiff Minerva is a Maryland corporation that is an indirect subsidiary of

Luminent having its principal place of business at 101 California Street in San Francisco,

California 94111.

3. Plaintiff Mercury is a Maryland Business Trust that is a subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

4. Plaintiff Saturn is a Delaware corporation that is an indirect subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

5. Upon information and belief, Defendant is a Connecticut corporation having its principal place of business at 200 Park Avenue, New York, New York 10018.

## JURISDICTION AND VENUE

6. There is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Therefore, the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

7. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that Defendant resides in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## NATURE OF THE ACTION

8. This action for damages arises out of Defendant's egregious attempt to exploit recent adverse conditions in the credit markets and wrongfully confiscate value contained in certain bonds Plaintiffs had effectively posted with it as collateral, while crediting Plaintiffs with a mere fraction of those bonds' actual worth. Defendant attempted to deprive Plaintiffs of the true value of those bonds by willfully breaching, without justification, repurchase agreements that required it to sell those securities, if at all, only in a commercially reasonable manner, and to otherwise act in good faith.

2

9.    More specifically, Defendant accomplished its money-grab at Plaintiffs' expense by falsely discounting and misrepresenting the true value of the bonds and misrepresenting its liquidation efforts in order to misappropriate a significant portion of the securities' value by (i) falsely claiming to have sold certain of them to unidentified "3rd-parties" at unreasonably low prices, and/or (ii) assigning, in bad faith, unreasonably low values to certain of the bonds it did not purport to sell to a "3rd Party" (and then crediting Plaintiffs' accounts merely in the amount of such improper amounts).

10.    Worse still, Defendant's wrongful conduct followed a prior breach of one of its agreements with Saturn in which Defendant refused to honor a repurchase trade regarding a bond it had issued, and then lied about its reasons for its refusal, forcing Saturn to ultimately sell the bond back to Defendant at an artificial discount.

## COMMON ALLEGATIONS

11.    Luminent is a real estate investment trust with operations in Philadelphia, Pennsylvania.    Minerva, Mercury and Saturn are qualified real estate investment trust subsidiaries of Luminent.

12.    As part of their businesses, Plaintiffs purchase and sell securities and, in connection with such transactions, sometimes enter into so-called "repurchase agreements."

13.    Barclays describes itself as "the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP." Upon information and belief, Barclays is a registered broker-dealer engaged in the business of, *inter alia*, buying and selling securities and, in connection with such activity, often enters into so-called "repurchase agreements."

3

14.    Repurchase agreements are a common financing tool that permit a buyer of a security to obtain temporary financing for the purchase price by effectively borrowing funds from a counter-party (such as Barclays) who receives, in exchange for a loan, a security interest in the security to be purchased. More specifically, in exchange for the counterparty providing the borrower/purchaser with loan proceeds that it uses to complete its purchase, the borrower/purchaser typically transfers the purchased security to the counterparty. After an agreed-to period of time, the borrower/purchaser then repurchases the security from the counterparty. The repurchase price typically consists of the principal amount the buyer originally received plus interest that has accrued at an agreed-to rate.

**A.    Plaintiffs' Respective Repurchase Agreements With Barclays.**

15.    At different times between 2005 and 2006, each Plaintiff entered into its own "Master Repurchase Agreement" with Barclays, each agreement being supplemented by certain annexes attached thereto (each a "Repurchase Agreement" and, collectively, the "Agreements"). Luminent's Repurchase Agreement was dated June 27, 2005; Minerva's and Mercury's respective Repurchase Agreements were each dated December 22, 2005; and Saturn's Repurchase Agreement was dated August 25, 2006.

16.    Under Section 1 of the Agreements, Plaintiffs could execute repurchase transactions with Barclays from time to time, wherein Plaintiffs would transfer to Barclays securities in exchange for a payment, "with a simultaneous agreement by [Barclays] to transfer to [Plaintiffs] such securities at a date certain or on demand, against the transfer of funds by [Plaintiffs]." The security "transferred" to Barclays would, in effect, serve as collateral for the funds transferred to Plaintiffs until the date Plaintiffs repurchased from Barclays the previously "transferred" security.

4

17.    Section 3 of the Agreements provided that "[a]n agreement to enter into a [repurchase] Transaction may be made orally or in writing."

18.    Section 4 of the Agreements provided that in the event the market value of any security so transferred to Barclays diminished beyond a certain agreed-to level, Barclays could issue a "margin call" and thereby require Plaintiffs to post additional collateral or cash.

19.    The Agreements endowed Barclays with much control over the securities "transferred" to it with respect to the determination of their value and their disposition in the event of an unsatisfied margin call.    However, in determining the value of securities "transferred" or other collateral posted, Barclays was required to act in a commercially reasonable manner and in good faith at all times.

20.    Section 11 of the Agreements provided that, should Plaintiffs fail to meet a margin call, Barclays could declare an "Event of Default" and then attempt to liquidate the collateral (and credit Plaintiffs in the amount of liquidation proceeds received) or, in the event the collateral is not liquidated, credit Plaintiffs in the amount of the collateral's true value.    In such case, Barclays would be required to act in a commercially reasonable manner, and act in good faith at all times and in all respects.

**B.    The Repurchase Transactions and the Subsequent Market Downturn.**

21.    In accordance with their respective repurchase agreements, on various dates during 2006 and 2007, Plaintiffs executed repurchase transactions with Barclays regarding the financing of certain bonds that were still the subject of such transactions with Barclays in early August of 2007.    In addition, at various other times, certain of Plaintiffs had posted other bonds with Barclays which served as additional collateral regarding certain of those bonds Barclays had financed, and that were still serving as additional collateral in early August of 2007 (such

5

additional bonds and the aforementioned bonds that Barclays had financed, collectively, the "Bonds").

22.    On August 2, 2007, Barclays issued margin calls with respect to the Bonds it had financed – purportedly to cover a shortfall in the value of such bonds and the additional ones posted with it as collateral – ultimately demanding an unreasonable total of approximately $35 million in margin payments from Plaintiffs. Barclays' margin demands coincided with a major seizing-up of the bond market the next day (August 3, 2007) against the backdrop of a perceived crisis concerning the so-called "sub-prime" mortgage loan market.

23.    Aware that the Bonds were much more valuable than Barclays was representing them to be, Plaintiffs ultimately refused to simply submit to Barclays' unreasonable margin demands.

### C.    Barclays' Subsequent Breaches – Its Phony Liquidation Efforts and Wrongful Confiscation of the Posted Bonds' Value At Artificially Low Prices.

24.    On August 8, 2007, Barclays transmitted a letter declaring the occurrence of an "Event of Default" under Section 4 of the Agreements as a result of the unmet margin demands.

25.    Plaintiffs were subsequently informed that Barclays had supposedly attempted to liquidate the Bonds.

26.    However, despite Plaintiffs' repeated requests, Barclays failed to provide it with any form of an accounting concerning its purported liquidation efforts until September 10, 2007, when it transmitted a separate letter to each of the Plaintiffs demanding in each case a payment of a certain "close-out deficit" amount. The "close-out deficit" amounts Barclays demanded ranged from between approximately $1.23 million and $3.39 million, and totaled approximately $9.61 million.

27.    The only information Barclays provided Plaintiffs regarding its purported liquidation results and efforts was that which appeared in a spreadsheet that was attached to each of its September 10, 2007 demand letters. Those spreadsheets contained a column that, in certain cases, indicated that some completely unidentified "3rd Party" supposedly bought the listed/posted bond, and in certain other cases, did not even say "3rd Party" but was left blank (which presumably meant that such bonds were not sold at all, but were merely assigned a value by Barclays for which Plaintiffs received a credit).

28.    Barclays' September 10 letters contained no information regarding the identity of the supposed "3rd Party" buyers of the Bonds, or Barclays' purported liquidation efforts regarding any of the Bonds, whether supposedly "sold" to a "3rd Party" or not – e.g., to whom it tried selling any of the Bonds and when.

29.    Moreover, with respect to certain of the Bonds that were noted as having been purportedly sold to an unidentified "3rd Party" buyer, the supposed sale price was clearly false and could not represent a true sales price, assuming such bonds actually were sold to a "3rd Party" at all. In either situation, Luminent was not being properly credited for the full value of such bonds.

30.    For example, one of the Bonds supposedly sold to a "3rd Party" is a bond that was the subject of Minerva's repurchase transactions with Barclays, and that was issued by Fremont NIM Trust 2006-B and known as "FRENTFRN-0911a" while bearing CUSIP number "357524AA5" (the "FRENTFRN Bond"). The repurchase transaction relating to the FRENTFRN Bond had a 30-day term such that Minerva would repurchase it on August 17, 2007 for the principal amount borrowed, plus accrued interest at a rate of 5.47% per annum.

31.    At the time of the repurchase trade, the FRENTFRN Bond had a current face amount of $9,000,000, and was a very solid credit rated "AA" by Standard & Poor's.

32.    However, Barclays' September 10 letter to Minerva indicated that it sold the FRENTFRN Bond to a "3rd Party" for a cash price of merely $9 (per $100 of the bond's face amount). In fact, no such actual, *bona fide* sale could have possibly occurred as that bond was then worth approximately ten times such price.

33.    In fact, there actually was no such "3rd Party" buyer for the FRENTFRN Bond. Rather, Barclays simply kept the bond for itself and then credited Minerva in the amount of only $9 (that is, 9 cents on the dollar) regarding such posted bond. As a result, Barclays confiscated for itself approximately $5,000,000 of that bond's value (whose principal amount was then approximately $6 million).

34.    Similarly, the September 10 demand letter to Luminent indicated that it had sold to an unidentified "3rd Party" buyer – for merely $24 (per $100 of the bond's face amount) – a $8,000,000 bond issued by RAMP Series 2005-RS6 Trust, known as "RAMPFRN-0635" and bearing CUSIP number "76112BUB4" (the "RAMPFRN Bond"). In fact, $24 could not have been a *bona fide* sale price as the RAMPFRN Bond was actually then worth approximately three times such price. As a result, Barclays confiscated for itself approximately $4,000,000 of that bond's value.

35.    Indeed, Barclays did not attempt to liquidate or valuate certain of the Bonds (as applicable) in a commercially reasonable manner or otherwise in good faith, and tried to conceal its sham liquidation and valuation efforts by ignoring repeated requests to provide Luminent with basic information regarding its supposed "sales" and otherwise provide an accounting of its supposed liquidation and valuation efforts.

8

36.    And, as was evident in the case of the FRENTFRN Bond and the RAMPFRN Bond, the purported sale and/or sale price was a total fabrication – Barclays claimed to have sold such bonds for a mere tiny fraction of their value.

37.    Barclays' representations regarding the results of its supposed liquidation efforts, and the values it assigned to those Bonds it did not purport to sell to a "3rd Party," were false. Indeed, Barclays was simply exploiting an aberrational market as a pretext to unreasonably mark down the purported value of the Bonds, demand an unreasonable amount of additional collateral from Plaintiffs, and then confiscate a portion of the value contained in certain of the Bonds by either falsely claiming to have sold them at an artificially low price, or by assigning unreasonably low values to them.

**D.    Barclays' Prior Breach of Saturn's Repurchase Agreement.**

38.    Defendant's August breaches, however, do not represent the first time it had breached one of the Agreements.

39.    On June 27, 2007, Saturn arranged for financing, starting July 30, 2007, from Barclays regarding a bond issued by Barclays itself, having a face amount of $150,000,000, and known as "BCAP 2007-AA4 IIA" (herein, the "Barclays Bond"). The repurchase transaction would have a 30-day term and require Saturn to pay Barclays interest at the rate of LIBOR plus 3 basis points, and the Bond was valued at 97.5% of its face amount – a 2.5% "haircut," which is a form of price protection bargained for by Barclays.

40.    At the time that it had executed the repurchase transaction for the Barclays Bond, Mercury already had $77,000,000 of outstanding repurchase transactions with Barclays (pursuant to its Repurchase Agreement) relating to certain other ("mezzanine level") bonds.

41.     A month later, on July 27, 2007, Minerva sought to arrange financing for a different bond. That bond, known as "LUM 06-5 A1A," had a face amount of approximately $150,000,000 and was rated "AAA" (herein, the "Luminent Bond"). Minerva called Barclays' "repo desk" and asked if Barclays would enter into a repurchase transaction (pursuant to its Repurchase Agreement) with respect to such bond.

42.     Barclays ultimately agreed that the Luminent Bond would be financed with a 90-day term, at a 5.41% interest rate with a 2.5% "haircut." That trade was executed on July 27, 2007.

43.     In addition, because the initial 30-day financing term for the Barclays Bond was expiring and the parties had already agreed on June 27 to finance that bond, Saturn requested on July 30, 2007 that such bond also be financed with a 90-day term as was just executed with respect to the Luminent Bond.

44.     Barclays agreed, and so that trade was orally executed by the parties, as permitted under the parties' Repurchase Agreement.

45.     Later that same day, however, Barclays breached the parties' agreement, giving the excuse that its "credit desk" supposedly would not approve of the financing for the Barclays Bond after all, as doing so would put Mercury, Minerva and Saturn (as a whole) over their purported credit limit of $150,000,000 for certain longer term committed trades.

46.     Barclays' excuse for reneging on its agreement was remarkable in that it had never previously mentioned any "credit limit," let alone one set at $150,000,000. Indeed, Barclays' explanation was clearly false in that, if there were any such limit, it would have already been effectively exceeded twice without any mention by Barclays of any "credit limit" – i.e., it would have been exceeded when Barclays previously agreed to finance the Barclays Bond

(on June 27) and the Luminent Bond (on July 27) while $77,000,000 of repurchase financing was still outstanding with respect to certain other (mezzanine level) bonds it had financed for Mercury.

47.    Faced with Barclays' breach, Saturn was forced to enter into a 1-day term repurchase transaction for the Barclays Bond and to try to seek alternate financing for the Luminent Bond.  Meanwhile, because Barclays had effectively refused to finance the Barclays Bond on the terms it had previously agreed to (i.e., 90 day term at 5.41% interest rate with a 2.5% "haircut"), Saturn requested three days later, on August 2, that Barclays provide it with a bid to simply buy the Barclays Bond back from Saturn.

48.    In response, Barclays insisted on paying merely 98.375% of the bond's face amount, notwithstanding the fact that this was a new bond that Barclays itself had issued approximately 30 days earlier, with no delinquency or other data to support such a reduction in value by Barclays.

49.    Due to Barclays' breach and refusal to finance the Barclays Bond, Saturn was forced to accept Barclay's demand to purchase that bond at the inappropriate price it had offered.

## FIRST CAUSE OF ACTION
### Breach of Contract

50.    Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 49 as if set forth fully herein.

51.    Each Repurchase Agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, that required Defendant to act in a commercially reasonable manner with respect to the valuation and any liquidation of any bonds Plaintiffs had posted with it.

11

52.    Defendant breached these contracts by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; and/or (3) misrepresenting its liquidation results/efforts, or assigning false values, with respect to certain of the Bonds in order to confiscate a significant portion of their value for its own account (while crediting Plaintiffs in the amount of its false and/or artificially low prices/values).

53.    As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

54.    Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

55.    Each Repurchase Agreement required Defendant to act in all instances in good faith in accordance with the implied covenant of good faith and fair dealing.

56.    Defendant breached each contract's implied covenant of good faith by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; and/or (3) misrepresenting its liquidation results/efforts, or assigning false values, with respect to certain of the Bonds in order to confiscate a significant portion of their value for its own account (while crediting Plaintiffs in the amount of its false and/or artificially low prices/values).

57.    As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

12

## THIRD CAUSE OF ACTION
### Unjust Enrichment

58.    Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 57 as if set forth fully herein.

59.    Plaintiffs "transferred" the Bonds to Barclays solely for the purpose of serving as collateral and subject to their right to retake possession in exchange for the principal amount borrowed from Barclays, plus accrued interest. In the event the collateral was fairly deemed to be insufficient and resulted in a margin call that was not met, Barclays could opt to declare an "event of default" and either liquidate the bonds or credit Plaintiffs in the amount of the Bonds' true value, but at all times and in all respects acting in a commercially reasonable manner and in good faith.

60.    Instead of properly valuing the Bonds to begin with, Defendant made unreasonable margin demands and then represented that it would attempt to liquidate all of them in a commercially reasonable manner and in good faith.

61.    In fact, as Barclays was well aware, the Bonds actually had a market value much higher than the prices at which Barclays purported to have sold them to certain (completely unidentified) third-parties, or in the case of Bonds that it did not claim to have sold, the amounts/values for which it credited Plaintiffs for such Bonds. Indeed, Barclays was simply trying to confiscate a significant portion of certain of the Bonds' value (while crediting Plaintiffs in the amount of its artificially low prices) by exploiting an aberrational market with its unreasonable margin demands and phony liquidation and valuation results and efforts.

62.    By reason of the forgoing acts of confiscating a portion of the value of certain of the Bonds at a false and/or unreasonable price, Barclays has been unjustly enriched at Plaintiffs'

expense by wrongfully taking for itself certain of the Bonds' value and then crediting Plaintiffs for a mere fraction of those Bonds' actual worth.

63.     In addition, by breaching its agreement with Saturn to finance the Barclays Bond, Defendant ultimately forced Saturn to sell such bond back to Defendant at an artificial discount on a new bond that Barclays itself had issued approximately 30 days earlier – with no delinquency or other data to support such a reduction in value by Barclays – thereby unjustly enriching Barclays at Saturn's expense.

64.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs have suffered and will continue to suffer damages.

## FOURTH CAUSE OF ACTION
### Accounting

65.     Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 64 as if set forth fully herein.

66.     In the event of an unsatisfied margin call under the Repurchase Agreements, Defendant was required to, among other things, sell any collateral posted with it, if at all, only in a commercially reasonable manner and act in all instances in good faith.  Defendant was then required to credit Plaintiffs for the amounts received in such sales.  With respect to Bonds that were not sold to third-party buyers, Defendant was required to credit Plaintiffs for the fair value of such Bonds.  In either case, the amount credited to Plaintiffs should have taken into account, among other things, any principal or interest received on the Bonds by Defendant.

67.     Defendant has a duty to provide Plaintiffs with sufficient information to enable Plaintiffs to corroborate the amounts, if any, actually received by Defendant, or to review its purported liquidation and valuation efforts regarding any of the Bonds, but has failed to do so. Such fundamental information is required in order for Plaintiffs to determine whether Defendant

acted in a commercially reasonable manner, and in good faith, as well to determine the amount of credit Plaintiffs was entitled to receive. In addition, Defendant's September 10 demand letters failed to provide certain basic information regarding the Bonds, and failed to explain certain terms appearing in such letters.

68.    For example, Defendant has refused to provide a description of any potential third-party buyers it may have approached regarding the bonds. Indeed, Barclays failed to even provide the identity the "3rd Party" buyers of the Bonds it supposedly did locate, or a copy of the trade tickets relating to such purported sales. It also failed to confirm that the blank entries in its spreadsheets' "buyer" column meant that Barclays attempted to locate a third-party buyer but was unable to do so, or to provide the basis for the unreasonably low values it assigned to the Bonds it did not purport to sell to a "3rd Party." In addition, Barclays failed to provide any information indicating the amount of any principal and interest received by Barclays with respect to each of the Bonds, and failed to identify the "Non Collateral Structured Repo Closeout" amounts referenced in its September 10 demand letters.

69.    Plaintiffs have demanded that Defendant account to Plaintiffs regarding its liquidation efforts with respect to all of the Bonds, and fully explain all amounts received with respect to the Bonds and referenced in its demand letters. Defendant, however, has failed and refused and continues to fail and refuse to render an appropriate accounting, or to fully credit and pay the monies now due to Plaintiffs following Defendant's supposed liquidation and/or misappropriation of the Bonds.

70.    Accordingly Plaintiffs hereby demand an accounting of any amounts received, and/or attempted to be received, by Defendant with respect to all of the Bonds from any third-parties.

## FIFTH CAUSE OF ACTION
### Breach of Contract – Saturn's Repurchase Agreement

71.    Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 70 as if set forth fully herein.

72.    Saturn's repurchase agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, that required Defendant to honor repurchase transactions it agreed to – orally or in writing – thereunder with Saturn.

73.    Pursuant to Minerva's and Saturn's respective repurchase agreements, Defendant had agreed to enter into repurchase transactions to both finance the Luminent Bond and provide extended financing for the Barclays Bond.

74.    Barclays then breached Saturn's Repurchase Agreement by subsequently reneging on its agreement to finance the Barclays Bond, ultimately forcing Saturn to sell such bond back to Barclays at an artificially low discount.

75.    As a result of the foregoing breach, Saturn has suffered and will continue to suffer damages.

### JURY DEMAND

Plaintiffs demand a trial by jury.

### RELIEF SOUGHT

WHEREFORE, Plaintiffs demand relief as follows:

(i)     Compensatory damages in an amount to be proved at trial;

(ii)    Punitive damages;

(iii)   Attorney's fees and costs of suit; and

(iv)    Such other and further relief as the Court may deem just and appropriate.

Dated:    New York, New York
          November 13, 2007

_____
Sean F. O'Shea (SO5476)
Michael E. Petrella (MP3794)
**O'SHEA PARTNERS LLP**
90 Park Avenue, 20th Floor
New York, New York 10016
Tel:    (212) 682-4426
Fax:    (212) 682-4437

17

EXHIBIT I



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
LUMINENT MORTGAGE CAPITAL, INC.;                      :
MINERVA MORTGAGE FINANCE                              :
CORPORATION; and MERCURY MORTGAGE                     :        07 Civ. 9340 (PKC)
FINANCE STATUTORY TRUST,                              :
                                                      :
                              Plaintiffs,             :
                                                      :
                v.                                    :        **AMENDED ANSWER AND**
                                                      :        **COUNTERCLAIMS**
HSBC SECURITIES (USA) INC.,                           :
                                                      :
                              Defendant.              :
------------------------------------------------------------------ X

Defendant HSBC Securities (USA) Inc. ("HSBC") by its attorneys Cleary

Gottlieb Steen & Hamilton LLP, as and for its Answer to the Complaint of Plaintiffs Luminent

Mortgage Capital, Inc. ("Luminent"), Minerva Mortgage Finance Corporation ("Minerva"), and

Mercury Mortgage Finance Statutory Trust ("Mercury") (collectively, "Plaintiffs"), dated

October 18, 2007, states as follows:

### PARTIES

1.      HSBC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 1 of the Complaint.

2.      HSBC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 2 of the Complaint.

3.      HSBC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 3 of the Complaint.

4.      HSBC admits the allegations in paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.     HSBC lacks knowledge or information sufficient to form a believe as to the truth of the allegations in paragraph 5 of the Complaint, except that it admits that the amount in controversy is in excess of $75,000, exclusive of interest and costs.

6.     Paragraph 6 of the Complaint purports to state legal conclusions to which no responsive pleading is required.

## NATURE OF THE ACTION

7.     HSBC denies the allegations in paragraph 7 of the Complaint.

8.     HSBC denies the allegations in paragraph 8 of the Complaint.

## COMMON ALLEGATIONS

9.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint, except that it admits that in connection with transactions with HSBC, Luminent irrevocably and unconditionally guaranteed Minerva's and Mercury's obligations.

10.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint, except that it admits that Minerva entered into a "repurchase agreement" with HSBC.

11.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint, except that it admits that Mercury entered into a "repurchase agreement" with HSBC.

12.     HSBC denies the allegations in paragraph 12 of the complaint, except that it avers that it is a FINRA regulated broker/dealer engaged in the business of, *inter alia*, buying and selling securities and enters into repurchase agreements as part of its business.

13.     HSBC denies the allegations in paragraph 13 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

14.     HSBC admits the allegations in paragraph 14 of the Complaint, except that it refers to the Agreements for their dates of execution.

15.     HSBC admits the allegations in paragraph 15 of the Complaint.

16.     HSBC denies the allegations in paragraph 16 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

17.     HSBC denies the allegations in paragraph 17 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

18.     HSBC denies the allegations in paragraph 18 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

19.     HSBC denies the allegations in paragraph 19 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

20.     HSBC denies the allegations in paragraph 20 of the Complaint, except that it avers that the NIM Bond was originally purchased on July 23, 2007 and that the repurchase transaction was subsequently extended on July 27, 2007 and refers to the Agreements and the written confirmation of these transactions for their true and correct contents.

3

21.     HSBC denies the allegations in paragraph 21 of the Complaint, except that it admits that on July 27, 2007, the NIM Bond had a face amount of $14,065,818.87 and was rated "A-" by Standard & Poor's and Fitch Ratings.

22.     HSBC denies the allegations in paragraph 22 of the Complaint, except that it avers that Mercury executed eight repurchase transactions with HSBC between May 7 and May 11, 2007 relating to eight additional bonds, and that Mercury renewed each bond's repurchase agreement between five and seven times through subsequent repurchase transactions (known as "rolling") during May, June, July and August of 2007.  HSBC admits that Mercury "rolled over" the repurchase transactions on the eight additional bonds in question on August 3, 2007.

23.     HSBC denies the allegations in paragraph 23 of the Complaint, except that it admits that the price of many subprime bonds fell in August 2007 as a result of actual and significant adverse developments in the subprime mortgage market.

24.     HSBC denies the allegations in paragraph 24 of the Complaint, except that it admits that on August 3, 2007, HSBC issued margin calls, in accordance with the provisions of the Agreements.  HSBC further avers that Mercury agreed to pay all of the August 3, 2007 margin calls on the repurchase transactions on Mercury's eight bonds, and HSBC agreed to withdraw the August 3, 2007 margin call on the repurchase transaction on Minerva's NIM Bond.

25.     HSBC denies the allegations in paragraph 25 of the Complaint, except that it avers that Mercury agreed to pay all of the August 3, 2007 margin calls on the repurchase transactions on Mercury's eight bonds, and HSBC agreed to withdraw the August 3, 2007 margin call on the repurchase transaction on Minerva's NIM Bond.

4

26.    HSBC denies the allegations in paragraph 26 of the Complaint, except that it admits that prior to August 27, 2007, HSBC held an auction with respect to the nine Bonds regarding which Plaintiffs failed either to repurchase from HSBC or meet HSBC's margin calls on August 8, 2007 as required by the Agreements.

27.    HSBC denies the allegations in paragraph 27 of the Complaint, except that it admits that on August 27, 2007, HSBC emailed Luminent a spreadsheet that showed the results of the auction held with respect to the nine Bonds regarding which Plaintiffs failed either to repurchase from HSBC or meet HSBC's margin calls on August 8, 2007 as required by the Agreements. HSBC further admits that it submitted the highest bid for each of the Bonds.

28.    HSBC denies the allegations in paragraph 28 of the Complaint, except that it admits that it received one third-party bid for the NIM Bond, two third-party bids for five of the other eight Bonds, and three third-party bids for the remaining three Bonds.

29.    HSBC denies the allegations in paragraph 29 of the Complaint, except that it admits that a third-party bidder for the NIM Bond bid $60.13 per $100 of face value and that HSBC bid $70.

30.    HSBC denies the allegations in paragraph 30 of the Complaint.

31.    HSBC denies the allegations in paragraph 31 of the Complaint, except that it admits that by September 20, 2007, HSBC owned the Bonds.

32.    HSBC denies the allegations in paragraph 32 of the Complaint, except that it admits that Plaintiffs sent HSBC an email at 5:42 PM on October 2, 2007, offering to repurchase the Bonds on the next day for the contractual repurchase price through October 2. HSBC further avers that it responded in its own email that same day that the Bonds were no longer held subject to a repo position, that it had conducted an auction and purchased the

5

securities free of the repo, and that it welcomed a discussion to resolve its claims against Plaintiffs and was prepared to negotiate those claims. HSBC further avers that Plaintiffs did not respond to this email to engage in such discussion.

33.  HSBC denies the allegations in paragraph 33 of the Complaint.

## FIRST CAUSE OF ACTION

34.  HSBC repeats and realleges each and every response set forth in paragraphs 1 through 33 of this answer as if fully set forth herein.

35.  HSBC denies the allegations in paragraph 35 of the Complaint, except that it admits that each Repurchase Agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, and refers to the Agreements for their true and correct contents.

36.  HSBC denies the allegations in paragraph 36 of the Complaint.

37.  HSBC denies the allegations in paragraph 37 of the Complaint.

## SECOND CAUSE OF ACTION

38.  HSBC repeats and realleges each and every response set forth in paragraphs 1 through 37 of this answer as if fully set forth herein.

39.  HSBC denies the allegations in paragraph 39 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

40.  HSBC denies the allegations in paragraph 40 of the Complaint.

41.  HSBC denies the allegations in paragraph 41 of the Complaint.

## THIRD CAUSE OF ACTION

42.  HSBC repeats and realleges each and every response set forth in paragraphs 1 through 41 of this answer as if fully set forth herein.

6

43.    HSBC denies the allegations in paragraph 43 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

44.    HSBC denies the allegations in paragraph 44 of the Complaint.

45.    HSBC denies the allegations in paragraph 45 of the Complaint.

46.    HSBC denies the allegations in paragraph 46 of the Complaint.

47.    HSBC denies the allegations in paragraph 47 of the Complaint.

## FOURTH CAUSE OF ACTION

48.    HSBC repeats and realleges each and every response set forth in paragraphs 1 through 47 of this answer as if fully set forth herein.

49.    HSBC denies the allegations in paragraph 49 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

50.    HSBC denies the allegations in paragraph 50 of the Complaint.

51.    HSBC denies the allegations in paragraph 51 of the Complaint.

52.    HSBC denies the allegations in paragraph 52 of the Complaint.

53.    HSBC denies the allegations in paragraph 53 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

54.    The Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

55.    Plaintiffs lack standing to bring these claims.

## THIRD AFFIRMATIVE DEFENSE

56.    Plaintiffs' claims are barred by the doctrine of unclean hands.

7

### FOURTH AFFIRMATIVE DEFENSE

57.    Plaintiffs' claims are barred by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

58.    Plaintiffs' claims are barred by estoppel.

### SIXTH AFFIRMATIVE DEFENSE

59.    Plaintiffs' claims are barred by waiver.

### SEVENTH AFFIRMATIVE DEFENSE

60.    To the extent that Plaintiffs have suffered damages, any such damages were not caused by any conduct of HSBC, but resulted in whole or in part from the conduct of Plaintiffs and/or persons other than HSBC.

### FURTHER AFFIRMATIVE DEFENSES

61.    HSBC hereby gives notice that it intends to rely upon any other defense or defenses that may become available or appear during the pre-trial proceedings in this case and hereby reserves the right to amend its Answer to assert any such defenses.

### AS AND FOR HSBC'S COUNTERCLAIMS AGAINST PLAINTIFFS

62.    Notwithstanding Plaintiffs' commencement of this lawsuit, Plaintiffs are the parties who have breached their Agreements with HSBC, refused to pay amounts plainly owed to HSBC, and wrongfully retained principal and interest payments erroneously paid to them instead of to HSBC. As such, HSBC brings counterclaims against Plaintiffs for 1) breach of contract, 2) unjust enrichment, and 3) monies had and received to recover the losses HSBC has suffered, as well as a claim for legal fees and expenses (including attorneys' fees) as provided for under the parties' contracts.

## COMMON ALLEGATIONS

**A.    Plaintiffs' Agreements with HSBC**

63.    On or around December 19, 2005, Minerva and Mercury each entered into a "Master Repurchase Agreement" with HSBC, each agreement being supplemented by certain annexes thereto (collectively, the "Agreements"). Luminent simultaneously agreed absolutely and unconditionally to act as guarantor for all of Minerva's and Mercury's respective obligations to HSBC.

64.    Under the Agreements, Plaintiffs could enter into transactions with HSBC from time to time, whereby Plaintiffs would sell securities or other assets to HSBC at a specified "Purchase Price." HSBC would in turn simultaneously agree to sell the Purchased Securities back to Plaintiffs at a specified "Repurchase Date" or on demand at a specified "Repurchase Price." See Agreements §§ 1, 3. The "Repurchase Price" was the price at which the securities were to be transferred from HSBC to Plaintiffs upon termination of the transaction, which price is the sum of the Purchase Price and the "Price Differential," representing the charge for funding the Purchase Price over the term of the repurchase transaction. See Agreements §§ 2(r); 2(k).

65.    In the Agreements, Plaintiffs agreed that if at any time the aggregate market value of any of the Purchased Securities fell below 100% of the applicable Repurchase Price, HSBC would have the right to issue a margin call, and Plaintiff would be obligated to post cash or additional securities sufficient to cover the shortfall in value. See Agreements § 4; Agreements Annex I § 3.

66.    Plaintiffs further supported their promise to meet margin calls and satisfy their shortfall in Section 11 of the Agreements, which provided that if Plaintiffs failed to meet a margin call, HSBC could declare an "Event of Default."

9

67.    Plaintiffs agreed that, following an Event of Default, they would be obligated "to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date [i.e., the date of the default]." Such payment would be "immediately due and payable." See Agreements § 11(b)(i). Furthermore, Plaintiffs acknowledged that all income paid on the Purchased Securities after the Event of Default would be retained by HSBC. See Agreements § 11(b)(ii).

68.    If Plaintiffs failed to comply with their obligations to repurchase all Purchased Securities at the Repurchase Price, HSBC would be entitled to "(A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as [HSBC] may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices or any other amounts owing by [Plaintiffs] hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give [Plaintiffs] credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by [Plaintiffs] hereunder." Agreements § 11(d)(i).

69.    The parties agreed that if Plaintiffs defaulted, Plaintiffs would be liable to HSBC for all damages arising out of the Event of Default and for all expenses, including reasonable legal expenses, incurred by HSBC in connection with or as a result of the Event of Default. See Agreements § 11(g).

**B.    The Repurchase Transactions and Plaintiffs' Subsequent Default**

70.    Between May 7 and 11, 2007, pursuant to its Repurchase Agreement, Mercury sold HSBC eight bonds and agreed to repurchase them on dates ranging from May 14 to

10

June 11 for Repurchase Prices representing the Purchase Prices plus the Price Differentials (calculated by reference to funding rates between 5.4%–5.5% per annum).

71.    Mercury subsequently "rolled over" the repurchase transactions for each bond, renewing and/or extending the repurchase agreement of each bond between five and seven times in May, June, July and August 2007.

72.    On July 23, 2007, pursuant to its Repurchase Agreement, Minerva sold HSBC a bond issued by HASCO NIM (CAYMAN) COMPANY 2007-NC1 bearing CUSIP number 418098AA7 (the "NIM Bond" and, together with the eight bonds referenced in the preceding two paragraphs, the "Bonds") for a net price of $62.50 per $100 of face value. Minerva agreed to repurchase the NIM Bond on August 22, 2007 for a Repurchase Price representing the initial Purchase Price plus the Price Differential (calculated by reference to a funding rate of 5.57% per annum).

73.    On July 27, 2007, Minerva extended the repurchase transaction for the NIM Bond, agreeing to repurchase the Bond on August 27, 2007 for a Repurchase Price representing the initial Purchase Price plus the Price Differential (calculated by reference to a funding rate of 5.57% per annum).

74.    Payment of the eight Bonds that Mercury sold to HSBC were collateralized by so-called "subprime mortgages." As a result, the value of the Bonds and the likelihood of ultimate repayment were dependent on, among other factors, the payment performance of borrowers under such subprime mortgages.

75.    Payment of the NIM Bond that Minerva sold to HSBC was not backed directly by subprime mortgage loans but was backed by so-called "residual interests," the most subordinated securities issued in securitized pools of subprime mortgage loans. As a result, the

NIM Bond was particularly susceptible to the risk of non-payment on the underlying subprime mortgages.

76.     The rate of default in the market for subprime mortgages rose significantly in 2007.  Rising default rates on subprime home loans have led to large declines in the values of securities, such as the Bonds, collateralized by such mortgages.  More than twenty subprime mortgage originators have declared bankruptcy.  Many such securities once rated AAA by credit rating agencies have been significantly downgraded due to the non-payment or predicted non-payment of principal and interest payments.  Large financial institutions have been forced to mark down, and continue to mark down, billions of dollars of subprime-mortgage-backed assets.  Not surprisingly, the subprime mortgage crisis also affected the market value of the Bonds.

77.     The subprime mortgage crisis has also affected the payment window of the Bonds.  In particular, because the NIM Bond was highly susceptible to the performance of subprime mortgages, rising default rates and declining rates of subprime mortgage prepayment caused the NIM Bond to fall behind its projected payment plan, thus extending its payment window beyond the projections in its offering plan.

78.     As a result of the Bonds' decline in market value, HSBC issued several margin calls to Mercury prior to August 6, 2007, all of which were met in accordance with Mercury's obligations under the Agreements.

79.     For example, on July 10, 2007, HSBC issued a margin call to Mercury in the sum of $500,224.42, which was duly satisfied on July 11, 2007.

80.     On August 3, 2007, HSBC issued margin calls to Mercury and Minerva.  Plaintiffs disputed all of HSBC's margin calls, but eventually agreed to pay all of the Mercury

margin calls.  HSBC agreed to withdraw the margin call on the repurchase transaction on
Minerva's NIM Bond.

**C.      Plaintiffs' Failure to Pay the Repurchase Price and Satisfy Their Obligations**

      81.      On August 6, 2007, Luminent issued a press release in which it stated,
*inter alia*, that Luminent was suspending dividend payments and that the New York Stock
Exchange had halted trading in Luminent's common stock.

      82.      On August 7, 2007, at or around 11:00 a.m., Luminent conducted a
conference call with its repurchase agreement counterparties.  Luminent CEO Trez Moore stated
that Luminent received margin calls from ten repurchase agreement counterparties that day.

      83.      Mr. Moore stated on this call that Luminent had received approximately
$60 million in margin calls and admitted that he could not say whether or not Plaintiffs could
meet their margin call obligations.

      84.      The Repurchase Date for the repurchase transaction on one of the Bonds
(bearing the CUSIP number 40430HCQ9 (the "HCQ9 Bond")) was August 7, 2007.  Under the
relevant Agreement, Mercury was obligated to repurchase the HCQ9 Bond for the full
Repurchase Price on August 7, 2007.  Following Mr. Moore's conference call, HSBC agreed to
roll over the HCQ9 Bond for one more day, to August 8, 2007.

      85.      The revised Repurchase Date for the repurchase transaction on the HCQ9
Bond, along with the Repurchase Dates for the repurchase transactions of six other bonds — all
of the Bonds except the NIM Bond and the bond bearing CUSIP number 32029AAP2 (the
"AAP2 Bond") — was August 8, 2007.  Under the relevant Agreement, Mercury was obligated
to repurchase these seven bonds for the full Repurchase Prices on August 8, 2007.

      86.      On August 8, 2007, HSBC told Plaintiffs that it would not further roll over
the repurchase transactions on the seven bonds due for repurchase past that date.

87.     Plaintiffs failed to repurchase the Bonds as required by the Agreements.

88.     Also on August 8, 2007, as it had done several times previously, HSBC issued margin calls to Minerva and Mercury, respectively, due to the Bonds' continued decline in market value. On this date, Plaintiffs did not satisfy the margin calls.

89.     Consequently, on August 8, 2007, HSBC notified Plaintiffs that they were in default. As prescribed by the Agreements, HSBC sent to Plaintiffs notices of the termination of their respective repurchase transactions.

90.     Under the Agreements, upon the occurrence of an Event of Default, HSBC had the right to sell the Bonds in order to mitigate its losses on its transactions with Plaintiffs.

91.     On August 9, 2007, as was its right under the Agreements, HSBC conducted an auction for the Bonds.

92.     HSBC invited the relevant bond trading desks of five major dealers that are active in the market for securities such as the Bonds — RBS Greenwich Capital, Barclays, Lehman Brothers, Merrill Lynch and Goldman Sachs — to participate in the auction. By notifying these five dealers of the auction, HSBC anticipated that their bids would not only reflect their own interest but also that of their customers, such as insurance companies, investment managers, retirement funds, collateralized debt obligation managers, and hedge funds. In addition to these five dealers, HSBC participated in the auction.

93.     The auction elicited little buying interest in the Bonds. Two dealers declined to bid altogether, presumably reflecting their independent commercial analyses that they would be unable to resell the Bonds to customers or to other dealers.

94.    The other three dealers each bid on between three and all nine of the Bonds. The bids HSBC received were not surprising, in light of the subprime mortgage crisis, which had caused significant illiquidity in the market for subprime mortgage-backed securities.

95.    Plaintiffs were aware that the Bonds had lost considerable market value. In the days preceding HSBC's auction, Plaintiffs had attempted — and failed — to find any third party interested in either buying the Bonds or extending financing to Plaintiffs based on the Bonds at a price level that would enable Plaintiffs to satisfy their obligations to HSBC (i.e., at a price equal to the Repurchase Price).

96.    In the auction, HSBC submitted the highest bids for each of the Bonds, by a significant percentage in some instances. While HSBC would have gladly sold the Bonds to a third party willing to meet or exceed its bids, no other bidder was willing to do so. Had HSBC not participated in the auction, the Bonds would have sold for even less.[1]

97.    Throughout the day of the auction, HSBC repeatedly contacted Plaintiffs, informed them that it was offering the Bonds for sale, and stated that it would be willing to consider any bids by Plaintiffs on the Bonds.

98.    Plaintiffs did not make any bids on any of the Bonds that met or exceeded HSBC's bids.

99.    Because the prices for which the Bonds were sold were below the contractually agreed-upon Repurchase Prices, the Agreements require Plaintiffs to make up the shortfall between the Bonds' sale values and the contractual Repurchase Prices.

100.    Plaintiffs have refused to comply with their contractual obligations to pay HSBC the shortfall.

---

[1] While they have fluctuated somewhat since the auction, overall the Bonds' value has fallen since they were acquired by HSBC.

15

**D.    Plaintiffs' Wrongful Retention of Unearned Income Profit**

101.    Section 11(b) of the Agreements provides that, following an Event of Default, all principal and interest payments paid on the Bonds are to be retained by HSBC.

102.    Furthermore, following the termination of Plaintiffs' repurchase transactions and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and hence was entitled to all principal and interest income paid on the Bonds.

103.    On or about August 25, 2007, even though Events of Default had occurred and HSBC was the rightful owner of the Bonds, $1.64 million of principal and interest income on the Bonds was erroneously paid to Minerva and Mercury.

104.    On or about September 25, 2007, even though Events of Default had occurred and HSBC was the rightful owner of the Bonds, $1.89 million of principal and interest income on the Bonds was erroneously paid to Minerva and Mercury.

105.    Despite demands from HSBC to Plaintiffs that they remit the aforementioned payments to HSBC in accordance with the Agreements, Plaintiffs have refused to do so.

## FIRST COUNTERCLAIM

### Breach of Contract (Against Mercury)

106.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 105 as if set forth fully herein.

107.    The Master Repurchase Agreement between HSBC and Mercury is a valid, binding, and enforceable contract, supported by good and valuable consideration.

108.    The Agreement requires Mercury to meet margin calls by posting cash or additional securities sufficient to cover any shortfall in the market value of the Bonds.

109.    HSBC issued margin calls, which Mercury failed to meet.

16

110. As a result of Mercury's failure, an Event of Default occurred under the Agreement.

111. Further, the Agreement requires Mercury to repurchase bonds on a specific date. In the case of seven of the eight bonds Mercury was required to repurchase (all except the AAP2 Bond), Mercury failed to do so, and failed timely to pay its obligations to repurchase those Bonds. As a result of Mercury's failure, an Event of Default occurred under the Agreement.

112. The Agreement further provides that if Mercury defaults, Mercury is obligated to immediately repurchase the Bonds at the agreed-upon Repurchase Price.

113. The Agreement provides that if Mercury fails to so repurchase the Bonds and HSBC exercises its option to sell the Bonds, Mercury is obligated to pay the shortfall to HSBC between the sale price and the Repurchase Price.

114. After Mercury failed either to meet HSBC's margin calls or repurchase the bonds that were scheduled to be repurchased, and the Event of Default occurred, Mercury further breached the Agreement by failing to pay the shortfall between the sale price and the Repurchase Price following the sale of the Bonds. The shortfall was $2,256,891.86.

115. The Agreement also provides that, following an Event of Default, all principal and interest income paid on the Bonds is to be retained by HSBC.

116. After Mercury failed to meet HSBC's margin calls and the Event of Default occurred, $398,034.60 in principal and interest income paid on the Bonds was erroneously transferred to Mercury instead of to HSBC.

17

117.    Notwithstanding HSBC's demand, Mercury has breached the Agreement by refusing to remit to HSBC the principal and interest payments on the Bonds it received following the Event of Default.

118.    As a result of the foregoing, HSBC has suffered damages in an amount not less than $2,654,926.46 plus applicable interest.

## SECOND COUNTERCLAIM

### Breach of Contract (Against Minerva)

119.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 118 as if set forth fully herein.

120.    The Master Repurchase Agreement between HSBC and Minerva is a valid, binding, and enforceable contract, supported by good and valuable consideration.

121.    The Agreement requires Minerva to meet margin calls by posting cash or additional securities sufficient to cover any shortfall in the market value of the Bonds.

122.    HSBC issued a margin call, which Minerva failed to meet.

123.    As a result of Minerva's failure, an Event of Default occurred under the Agreement.

124.    The Agreement further provides that if Minerva defaults, Minerva is obligated to immediately repurchase the Bonds at the agreed-upon Repurchase Price.

125.    The Agreement provides that if Minerva fails to so repurchase the Bonds and HSBC exercises its option to sell the Bonds, Minerva is obligated to pay to HSBC the shortfall between the sale price and the Repurchase Price.

126.    After Minerva failed to meet HSBC's margin calls and the Event of Default occurred, Minerva further breached the Agreement by failing to pay the shortfall

between the sale price and the Repurchase Price following the sale of the Bonds. The shortfall was $737,896.53.

127.    The Agreement also provides that, following an Event of Default, all principal and interest income paid on the Bonds is to be retained by HSBC.

128.    After Minerva failed to meet HSBC's margin calls and the Event of Default occurred, $3,196,241.86 in principal and interest income paid on the Bonds was erroneously transferred to Minerva instead of to HSBC.

129.    Notwithstanding HSBC's demand, Minerva has breached the Agreement by refusing to remit to HSBC the principal and interest payments on the Bonds it received following the Event of Default.

130.    As a result of the foregoing, HSBC has suffered damages in an amount not less than $3,934,138.39 plus applicable interest.

### THIRD COUNTERCLAIM

#### Unjust Enrichment (Against Mercury)

131.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 130 as if set forth fully herein.

132.    Following Mercury's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

133.    Despite HSBC's ownership of the Bonds, Mercury was erroneously paid income from the Bonds in the amount of $398,034.60.

134.    Notwithstanding HSBC's demand, Mercury refuses to remit the income to HSBC and continues to retain such income for itself.

135.    In retaining this income for itself even though HSBC owns the Bonds outright, Mercury has benefited at HSBC's expense in an amount not less than $398,034.60 plus applicable interest. Equity and good conscience require restitution.

## FOURTH COUNTERCLAIM

### Unjust Enrichment (Against Minerva)

136.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 135 as if set forth fully herein.

137.    Following Minerva's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

138.    Despite HSBC's ownership of the Bonds, Minerva was erroneously paid income from the Bonds in the amount of $3,196,241.86.

139.    Notwithstanding HSBC's demand, Minerva refuses to remit the income to HSBC and continues to retain such income for itself.

140.    In retaining this income for itself even though HSBC owns the Bonds outright, Minerva has benefited at HSBC's expense in an amount not less than $3,196,241.86 plus applicable interest. Equity and good conscience require restitution.

## FIFTH COUNTERCLAIM

### Monies Had and Received (Against Mercury)

141.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 140 as if set forth fully herein.

142.    Following Mercury's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

20

143.    Despite HSBC's ownership of the Bonds, Mercury was erroneously paid income from the Bonds in the amount of $398,034.60.

144.    Mercury has received monies that belong to HSBC in an amount not less than $398,034.60 plus applicable interest and has benefited from these monies.  Equity and good conscience require restitution.

## SIXTH COUNTERCLAIM

### Monies Had and Received (Against Minerva)

145.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 144 as if set forth fully herein.

146.    Following Minerva's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

147.    Despite HSBC's ownership of the Bonds, Minerva was erroneously paid income from the Bonds in the amount of $3,196,241.86.

148.    Minerva has received monies that belong to HSBC in an amount not less than $3,196,241.86 plus applicable interest and has benefited from these monies.  Equity and good conscience require restitution.

## SEVENTH COUNTERCLAIM

### Legal Fees and Expenses (Against Minerva and Mercury)

149.    HSBC restates and realleges the allegations set forth in Paragraphs 62 through 148 as if set forth fully herein.

150.    Under the Agreements, following Events of Default, the defaulting parties shall be liable to the nondefaulting party for, *inter alia*, "the amount of all reasonable legal fees

and expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default." Agreements § 11(g).

151. Minerva and Mercury have defaulted on their Agreements.

152. Accordingly, by the terms of the Agreements, Minerva and Mercury are liable to HSBC for its reasonable legal fees and expenses.

## EIGHTH COUNTERCLAIM

### Breach of Contract (Against Luminent)

153. HSBC restates and realleges the allegations set forth in Paragraphs 62 through 152 as if set forth fully herein.

154. Luminent entered into Guarantee Agreements under which Luminent served as primary obligor and "irrevocably and unconditionally guarantee[d] to [HSBC] ... all of [Minerva's or Mercury's (as applicable)] obligations, liabilities and undertakings to [HSBC] ... as well as all reasonable expenses (including attorney's fees) of collection and enforcement hereof related to transactions entered into by [Minerva or Mercury (as applicable)] with HSBC." Guarantee Agreements § 1(a).

155. HSBC was expressly listed as a counterparty in the Guarantee Agreements and thus was a third-party beneficiary of the Guarantee Agreements.

156. HSBC transacted with Mercury and Minerva pursuant to the Master Repurchase Agreements in reliance upon Luminent's guarantees.

157. Mercury and Minerva have defaulted on their Agreements and are liable to HSBC.

158. Independent of their contractual obligations, Mercury and Minerva are liable to HSBC for claims of unjust enrichment and monies had and received, each of which constitutes an "obligation" and/or "liability" to HSBC covered by the Guarantee Agreements.

159.    Notwithstanding HSBC's demand, Luminent has refused to pay any of the amounts owed to HSBC by either Mercury or Minerva pursuant to the Agreements or otherwise, or by Luminent pursuant to the Guarantee Agreements, including all amounts owed by Mercury and Minerva in connection with the First through Seventh Counterclaims herein.

160.    As a result, Luminent has breached the Guarantee Agreements. By virtue of Luminent's breaches, HSBC has suffered damages in an amount not less than $6,589,064.85 plus applicable interest.

161.    Under the Guarantee Agreements, Luminent is also liable to HSBC for "all reasonable expenses (including attorney's fees)." Guarantee Agreements § 1(a).

## RELIEF SOUGHT

WHEREFORE, HSBC requests that this Court:

(i)     dismiss the Complaint in its entirety;

(ii)    award HSBC damages against Mercury in the sum of not less than $2,654,926.46, plus interest;

(iii)   award HSBC damages against Minerva in the sum of not less than $3,934,138.39, plus interest;

(iv)    award HSBC damages against Luminent in the sum of not less than $6,589,064.85, plus interest;

(v)     award HSBC all of its costs and expenses of this action, including reasonable attorneys' fees, as authorized by the parties' contracts and permitted by law; and

(vi) grant HSBC such other and further relief as this Court may deem just and

proper.

Dated: New York, New York
       February 25, 2008

                            Respectfully submitted,

                            CLEARY GOTTLIEB STEEN & HAMILTON LLP

                            By:   /s/ Jeffrey A. Rosenthal
                                     Jeffrey A. Rosenthal
                                     A Member of the Firm

                            One Liberty Plaza
                            New York, New York 10006
                            (212) 225-2000

                            Attorneys for Defendant and Counterclaim Plaintiff
                            HSBC Securities (USA) Inc.

Of Counsel:
Jason P. Gottlieb

24

EXHIBIT J

www.moodys.com

## Special Comment

## Moody's Global
# Insurance

September 2007

# Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

## Summary Opinion

**Table of Contents:**

| | |
|---|---|
| Summary Opinion | 1 |
| Where to Find Subprime Mortgages: A Primer on Financial Engineering | 3 |
| Risks of Direct Subprime RMBS Exposure Should Remain Well Contained | 3 |
| Net Interest Margin Securities (NIMS) | 4 |
| Subprime Risks in ABS CDOs Are Harder to Assess | 4 |
|    Direct Subprime RMBS Risks and CDO Risks Within ABS CDOs | 5 |
|    Survey of ABS CDO Exposures | 6 |
|    Scenario Testing and Exposure Monitoring of ABS CDOs | 7 |
|    Current Subprime Performance Expectations Suggest Little or No Loss | 8 |
|    Further Subprime Deterioration Could Lead to Losses and Merits Close Study | 9 |
|    Continuing Study and Ongoing Monitoring | 9 |

**Analyst Contacts:**

**New York**    1.212.553.1653

**Stanislas Rouyer**
*Senior Vice President*

**Ranjini Venkatesan**
*AVP-Analyst*

**Jack Dorer**
*Team Managing Director*

**Ted Collins**
*Group Managing Director*

Stress in the subprime mortgage market as a result of poor performance in recent-vintage mortgage loans is affecting structured finance transactions insured by the financial guaranty companies rated by Moody's. These structured transactions include subprime residential mortgage backed securities (RMBS), whether first mortgages or closed-end seconds, and structured securities collateralized by asset backed securities (ABS CDOs) containing mortgage exposure.

Moody's believes that the risks presented by the direct insurance of subprime RMBS transactions should be reasonably well-contained as the credit enhancement levels (the cumulative losses assumed by third parties before the guarantors have to pay claims) are generally well in excess of our current estimates of the ultimate cumulative losses these transaction will suffer. These manageable exposures reflect the guarantors' more conservative underwriting of 2006-7 vintage subprime loans, with most of the transactions insured during this period having initial underlying ratings in the Aaa range. While some guarantors may experience credit deterioration within certain insured RMBS transactions and could even suffer actual losses, the resulting impact should not meaningfully affect their financial health.

Evaluating the impact of subprime mortgage stress on the guarantors' exposures to ABS CDOs is more complex, as such transactions can invest in various tranches of subprime securitizations and/or in other ABS CDOs that may also invest in subprime mortgage tranches. The guarantors have typically participated in this market by providing credit default swap protection on the most senior layers of the securities' capital structures, usually attaching above a Aaa tranche[1].

---

[1] While most of the guarantors' CDO exposure is in credit default swap (CDS) form, they avoid exposure to margin collateralization requirements that are customary for such agreements.



Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

So far, these senior-most tranches insured by the guarantors have suffered minimal deterioration as reflected by limited underlying rating movement. However, ABS CDOs with concentrations in recent vintage RMBS or CDO collateral are exposed to further deterioration in the underlying mortgage markets. Here, Moody's approach involves developing stress scenarios that estimate the negative impact of potential further deterioration in the underlying mortgage market on the guarantors' exposures, and capitalization.

In our projected ABS CDO model results using Moody's current cumulative loss expectations for the troubled 2006-vintage subprime mortgage pools, most of the guarantors would experience zero expected claims[2], with no guarantor suffering expected claims that would be material from a rating perspective. If Moody's cumulative loss estimates are stressed significantly beyond current expectations, however, some guarantors could suffer meaningful increases in expected claims in our modeling, although we note that many of our stress-case assumptions are conservative and that these stressed model results are highly sensitive to the underlying inputs, some of which – as discussed below – are based on broad assumptions about specific CDO collateral composition and performance.

We continue to refine our ABS CDO analysis, which is complicated by the substantial number of granular exposures underlying many of these securities, as well as issues of correlation between the different underlying risks. We will also continue to monitor the impact of any underlying rating actions, should they occur, on the credit profile of the guarantors. Our analysis suggests that further deterioration in the US subprime residential mortgage market could have significantly different net effects on individual guarantors given their unique risk and franchise profile. If Moody's subprime cumulative loss expectations were to increase beyond current estimates or if the guarantors' insured deals were to suffer large rating downgrades, Moody's would evaluate the impact of such developments on the capital adequacy and, ultimately, the ratings of the guarantors.

We note that most of the established guarantors are facing today's challenging mortgage markets from a position of financial strength, with solid capital ratios and ample reinsurance capacity. Should market developments unfold such that a guarantor's capital ratios deteriorate meaningfully from their current levels, we would evaluate the company's ability to correct the situation through such means as raising additional capital or ceding portions of the existing book to reduce portfolio risk. Because ratings are so important to the industry's value proposition, we believe that a highly rated financial-guarantor with a strong ongoing franchise would likely take whatever action is feasible to preserve its rating during times of stress. Beyond the immediate disruption to the guarantors' business opportunities due to chaotic conditions within the global credit markets, these events are likely to be a positive catalyst for financial guarantor business growth over the medium term, as credit re-prices to levels that increase demand for their core product.

---

[2] Expected claims is defined as the average claims to the guarantors resulting from the stochastic simulation for the given subprime cumulative loss assumption.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

# Where to Find Subprime Mortgages: A Primer on Financial Engineering

Subprime mortgages are mortgage loans extended to borrowers with weak credit profiles (often with FICO scores below 620). They can be first mortgages, with a first lien on the property serving as collateral to the loan, or second mortgages (generally closed-end loans where the borrower receives a specified amount at closing) that are subordinated to the first mortgage. As an example, a subprime borrower might obtain an 80% first mortgage and a 20% closed-end second mortgage to purchase a home (see accompanying diagram).



Allocation of Subprime Mortgage risks in CDOs

Such loans are generally packaged by type (i.e., first or second mortgages) into pools of collateral, which form the basis of Residential Mortgage Backed Securities (RMBS). Different tranches of these securities, created with varying levels of priority on the cash flows generated by the underlying pool of mortgages, are then sold to third parties. The Aaa-rated tranche has first priority, followed by the Aa-rated tranche, the A-rated tranche and so on, down to the equity of the transaction.

ABS CDOs, in turn, may invest in tranches of RMBS transactions, as well as in other asset backed securities. ABS CDOs have generally been classified as "high-grade" when they invest primarily in Aa-or-higher-rated tranches, and as "mezzanine" when they invest in Baa-or-higher-rated tranches. Both types, however, typically have a small allocation within the collateral pool that may be invested in lower-rated collateral. As the dotted lines in the diagram show, a high-grade CDO may ultimately be exposed to lower-rated RMBS collateral if it purchases highly-rated tranches of a mezzanine CDO (since the mezzanine CDO can hold Baa and Ba-rated RMBS tranches). Similarly, mezzanine CDOs can invest in lower-rated tranches of high-grade CDOs.

# Risks of Direct Subprime RMBS Exposure Should Remain Well Contained

Collectively, the financial guarantors insured roughly $7½ billion in residential mortgage backed securities collateralized by subprime mortgage loans during 2006. This volume, however, was lower than in prior years. At the same time, the average enhancement level in 2006 increased, due to tighter underwriting criteria on the part of the guarantors and increasing competition from alternative forms of execution (e.g., senior-subordinated structures). Furthermore, because most of the subprime RMBS transactions wrapped by the guarantors during 2006 had underlying ratings of Aaa, the typical level of subordination on

**Guarantors' Exposure to Subprime RMBS**
The table below shows the typical subordination, or credit enhancement, levels for subprime RMBS transactions issued in 2006. Differences in credit quality of the underlying mortgages could lead to meaningful variations in credit enhancement levels.

**Typical Credit Enhancement Levels** [1]

|     | Subprime First lien | Subprime Second |
| --- | --- | --- |
| Aaa | ± 28.0% | ± 42.0% |
| Aa  | ± 19.5% | ± 33.0% |
| A   | ± 14.0% | ± 25.5% |
| Baa | ± 10.5% | ± 19.0% |
| Ba  | ± 7.5%  | ± 14.5% |

[1] For 2006 vintage deals rated by Moody's

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

first-lien deals (i.e., the cumulative losses that would need to occur before the guarantor pays claims) averaged approximately 26% to 30%. The guarantors also wrote a modest volume of subprime RMBS with underlying ratings of Baa to Aa, which carry smaller levels of subordination.

Evaluating the impact of higher subprime mortgage pool losses on the RMBS transactions insured by the guarantors is quite straightforward as they typically insure the senior-most tranches of these securities. Therefore, as long as cumulative losses remain below the insurance attachment point, the guarantor's exposure may become riskier with higher underlying loan loss rates (due to an erosion of subordination levels), but the guarantor would not be subject to claims. Because Moody's current cumulative loss expectations for the worst performing pools originated in 2006 range from 10% to 16%,[3] it appears that the guarantors' Aaa-rated exposures would still enjoy substantial subordination, although the few deals that were rated Baa at origination could potentially be exposed to claims. Any such claims would likely remain modest, however, as the subordination built into these transactions would absorb most of the losses[4].

## Net Interest Margin Securities (NIMS)

NIM securitizations comprise another less prevalent and riskier form of mortgage-related exposure, although most of the financial guarantors have steered away from this asset class. In a NIM securitization, an RMBS issuer securitizes the residual cash flows from existing mortgage-backed transactions to monetize these residuals and accelerate the receipt of cash flow from outstanding deals. In a typical mortgage securitization structure, excess spread, which is a stream of cash formed out of the disparity between the interest rate paid on the mortgage loans (net of fees and expenses) and the lower interest rate paid on the deal's securities, is made available to protect the deal's security holders by absorbing losses on the underlying loans and by building credit enhancement to absorb future losses. Excess spread that is not needed to absorb losses or build credit enhancement is ultimately returned to the issuer of the mortgage-backed security. It is this "extra" excess spread that is securitized in a NIM transaction.

Because the cash flow available to a NIM deal is usually subordinated to the needs of the RMBS transactions underlying the NIM, there is no specified amount of principal and interest that the NIM securities will definitely receive, and the timing and amount of the cash flow that ultimately reaches the NIM bonds are likely to be highly volatile. Moreover, the performance of a NIM security will be especially sensitive to the prepayment and loss experience of the underlying transactions since prepayments and losses lead to a reduction in total residual receipts. As a result, the performance of these transactions can deteriorate sharply during adverse market conditions.

Among the guarantors, FSA has been the most active in this sector by providing excess-of-loss coverage (with the first-loss position often assumed by the mortgage insurance arm of Radian Group). While some NIM-related losses could occur in the current environment, they should remain immaterial to FSA's financial strength given its senior position and relatively modest exposure.

## Subprime Risks in ABS CDOs Are Harder to Assess

### Complex Exposures, but Underwriting Approaches Provide Protection

In contrast to RMBS, the effect of potentially higher-than-expected subprime mortgage pool losses on ABS CDOs insured by the guarantors is indirect, making it more difficult to assess. ABS CDOs, unlike RMBS, do not invest directly in mortgages but invest in securities that may themselves, either directly or indirectly, invest in mortgages. In many instances, the ABS CDOs insured by the guarantors have invested in subprime RMBS and/or in other CDOs that have, in turn, invested in securities that include some subprime RMBS. The complexity of these exposures, with the subprime mortgage loan risk being once or twice removed from the

---

[3] See Moody's special report, US Subprime Mortgage Market Update: July 24, 2007.
[4] For example, assuming that a guarantor insures the senior Baa tranche of a $500 million subprime mortgage deal (a $448 million tranche reflecting a 10.5% subordination), cumulative underlying losses of 16% are modeled as resulting in claims of $28 million for the guarantor (net of subordination of $52 million), representing a 6.25% severity of loss.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

direct investment of the ABS CDO, renders reasonable estimation of CDO performance (based on estimated or stressed cumulative subprime loan losses) quite challenging[5].

Nevertheless, the underwriting approaches employed by financial guarantors tend to militate against "worst-case" outcomes for these exposures. Financial guarantors typically work with CDO managers to determine exposures (whether RMBS or CDO) that would fall within the guarantors' underwriting criteria. This should help mitigate the risk of adverse selection and improve the overall characteristics of insured transactions. Furthermore, certain protective triggers built into insured CDOs can meaningfully improve the guarantors' position by accelerating the amortization of the tranches that they insure, diverting cash flow away from more junior tranches, revoking the manager's ability to trade underlying assets and/or allowing for the replacement of the collateral manager.

We note that the guarantors generally participate in the CDO market by writing credit default swaps (CDS), as this form of execution (as opposed to an insurance policy) better meets the needs of their counterparties. However, unlike traditional corporate CDS transactions, the guarantors' obligation to pay claims does not accelerate upon the default of the underlying exposure (given the use of 'pay-as-you-go' language). Furthermore, the absence of collateral posting requirements means that the guarantors' liquidity and financial flexibility are insulated from the negative impact of CDS price dislocation.

## Direct Subprime RMBS Risks and CDO Risks Within ABS CDOs

In today's troubled mortgage environment, certain tranches of mezzanine CDOs with large subprime mortgage exposures could well suffer large increases in expected losses, given Moody's current cumulative loss expectations on 2006-vintage subprime mortgages. Moody's currently expects the best quartile of pools of subprime first lien mortgages underwritten in 2006 to produce cumulative losses in the 5% to 7% range while the worst performing quartile is expected to generate cumulative losses in the 10% to 16% range[6]. This means that impairment to the principal amounts associated with some Baa-and-lower-rated RMBS tranches is likely (2006-vintage Baa-rated tranches typically attach at subordination levels of around 10% to 11% and detach at 13% to 15%[7]). As a result, high grade CDOs are significantly less at risk of meaningful increases in expected loss (in relation to total deal size) than are mezzanine CDOs as high-grade CDOs typically invest in A through Aaa-rated tranches that benefit from higher subordination levels. On the other hand, the subordination built into each rated tranche of a high-grade CDO is lower than for a mezzanine CDO.

Ultimately, however, credit performance is highly dependent upon the actual composition of investments within the structure of each CDO. In addition to CDO attachment points and the weighted-average rating of the investment pool, other key variables include the concentration in subprime RMBS and ABS CDO collateral, the vintage of that collateral, RMBS originator and servicer details, the underlying collateral composition of each ABS CDO held by the insured CDO, the timing of losses incurred by the pool, and the existence of structural protections such as triggers -- tied to over-collateralization or interest coverage tests – that accelerate repayment of the senior tranches or confer some other benefit to those creditors. Within the guarantors' insured portfolios, for example, subprime RMBS collateral varies significantly from CDO to CDO. In many instances, RMBS collateral consists of earlier-vintage deals where exposure to the worst-performing 2006 loans is not at issue. And as noted earlier, the guarantors also often work with CDO managers to determine an approved list of lenders whose mortgage collateral may be held by the ABS CDO, which can help to limit exposure to the worst performing pools.

Nevertheless, the collateral pools of ABS CDOs with large exposures to the worst-performing subprime risk could face substantial deterioration. This means that CDOs which invest in tranches of such CDOs are also exposed to possible stress, including high grade CDOs that may be indirectly exposed to lower-rated tranches of subprime mortgage deals through their investments in A- or Aa-rated tranches of mezzanine CDOs. As there is typically somewhat incomplete transparency into the specific underlying CDO risks held within the guarantors' ABS CDOs, due in part to their managed nature, and/or the precise benefit that would ultimately

---

[5] Moody's special comment, The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review, March 23, 2007, highlights the potential effect of the downgrade of subprime mortgage backed securities on the ratings of ABS CDOs.

[6] See Moody's special report, US Subprime Mortgage Market Update: July 24, 2007.

[7] See Moody's special report, Challenging Times for the US Subprime Mortgage Market, March 7, 2007.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

be derived from exercise of trigger options, it is difficult to determine with accuracy the potential impact that further deterioration in subprime mortgage performance may have on the guarantors' ABS CDO positions.

## Survey of ABS CDO Exposures

**Guarantors' ABS CDOs with Subprime and CDO Collateral Originated in 2006 and 2007**

| | Net Par $million | Average Underlying Exposure Type | | | Average Subordination |
|---|---|---|---|---|---|
| | | Subprime | CDO | Other [1] | |
| **MBIA** | | | | | |
| High Grade | $10,613 | 33.6% | 21.0% | 45.4% | 13.9% |
| Mezzanine | $    473 | 44.0% | 5.0% | 51.0% | 37.0% |
| Total | $11,086 | | | | |
| **Ambac** | | | | | |
| High Grade | $19,082 | 36.6% | 24.0% | 39.4% | 20.4% |
| Mezzanine | $ 2,910 | 16.9% | 81.1% | 2.0% | 40.9% |
| Total | $21,992 | | | | |
| **FGIC** | | | | | |
| High Grade | $ 5,949 | 43.2% | 20.8% | 36.0% | 15.1% |
| Mezzanine | $ 2,228 | 78.4% | 5.3% | 16.4% | 39.7% |
| Total | $ 8,177 | | | | |
| **SCA** | | | | | |
| High Grade | $13,159 | 17.6% | 23.0% | 59.3% | 12.5% |
| Mezzanine | $     - | 0.0% | 0.0% | 0.0% | 0.0% |
| Total | $13,159 | | | | |
| **CIFG** | | | | | |
| High Grade | $ 1,600 | 22.1% | 14.4% | 63.5% | 13.1% |
| Mezzanine | $ 4,858 | 48.0% | 6.1% | 45.9% | 35.0% |
| Total | $ 6,458 | | | | |
| **Industry** | | | | | |
| High Grade | $ 50,403 | 31.6% | 22.5% | 45.9% | 16.3% |
| Mezzanine | $ 10,469 | 45.4% | 27.8% | 26.8% | 37.8% |
| Total | $ 60,872 | | | | |
| [1] Including other RMBS collateral. | | | | | |

Moody's preliminary review of the guarantors shows that only three, Financial Security Assurance, Assured Guaranty Corp and Radian Asset Assurance have not insured meaningful volume of ABS CDOs in recent years. Most of the remaining guarantors rated by Moody's, including Ambac, CIFG, FGIC, MBIA and Security Capital Assurance, have been active in this sector, insuring in aggregate approximately $61 billion in ABS CDOs during 2006 and 2007. An important point, however, is that almost all of this exposure attaches at the "super-senior" level (i.e., senior to a Aaa tranche), thereby providing significant collateral protection against changes in the underlying expected losses.

Yet the large differences in performance of subprime mortgages by vintage and originator, or even pool to pool, combined with the potential impact on the various tranches of RMBS, calls for a more in-depth review of the specific investments of ABS CDOs. Guarantors have not uniformly tracked – in detail – the composition of cascading CDO assets held within the CDOs that they insure. Nevertheless, we continue to develop stress scenarios based on a variety of assumptions about both the specific construction of, and the performance of, underlying collateral.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

## Scenario Testing and Exposure Monitoring of ABS CDOs

### *Overview of Scenario Testing*

In order to assess the potential for claims on the financial guarantors' exposures to CDOs containing subprime RMBS, including CDOs that, in turn, hold CDO collateral containing subprime RMBS, Moody's developed a model that estimates the expected loss content of 2006-7 vintage CDOs, via stochastic simulation, based on a combination of company-provided data and Moody's assumptions. All companies provided us with the general type (high grade or mezzanine) and asset breakdown (% subprime, % CDO) of their insured CDOs on a deal-by-deal basis. We did not model pre-2006 ABS CDOs, assuming that their assets were largely unexposed to recent vintage subprime loans. In some cases, we used further details, where available from the guarantor, such as the rating distribution and CDO collateral breakdown (high grade, mezzanine or other). In the absence of specific data from the company, we made the following assumptions regarding the asset composition of each ABS CDO:

| High-Grade CDO Assumptions | | | | |
|---|---|---|---|---|
| X% [1] | Subprime Collateral | | 60% 40% 0% | Aa A Baa |
| Y% [1] | CDO Collateral | 20% | High Grade | 20% Aa 80% A 0% Baa |
| | | 60% | Mezzanine | 20% Aa 80% A 0% Baa |
| | | 20% | Other | |
| Other = 100% - X% - Y% | | | | |

| Mezzanine CDO Assumptions | | | | |
|---|---|---|---|---|
| X% [1] | Subprime Collateral | | 0% 10% 90% | Aa A Baa |
| Y% [1] | CDO Collateral | 20% | High Grade | 0% A 90% Baa 10% Ba |
| | | 60% | Mezzanine | 0% A 90% Baa 10% Ba |
| | | 20% | Other | |
| Other = 100% - X% - Y% | | | | |

[1] Data provided by the guarantors.

At an even more granular level, we used the following assumptions to describe the characteristics of the CDO collateral held within their insured CDOs, where we have assumed the following "inner CDO" distribution by type and rating[8]:

**Inner CDO Assumptions**

**20% High Grade**

| 45% Subprime | 60% Aa 40% A 0% Baa |
|---|---|
| 55% Other | |

**60% High Grade**

| 45% Subprime | 0% Aa 10% A 90% Baa |
|---|---|
| 55% Other | |

**20% Other**

---

[8] We have assumed that the CDO collateral held within the guarantors' insured CDOs do not themselves contain CDO collateral.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

### *Subprime RMBS characteristics and performance*

- In our base case, we assumed a lognormal distribution of cumulative losses with a 10% mean and a 3% standard deviation.

- For stress scenarios, we increased the cumulative losses on subprime pools, keeping the standard deviation constant.

- We assumed that the "other" collateral held within the CDO does not generate losses (which, for mezzanine deals, may understate risk given the low average rating of the collateral.)

### *Limitations of, and conservative bias of, the model*

- We did not take into consideration the actual timing of CDO pool losses (from subprime RMBS or CDO collateral), instead making the conservative assumption that all cumulative losses occur on day one. This is likely to overstate actual CDO expected losses.

- We did not capture the possible benefit of positive (nor did we assume adverse) selection on the part of the guarantors, which could result in above average performance. Guarantors also use different definitions for subprime collateral, resulting in somewhat inconsistent reporting.

- Our model does not give benefit for actual triggers built into the deals (i.e. over-collateralization and interest coverage tests). The breach of such triggers when deals perform below expectations could lead to earlier amortization or other changes that benefit senior creditors, thereby improving actual performance relative to our modeled results.

- We applied the same loss distribution to all subprime collateral held within a CDO without regard to vintage. This is conservative in that some subprime collateral was originated in 2005 or earlier, which is likely to perform significantly better than implied by our assumptions.

## Current Subprime Performance Expectations Suggest Little or No Loss

Based on the modeling work described above, no guarantors would experience material increases in expected claims (defined as the average claims to the guarantors resulting from the stochastic simulation for the given subprime cumulative loss assumption) from a rating perspective given Moody's current cumulative loss expectations for 2006-vintage subprime mortgage pools. This result is generally consistent with the tone of public disclosure provided by the guarantors themselves, and is not unexpected given the senior nature of their exposure. We note, however, that our model does not specifically focus on the potential for CDO downgrades and the impact that such downward rating migration would have on the guarantors' current capital adequacy ratios. The table bellow shows the effect of our ABS CDO stresses on the capital profile of the guarantors, as captured by the reduction in hard capital ratios[9].

---

[9] Moody's hard capital ratio shows the relation between a guarantor's claims paying resources and its insurance portfolio's cumulative losses at the 99.9th percentile. A ratio of 1.0 times implies capital resources consistent with a Aaa probability level but Moody's overall expectation is a hard capital ratio of at least 1.3 times for a Aaa-rated guarantor to account for possible subsequent capital needs and prudent risk management.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs



### Further Subprime Deterioration Could Lead to Losses and Merits Close Study

If we increase the current 10% assumption for subprime RMBS cumulative expected losses to 12% or 14%, material increases in expected claims could develop for some guarantors. These stresses reveal the sensitivity of modeled expected losses to the underlying assumptions used, although it is important to note that many of our assumptions are quite conservative, making it premature to reach a definitive conclusion about the extent of the guarantors' exposure to further deterioration in subprime performance beyond Moody's current estimates.

The model results are particularly sensitive to the collateral type and rating distribution of the CDOs within the CDOs, which for most transactions has been modeled using standard assumptions, as per above. Based on an in-depth review of selected individual deals conducted at a more granular level, our standard assumptions in these areas appear to be conservative, although they allow us to highlight individual transactions requiring further analysis. Structural protections such as triggers (both for insured CDOs and for CDO collateral within insured CDOs) could also meaningfully improve the position of senior creditors, which we are not currently capturing in our model.

### Continuing Study and Ongoing Monitoring

Moody's will continue to refine its analysis of these portfolios, taking note of the sensitivity of the expected claim estimates to the character and composition of the collateral within CDOs of CDOs. We are also monitoring the underlying ratings of the transactions insured by the guarantors. So far, none of the insured risks have been downgraded by Moody's, although there have been tranches of subprime RMBS collateral held within insured CDOs, as well as junior tranches of certain insured CDOs, that have been downgraded, providing evidence of deterioration to date. Should Moody's increase its subprime cumulative loss expectations beyond current estimates or should the guarantors' insured deals suffer rating downgrades, we will evaluate the impact of such developments on the capital adequacy, and ultimately the ratings, of the guarantors and communicate our opinion to the market.

Financial Guarantors' Subprime Risks: From RMBS to ABS CDOs

*To order reprints of this report (100 copies minimum), please call 1.212.553.1658.*
Report Number: 104811

|  | **Production Associate** |
|---|---|
| Stanislas Rouyer | Petra Daley |

© Copyright 2007, Moody's Investors Service, Inc. and/or its licensors and affiliates including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings and financial reporting analysis observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,400,000. Moody's Corporation (MCO) and its wholly-owned credit rating agency subsidiary, Moody's Investors Service (MIS), also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually on Moody's website at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."



*Moody's Investors Service*

# EXHIBIT K



# The Journal of Structured Finance

Spring 2007    ( www.iijsf.com )    Volume 13, Number 1

# Legal Structure of Net Interest Margin Securities

KEITH L. KRASNEY

## McKee Nelson LLP

1919 M Street, NW
Suite 200
Washington, DC 20036
202.775.1880
202.775.8586

One Battery Park Plaza
34th Floor
New York, NY 10004
917.777.4200
917.777.4299

# Legal Structure of Net Interest Margin Securities

KEITH L. KRASNEY

ILLEGAL TO REPRINT AND DISTRIBUTE

KEITH L. KRASNEY
is a partner at McKee
Nelson LLP in New York,
NY.
kkrasney@mckeenelson.com

A Net Interest Margin Security ("NIM") is the securitization of excess cash flow from residential mortgage-backed securitizations ("RMBS") effected by the re-securitization of economic residual interests. This excess cash flow remains after the interest entitlements on the underlying deal have been satisfied, which includes the payment on the underlying securities, the payment of fees of the underlying trust, the funding of any reserve funds, the covering of current period losses and the building and maintenance of the required level of overcollateralization of the underlying trust. The first NIM was issued in 1994, and although NIM-type transactions involving auto loans and student loans have been offered in the past, today NIMs are commonly associated with RMBS, including securitized subprime loans, home equity loans, and Alt-A loans.

## UNDERLYING TRANSACTION

To successfully structure a NIM, one must understand the underlying RMBS securitization and construct the NIM based on the characteristics of the underlying transaction. Any risks that exist within that structure must be addressed within the NIM. Because a NIM involves the securitization of excess cash flow, the starting point of a NIM is to ensure that the structure of the underlying transaction provides an amount of cash flow that is not required by the underlying trust. Accordingly, a NIM is possible only where the underlying transaction involves economic residuals, such as in the common "overcollateralization" or "OC" structure. Generally, in an RMBS transaction where credit enhancement is provided by overcollateralization, the extent by which the aggregate mortgage pool balance exceeds the aggregate certificate balance defines the amount of overcollateralization. After the required overcollateralization amount is realized, and other required allocations of excess cash flow have also been satisfied, then excess cash flow is distributed to the holder of the residual interest. The other common form of RMBS transaction that uses a subordination and shifting interest structure does not result in substantial economic residuals and therefore is not able to accommodate a NIM. However, the most common form of RMBS involving overcollateralization does also have a subordination component, and does result in an economic residual interest.

Excess cash flow is derived primarily from interest on the mortgage loans. The underlying RMBS transaction uses interest from the underlying mortgage loans to pay interest on the RMBS certificates, servicing fees, amounts payable to derivative counterparties, any lender-paid mortgage insurance premium, any premium and reimbursements due to any bond insurer, any trustee fees, any

other fees and trust expenses, amounts necessary to build or maintain overcollateralization, and amounts required to absorb realized losses (these payments, other than certificate interest, are referred to as "Other Trust Interest Entitlements"). Through the mechanism of overcollateralization, if losses occur on the mortgage loans, there is a greater proportion of aggregate mortgage loan principal balance outstanding when compared to the outstanding principal balance of the underlying certificates. If losses were to occur, there is mortgage loan principal in excess of that required for payment of principal on the RMBS, so that if such losses do not exceed the amount of the excess, then those securities will not suffer any loss.

An additional feature of the underlying RMBS transaction that makes NIMs possible is in the nature of the underlying assets that can support an OC structure. Economically, in order for the OC structure to accomplish its goal, there must be excess cash flow, which means that the weighted average coupon of the mortgage loans must be sufficiently greater than the weighted average coupon of the underlying RMBS certificates plus the Other Trust Interest Entitlements. The mortgage loans underlying an OC structure will generate excess spread. This excess spread is allocated to pay principal on the underlying securities to the extent necessary to ensure that the excess of the aggregate mortgage pool principal balance over the aggregate certificate principal balance is equal to the required overcollateralization amount. Upon the occurrence of losses, if necessary, excess spread is applied to accelerate the payment of principal, thereby re-establishing the required level of overcollateralization.

Since excess cash flow is a function of interest payments on the mortgage loans, a decrease in interest collections will result in less excess cash flow. Prepayments, delinquencies, liquidation of loans, and charge-offs will result in less interest collections from the mortgage loans. If the underlying RMBS certificates bear interest at a floating rate, then adjustments in the level of the index may result in less cash flow being available if the mortgage loan does not similarly adjust at the same time. Prepayment interest shortfalls and shortfalls due to the application of the Servicemembers Civil Relief Act also will reduce the amount of excess cash flow.

It is common in today's market for the required level of overcollateralization to be established upon issuance of the underlying securities. When NIMs were first introduced, the customary structure involved little or no overcollateralization at initial issuance, with the overcollateralization building over time. Building overcollateralization over time results in a delay in the release of excess cash flow to the residual interest since it is captured to build overcollateralization to the required level and results in NIMs being issued later in the term of the underlying securities. Initial funding of overcollateralization at the required level permits NIMs to be issued simultaneously with the closing of the underlying RMBS transaction, since the residual interest will receive cash flow from the outset.

Another significant characteristic of today's underlying OC transactions that affects NIMs is the concept of "Stepdown Date." The Stepdown Date is the date on which the level of required overcollateralization will decrease (or "stepdown") to a pre-determined amount. Typically, the Stepdown Date is defined to occur on the earlier of (1) the date on which the principal balance of the senior certificates is reduced to zero and (2) the later of (a) a date specified at issuance of the underlying RMBS certificates and (b) the date on which the credit enhancement provided by overcollateralization and subordinate certificates to more senior certificates is equal to a specified amount. After the Stepdown Date, a comparatively greater amount of excess cash flow will be available to the residual interest and the associated NIM trust.

## BASIC NIM CHARACTERISTICS

### Issuer Organization

NIMs are issued either by a U.S. entity (typically a Delaware statutory trust) or a foreign entity (typically a Cayman Islands company). In either case, the issuer's activities are restricted to issuing the NIMs, holding the trust estate assets, and related activities. The NIM securities are debt, not equity, of the issuer. If the issuer is a U.S. entity, then only one tranche of notes may be issued. However, if the issuer is a Cayman Islands domiciled company, then multiple tranches are permitted. The residual interest in the NIM issuer is represented by owner trust certificates in the case of a U.S. issuer, and preference shares in the case of a Cayman Islands issuer. In both cases, a special purpose entity deposits the underlying RMBS certificates into the issuer and operates to preserve the bankruptcy remoteness of the transaction. A Cayman Islands issuer also issues ordinary shares that are held by a charitable organization in the Cayman Islands. The owner trust certificates and the preference

ILLEGAL TO REPRINT AND DISTRIBUTE

shares usually are transferred to the sponsor of the NIM as partial consideration for the transfer of the underlying RMBS certificates. The owner trust certificates or preference shares may be retained, or may themselves be offered to investors.

### Assets of the NIM

The trust estate of the NIM will consist of one or more underlying RMBS certificates, perhaps a derivative contract providing some degree of yield maintenance, and perhaps a note financial guaranty insurance policy issued by a monoline financial guaranty insurance company providing certainty of payment. RMBS certificates from one or more transactions can be included in a NIM. By including underlying certificates from more than one RMBS issuance, greater diversity is obtained, thereby potentially reducing the risk of non-payment or payment schedule irregularities, but such NIMs involving multiple underlying trusts also increase the complexity of modeling the cash flows. If the issuance of the NIM is occurring simultaneously with the closing of the underlying RMBS transaction, then the assets of the NIM trust estate will consist of only the underlying RMBS certificates of one transaction. While usually the RMBS certificates deposited into the NIM constitute 100% of the particular class, a certificate representing a smaller percentage can also constitute an asset of a NIM.

When NIMs were first issued, the assets consisted solely of certificates representing interests in the residual cash flow of the underlying transaction. Most current NIMs include a second type of underlying certificate, commonly designated as the Class P, which represents entitlement to receive prepayment charges or penalties paid in connection with prepayments on the underlying mortgage loans.

Yield on NIMs is particularly sensitive to prepayments on the underlying mortgage loans. Faster prepayment speeds may negatively affect NIM performance. Since mortgage loan interest accrues on a principal balance, prepayments, by decreasing the aggregate principal balance of the mortgage loans in the underlying transaction, reduce the amount of interest that would otherwise have accrued in the current and future periods and would have contributed to excess cash flow. In addition, because excess cash flow from the underlying transaction is used to pay principal on the NIM notes, increased levels of prepayments may extend the average life of the NIM

notes, while exposing the NIM to a longer period of possible losses on the mortgage loans. However, increased prepayments result in the underlying RMBS certificates paying down more quickly and may result in the occurrence of the Stepdown Date, releasing more excess cash flow to the NIM. To discourage prepayments and provide some order of call protection to the underlying RMBS trust, mortgage originators introduced prepayment penalties or charges.

Typically, the period during which a borrower is obligated to pay a prepayment penalty is the first two to three years after origination. The penalty is typically the amount of interest on the amount prepaid in excess of 20% of the outstanding principal balance of the mortgage loan. Prepayment penalties have been demonstrated to slow prepayments during the period of a mortgage loan in which they are effective. The penalties also act as a natural hedge, providing an additional source of cash flow at the point when excess cash flow has diminished as a result of prepayment. If a prepayment penalty class has been incorporated into the underlying RMBS transaction, this class will have the right to receive the prepayment penalties. Prepayment penalties are the only source of cash flow for the class P note holders. The inclusion of the class P certificate in a NIM provides a source of additional cash flow when the excess cash flow otherwise available has diminished as the result of mortgage loan prepayments.

Not all mortgage loans are originated with prepayment penalties, so when structuring a NIM it is important to determine whether the mortgage loans have penalties. Some mortgage loan sale and servicing agreements provide that a percentage of the penalty will be retained by the servicer as additional compensation. In such a case, if the servicer is also the sponsor of the underlying securitization, it will be possible to contribute 100% of the penalty to the RMBS transaction; however, absent economic motivation, the servicer has no reason to surrender its portion of the penalty to the transaction.

The inclusion of prepayment penalties in mortgage loans also is subject to federal and state consumer finance and predatory lending restrictions. As a consequence, the typical mortgage securitization contains a representation and warranty of the loan seller that the prepayment provision is enforceable under applicable law.

Typically, the servicer has been permitted to waive or modify the borrower's obligation to pay prepayment penalties as part of its usual servicing activities. Since

waiver or reduction will have a negative impact on the class P and the NIM, restrictions have been added to the obligations of the servicer of the mortgage loans. Current servicing agreements typically provide that the servicer is not permitted to waive any prepayment penalty unless i) its enforceability is limited by bankruptcy or insolvency laws, ii) the enforcement of the penalty is deemed illegal or any governmental agency has threatened action if the penalty is enforced, iii) the collectability of the penalty is limited because of the acceleration in connection with the foreclosure of the mortgage loan, or iv) the waiver is deemed standard in connection with a default or foreseeable default and the servicer views the waiver as maximizing recovery of total proceeds. If the servicer waives a penalty without meeting the standards described above, it will be obligated to pay out of its own funds the amount that otherwise would have been paid by the borrower as the prepayment penalty. It is possible to include in a NIM an obligation of the servicer's parent (if it has a higher rating than the servicer) to pay an amount equal to the waived prepayment penalty.

A yield maintenance agreement may be included as an asset of a NIM and that agreement may generally provide that the counterparty is obligated to make payments when LIBOR (a typical reference index) exceeds a specified amount. Many RMBS transactions are backed by hybrid adjustable-rate mortgage loans. If interest rates rise during the period which the underlying mortgage loans provide for a fixed rate of interest, the interest rate paid by the trust to holders of the RMBS certificates will rise and there will be less excess cash flow available to the NIM. Also, if rates decrease, an interest rate swap on the underlying RMBS transaction may cause the RMBS trust to be a net payer under the swap contract, thereby also reducing the amount of excess cash flow available to the NIM. The yield maintenance agreement for the NIM provides protection against a decrease in excess cash flow resulting from the total interest entitlement of the underlying RMBS consuming a greater amount of what would otherwise be excess cash flow, especially when the NIM notes pay a fixed rate of interest (as is usually the case).

A note financial guaranty insurance policy may be included in a NIM trust. This policy will guarantee payments on the NIM notes, similar to a financial guaranty policy in an RMBS transaction, and will allow the notes to obtain a higher rating. It is difficult to provide for a NIM insurance policy in the NIM transaction if the possibility

of one was not contemplated in the pooling and servicing agreement of the underlying RMBS. The NIM insurer will want control over certain issues, including i) the right to provide notices of master servicer defaults and the right to direct the termination of the rights and obligations of the master servicer under the pooling and servicing agreement in the event of a default by the master servicer, ii) the right to remove transaction participants, such as the trust administrator, the trustee, and the custodian under the pooling and servicing agreement, and iii) the right to direct the trustee or the trust administrator to make investigations and take action pursuant to the pooling and servicing agreement. In addition, absent a default by the NIM insurer, consent of the NIM insurer will be required for actions such as i) the removal or replacement of the master servicer, the trust administrator, or a custodian, ii) the appointment or termination of any servicer, subservicer, or co-trustee, or iii) any amendment to the pooling and servicing agreement. Many pooling and servicing agreements provide for the possibility of a NIM insurer even though a NIM is not then contemplated or there is no current expectation that an insurer will be part of the NIM transaction.

### Issuance of Notes

The notes will represent nonrecourse obligations of the issuer, secured by the trust estate pledged to an indenture trustee. The property of the trust estate will be the sole source of payments on the notes.

A typical structure for a Cayman Islands NIM is to issue three classes of notes in a sequential pay arrangement. The two senior classes will be rated investment grade and the third class will be non-investment grade. Interest will be paid first to the most senior class, then the next senior class, and then to the most junior class. Principal will be paid in the same order after the payment of interest to all classes. However, upon the occurrence of a downgrade in the ratings of either of the two most senior classes, the waterfall will shift to insure the senior classes are more likely to receive payments in full. After such event, the waterfall will be i) payment of interest to the senior-most class, ii) payment of interest to the next most senior class, iii) payment of principal to the most senior class of notes, iv) payment of principal to the next most senior class, v) payment of interest to the most junior class, and then vii) payment of principal to the most junior class.

ILLEGAL TO REPRINT AND DISTRIBUTE

ILLEGAL TO REPRINT AND DISTRIBUTE

The structure of a U.S. NIM will provide for the issuance of one class of notes. Issuance of multiple classes by a U.S. NIM would result in the characterization of the issuer as a taxable mortgage pool with resulting entity-level taxation.

As a general matter, interest on the underlying mortgage loans funds the excess cash flow stream. Because of the priority entitlement to that cash flow stream of the underlying RMBS transaction, and even though the transaction is modeled, it is not possible in current Cayman Islands or U.S. NIM structures to provide certainty as to the amounts and timing of funds that will be passed through to the NIM. Consequently, failure to pay interest and principal on the notes generally will not constitute an event of default until failure to pay on the specified final maturity date of the notes. However, to support the tax characterization of the notes as debt, it may be necessary to specify in the NIM transaction documents a number of missed interest payments that would constitute an event of default. Usually, that number is four to six. This means that after the specified number of interest payments is missed, an event of default would occur.

NIM transactions do not provide for optional termination of the NIM trust and early payment of the NIM notes.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

When structuring a NIM transaction, the participants should also consider the federal income tax consequences to the sponsor of the transaction. If the issuer in the NIM transaction is a domestic entity characterized as a trust or a disregarded entity for federal income tax purposes, the NIM notes generally are structured to be taxed as debt for tax purposes. In such a case, the NIM transaction will be treated as if the holder of the equity in the NIM issuer entered into a borrowing transaction, which does not result in any immediate tax consequences. For tax purposes, the equity holder would be treated as owning the collateral backing the NIM notes and as having issued the NIM notes. As a result, the holder of the equity in the issuer generally will be taxed on the income of the issuer when and as such income is earned, taking into account income on the collateral and deductions on the NIM notes, even though no distributions are being made to the equity holder at that time. In contrast, if the issuer in the NIM transaction is a foreign entity, the transfer of the collateral to the issuer may require the transferor to recognize gain (but not loss) upon such transfer. In addition, the holder of the equity in the foreign issuer generally will be taxed on income of the foreign issuer when and as such income is earned, even though no distributions are being made to the equity holder at that time. In some cases, however, the equity holder might not be able to use losses incurred by the foreign issuer. Finally, upon liquidation of the foreign issuer, the holder of the equity might be required to reduce its tax basis in its investment in the foreign issuer without being able to recognize the related loss, resulting in a permanent denial of a loss. Given these possible tax consequences, the sponsor of a NIM transaction should consider how the transaction will affect its own tax position.

## RISKS TO CONSIDER IN NIM TRANSACTIONS

### Prepayments and Default

The average life of NIM notes and the yields realized by holders of NIM notes is sensitive to levels of payments, including prepayments, on the mortgage loans. The yield to maturity will be affected by higher than expected rates of principal payments, including prepayments and distributions of unused amounts in any prefunding account, and collections upon defaults, liquidations and repurchases, and losses on the mortgage loans. Prepayment penalties may offset only part of the decreased yield associated with prepayments and will expire at the conclusion of the period specified in the related mortgage note.

### Loan Losses

Losses on the mortgage loans will decrease the yield on the NIM notes. Characteristics of mortgage loans and the related loan pool that may contribute to the incidence of losses include high loan-to-value ratios, loans made to riskier borrowers, adjustable-rate or hybrid adjustable-rate loans, interest-only loans and loans made according to alternative underwriting criteria, such as no-income verification or limited documentation mortgage loans.

### Underlying Trust

The factors that may decrease the amount of excess cash flow on the underlying transaction include the

necessity to build or maintain overcollateralization levels, prepayments, basis risk, possible payments to derivative counterparties, levels of fees that will be paid out of interest collections, losses, and interest payments to senior certificate-holders, among others. If the underlying transaction provides for a ceiling on the pass-through rate that is payable on a distribution date and such amounts are carried forward to be paid on future distribution dates, the payment in the future of those "carry forward" amounts will reduce the amount of excess cash flow available on those future distribution dates.

If the underlying trust has performance triggers that have not been satisfied, then less excess cash flow will be available. This is particularly the case if the underlying transaction utilizes a certificate financial guaranty insurance policy. Financial guarantors insist on performance triggers, and failure of the underlying transaction to satisfy these tests most likely will result in the postponement of the Stepdown Date or may even increase the amount of the required overcollateralization.

If the NIM involves seasoned collateral, losses and prepayments may have already occurred and may be affecting cash flow in a significant manner.

## CONCLUSION

NIM transactions offer sponsors of RMBS transactions a viable way to realize present value from economic residual interests. When structuring a NIM, one must be cognizant of the features of the underlying RMBS transaction, its risks, and the manner in which such risks can be addressed. In particular, the possibility of principal prepayments and losses on the mortgage loans must be accommodated, and the possibility of the NIM transaction itself occurring is best addressed at the time of structuring the underlying RMBS transaction.

*To order reprints of this article, please contact Dewey Palmieri at dpalmieri@iijournals.com or 212-224-3675*

Reprinted with permission from the Spring 2007 issue of *The Journal of Structured Finance*. Copyright 2007 by Institutional Investor Journals, Inc. All rights reserved. For more information call (212) 224-3066. Visit our website at www.iijournals.com.

ILLEGAL TO REPRINT AND DISTRIBUTE

EXHIBIT L



<HELP> for explanation.

Index **HP**

# CLOSE/PRICE

BBREMTG  BBG REIT MORTGAGE INDEX    PRICE 51.90                    Page  1 / 1

Range 8/ 2/07 to 8/ 9/07                                    HI   72.83  ON  8/ 2/07
            USD            Period D Daily                    AVE  68.74
                           Market M mid/trd                  LOW  65.58  ON  8/ 7/07

| DATE | PRICE | VOLUME | DATE | PRICE | VOLUME | DATE | PRICE | VOLUME |
|------|-------|--------|------|-------|--------|------|-------|--------|
| F | | | | | | | | |
| T 8/ 9 | 67.47 | 60.6MLN | | | | | | |
| W 8/ 8 | 68.97 | 85.1MLN | | | | | | |
| T 8/ 7 L | 65.58 | 130MLN | | | | | | |
| M 8/ 6 | 69.48 | 100MLN | | | | | | |
| | | | | | | | | |
| F 8/ 3 | 68.12 | 90.0MLN | | | | | | |
| T 8/ 2 H | 72.83 | 131MLN | | | | | | |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900            Singapore 65 6212 1000        U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                                       H188-668-0 29-May-2008 16:28:06

]
Screen saved as C:\Documents and Settings\blpus\My Documents\lumc historical pri

**Comp/CLOSE/PRICE**                                                    Equity**HP**

LUMINENT MORTGAGE CAPITA (LUMC    US)        PRICE .275                    Page 1/1

Range 8/ 2/07 to 8/ 9/07                                          $        DELAYED
USD

| | DATE | PRICE | VOLUME | DATE | PRICE | VOLUME | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|
| F | | | | | | | | | |
| T | 8/ 9 | L.850 | 4021400 | | | | | | |
| W | 8/ 8 | .950 | 12148400 | | | | | | |
| T | 8/ 7 | 1.080 | 32344200 | | | | | | |
| M | 8/ 6 | 4.3799 | 2065300 | | | | | | |
| | | | | | | | | | |
| F | 8/ 3 | 6.330 | 2524200 | | | | | | |
| T | 8/ 2 | H7.280 | 1598300 | | | | | | |

Period **D** Daily
Market **T** Trade

HI 7.280  U
AVE 3.4783
LOW .850

ON  8/ 2/07
VL  9116967
ON  8/ 9/07

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
H188-668-1 29-May-2008 16:46:57