Joseph J. Tabacco, Jr. (SBN 75484)
E-mail: jtabacco@bermanesq.com
Nicole Lavallee (SBN 165755)
E-mail: nlavallee@bermanesq.com
**BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, California 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Local Counsel*

Richard W. Cohen (admitted *pro hac vice*)
E-mail: rcohen@lowey.com
Barbara J. Hart (admitted *pro hac vice*)
E-mail: bhart@lowey.com
David C. Harrison (admitted *pro hac vice*)
E-mail: dharrison@lowey.com
**LOWEY DANNENBERG COHEN & HART, P.C.**
One North Broadway, Suite 509
White Plains, New York 10601-2310
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

*Lead Counsel for Plaintiff
and the Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LUMINENT MORTGAGE CAPITAL, INC. SECURITIES LITIGATION | C 07-04073 PJH |
| | **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS | |

1

## TABLE OF CONTENTS

2

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS

       A.     The Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     Luminent's Portfolio and Borrowing Arrangements . . . . . . . . . . . . . . . . . . . . . 5

       C.     Defendants' Continuing Campaign to Convince the
             Market that Luminent Was Uniquely Insulated from
             Problems Affecting Other Mortgage Investment Companies . . . . . . . . . . . . . . . 6

       D.     False and Misleading Statements During the Class Period . . . . . . . . . . . . . . . . . 7

       E.     Additional Facts and Contentions Derived
             From the Public Record, But Not Yet Pleaded . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       F.     Defendants' Deteriorating Financial
             Condition Is Finally Revealed on August 6, 2007 . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT

I.      THE COMPLAINT PLEADS WITH SPECIFICITY THAT
       DEFENDANTS MADE MATERIAL MISREPRESENTATIONS
       AND OMISSIONS OF MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.     THE COMPLAINT PLEADS FACTS FROM WHICH
       A STRONG INFERENCE OF SCIENTER CAN BE DRAWN

       A.     The Applicable Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       B.     The Facts Establish Defendants' Scienter With Particularity . . . . . . . . . . . . . . . 16

             1.     Depletion of Capital Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             2.     The Writedown of the MBS Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             3.     The July 2007 Margin Calls Are Sufficiently Identified . . . . . . . . . . . . . 19

             4.     Subprime and Residual Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

             5.     Temporal Proximity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       C.     Defendants' Pre-Class-Period Stock Purchases
             Are Irrelevant to Their Subsequent Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION . . . . . . . . . . . . 27

28

IV.     DEFENDANTS' STATEMENTS ARE NOT PROTECTED
        BY THE PSLRA'S SAFE HARBOR PROVISION

        A.     Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        B.     Safe Harbor Does Not Immunize Omissions of
               Fact And Statements That Are False When Made . . . . . . . . . . . . . . . . . . . . . . . . 33

        C.     The Misstatements Concerning Luminent's Ample
               Liquidity And Secure Dividend Are Not "Forward Looking" . . . . . . . . . . . . . . 33

        D.     Generic Cautionary Language Does Not Shield
               Risks That Have Already Materialized And
               Does Not Afford Defendants Safe Harbor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V.      DEFENDANTS' STATEMENTS OF OPTIMISM ARE ACTIONABLE . . . . . . . . . . 37

VI.     THE COMPLAINT ALLEGES CONTROL PERSON
        LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 215 (2d Cir. 2000) . . . . . . . . . . . . . . . . 30

4

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997) . . . . . . . . 30

5

*Castellano v. Young & Rubicam*, 257 F.3d 171, 188 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 31

6

*DeMarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110, 123-124 (S.D.N.Y. 2004) . . . . . . 31

7

*Dura Pharm. v. Broudo*, 544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

8

*Emergent Capital Inv. Mgmt. v. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003) . . . . . . . 32

9

*Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) . . . . . . . . . . . 25

10

*Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) . . . . . . . . . . . 30

12

*Ganino v. Citizen Utils.*, 228 F.3d 154, 162-63 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 24

13

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir.1998) . . . . . . . . . . . . . . 26

14

*Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 25

15

*Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . 38

16

*In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 961 (C.D. Cal. 2000) . . . . . . . . . . . . . . 37

17

*In re Adaptive Broadband Sec. Litig.*, C01-1092-SC, 2002 WL 989478,
(N.D. Cal. Apr. 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18

19

*In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . 35

*In re Clearly Canadian Secs. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) . . . . . . . . . . . 25

20

*In re Complete Mgmt, Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) . . . . . . . . . . . . 33

21

*In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 689 (E.D. Mich. 2004) . . . . . . . . . . . . . . 34

22

*In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . 23

23

*In re Copper Mt. Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . 35

24

*In re CV Therapeutics, Inc. Sec. Litig.*, No. 03-3709 SO, 2004 WL 1753251,
(N.D. Cal. Aug. 5, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 36

25

26

*In re DDi Corp. Sec. Litig.*, No. 03-7063 NM, 2005 WL 3090882,
(C.D. Cal. July 21, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

27

28

*In re HI/FN, Inc. Sec. Litig.*, No. 99-4531 SI, 2000 WL 33775286,
(N.D. Cal. Aug. 9, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Home Health Corp. of Am. Inc. Sec. Litig.*, No. Civ. A. 98-834, 1999 WL 79057,
(E.D. Pa. Jan. 29, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re IPO Sec. Litig.*, No. 21 MC 92 (SAS), 2008 WL 819762 (S.D.N.Y. Mar. 26, 2008) . . . . 25

*In re Leapfrog Enters. Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1040-41 (N.D. Cal. 2007) . . . . . 28

*In re Ligand Pharm., Inc. Sec. Litig.*, No. 04CV1620DMS(LSP), 2005 WL 2461151
(S.D. Cal. Sept. 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Metawave Communs. Corp. Sec.Litig.*, 298 F. Supp. 2d 1056
(W.D. Wash. 2003)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1296-97 (E.D. Wash. 2007) . . . . . . . . . 38

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) . . . . . . . . . 33

*In re Portal Software, Inc., Sec. Litig.*, No. 03-5138 VRW, 2005 WL 1910923,
(N.D. Cal. Aug. 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re ProNetLink Sec. Litig.*, 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . 31

*In re Prudential Sec. Inc. Ltd. Pshps. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) . . . . . . . . . 36

*In re Secure Computing Corp., Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) . . . . . 34

*In re SeeBeyond Tech Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) . . . . . 25

*In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1293 (D.N.M. 2002) . . . . 25

*In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267-68 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 23

*In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 878 & n.1 (E.D. Tenn. 2005) . . . 27

*In re U.S. Aggregates, Inc. Sec. Litig.*, No. C 01-1688 CW, 2003 WL 252138
(N.D. Cal. Jan. 24, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Verity, Inc. Sec. Litig.*, No. C99-5337CRB, 2000 WL 1175580
(N.D. Cal. Aug 11, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Lentell v. Merrill Lynch & Co.*,396 F.3d 161, 174 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 30, 31

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) . . . . . . . . . 32, 33, 35

*Marucci v. Overland Data, Inc.*, No. 97CV0833-TW (JFS), 1999 WL 1027053
(S.D. Cal. Aug. 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1    *Miller v. Thane International, Inc.*, 519 F.3d 879, 892 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . 24

2    *Miss. Pub. Emp. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75 (1st Cir. 2008) . . . . . . . . . . . . . . 23

3    *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys. Inc.*, 411 F. Supp. 2d 1172,
     (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

4
     *Powell v. Idacorp, Inc.*, Case No. CIV 04-249-S-EJL, Case No. 04-322-S-EJL, 2007 WL
5    1498881 (D. Idaho May 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

6    *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) . . . . . . . . . . . . . . . . 30

7    *Rubinstein v. Collins*, 20 F.3d 160, 170 n.41 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

8    *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) . . . . . . . . . . . . . . . 23

9    *South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (W.D. Wash. 2005) . . 32, 35, 37, 38

10   *Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11   *Tercica, Inc. v. Insmed, Inc.*, No. C 05-5027, 2006 WL 1626930 (N.D. Cal. June 9, 2006) . . . 27

12   *Verona Ptnrs. LLC v. Tenet Capital Ptnrs Convertible Opportunities Fund LP*,
     No. C-05 5369 PJH, 2006 WL 2669035, at *14 (N.D. Cal. Sep. 18, 2006) . . . . . . . . . . . . . . . 28
13
     *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
14

15   **Statutes**

16   15 U.S.C. § 78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

17
     Moody's Investors Service, "Financial Guarantors' Subprime Risks: From RMRS to ABA
18   CDOs," September 2007, at 4; Keith Krasney, "Legal Structure of Net Interest Margin
     Securities," The Journal of Structured Finance, Spring 2007, at 1. (*See* Pltf. RJN, Exs. J
19   and K.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2          Defendant Luminent Mortgage Capital, Inc. ("Luminent" or "Company") is a publicly-traded

3    real estate investment trust, which invests primarily in debt secured by mortgaged real estate.  In the

4    first half of 2007, values of subprime real estate debt in the United States plummeted, and the stock

5    prices of the public companies which acknowledged they had invested in subprime mortgages

6    plummeted accordingly.  But not Luminent's stock.  Luminent executives (collectively, "Individual

7    Defendants") kept its stock price up by touting its unique immunity from this nationwide "subprime

8    flu."

9          However, by late June 2007, Luminent had become infected with the same economic viruses

10   that were killing its competitors.  Between June 25, 2007 through August 6, 2007 ("Class Period"),

11   defendants concealed its rapidly worsening condition from investors.  Instead, they repeatedly

12   assured investors that Luminent remained insulated from the risks that were causing deterioration

13   of values of mortgage-backed investments held by other investment companies.

14         On June 27, 2007, Luminent declared in a press release that it would increase its quarterly

15   dividend, payable August 8, 2007, to $.32 per share (representing a 12.9% annual yield).  Luminent

16   boasted that it could afford to increase its dividend while its competitors were struggling:

17                    Our disciplined high quality investment strategy has allowed us to
                     increase our dividend to our shareholders by nearly 7% during a
18                    period of unprecedented turmoil in the mortgage industry.

19         What Luminent did not tell investors was that its available cash was diminishing so rapidly,

20   from the $60 million level it had reported at March 31, 2007 (it's last financial reporting date), that

21   Luminent was left with only $13 million by June 30, 2007, less than the amount necessary to pay the

22   dividend announced only three days earlier.  Nor did Luminent disclose that it had begun to

23   experience reversals in other financial indicators during the June 30, 2007 quarter, which had

24   ratcheted up its portfolio risk and virtually eliminated its oft-touted liquidity.

25         On July 23, 2007, Luminent's president, defendant S. Trezevant Moore, issued a public

26   newsletter reaffirming Luminent's unique immunity from the problems affecting other mortgage

27

28

1    investors and re-emphasizing its strong financial condition.  On July 30, 2007, Luminent reaffirmed

2    in a press release its "ample liquidity" and the safety of the $.32 quarterly dividend, which was

3    payable in nine days.

4        On August 6, 2007, the market learned for the first time that Luminent had misrepresented

5    its credit quality and the riskiness of its investments, that its liquidity had disappeared and the

6    dividend was a mirage.  Luminent's stock price plunged immediately, causing massive losses for

7    persons who invested in Luminent during the Class Period, from which the Company has never

8    recovered.[1]

9        The Consolidated Complaint ("Complaint" or "CC")[2] pleads detailed and cogent allegations

10   of fact, juxtaposing defendants' bullish public statements during the Class Period about Luminent's

11   uniquely low risk, high-quality investment portfolio, ample liquidity and safe dividend, with the

12   simultaneous deterioration of the value of Luminent's investments and dissipating liquidity.  The

13   Complaint further details amply how Luminent's principal officers responsible for its actionable

14   public statements, were "hands on" executives who knew, or disregarded with deliberate

15   recklessness, Luminent's deteriorating financial condition at all times relevant.

16       The Complaint's allegations stating fraud are derived primarily from Luminent's own public

17   filings and from pleadings in other civil litigation commenced by Luminent against its lenders.

18   Further, Lead Plaintiff's counsel's investigation, subsequent to filing the complaint, has uncovered

19   additional material facts supporting these allegations, which it would, if necessary or appropriate,

20   plead in a subsequent amended complaint.

---

21

22   [1]  In its Report on Form 10-Q for the period ended March 31, 2008 ("1Q 2008 10-Q"), Luminent
     announced to investors that its "liabilities exceed assets by more than $200 million, raising
23   substantial doubt about the Company's ability to continue."  *See* excerpt from Luminent's Form 10-
     Q for the quarterly period ended March 31, 2008 at 37, Lead Plaintiff's Request for Judicial Notice
24   ("Pltf. RJN"), Ex. A.

25   [2]  On November 21, 2007, the Court appointed Southern Improvement Company, VGA, Inc., and
     Allen Dayton (together, "Southern" or "Lead Plaintiff") as the Lead Plaintiff, and Southern's
26   counsel, now known as Lowey Dannenberg Cohen & Hart, P.C., as Lead Counsel.  On February 15,
     2008, Lead Plaintiff filed the Complaint on behalf of the putative class of purchasers of Luminent
27   stock and sellers of put options during the Class Period.  (CC ¶ 1.)

28   LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS
     THE CONSOLIDATED COMPLAINT [C 07-04073-PJH]
     2

1       In their motion to dismiss, Luminent and the Individual Defendants argue that they cannot

2    be held accountable to investors.  Their principal arguments, boiled down, are: (1) Luminent's

3    executives must have believed their bullish statements because they bought Luminent's stock, and

4    (2) "the Complaint alleges that Luminent and its top officers committed securities fraud simply

5    because they failed to predict the worldwide credit crisis and its negative effect on Luminent's

6    business."  (Def. Br. at 1-2.)

7       One fatal – and obvious – flaw in defendants' insider stock purchase argument is their factual

8    premise.  No defendant bought a single share of Luminent stock during the Class Period.  Their

9    purchases of Luminent stock all occurred <u>before</u> the Class Period.  To try to make these purchases

10   relevant, defendants aim their arguments principally at a straw man – statements made <u>before</u> the

11   Class Period, which appear in the Complaint primarily for historical context.[3]  However, Lead

12   Plaintiff's claims for relief depend upon defendants' misstatements and omissions made <u>during</u> the

13   Class Period.

14      Defendants' other principal argument, that the decline in Luminent's stock price was caused

15   by intervening market events which first arose in early August 2007, merely raises an issue of

16   material fact that cannot be resolved on a motion to dismiss.  Lead Plaintiff has pleaded facts in the

17   Complaint, (and could now plead significant additional facts in an amended complaint if necessary),

18   that demonstrate Luminent's statements during the Class Period that inflated its stock were

19   materially misleading when made.  When Luminent belatedly admitted it was infected with the same

20   mortgage debt problems from which it had so convincingly claimed immunity, its stock price

21   dropped almost 85% overnight, and people who had invested in Luminent during the Class Period

22   were instantly and severely damaged.

23

24

_____

25   [3] During the Class Period, Defendants did have a duty to update certain pre-Class Period statements,
     pleaded in the Complaint, which, in light of the Company's deteriorating financial condition and
26   bullish public statements made during the Class Period, had become materially misleading.  *See*
     Points II(B)(4) and V, *infra*.
27

28

1          Defendants also argue that all of their alleged misstatements were forward-looking statements

2     that are granted safe harbor under the Private Securities Law Reform Act (the "PSLRA"). However,

3     the safe harbor provisions do not apply to the material omissions of then-existing facts alleged in the

4     Complaint (and other historical facts discernable from Luminent's public filings which could be

5     pleaded in an amended complaint if necessary) which contradict Luminent's bullish statements

6     during the Class Period. Defendants' June 27, July 23 and July 30, 2007 statements were present-

7     tense statements that misled investors regarding the Company's then-current financial condition.

8          The motion to dismiss should be denied.

9                                   **STATEMENT OF FACTS**

10    **A.     The Individual Defendants**

11         During the Class Period, Luminent was a small public company, with only 32 employees,

12    five of whom were officers. (CC ¶ 19). The Company's three senior executives, Gail Seneca

13    ("Seneca"), S. Trezevant Moore ("Moore") and Christopher J. Zyda ("Zyda"), were intimately

14    involved in the Company's day-to-day operations, including the selection, allocation and

15    management of Luminent's mortgage-backed securities ("MBS") and loan portfolios.[4] (CC ¶¶ 14-

16    19.) The Individual Defendants made, participated in the issuance of, and/or signed Luminent's

17    public statements, including SEC filings, press releases and conference calls with the financial

18    community that form the basis of the claims asserted in the Complaint. (CC ¶¶ 19-20.) Moreover,

19    pursuant to the requirements of the Sarbanes-Oxley Act of 2002, the Individual Defendants were

20    responsible for the accuracy of the Company's SEC disclosures and the sufficiency of the

21    Company's internal controls. (CC ¶ 22.)

22

23    _____

24    [4] Defendant Seneca formed the Company in 2003 and served as Chairman of its Board of Directors
      until she resigned in August 2007, and as Chief Executive Officer ("CEO") until May 2007.
25    Defendant Moore served as the Company's President and Chief Operating Officer ("COO") from
      March 2005 through May 10, 2007, and thereafter replaced Seneca as CEO until his resignation in
26    May 2008. Moore also served as a director since November 2005. Defendant Zyda served from
      August 2003 as the Company's Chief Financial Officer ("CFO") and Senior Vice President until he
      resigned as of year-end 2007. (CC ¶¶ 14-18.)

27

28

**B.    Luminent's Portfolio and Borrowing Arrangements**

Luminent's investments in MBS and mortgage loans had three primary components: (1) the Credit-Sensitive Securities Portfolio, which is comprised of private-issuer MBS with credit ratings below "AAA" from Standard & Poor's (or the equivalent rating of "Aaa" from Moody's Investment Services)[5]; (2) the Mortgage Loan Portfolio, which was comprised of Alt-A residential mortgage loans initially purchased from certain mortgage lenders under short-term financing agreements and then pooled as collateral for new MBS which were marketed to investors as non-recourse to Luminent (a process known as securitization)[6]; and (3) the government securities Spread Portfolio, which consisted of MBS issued by U.S. agencies (*e.g.*, Fannie Mae) and privately issued AAA-rated MBS.[7]  (CC ¶¶ 30-39.)

The primary source of funds used to finance the Company's MBS was short-term (typically, 30-day) repurchase agreements.  Under the repurchase agreements, the Company "sold" MBS to a lender and simultaneously agreed to repurchase collateral 30 days later at a price equal to the purchase price plus interest.  (CC ¶ 41.)  If the lender determined that the value of the MBS had declined before the repayment date, it could issue a margin call.  Luminent was then obligated to either provide more cash or securities or to repurchase the original collateral.  If the Company had insufficient liquidity to satisfy a margin call, the lender could declare a default, seize the collateral

---

[5]  A credit rating of AAA represents the highest levels of safety with respect to the timely payment of principal and interest.  (CC ¶ 36.)  At the other end of the risk spectrum were non-investment-grade securities with ratings below BBB-, which are speculative investments.  As of year-end 2006, Luminent's Credit-Sensitive Securities Portfolio was worth $800 million and increased to approximately $1 billion by the end of the first quarter of 2007.  (CC ¶¶ 36, 39.)

[6]  Alt-A loans are designed for borrowers who provide less than full documentation to verify income.  Alt-A loans are considered less risky than subprime loans, but of lower credit quality than fully documented prime loans.  As of year-end 2006, Luminent's Residential Mortgage Loan Portfolio was valued at approximately $5.6 billion, of which $3.9 billion was secured by nonrecourse MBS.  (CC ¶¶ 34, 35, 38.)

[7]  Luminent sought to profit on the interest-rate spread between the Company's borrowing costs and the returns paid by these securities.  Luminent used leveraged borrowing to increase the returns on its investments.  As of year-end 2006, the Spread Portfolio was valued at $2.1 billion.  (CC ¶¶ 30-33.)

---

1    and sell it to pay off the margin call.  (CC ¶¶ 42-43.)

2         Luminent's repurchase agreements financed $2.9 billion in MBS as of year-end 2006.  (CC

3    ¶ 43.)  The Company also had (1) more than $1 billion in available financing under short-term

4    repurchase agreements, known as "warehouse facilities," to acquire mortgage loans and

5    (2) approximately $600 million in short-term asset-backed commercial paper borrowings, which also

6    funded the MBS portfolio.  (CC ¶¶ 46-47, 50.)  Thus, Luminent's short-term collaterized debt

7    exceeded $4.0 billion.

8    **C.    Defendants' Continuing Campaign to Convince the**
     **Market that Luminent Was Uniquely Insulated from**
9    **Problems Affecting Other Mortgage Investment Companies**

10         Throughout 2007, the Company aggressively distinguished itself from other mortgage

11   investment companies which had been adversely affected by the collapse in value of U.S. subprime

12   debt which began in late 2006 and accelerated in early 2007.[8]

13         Defendants "set the table" in the months immediately preceding the Class Period,

14   representing that in the Company's Quarterly Report on Form 10-Q for the period ended March 31,

15   2007, (the "1Q2007 Form 10-Q") and in the Company's May 10, 2007 press release announcing first

16   quarter results: (1) "[o]ur mortgage loan portfolio has virtually no exposure to the subprime sector

17   which is currently generating high delinquencies"; (2) [w]e own no subprime loans; (3) "[w]e

18   maintain ample liquidity to manage our business"; and (4) "we experienced no liquidity strains

19   during the recent market turmoil."  (CC ¶¶ 64, 67, Ex. 4 to Defendants' Request for Judicial Notice

20   ("Defs. RJN").)

21         The May 10, 2007 press release emphasized Luminent's "strong capital position and modest

22   leverage," featuring "cash and unencumbered assets [*i.e.*, unpledged MBS] . . . in excess of $200

23   million" at March 31, 2007 (CC ¶¶ 65), and predicted that "As the market struggles, our investment

24   opportunities increase" (CC ¶ 63); and "our dividend will remain strong."  (CC ¶ 62.)

25   _____

26   [8]  Defendants cite to an online database compiled by *The Wall Street Journal* which identified more
     than 40 subprime mortgage companies which, from November 2006 through March 31, 2007, either
27   closed, were sold, or filed for bankruptcy.  *See* Def. Br. at 9, n.9.

28

1    Luminent also held a conference call with the financial community on May 10, 2007 during

2    which defendant Moore represented that the "well-publicized trouble in the subprime market did not

3    spread to our high quality prime loan portfolio."  (CC ¶¶ 71-72.)

4    **D.    Luminent's False and Misleading Statements During the Class Period**

5        The Class Period begins on June 25, 2007 with the publication by *Barron's* of an analyst's

6    favorable recommendation, based upon misleading information provided by Luminent to Arnie

7    Schneider.  Schneider, the founder and Chief Investment Officer of Schneider Capital Management,

8    stated in *Barron's* that Luminent's "portfolio is showing significantly better credit performance than

9    portfolios with similar metrics."  (CC ¶¶ 98-99.)

10       Two days later, on June 27, 2007, the Company announced that it would increase its dividend

11   to $0.32 per share for the second quarter of 2007, payable August 8, 2007.  In the June 27 Release,

12   defendant Moore identified "[o]ur disciplined high quality investment strategy" as the reason

13   Luminent could increase its dividend while its competitors were going under in this "period of

14   unprecedented turmoil in the mortgage industry."  (CC ¶ 101.)  Moore also said Luminent had

15   "ample liquidity" and that "we expect that our new, higher, dividend will be easily sustainable in the

16   near future."  (CC ¶¶ 100-101.)

17       On July 23, 2007, Luminent's president, defendant S. Trezevant Moore, issued a public

18   newsletter titled "Pharos" in which he repeated prior claims of Luminent's unique immunity from

19   the problems of other mortgage investment companies and emphasized its strong financial condition.

20   (CC ¶¶ 105-107.)  On July 30, 2007, Luminent reaffirmed in a press release its "ample liquidity" and

21   the safety of the $.32 quarterly dividend, which was payable in nine days.  (CC ¶¶ 108-109.)

22       These statements regarding the Company's financial condition were materially false and

23   misleading.  By late June 2007, Luminent had begun to experience the same problems that had sunk

24   its competitors.  First, defendants did not disclose to investors that its available cash position had

25   deteriorated from approximately $60 million at March 31, 2007 to approximately $13 million by

26   June 30, 2007, a level inadequate to pay the newly-announced dividend.  This was the natural

27

28
                                             7

1  consequence of other undisclosed negative financial trends that Luminent had begun to experience

2  by the beginning of the Class Period and which continued to accelerate.  Margin calls were no longer

3  potential risks, but rather events that were currently and negatively impacting the Company's

4  liquidity during the Class Period.  Defendants have now admitted that Luminent was forced to sell

5  MBS in order to satisfy margin calls under repurchase agreements during the Class Period.  For

6  example, defendants disclosed in a November 19, 2007 presentation to the financial community

7  (which was attached to a Form 8-K filed the same day):

8          Asset Sales/Financing Arrangements

9          July/August [2007]    Sold mortgage-backed securities with
   amortized cost of approximately $1.9 billion

10                                              at a loss of approximately $114 million.

11  (CC ¶ 111.)[9]

12        Other examples abound.  For instance, based upon the pleadings in other actions between

13  Luminent and its creditors, the Complaint alleges that Luminent financed eight bonds through HSBC

14  between May 7 and 11, 2007 which were backed by subprime mortgages, plus a NIM (residual) bond

15  on July 27, 2007, with a collective value of $39 million.  On July 10, 2007, HSBC issued a margin

16  call to Luminent in the sum of $500,224.42, which was satisfied on July 11.  On August 3, 2007,

17  HSBC issued a margin call to Luminent in the sum of $1,612,000, which was also satisfied that same

18  day.  On August 3 and August 6, 2007, HSBC again issued margin calls to Luminent as the HSBC

19  Bonds continued to decline in market value.  When Luminent failed to satisfy these margin calls,

20  HSBC declared an "event of default" and sold the HSBC Bonds at distressed prices.  (CC ¶¶ 92-93,

21  114-18.)

22        The Complaint also alleges that in June 2007, the Company entered into $94 million of high

23  risk repurchase agreements with Barclays to finance Luminent's purchase of MBS.  By August 2,

24  _____

25  [9]  Similarly, Luminent represented in its Report on Form 10-Q for the period ended June 30, 2007 (the "2Q2007 Form 10-Q"), which was belatedly filed on September 26, 2007: "Between July 1, 2007 and August 31, 2007, the Company and our repo lenders have liquidated mortgage-backed

26  securities with an amortized cost of $1.9 billion subject to repurchase agreements" to satisfy margin calls and repay them.  (2Q2007 Form 10-Q at 8, Defs. RJN, Ex. 11.)

27

28

1    2007, the value of those MBS had fallen so substantially that Barclay's made $35 million of margin

2    calls under the repo agreements, money Luminent no longer had due to its consistently deteriorating

3    liquidity position throughout the Class Period.  (CC ¶¶ 115-17.)

4         Defendants failed to disclose that Luminent's MBS portfolio had experienced $14.1 million

5    of losses between March 31, 2007 and June 30, 2007.[10]  (CC ¶ 103.)

6         Defendants further failed to disclose Luminent's exposure to higher risks arising from

7    millions of dollars of high-risk subprime debt investments and MBS residual interests the Company

8    had purchased during the Class Period, including $26 million of MBS residual interests purchased

9    from Merrill Lynch.[11]  (CC ¶¶ 90-91, 94-96.)

10   **E.    Additional Facts and Contentions Derived**
     **From The Public Record, But Not Yet Pleaded**

11

12        Since the filing of the Complaint, Lead Counsel has discovered additional material facts in

13   support of its claims for relief.  For example, the Company recently disclosed and quantified its

14   subprime exposure at about $140 million as of year end 2007 in its Form 10-K filed March 28, 2008.

15   (*See* Excerpt from 2007 Form 10-K, at 36; Pltf. RJN, Ex. B.)  Luminent's actual subprime exposure

16   during the Class Period was in fact greater than the $140 million, because the Company admits in

17   the 2007 Form 10-K that the $140 million was net of writedowns and sales of subprime debt, which

18   occurred during the second half of 2007.  *Id.*

19        The Company's undisclosed subprime exposure was an omission of fact material to the risk

20   of investing in Luminent during the Class Period because, by late June and July 2007, the prices of

21

22

---

23   [10]  Defendants correctly note that the writedown was $14.1 million rather than the $14.4 million
     referenced in the Complaint (Def. Br. at 19, n.23), but they cite to the wrong document – the correct

24   document is Luminent's Form 10-Q for the June 2007 quarter, Defs. RJN, Ex. 11 at 11, not the
     March 2007 Form 10-Q.

25
     [11]  Defendants also failed to correct or update their representations in the May 10 Conference Call

26   regarding the Company's subprime and MBS residual exposure.  (CC ¶¶ 7, 76, 89.)  *See* Point
     II(B)(4), *infra*.

27

---

28

even the highest-rated investment-grade subprime paper had dropped significantly.[12]  On July 17, 2007, the prices for all classes of MBS dropped precipitously after trading down from the end of June, as reflected in the ABX indices that track these bonds.[13]  Price charts reflecting this major price decline are shown below.[14]







The July 17, 2007 edition of *The Wall Street Journal* (Pltf. RJN, Ex. E) reported:

> It isn't just the closely watched BBB-minus tranche of the ABX index that is suffering under growing subprime concerns.  Andrew Lahde, managing partner of Lahde Capital Management, a hedge fund in Santa Monica, Calif., pointed out that the A tranche is trading at about 70 cents on the dollar, compared with 90 cents on the dollar just a month ago.  Mr. Lahde has positioned for declines in the index.  "I think people are betting on a bloodbath," Mr. Lahde said, adding that he is surprised the higher tranches are "coming unglued" already.

---

[12]  The prices of the Alt-A loans were also weakening during the Class Period.  (CC ¶¶ 80-85).

[13]  The ABX index measures the credit risk of select subprime loans originated in the prior six-month period.  The ABX has five separate indices based on the rating of the underlying subprime securities, ranging from "AAA" to "BBB-."  For example, ABX index HE-AAA-07-1 tracks AAA-rated home loans underwritten in the second half of 2006, while ABX index HE-AAA 06-2 tracks AAA loans originated in the first half of 2006.  *See* Wang, Grace, CNN Money.com, "Behind Wall Street's Subprime Fear Index," Pltf. RJN, Ex. C.

[14]  *See* Exhibit D to Pltf. RJN.  It is proper for the Court to take judicial notice of this market index information which was utilized by defendants.  *See* Luminent's July 30, 2007 Press Release, Defs. RJN, Ex. 8.  *See also In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1217-18 (E.D. Wash. 2005) (judicial notice of Dow Jones Utility Average) (collecting cases); *Ravens v. Iftikar*, 174 F.R.D. 651, 661 (N.D. Cal. 1997) (judicial notice of NASDAQ composite index).

---

1  Thus, the same market concerns cited by defendants (CC ¶ 123) that led to the collapse of the

2  commercial paper market had already impacted the market for MBS during the Class Period.

3      Second, plaintiff recently learned facts indicating the $26 million Merrill Lynch investment

4  was subject to a margin call during the Class Period.[15]  In April 2007, Luminent reviewed this

5  investment, which had deteriorating performance. (*See ML* Complaint, ¶¶ 69, 99, Pltf. RJN, Ex. F.)

6  In a letter dated September 21, 2007 from Luminent's counsel, Sean F. O'Shea, to Merrill Lynch,

7  recently filed as an exhibit in the Merrill Lynch action, Mr. O'Shea recounts that representatives of

8  Luminent and Merrill Lynch discussed its investment performance at a meeting in New York.  Mr.

9  O'Shea further states that "**[i]n recent months**, Merrill has demanded $8 million in margin payments

10  from Luminent to cover a perceived shortfall in the value of the Merrill Certificates." (Emphasis

11  added.)  (*See* Pltf. RJN, Ex. G.)  Luminent's counsel's reference in September 2007 to the $8.0

12  million margin call that had occurred "in recent months" is a strong indication that the margin call

13  occurred before August 6, 2007.  The fair inference at this pre-discovery stage of this action is that

14  "recent months" includes all or part of the Class Period.

15      In light of these other factual developments, defendants' admission that, by the end of June

16  2007, the Company's capital position (comprised of cash and unpledged MBS) had fallen to less than

17  40% of the approximately $260 million in available capital held at the end of March 2007, takes on

18  great significance and is contrary to defendants' statements regarding Luminent's "ample liquidity."

19  As disclosed in Luminent's August 6, 2007 Press Release, as well as in the 2Q2007 Form 10-Q, the

20  Company's cash position had declined from $60 million at the end of March 2007 to approximately

21  $13 million by the end of June 2007, even after accounting for the proceeds from the convertible

22

23

---

24  [15]  After the Class Period, Luminent commenced litigation against three of its lenders alleging excessive margin calls.  *See Luminent Mortgage Capital, Inc. v. HSBC Securities (USA), Inc.*, No.

25  07 Civ. 9340 (S.D.N.Y.) (filed October 18, 2007) ("*HSBC*"); *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co., Inc.*, No. 07-Civ. 5423 (E.D. Pa.) (filed December 24, 2007) ("*ML*"); *Luminent*

26  *Mortgage Capital, Inc. v. Barclays Capital, Inc.*, 07 Civ. 10275 (S.D.N.Y.) (filed November 12, 2007) ("*Barclays*") (*see also* Pltf. RJN, Exs. F, H and I).

27

---

28  LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS THE CONSOLIDATED COMPLAINT [C 07-04073-PJH]

1  notes completed offering three weeks earlier referenced in the Company's June 27, 2007 release.[16]

2  (*See* Defs. RJN, Exs. 9, 11.) Thus, on June 30, 2007, the amount of Luminent's available cash was

3  less than the $13.76 million needed to pay the second-quarter dividend it had announced only three

4  days earlier.

5      Moreover, the amount of unpledged MBS had declined from $200 million at the end of the

6  March 2007 quarter to only $84 million by the end of the June 2007 quarter. (*Id.*) In total, Luminent

7  converted more than $160 million of liquid assets into pledged MBS and loans on a leveraged basis.

8  This depleted its liquidity and increased its exposure to the downward price movements in MBS

9  generally.[17]

10  **F.    Defendants' Deteriorating Financial
        Condition Is Finally Revealed on August 6, 2007**

11

12      On Friday, August 3, 2007, word apparently began to leak about Luminent's problems, and

13  its stock price dropped 13%, from $7.28 on August 2 to $6.33. (CC ¶¶ 9, 122.) Prior to the opening

14  of trading on Monday August 6, 2007, J. P. Morgan issued a report questioning the Company's

15  repeated claims that it had "ample liquidity." (CC ¶ 121.) The report stated that the "bid for non-

16  agency assets [*i.e.*, the Credit Sensitive and Mortgage Loan Portfolios] has continued to dry up,

17  causing large value declines, and banks have been increasingly vigilant of lent capital. As a result,

18  further deterioration could put liquidity at risk." (CC ¶ 121.)

19  _____

20  [16] While Luminent's August 6, 2007 press release and the 2Q2007 Form 10-Q were cited at length in the Complaint (¶ 123), and defendants have requested that the Court take judicial notice of these

21  documents, the information in the release regarding the reduction in the Company's capital position was not specifically alleged. In the event that the Court finds that the Complaint is deficient in this

22  respect, plaintiff requests leave to add this information from the August 6 release (and other information which is now in the public domain).

23

24  [17] Several adverse trends also contributed to the Company's liquidity pressures. These included (1) the amount of residential loans more than 90 days delinquent more than doubled, from $33.9 million

25  at December 31, 2006 to $84.6 million at June 30, 2007; (2) the Company's "net interest spread" (the difference between the average yield on income-producing assets and the average financing costs)

26  had declined by 8.2%, from 1.33% for March 2007 to 1.12% for June 2007, and dropped 35% from the 1.72% net interest spread for the same period in 2006 (2Q Form 10-Q at 13, 30; 1Q Form 10-Q

27  at 31, Defs. RJN, Exs. 4, 11)

28

On this negative news, the price of Luminent shares fell 30 percent in early morning trading to $4.38 on heavy volume. Trading was halted at 10:19 a.m. pending an announcement from Luminent, and did not resume that day. After the market closed, Luminent shocked the market by announcing it had suspended its dividend due to a full scale liquidity crisis. (CC ¶ 123.) The Company reported that it was "simultaneously experiencing a significant increase in margin calls [even] on its highest quality assets" and lenders had tightened their terms for financing MBS. The Company also reported that it had extended the term of its $168 million in outstanding commercial paper by 110 days. *Id.* Luminent also reported an increasing number of margin calls issued by HSBC, Barclays, and other lenders, which impacted $1.9 billion in MBS under repurchase agreements. If those margin calls remained unsatisfied, the lenders were entitled to sell off MBS securing the loans at distressed prices.

Analysts' reactions were swift and negative in recognition that the market had been misled by the Company's July 30 assurances:

<u>Deutsche Bank:</u>   "Just seven days after confirming its 2Q dividend and 'ample' liquidity, Luminent suspended the payment of its 2Q dividend as it faces margin calls and decreased advance rates. The significant and sudden market deterioration will likely force Luminent to sell assets to meet margin calls." (CC ¶ 124.)

<u>UBS:</u>   Luminent "did an about-face today and suspended its dividend and . . . management may be unable to restore investor and lender confidence anyway, after recently claiming to have 'ample liquidity to manage its business.'" (CC ¶ 125.)

<u>Associated Press:</u>   "Banks that finance investors are pulling the plug . . . Luminent said last week it was not really subject to the risk. A week later, Luminent issued a news release some analysts said spells the company's demise." (CC ¶ 8.)

Moreover, in another report on August 7, 2007, J. P. Morgan reported that Luminent had been on the wrong end of accelerating margin calls at least as early as July 30, 2007. The report stated: "It is clear that the drastic spread widening in mortgages, especially high grade bonds, caused significant margin call activity over the course of the last five trading days." (CC ¶ 127.)

1    On August 7, 2007, as a direct result of these disclosures by Luminent and the analysts,

2    Luminent's share price fell 75%, from $4.38 to $1.08, on extraordinary trading volume of 32 million

3    shares, and fell another 12% to $0.95 on August 8 on extraordinary volume of 12 million shares.

4    (CC ¶¶ 129-30.)

5    In light of its crisis, during July and August 2007, Luminent sold $1.9 billion in MBS and

6    $1.0 billion in mortgage loans to pay off its obligations, reporting initial losses of $114 million and

7    $39 million, respectively.  (CC ¶ 119, 2Q2007 Form 10-Q at 23.)[18]

8    **ARGUMENT**

9    **I.    THE COMPLAINT PLEADS WITH SPECIFICITY THAT
        DEFENDANTS MADE MATERIAL MISREPRESENTATIONS**

10   **AND OMISSIONS OF MATERIAL FACT**

11   The elements of a 10b-5 claim in the Ninth Circuit are well settled: (1) a misrepresentation

12   or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and (5) damages.  *See In re*

13   *Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  Here, the well-pled allegations set

14   forth each of these elements.

15   First, the Complaint identifies the alleged misrepresentations made during the Class Period

16   regarding Luminent's ample liquidity, the safety of its increased dividend, and the quality of its MBS

17   portfolio.  (CC ¶¶ 99, 101, 107-09.)  Next, the Complaint alleges the omission of adverse facts

18   relating to Luminent's MBS write-down, margin calls, and exposure to subprime debt and MBS

19   residual interests, that rendered their representations materially false and misleading.[19]  Defendants

20   are alleged to have known or deliberately disregarded these adverse facts, which were derived from

21   their own admissions in their public filings.  (CC ¶¶ 111-20.)  Luminent's supposed immunity from

22   the risks that were plaguing other mortgage investment companies and its supposed ample liquidity

23

24   [18]  Post-Complaint, the Company has further clarified that it recorded a $44.5 million loss from its
     sale of subprime investments as of March 31, 2008.  (1Q 2008 10-Q, Pltf. RJN, Ex. A at p. 37.)

25

26   [19]  Plaintiff also claims that the 60% reduction in Luminent's capital from the end of March 2007
     quarter to the end of June 2007 quarter was a material omission that undermined defendants'
     assertion that Luminent had ample liquidity.  See Statement of Facts, Section E.

27

28

1    that enabled it to increase its dividend in such an economic environment were the factors that most

2    distinguished it (and its stock price) from those companies.

3         Defendants' omissions were unquestionably material. Materiality is established where there

4    is a "substantial likelihood that the disclosure of the omitted facts would have been viewed by the

5    reasonable investor as having significantly altered the 'total mix' of information made available."

6    *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Both materiality and causation were

7    demonstrated when Luminent's stock lost 85% of its value instantly when the truth emerged that it

8    was not any safer than other subprime mortgage investment companies. (CC ¶¶ 9, 122, 129-30.) *See*

9    *In re Daou Sys., Sec. Litig.*, 411 F.3d at 1026.

10        Defendants do not dispute plaintiff has sufficiently alleged that Plaintiff purchased Luminent

11   stock and has been damaged (CC ¶ 13); or that Luminent traded on an open and efficient market and

12   therefore the fraud-on-the-market doctrine as pled adequately alleges reliance (CC ¶ 136).

13        Defendants only argue that (1) the Complaint fails to plead the existence of adverse facts

14   during the Class Period with the specificity needed to show that defendants' representations were

15   materially false and misleading, (2) the Complaint fails to plead that the alleged fraud caused the

16   investors' losses rather than intervening market events, and (3) that the misstatements were forward-

17   looking statements protected by the safe harbor provisions of the PSRLA. Each of defendants'

18   arguments is addressed below.

19   **II.    THE COMPLAINT PLEADS FACTS FROM WHICH A
          STRONG INFERENCE OF SCIENTER CAN BE DRAWN**

20

21        **A.    The Applicable Standards**

22        In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007), the Supreme

23   Court provided two key principles to guide courts in evaluating the elements of scienter. First, the

     Court rejected a piecemeal analysis and held that "the appropriate inquiry . . . is whether *all* of the

24
     facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

25
     allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in

26
     original) (citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)).

27

28

1    Second, *Tellabs* held the "[t]he inference that the defendant acted with scienter need *not* be

2    irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"

3    127 S. Ct. at 2510 (emphasis added, citation omitted).  Rather, a complaint should be sustained if,

4    as here, considering the allegations as true and taken collectively, a reasonable person would

5    consider the inference of scienter cogent and "at least as compelling as any opposing inference one

6    could draw from the facts alleged."  *Id*. at 2510.

7    ### B.    The Facts Establish Defendants' Scienter With Particularity

8    The Complaint pleads undisclosed facts which collectively undermined defendants'

9    representations that Luminent had ample liquidity to operate its business during the unprecedented

10   turmoil in the mortgage industry, and that its dividend was secure and would not be cancelled.[20]

11   These omissions include the writedown of the company's MBS portfolio, its exposure to risky

12   subprime and residual MBS interests, and millions of dollars in margin calls resulting from the rapid

13   decline in value of Luminent's MBS portfolio.

14   While defendants argue that the Complaint fails to allege these facts with specificity,

15   construing defendants' admissions and other factual indicia collectively, and crediting the more

16   likely inferences to be drawn therefrom, support a strong inference of scienter.  *See, e.g., Oracle*, 380

17   F.3d at 1226, 1232-33 (post-class-period admissions support scienter); *In re Juniper Networks Inc.*

18   *Sec. Litig.*, 542 F. Supp. 2d 1037, 1048 (N.D. Cal. 2008) (same).  Defendants have not proffered

19   credible opposing inferences that are more compelling and, thus, their motion should be denied.  *See*,

20   *e.g.*, *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 711 (7th Cir. 2008).  *See* Points II(B)(2)

21   through II(B)(4), *infra*.

---

[20]  Defendants are also liable for the alleged misrepresentation made on June 25, 2007 by a securities
analyst, Arnie Schneider, based upon information they supplied, that Luminent's portfolio was
showing significantly better credit performance than portfolios with similar metrics. (CC ¶¶ 98-99.)
A defendant can be held liable for false or misleading statements made by an analyst if the defendant
provides the analyst with false or misleading information with the intent that the analyst will
communicate that information to the market.  *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997).
Where, as here, statements in analysts' reports (or, in this case, an interview) originated from the
defendants, "the statements may be held to be actionable even if they are not exact quotes."  *Nursing
Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004).

---

1                          **1.   Depletion of Capital Position**

2           Lead Plaintiff has also uncovered additional material facts supporting their scienter

3    allegations.[21]   For example, in its August 6, 2007 press release, Luminent first announced its

4    financial results for the June 2007 quarter, which showed that Luminent's capital position was 63%

5    lower than the $260 million reported for the March 2007 quarter – which defendants had repeatedly

6    held up as the barometer of Luminent's strong liquidity.  (CC ¶¶ 53, 65, 68, 73.)  (*See* Defs. RJN,

7    Ex. 8.)  Not only that, Luminent failed to tell investors that the Company's cash position had

8    diminished from the $60 million reported as of March 31, 2007, to only $13 million by June 30,

9    2007, less than the amount necessary to pay the dividend announced on June 27, 2007.[22]

10          While defendants argue that they did not have an independent legal duty to disclose these

11   facts before the August 6 release of the June results, under the time-honored "disclose or abstain"

12   principle,  defendants were obligated to disclose adverse facts once they chose to affirmatively

13   publish their bullish statements.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992);

14   *In re RasterOps Corp. Sec. Litig.*, No. C 92-20349, 1993 WL 476661, at *13 (N.D. Cal. Aug. 13,

15   1993) ("[T]his case does not present the issue of whether there is an abstract duty to disclose

16   . . . [Rather,] defendants were under a duty to disclose any material facts in order to make the

17   statements not false and misleading") (citation omitted).

18          Defendants' obligation not to mislead was particularly compelling given the significant

19   downturn in market conditions since the Company's May 10 statements which reported Luminent's

20   capital position at more than two and one-half times higher than it was at June 30, 2007.  (CC ¶ 65,

21   68, 73.)  Defendants took their deception to the extreme during the Class Period, when they

22   announced on June 27, and subsequently reaffirmed on July 30, that Luminent would increase its

23   dividend to a level which appeared safe and sustainable when viewed against its latest published

24

25   [21]  As noted above, plaintiff is prepared to file an amended complaint to plead these additional facts.

26   [22]  In addition, defendants first disclosed the $14.1 million MBS writedown in the August 6, 2007
     release.

27

1  financial statements (March 31, 2007). However, it was not until after the close of the class period

2  that investors could learn that by June 30, 2007, Luminent's liquidity had dissipated so badly that

3  it lacked the cash to pay the dividend.

4       These facts support a strong inference that defendants knowingly concealed this dramatic

5  reduction of its liquid assets from investors. The Individual Defendants actively managed the MBS

6  portfolio, and were obviously aware of the amount of MBS that was unencumbered and the available

7  cash at the end of June and July 2007. Indeed, in regard to much larger organizations, courts have

8  found defendants were knowledgeable about matters such as those at issue here. *See Oracle*, 380

9  F.3d at 1234 (scienter established where top officers are aware of the state of the Company's

10  financial health and are involved in all aspects of the business); *No. 84 Employer-Teamster Joint*

11  *Council Pension Trust Fund v. America West Hldg.*, 320 F.3d 920, 943 n. 21 (9th Cir. 2003) (notion

12  that a major company issue did not come to the attention of management was "patently incredible"

13  and "absurd"); *In re PeopleSoft, Inc. Sec. Litig.*, No. C99-00472 WHA, 2000 WL 1737936, at *3

14  (N.D. Cal. May 25, 2000) (courts have held that "facts critical to a business's core operations or an

15  important transaction generally are so apparent that their knowledge may be attributed to the

16  company and its key officers").

17            **2.    The Writedown of the MBS Portfolio**

18       Defendants contend (Def. Br. at 20) that the alleged MBS writedown cannot support scienter

19  because "Plaintiff has alleged absolutely no facts from which a reasonable jury could conclude that

20  Luminent made or recognized the need to make this particular write-down [prior to the September

21  24, 2007 filing of the 2Q 2007 Form 10-Q], let alone before August 7 [2007]." However,

22  defendants' admissions in the 2Q 2007 Form 10-Q and the July 30 Release (Defs. RJN, Exs. 8 and

23  11) support plaintiff's claim that the charge occurred <u>before</u> the end of the June quarter.

24       First, the 2Q Form 10-Q (at 11) provides that MBS are evaluated "for other than temporary

25  impairment on a quarterly basis, and more frequently when conditions warrant such evaluation."

26  Here, the acknowledged ongoing deterioration in market conditions supports the strong inference

27

28

1  that the impairment occurred by the end of June 2007, if not sooner, and certainly during the Class

2  Period. The precise dates when these conditions were known to defendants presents an issue of fact

3  which cannot be resolved on a motion to dismiss.

4      Second, the 2Q Form 10-Q (at 11 and 21) states that certain MBS which were downgraded

5  by the rating agencies after June 30, 2007 were already identified by the Company as having higher-

6  than-expected delinquencies and losses, and "impairment charges were recognized in the statement

7  of operations *prior* to June 30, 2007" (emphasis added). Third, the 2Q Form 10-Q (at 3) reports total

8  impairment losses of $18.7 million. The report explains that, of this amount, $4.6 million initially

9  had been treated as "temporarily" impaired as of June 30, 2007. However, after the quarter closed,

10  that amount was reclassified. The fact that Luminent went out of its way to distinguish the $4.6

11  million reclassified amount, from the $14.1 million impairment charge, supports the conclusion that

12  the initial $14.1 million impairment was taken by June 30 if not sooner. Such timing would have

13  complied with Luminent's stated impairment review procedures, and was then followed by the

14  supplemental $4.6 million impairment charge taken after the quarter closed.

15      Finally, the Company's July 30 Release states that "[d]uring the quarter ended June 30, 2007,

16  the strong performance of Luminent's credit hedges more than offset . . . certain impairment charges

17  related to its credit-sensitive [MBS] assets" (CC ¶ 109 (emphasis added)).

18      In any event, as long as the writedown was taken at any time before defendants' July 30,

19  2007, announcement, defendants were obligated to disclose it. Failure to disclose the writedown

20  rendered their Class Period statements false and misleading.

21          **3.      The July 2007 Margin Calls Are Sufficiently Identified**

22      Defendants contend that the Complaint lacks specificity as to the undisclosed margin calls.

23  However, defendants' admit in the 2Q2007 Form 10-Q and the November 19, 2007 Presentation,

24  that "between July 1, 2007 and August 31, 2007, the Company and our repo lenders have liquidated

25  mortgage-backed securities with an amortized cost of approximately $1.9 billion at a loss of

26

27

28

1   approximately $114.1 million to repay approximately $1.8 billion of repurchase obligations."[23]  At

2   the pleading stage, this admission of ongoing MBS liquidations in order to satisfy margin calls that

3   began in July 2007 is sufficient to support a strong inference of the falsity of defendants'

4   representations regarding ample liquidity.

5          Defendants' claim that the "generality of that time frame renders Plaintiff's allegations

6   meaningless."  The most likely inference to be derived from defendants' admission is that margin

7   calls followed by MBS sales occurred in July and continued through August 2007.  *See Daou*, 411

8   F.3d at 1020 (pleading approximate amount by which revenues were overstated, and some dates of

9   the related transactions is sufficient).  This conclusion is consistent with the substantial wholesale

10  decline in MBS prices in July 2007.  If the margin calls had occurred only in August, as defendants

11  now urge, then why did they repeatedly state that these problems happened in July?

12         Where, as here, defendants' own statements indicate that the problems occurred during the

13  Class Period and quantify the total amount at stake, the fact that the Complaint did not list the dates

14  and amounts of each margin call on $1.9 billion MBS is not fatal.  The allegations clearly show that

15  undisclosed margin calls occurred at least in part during the Class Period.

16         Defendants also contend that the Complaint only identifies one margin call by HSBC prior

17  to the market disruption in August 2007, and that this is insufficient to show that defendants'

18  statements about liquidity were false and misleading.  This argument fails on the law and the facts.

19  "Even if the plaintiffs can only allege one incident of fictitious billing, if that one incident was

20  enough to make their statements false, the description of the fraud satisfies both Rule 9(b) and the

21  PSLRA, 15 U.S.C. § 78u-4(b)(1)."  *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 948

22  (N.D. Ill. 2002), *see also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) (just

23  one fact properly pled can be "a sufficient basis upon which to form" the belief that a false statement

24  was made with the proper state of mind).

25

26  [23]  2Q 2007 Form 10-Q, Defs. RJN, Ex. 11, at 23.  *See also* CC ¶ 111, November 19, 2007
    Presentation, Defs. RJN, Ex. 12.

27

28

When considered collectively with the other undisclosed facts and defendants' admissions, the HSBC margin call supports an inference of falsity. For example, defendants acknowledge that Barclays issued margins calls beginning August 2, 2007 totaling more than $35 million, but ignore the additional allegations, derived from the *Barclays* Complaint, that Luminent previously was required to post additional securities as collateral and that the securities were still serving as collateral in early August 2007. (CC ¶ 115-17; *Barclays* complaint ¶ 21, Ex. G to Pltf. RJN.) The purpose of posting additional collateral, as Luminent admits in its SEC filings, is to satisfy a margin call when the value of the MBS serving as collateral declines. *See* 2Q 2007 10-Q at 23 ("The Company settled its obligations of approximately $186.8 million with one repo lender by transferring ownership of securities"). Although the date and amount of additional collateral was not specified, the allegations support the conclusion that Barclays issued margin calls before August 2, 2007. *See, e.g., Cooper*, 137 F.3d at 627 (plaintiffs are not required to identify each specific transaction which may be fraudulent).[24]

Information recently uncovered by plaintiff also indicates the Company's Merrill Lynch investment resulted in a $8 million margin call prior to August 2007. As set forth in a letter dated September 21, 2007 from Luminent's counsel, Sean F. O'Shea, to counsel for Merrill Lynch, which was recently filed in the Merrill Lynch action: "In recent months, Merrill has demanded $8 million in margin payments from Luminent to cover a perceived shortfall in the value of the Merrill Certificates." (*See* Pltf. RJN, Ex. G.) The only fair reading of Luminent's counsel's reference to the $8.0 million margin call that had occurred "in recent months" is that it occurred before August 2007.

The three margin calls that are subject to litigation are likely just the tip of the iceberg, given that other margin calls were simply paid rather than litigated. Accordingly, when considered

---

[24] *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) ("Although pleading securities fraud after the PSLRA can no longer be described as merely 'notice pleading,' courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws"); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) ("'A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage'") (citations omitted).

---

1   collectively with the other factors, these facts support that defendants knew, or were deliberately

2   reckless, in making bullish representations about the Company's liquidity.

3                   **4.    Subprime and Residual Exposure**

4           Defendants' failure to disclose the Company's exposure to at least $140 million in subprime

5   debt (as of year-end 2007),[25] plus $49 million in residual interests in MBS, also made Luminent's

6   disclosures materially misleading, given the high price volatility of those investments during the

7   Class Period. (CC ¶ 91.) *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,

8   No. 05 Civ. 1898 (SAS), 2005 WL 2148919, at *12 (S.D.N.Y. Sept. 6, 2005) (failure to disclose

9   high-risk volatile loans material).

10          As revealed in three separate litigations brought by Luminent involving purportedly excessive

11  margin calls by lenders under repurchase agreements, the Company's residual exposure included

12  (1) $26 million of MBS from Merrill Lynch, which comprised the three most junior and most risky

13  of 14 classes of MBS certificates sold by Merrill Lynch, representing the last and next to last in line

14  for payment, and a third certificate that only made payments from the proceeds of prepayment

15  penalties paid by borrowers who paid off their mortgages (CC ¶¶ 95-96); (2) a $14 million NIM

16  bond financed through HSBC Securities (CC ¶¶ 94, 111-14)[26]; and (3) a $9.0 million bond called

17  Fremont NIM Trust 2006-B, financed through Barclays Capital (CC ¶¶ 115-17; *see also* Pltf. RJN,

18  Exs. F, G, and I).

19          Defendants also had an independent duty to update the May 10 statements concerning the

20  quality of the Company's Credit Sensitive Portfolio. "There can be no doubt that a duty exists to

21  _____

22  [25] The Company's subprime exposure was recently acknowledged in Luminent's 2007 Form 10-K.
    *See* Section E, *supra*.

23  [26] A "NIM Bond," or net interest margin bond, is funded by residual interests in MBS. Holders
    receive excess cash flow derived from mortgage payments after payment are made to all other
24  investors, fees and reserve funds have been paid, and all losses absorbed. As a result of the bond's
    payment priority at the lowest rung, its performance can deteriorate sharply during adverse market
25  conditions. *See* Moody's Investors Service, "Financial Guarantors' Subprime Risks: From RMRS
    to ABA CDOs," September 2007, at 4; Keith Krasney, "Legal Structure of Net Interest Margin
26  Securities," THE JOURNAL OF STRUCTURED FINANCE, Spring 2007, at 1. (*See* Pltf. RJN, Exs. J and
    K.)

27

28  _____

1    correct prior statements, if the prior statements were true when made but misleading if left

2    unrevised." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 316 (3d Cir. 1997). "While a company need

3    not reveal every piece of information that affects anything said before, it must disclose facts, 'if any,

4    that are needed so that what was revealed [before] would now be so incomplete as to mislead.'"

5    *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 76, 85 (1st Cir. 2008)

6    (citation omitted).

7        "[T]he disclosure required by the securities laws is measured not by literal truth, but by the

8    ability of the material to accurately inform rather than mislead prospective buyers." *In re

9    Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Here, the Complaint alleges that

10   Moore emphasized the high quality of the $1 billion Credit Sensitive MBS Portfolio by representing

11   that (1) there was no "noninvestment-grade subprime exposure," and (2) "we held virtually no

12   residuals." (CC ¶¶ 71-72.) However, by the start of the Class Period in late June 2007, market

13   conditions had started to deteriorate significantly, and even the prices of investment-grade subprime

14   debt began to decline significantly. *See* Pltf. RJN, Ex. D. In light of defendants' earlier statements,

15   they could not remain silent, because their subprime exposure carried an increased and undisclosed

16   level of risk. Although the Ninth Circuit has yet to address this issue, the Third Circuit has been

17   joined by the First, Second, Fifth, and Eleventh Circuits in establishing a duty to update. *Miss. Pub.

18   Emp. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75 (1st Cir. 2008); *In re Time Warner, Inc. Sec. Litig.*,

19   9 F.3d 259, 267-68 (2d Cir. 1993); *Rubinstein v. Collins*, 20 F.3d 160, 170 n.41 (5th Cir. 1994);

20   *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986). District Courts in the

21   Ninth Circuit have also recognized that a duty to update exists. *E.g., In re Verity, Inc. Sec. Litig.*,

22   No. C99-5337CRB, 2000 WL 1175580, at *5 (N.D. Cal. Aug 11, 2000). Defendants were obligated

23   to disclose the Company's substantial subprime exposure in excess of $140 million plus its $49

24   million in residual interests because their earlier statements were misleading if left uncorrected.

25       Contrary to defendants' contention, Luminent's $189 million in subprime and residual

26   exposure was material. It represented nearly 19% of the $1 billion Credit Sensitive MBS Portfolio

27

28

1  and almost 5% of the Company's $4.0 billion in short-term debt financing that was subject to

2  liquidity risk.  It is a question of fact whether the disclosure of an additional $189 million in

3  subprime debt and residual interests would have likely altered the total mix of information available

4  to investors when assessing the Company's statements touting the quality of its Credit Sensitive

5  MBS Portfolio.[27]  *See Miller v. Thane International, Inc.,* 519 F.3d 879, 892 (9th Cir. 2008); *Fecht*

6  *v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995).

7          Moreover, assuming arguendo, that one could view $189 million as not a material quantity,

8  qualitative factors, such as the market's aversion to all subprime paper during the Class Period, "may

9  cause misstatements of quantitatively small amounts to be material."  *Ganino v. Citizen Utils*., 228

10  F.3d 154, 162-63 (2d Cir. 2000) (quoting SEC Staff Accounting Bulletin No. 99, 17 C.F.R. pt. 211,

11  subpt. B).  Questions of materiality concerning fraud should not be decided quantitatively based on

12  a bright-line cutoff.  *See Basic Inc. v. Levinson*, 485 U.S. at 236, n.14 (rejecting bright-line test); *In*

13  *re Home Health Corp. of Am. Inc. Sec. Litig.*, No. Civ. A. 98-834, 1999 WL 79057, at *6-7 (E.D.

14  Pa. Jan. 29, 1999) (declining to hold immaterial as a matter of law failure to report loss of a *de*

15  *minimis* percentage of total revenue where qualitative factor rendered the loss significant).

16  Moreover, the materiality of defendants' misrepresentations is self evident from the market's

17  precipitous reaction to the corrective disclosures.

18              **5.    Temporal Proximity**

19          Finally, when considered with other factors, the temporal proximity between Luminent's

20  assurances on July 30, 2007 and the loss of liquidity and cancellation of the Company's dividend on

21  August 6, support a strong inference of scienter.  *See Cooper*, 137 F.3d at 626 ("This shortness of

22  time is circumstantial evidence that the optimistic statements were false when made"); *Fecht*, 70

23  F.3d at 1084 (same); *Mississippi Public Employees*, 523 F.3d at 91 ("The extremely short time

---

24

25  [27]  The Supreme Court has rejected the use of a strict numerical formula or bright-line test for
    materiality, urged by defendants, stating that "[a]ny approach that designates a single fact or
    occurrence as always determinative of an inherently fact-specific finding such as materiality, must

26  necessarily be overinclusive and underinclusive."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 236 n.14
    (1988).

27

28  Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss
    the Consolidated Complaint [C 07-04073-PJH]

1  period is strong evidence").[28]  Common sense informs us that the indicia were present, the facts were

2  known, or deliberately, recklessly ignored.

3    **C.    Defendants' Pre-Class-Period Stock Purchases**
         **Are Irrelevant to Their Subsequent Fraud**

4

5          Defendants' main argument against scienter is that the Individual Defendants' purchases of

   Luminent stock demonstrate their good faith in making the alleged misstatements.  This argument

6
   is a red herring that must be rejected out of hand because it is based on the incorrect premise that
7
   their purchases of stock were contemporaneous with their alleged misstatements.  In fact, defendants
8
   did not buy a single Luminent share during the Class Period.  As such, their own cases recognize the
9
   common-sense notion that a defendant cannot establish its innocence based on trading that occurred
10
   before the fraud began:
11
              As the class period defines the time during which defendants' fraud
12            was allegedly alive in the market, statements made or <u>insider trading</u>
              <u>allegedly occurring before or after the purported class period are</u>
13            <u>irrelevant to plaintiffs' fraud claims</u>.

14  *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1293 (D.N.M. 2002) (emphasis

15  added) (quoting *In re Clearly Canadian Secs. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995)).

16          Indeed, the more likely inference that can be drawn from defendants' purchases prior to the

17  Class Period is that they were motivated to inflate the stock price in order to maintain or increase the

18  value of defendants' holdings at the time the Company's business was deteriorating.  *See In re IPO*

19  *Sec. Litig.*, No. 21 MC 92 (SAS), 2008 WL 819762, at *9 (S.D.N.Y. Mar. 26, 2008) (collectively,

20  the "holdings of individual officers are therefore relevant to the question of scienter").[29]

21

22
   _____
23  [28]  In the event that the Court finds that the current allegations fail to satisfy the PSLRA's pleadings
   requirements, leave to amend is requested to cure any deficiencies.  *See*, *e.g.*, *Eminence Capital,*
   *L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).
24
   [29]  Some Courts have even found that an acquisition of stock can evidence scienter.  *Holmes v.*
25  *Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001).  *Compare In re SeeBeyond Tech Corp. Sec.*
   *Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (allegations support a strong inference that
26  defendants acted with deliberate or conscious recklessness despite fact that certain defendants
   purchased stock during the class period).
27

28

1    Defendants also make much of the fact that the Complaint does not include allegations of

2    insider trading.  (Def. Br. at 2, 17.)  However, Section 16(b) of the Exchange Acts precludes

3    corporate insiders from making short-swing profits from transactions in the corporation's stock.[30]

4    "The statute requires disgorgement to the company of any profit derived from the matching of any

5    purchase and any sale of an 'equity security' . . . within a six-month period by a statutory insider,

6    irrespective of intent or whether overall trading during that six months (i.e., all sales and purchases

7    combined) resulted in a loss."  *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d

8    Cir.1998).  For the statute to apply, it is not necessary to show any actual misuse of inside

9    information or of any unlawful intent.

10    Here, during the vast majority of the Class Period, Luminent's stock price traded higher than

11    the prices paid by defendants in connection with their stock purchases from April 11, 2007 through

12    June 21, 2007.  Accordingly, defendants could not have sold Luminent shares without subjecting

13    themselves to liability under Section 16(b).

14    In any event, it is well established in the Ninth Circuit that "[t]he PSLRA neither prohibits

15    nor endorses the pleading of insider trading as evidence of scienter."  *Daou Systems*, 411 F.3d at

16    1022.  Rather, "scienter can be established even if the officers who made the misleading statements

17    did not sell stock during the class period."  *Am. West*, 320 F.3d at 944 (citing *Hanon*, 976 F.2d at

18    507).  Where, as here, the complaint alleges knowing or reckless conduct, "it makes no difference

19    that there were no stock sales."  *In re Adaptive Broadband Sec. Litig.*, C01-1092-SC, 2002 WL

20    989478, at *16 (N.D. Cal. Apr. 2, 2002).  *Accord, In re U.S. Aggregates, Inc. Sec. Litig.*, No. C 01-

21

22    [30]  Section 16(b) provides; in relevant part:

          For the purpose of preventing the unfair use of information which
          may have been obtained by such ... officer by reason of his
23        relationship to the issuer, any profit realized by him from any
          purchase and sale, or any sale and purchase, of any equity security of
24        such issuer ... within any period of less than six months ... shall inure
          to and be recoverable by the issuer, irrespective of any intention on
25        the part of such ... officer in entering into such transaction of holding
          the security purchased or of not repurchasing the security sold for a
26        period exceeding six months.

    15 U.S.C. § 78p(b).

27

28

1  1688 CW, 2003 WL 252138 (N.D. Cal. Jan. 24, 2003) (lack of insider selling does not weigh against

2  a strong inference of scienter).

3      Finally, consideration of defendants' prior stock purchases is improper on a motion to

4  dismiss because those facts that fall outside the confines of the complaint are irrelevant to plaintiff's

5  theory of establishing scienter. *Tellabs* instructs the Court to draw plausible opposing inferences

6  "from the facts alleged," 127 S.Ct. at 2510, not from new facts introduced by defendants. Courts

7  in this District and elsewhere have refused on relevancy grounds to consider Forms 3 and 4 filed by

8  company executives. *See Tercica, Inc. v. Insmed, Inc.*, No. C 05-5027, 2006 WL 1626930, at *10

9  (N.D. Cal. June 9, 2006); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 878 & n.1

10  (E.D. Tenn. 2005).

11      In sum, the fact that defendants offer no credible competing inferences to plaintiff's

12  allegations demonstrates that plaintiff has pleaded a sufficiently cogent inference of scienter.

13  **III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION**

14      The Complaint alleges that the price of Luminent's stock fell dramatically when investors

15  learned from analysts and the Company that, contrary to Luminent's repeated representations, the

16  Company faced severe liquidity problems and was not insulated from the volatile and chaotic

17  subprime mortgage meltdown. Specifically, defendants disclosed on August 6, 2007 that (1) the

18  Company had suspended its dividend; (2) its liquidity had dried up due to increasing margin calls

19  that extended to its higher-quality MBS and an inability to secure short-term financing; and (3) the

20  write down of its MBS portfolio by $14.1 million, and the reduction of its cash position to $13

21  million, as of June 30, 2007, which was less than the amount needed to pay the second-quarter 2007

22  dividend. (*See* CC ¶ 123; *see also* Defs. RJN, Ex. 9.)

23      Securities analysts did not hesitate to express their displeasure. For example, in its August

24  7, 2007 report, J. P. Morgan observed that "the drastic spread widening in mortgages, especially

25  high-grade bonds, caused significant margin activity over the course of the last five trading days."

26  (CC ¶ 127.) Similarly, a UBS analyst questioned defendants' credibility, stating that "management

27

28

1   may be unable to restore investor and lender confidence anyway, after recently claiming to have

2   'ample liquidity to manage its business.'" (CC ¶ 125.) Other analysts expressed similar sentiments.

3   (CC ¶¶ 8, 124, 126-27.)

4        In response to these adverse disclosures exposing Luminent's true financial condition, the

5   price of Luminent stock plunged from $6.33 on the morning of August 6, 2007 to close at $0.95 on

6   August 8, 2007, on extraordinarily heavy volume. (CC ¶¶ 121, 129-30.) This represents a two-day

7   loss in value of 85%.

8        These allegations, which are mainly ignored by defendants, easily satisfy the element of loss

9   causation under *Dura Pharm. v. Broudo*, 544 U.S. 336 (2005). As the Ninth Circuit has held, all a

10  plaintiff need do is provide defendants with "some indication that the drop in stock was causally

11  related to defendants' false statement and omissions." *Daou*, 411 F.3d at 1026 (quoting *Dura*, 544

12  U.S. at 347). The loss causation requirement is "not meant to impose a great burden upon a

13  plaintiff" and simply requires a plaintiff to provide a short and plain statement in accordance with

14  Fed. R. Civ. P. 8(a)(2) setting forth the relevant loss and "what the causal connection might be

15  between plaintiff's loss and defendant's misconduct." *Dura*, 544 U.S. at 347.[31] Nothing more is

16  required at the pleading stage.[32]

17       Defendants argue that unforeseen market developments in early August, rather than

18  disclosures of Luminent's misstatements, caused plaintiff's losses. In support, they proffer several

19

20  [31] *See, e.g., Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys. Inc.*, 411 F. Supp. 2d
    1172, 1177 (N.D. Cal. 2005); *In re Juniper Networks Sec. Litig.*, 542 F. Supp. 2d at 104.

21

22  [32] The cases cited by defendants are not applicable to these facts, because in those cases, the alleged
    omissions remained concealed at the time of the adverse disclosures, and therefore could not have

23  contributed to the price drop as a matter of law. *See, e.g., Verona Ptnrs. LLC v. Tenet Capital Ptnrs
    Convertible Opportunities Fund LP*, No. C-05 5369 PJH, 2006 WL 2669035, at *14 (N.D. Cal. Sep.

24  18, 2006) (Hamilton, J.) ("no facts showing a connection between the decline in value [due to the
    Fund's poor performance] . . . and the claimed omission [failure to timely issue a report providing

25  net asset value]"); *Powell v. Idacorp, Inc.*, Case No. CIV 04-249-S-EJL, Case No. 04-322-S-EJL,
    2007 WL 1498881, at *4 (D. Idaho May 21, 2007) (alleged misstatements "remained concealed from

26  the public"); *In re Leapfrog Enters. Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1040-41 (N.D. Cal. 2007)
    (undisclosed adverse impact of competitive product unrelated to reduced financial projections which

27  caused stock drop).

28

1  articles not referenced in the Complaint which they claim discuss the sudden and unprecedented

2  disappearance of credit that adversely impacted companies worldwide. (*See* Defs. RJN, Exs. 17-22.)

3  If, as defendants contend, "Luminent fell prey to the same unexpected and unprecedented credit

4  crisis that drove hundreds of similar companies into bankruptcy," (Def. Br. at 3-4), it necessarily

5  follows that these companies would have sustained relatively similar declines in market value

6  following the events in early August 2007.  However, a comparison of the relative percentage price

7  drops between Luminent and similar companies included in the Bloomberg Mortgage REIT Index

8  reveals that the REIT Index and Luminent did not decline in sync from August 3 through August 9,

9  2007.  While the REIT Index lost a modest 8% of its value, Luminent stock plunged more than

10  85%.[33]

11



20

21      The huge disparity in percentage losses sustained by Luminent and the REIT Index refutes

22  defendants' contention that Luminent's demise was attributable exclusively to market forces.  The

23  fact that Luminent dropped so far as compared to the REIT Index indicates that other factors unique

24  to Luminent, such as disclosure of the fraud, acted independently of market forces and had a far

25  greater impact on investor losses.

26  ────────────

[33] *See* Pltf. RJN, Ex. L.

27

28
Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss the Consolidated Complaint [C 07-04073-PJH]

29

1    Defendants also contend that the Complaint supports the alternative conclusion that investor

2  losses were due to the unprecedented market developments in early August rather than the disclosure

3  of defendants' misrepresentations.  However, the Ninth Circuit has held that a plaintiff is not

4  required to show that a misrepresentation was the sole reason for the investment's decline in value

5  in order to establish loss causation.  "As long as the misrepresentation is one substantial cause of the

6  investment's decline in value, other contributing forces will not bar recovery under the loss causation

7  requirement."  *Daou*, 411 F.3d at 1025 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447

8  n.5 (11th Cir. 1997)).  Nor is a plaintiff required to rule out other possible explanations for a price

9  drop.  "Whether the alleged omissions and misstatements actually were the cause-in-fact of the

10 [decline in] price . . . raises an issue of fact and, as such, is a question properly reserved for a motion

11 for summary judgment or for the trier of fact."  *Immune*, 375 F. Supp. 2d at 1025.

12    Thus, the Complaint should not be dismissed even if plaintiff's allegations could be read to

13 infer that investor losses were due in part to market developments.  *Caremark, Inc. v. Coram*

14 *Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997) (plaintiff's allegation is not "negated by its

15 having mentioned in the complaint other causes that could have contributed to the fall in value of

16 the notes").  It is for the jury to decide the extent to which the stock price decline was due to the

17 specific disclosure of the fraud at Luminent or to unrelated market events.[34]

18    Defendants rely upon the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*,396

19 F.3d 161, 174 (2d Cir. 2005), in support of their contention that where "plaintiff's loss coincides

20 with a market wide phenomenon causing comparable losses to other investors, the prospect that the

21 plaintiff's loss was caused by the fraud decreases."  (Def. Br. at 23.)  But the Second Circuit has

22 emphasized that it "did not intend to bar a plaintiff from successfully pleading 'proximate cause

23 when the claim follows a market collapse.'"  *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202,

24

25 [34] Defendants' claim that plaintiff cannot recover as a matter of law for any declines in Luminent's stock price prior to the release of the "corrective disclosure" on August 6, 2007 is premature at best. (Def. Br. at 22.)  *See Immune*, 375 F. Supp. 2d at 1025.  This is particularly true given plaintiff's
26 allegations showing that the facts about the MBS writedown started to leak out by July 30, 2007. (CC ¶ 109.)

27

28

1  215 (2d Cir. 2000) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir.

2  1994)).  Whether "the loss was caused by an intervening event, like a general fall in the price of

3  Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule

4  12(b)(6) motion to dismiss."  *Lentell*, 396 F.3d at 174 (quoting *Emergent Capital Inv. Mgmt. v.*

5  *Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003)) (emphasis added).[35]  *See also In re ProNetLink*

6  *Sec. Litig.*, 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005) ("Defendants' contentions that intervening

7  causes – such as the inability to find further financing or the bursting of the general technology stock

8  bubble – were to blame for the collapse of [the Company's] share price must await the trial"),

9  *adhered to on reconsideration in light of Dura*, 2006 WL 1029069 (S.D.N.Y. April 19, 2006);

10 *DeMarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110, 123-124 (S.D.N.Y. 2004) (question of

11 fact about "'bursting of the telecommunications stock bubble' as the intervening cause of plaintiffs'

12 loss" where complaint alleged that "defendants' misrepresentations may well have buoyed a price

13 that would otherwise have sunk much faster").

14      Here, defendants represented that the Company had ample liquidity to operate its business

15 in the midst of "unprecedented turmoil in the mortgage industry."  (CC ¶ 99.)  As such, they were

16 assuring investors that Luminent had the financial wherewithal to meet its obligations under rapidly

17 deteriorating market conditions.  It was foreseeable that these volatile conditions could result in

18 increasing margin calls on the Company's higher-rated paper and its short-term financing might dry

19 up.  Indeed, the *Lentell* decision on which defendants rely acknowledges that a claim is stated where

20 the risk or condition "that caused the loss was within the zone of risk concealed by the

21 misrepresentations and omissions."  396 F.3d at 173 (citing *AUSA*, 206 F.3d at 238).  Here, the

22 adverse market developments in August were well within the "zone of risk," even if investors who

---

23 [35]  *Lentell* is factually inapposite because there, "plaintiffs allege[d] no loss resulting from the

24 market's realization that the [analysts'] ratings were false, or that [the broker] concealed any risk that
    could plausibly (let alone foreseeably) have caused plaintiffs' loss."  396 F.3d at 176.  On the

25 contrary, the reports indicated that the investments were "high-risk" with a "high potential for price
    volatility" – the very risks which caused the stock to decline.  *Id.*  Such circumstances are in stark

26 contrast to Luminent's affirmative statements about ample liquidity and the increased dividend,
    actively concealing its deteriorating liquidity.

27

28

1    believed defendants' assurances may have viewed a liquidity crunch as remote and highly unlikely.

2    *See Lentell*, 396 F.3d at 173 (quoting *Castellano v. Young & Rubicam*, 257 F.3d 171, 188 (2d Cir.

3    2001)).  Whether, as defendants argue, unforeseen market developments were "the intervening cause

4    of plaintiff's loss" is a factual determination for the jury.  *AUSA*, 206 F.3d at 217; *Emergent*, 343

5    F.3d at 197.

6    **IV.    DEFENDANTS' STATEMENTS ARE NOT PROTECTED
            BY THE PSLRA'S SAFE HARBOR PROVISION**

7        **A.    <u>Standards</u>**

8

9        To qualify for safe harbor under the PSLRA, a statement must be: (1) forward-looking <u>and</u>

10   (2) accompanied by meaningful cautionary language identifying important factors that could cause

11   actual results to differ materially from those projected in the forward-looking statement.  *See In re*

12   *CV Therapeutics, Inc. Sec. Litig.*, No. 03-3709 SO, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5,

13   2004).  However, a forward-looking statement may still be actionable if it was made with actual

14   knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B).  *See Am. West.*, 320 F.3d at

15   937 n.15 (statements were excepted from safe harbor rule altogether because strong inference of

16   actual knowledge was arguably raised).

17       The determination of each of these elements is intensively factual.  A case will only be

18   dismissed where there is sufficient "cautionary language or risk disclosure [such] that reasonable

19   minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd.*

20   *v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005) (citations omitted); *South Ferry*

21   *LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (W.D. Wash. 2005).  Moreover, once the Court has

22   determined that any of the alleged statements are actionable, it need not address the adequacy of

23   every alleged misstatement.  *See In re DDi Corp. Sec. Litig.*, No. 03-7063 NM, 2005 WL 3090882,

24   at *16 n.16 (C.D. Cal. July 21, 2005) ("The court need not determine at this time whether other

25   alleged misstatements and omissions in the Prospectus are rendered inactionable by the bespeaks

26   caution doctrine . . .") (citations omitted).

27

28

1     Applying these standards, defendants' argument that their statements qualify for safe harbor

2     protection under the PSLRA fails for several reasons.

3          **B.     Safe Harbor Does Not Immunize Omissions of
                    Fact And Statements That Are False When Made**

4          As a threshold matter, it is well settled that the safe harbor provisions protect only

5     forward-looking statements, and not material omissions of existing fact. *CV Therapeutics*, 2004 WL

6     1753251, at *10.[36] Plaintiff contends that defendants omitted several existing facts that undermined

7     their statements touting Luminent's "ample liquidity" and its "secure" and "easily sustainable"

8     dividend. These material omissions included (1) the depletion of the Company's capital position;

9     (2) Luminent's writedown of its MBS portfolio; (3) Luminent's exposure to at least $189 million

10    in subprime debt and MBS residual interests; and (4) margin calls with respect to repurchase

11    agreements during the Class Period. The safe harbor has no application with respect to defendants'

12    liability for failing to disclose these adverse facts, which rendered defendants' representations

13    materially misleading. *See* Point II.B., *supra*.

14         **C.     The Misstatements Concerning Luminent's Ample
                    Liquidity And Secure Dividend Are Not "Forward Looking"**

15

16         The PSLRA's safe harbor applies only to forward-looking statements and not historical facts.

17    *Livid*, 416 F.3d at 947-48 (extension of safe harbor to historical facts is inappropriate); *In re Portal*

18    *Software, Inc., Sec. Litig.*, No. 03-5138 VRW, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10, 2005)

19    ("neither the PSLRA's safe harbor provision nor the bespeaks caution doctrine are applicable to

20    statements of historical fact").

21

22

23

---

24    [36] *See also In re Complete Mgmt, Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (citing *In*
      *re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("[P]laintiffs point

25    out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather
      the defendants' failure to disclose historical and existing material facts about Oxford's computer

26    problems and the impact of those problems on the reliability of the financial statements. The . . .
      bespeaks caution doctrine [does] not apply to these omissions")).

27

28

1        Here, defendants concede (Def. Br. 24-25) that their repeated statements that Luminent had

2   ample liquidity to manage its business were "present tense" statements.[37]  However, they argue that

3   statements should nonetheless be treated as forward-looking because plaintiff's claims address

4   whether Luminent had the wherewithal to operate as market developments worsened in early August.

5   The rationale for defendants' argument is that a distinction should be drawn between having

6   sufficient capital to "manage the Company's then-current business," and having sufficient liquidity

7   to handle the market developments in early August.  Defendants characterize the latter as a

8   prediction about "the adequacy of its liquidity to cover future developments."  (Def. Br. 25.)

9   However, considered in context, the temporal distinction defendants seek to draw is an artificial one.

10       The representation that Luminent had ample liquidity to manage its business was not made

11  in a vacuum; rather, Luminent stated that it had the wherewithal to operate under current market

12  conditions, which defendants characterized as a "period of unprecedented turmoil in the mortgage

13  industry," in which at no time during the past 30 years had "the distaste for mortgage and mortgage-

14  backed securities been as high as we see now."  (CC ¶¶ 99, 106.)  Accordingly, a jury could

15  reasonably conclude that when the defendants touted the Company's "ample liquidity," they were

16  assuring investors that Luminent had sufficient capability to meet its obligations under extraordinary

17  market conditions, including the ability to satisfy increasing margin calls on its MBS portfolios and

18  to replace the potential loss of short-term financing.  This conclusion is consistent with the

19  Company's representations that it had designed its liquidity management policy "to maintain cash

20  flows that are adequate to fund operations and meet commitments on a timely and cost-effective

21  basis."  (CC ¶ 68.)

22       In short, defendants' assurances about ample liquidity were present-tense statements that

23  misrepresented the state of the Company's current business condition, which fall outside the

24  PSLRA's safe harbor protections.  Courts in this District have rejected similar arguments by

25  _____

26  [37]  Defendants simply label many other statements contained in the Complaint as forward-looking in a footnote, without discussion.  Many of these statements are also present-tense statements which are actionable.

27

1    defendants where, for example, their statement that a company was "on track" to meet earnings

2    expectations constituted a misrepresentation of its current business conditions, and was not forward-

3    looking. *See, e.g., In re Secure Computing Corp., Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal.

4    2000).[38]

5          In addition, the "Ninth Circuit . . . has refused to extend safe harbor protection to statements

6    that are grammatically about the future but whose subject matter is firmly lodged in the present."

7    *South Ferry*, 399 F. Supp. 2d at 1131 (citing *Am. West*, 320 F.3d at 936-7)(refusing to extend Safe

8    Harbor protection to statement that "the settlement agreement's provisions will not have a material

9    adverse affect [*sic*] on the Company's operations or financial results"). In *South Ferry*, the court

10   identified the following as a present-tense statement: "WAMU <u>will be</u> in a stronger position when

11   the current interest rate environment changes." *Id.* (emphasis added). According to the court, this

12   statement was not forward-looking insofar as it purported to reflect WAMU's actual expectations.

13   *Id.* at 1149 n.10. The same reasoning applies to defendants' statements that the second-quarter

14   dividend "<u>will be</u> easily sustainable," "<u>is secure</u> and <u>will not be</u> cancelled." These statements are

15   "firmly lodged in the present" because defendants knew or recklessly disregarded facts showing that

16   the sustainability of Luminent's dividend was in jeopardy.

17        **D.    Generic Cautionary Language Does Not Shield Risks That Have
                  Already Materialized And Does Not Afford Defendants Safe Harbor**

18

19        The fact that defendants included generic risk factors in their press releases, and referred

20   investors to the risk disclosures in the Company's SEC filings during the May 10 conference call,

21

22   [38] *See also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 1999) (company was "on
     track to meet all the objectives" was statement of present fact, not subject to "bespeaks caution"
23   immunity); *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 689 (E.D. Mich. 2004) ("We are
     pleased with the progress we have made in positioning [the company] for consistent long-term
24   growth and improved profitability. . . . Our business is on a solid foundation, we are executing our
     strategy and we are achieving our objectives. Our outlook for the future is very optimistic . . ." was
25   statement of present and historical facts, not forward-looking under safe harbor statute). Defendants'
     reliance upon *In re Copper Mt. Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004), is misplaced.
26   *Copper Mountain* holds that "to the extent that such statements rest upon a characterization of the
     present state of the company, such statements are not properly considered forward-looking." *Id.*

27

28

does not immunize them from liability.  To qualify for safe harbor, "the cautionary statement must discredit the alleged misrepresentation to such an extent that the 'risk of real deception drops to nil.'" *Immune*, 375 F. Supp. 2d at 1033 (citations omitted).  "Only if a disclosure was 'so obvious that reasonable minds could not differ' can the issue of whether shareholders have been adequately cautioned about the risks be settled as a matter of law."  *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (citations omitted).  *Accord Livid*, 416 F.3d at 947 (dismissal only if reasonable minds could not disagree on sufficiency of cautionary language).

Here, even if the alleged misstatements were deemed forward-looking, they are still actionable for two independent reasons.  First, defendants allegedly knew that the purported "risks" they warned of had actually materialized.  For example, defendants warned about Luminent's "ability to obtain or renew sufficient funding to maintain its leverage strategies," and that "liquidity pressures" were being experienced by companies exposed to subprime debt.  However, when defendants referenced those warnings, they knew that Luminent was already subject to margin calls, a MBS write-down, depletion of its capital position, and substantial exposure to subprime debt and MBS residual interests, which collectively indicated worsening liquidity problems.[39]  As one court aptly noted, no protection is afforded "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  *In re Prudential Sec. Inc. Ltd. Pshps. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

Moreover, considering the disclosed risk factors, together with the accompanying representations in the same documents, reveals that defendants effectively neutralized their warnings.  For example, defendants coupled their warning about subprime problems with statements

---

[39]  The Courts have been consistently unwilling to grant safe harbor protection to risk disclosures issued in comparable circumstances.  *See, e.g., In re HI/FN, Inc. Sec. Litig.*, No. 99-4531 SI, 2000 WL 33775286, at *5 (N.D. Cal. Aug. 9, 2000) (warning of decreased orders inadequate where defendants allegedly knew of company's two largest customers' imminent reduction of orders); *Marucci v. Overland Data, Inc.*, No. 97CV0833-TW (JFS), 1999 WL 1027053, at *9-10 (S.D. Cal. Aug. 2, 1999) (warning that supply problems could recur insufficient based on defendants' knowledge of existing supply problems); *CV Therapeutics*, 2004 WL 1753251, at *11 (warnings that FDA may interpret data differently, which could delay approval, insufficient where defendants already knew FDA had serious doubts).

---

1    emphasizing that "investors should distinguish our business model from that of a subprime

2    originator;" that "[o]ur mortgage loan portfolio has virtually no exposure to the subprime sector,"

3    that "[o]ur credit performance bears no resemblance to subprime performance; and that the Company

4    did not have "noninvestment grade subprime exposure."  (CC ¶¶ 60, 67, 72, 83.)  Similarly,

5    defendants neutralized the warning about obtaining sufficient funding to maintain liquidity by

6    highlighting that "our liquidity level is in excess of that necessary to satisfy our operating

7    requirements"; that "current financing and operating cash flow is sufficient to fund our business for

8    the foreseeable future"; and that "[w]e have designed our liquidity management policy to . . . provide

9    required liquidity to respond to the effect under our borrowing arrangements of interest rate

10   movements and changes in the market value of our mortgage-related assets."  (CC ¶ 59.)

11          Accordingly, defendants' so-called warnings were nothing more than general statements of

12   business risks, devoid of any meaningful cautionary language, and not entitled to protection under

13   the PSLRA's safe harbor.

14   **V.    DEFENDANTS' STATEMENTS OF OPTIMISM ARE ACTIONABLE**

15          Statements of expectation and belief are actionable if "(i) the statement is not actually

16   believed, (ii) there is no reasonable basis for the belief, or (iii) the speaker is aware of undisclosed

17   facts tending seriously to undermine the statement's accuracy."  *In re 2TheMart.com Sec. Litig.*, 114

18   F. Supp. 2d 955, 961 (C.D. Cal. 2000) (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1375  (9th Cir. 1994)

19   (additional citations omitted).  "Generally speaking, 'projections and general statements of optimism

20   may trigger liability under federal securities laws' . . . the exception for puffery is narrowly drawn."

21   *South Ferry*, 399 F. Supp. 2d at 1129.

22          Plaintiff claims that the May 10 Statements referenced in ¶ 89 of the Complaint should have

23   been updated at the beginning of the Class Period because defendants no longer had a reasonable

24   basis for believing the statements to be true.  In addition, plaintiff challenges defendant Moore's

25   representation in the July 23, 2007 Pharos newsletter that "our corporate performance, as a whole,

26   is very solid during a time of substantial stress in the overall mortgage market."  (*See* CC ¶¶ 107;

27   Defs. RJN, Ex. 7 at 2.)

28   Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss
     the Consolidated Complaint [C 07-04073-PJH]

1    Statements such as: "as the market struggles, our investment opportunities increase";

2    "Luminent's profile is ideal for the current environment"; and "our corporate performance is very

3    solid during a time of substantial stress in the overall mortgage market" were designed to distance

4    Luminent from the risks relating to market liquidity impacting other companies with exposure to

5    subprime mortgage assets.  (CC ¶¶ 63-64, 106-07; Defs. RJN, Exs. 3, 7.)  Moreover, defendants'

6    statements were made in actionable contexts (*e.g.*, earnings releases) that induced reliance.  *South*

7    *Ferry*, 399 F. Supp. 2d at 1129; *In re Ligand Pharm., Inc. Sec. Litig.*, No. 04CV1620DMS(LSP),

8    2005 WL 2461151, at *19-20 (S.D. Cal. Sept. 27, 2005) (statements in 10-Q and during conference

9    calls addressing sales shortfall, were not puffery) (citing *Kaplan*, 49 F.3d at 1375).

10    Statements similar to defendants' have been held to be actionable where, as here, the

11    optimistic statements failed to disclose material facts known to defendants that undermined their

12    accuracy.  *See Am. West*, 320 F.3d at 927, 935 ("bright revenue prospects" were ahead was

13    actionable where defendants failed to disclose or misrepresented maintenance issues, FAA

14    investigation and meaning of settlement agreement); *In re Metawave Communs. Corp. Sec.Litig.*,

15    298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003) (representation that there was demand when product

16    was not functional actionable).

17    Accordingly, these statements are not immaterial puffery that entitles defendants to dismissal

18    as a matter of law.

19    **VI.    THE COMPLAINT ALLEGES CONTROL PERSON**
     **LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS**

20

21    To establish control person liability under Section 20(a) of the Exchange Act or Section 15

22    of the Securities Act, a plaintiff must prove (1) a primary violation of the federal securities laws and

23    (2) that the individual defendant exercised actual power or control over the primary violator.

24    *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Immune*, 375 F. Supp. 2d at

25    1031.  Plaintiff need not show that the defendants were culpable participants in the violations, but

26    defendants may assert a "good faith" defense.  *Howard*, 228 F.3d at 1065.  As demonstrated in

27    Points II through V, *supra*, plaintiff has alleged primary violations of Rule 10b-5 against Luminent.

28

1     Moreover, the allegations showing the Individual Defendants' actual control over the

2   Company statements, and their participation in the underlying violations, are more than sufficient

3   to plead control person liability.  Whether an individual may be considered a "controlling person is

4   an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day

5   affairs of the corporation and the defendant's power to control corporate actions."   *In re*

6   *Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1296-97 (E.D. Wash. 2007) (quoting *Howard v.*

7   *Everex Systems, Inc.*, 228 F.3d at 1065).  It is sufficient at the pleading stage to identify the

8   defendants' positions and allege that they "had the power to control and influence [the defendant],

9   which they exercised." *Id.* (quoting *In re Cylink Secs. Litig.*, 178 F. Supp. 2d at 1089); *Immune*, 375

10  F. Supp. 2d at 1031 ("only some indirect means of discipline or influence short of actual direction"

11  is needed).  The allegations linking the Individual Defendants to the underlying misstatements and

12  omissions more than satisfy this lenient standard.

13                                          **CONCLUSION**

14     For the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

15

16  Date:   June 5, 2008                        BERMAN DeVALERIO PEASE
                                                    TABACCO BURT & PUCILLO
17

18                              By:          /s/ Nicole Lavallee
                                            JOSEPH J. TABACCO, JR. S.B.N. 75484
19                                          NICOLE LAVALLEE S.B.N. 165755
                                            425 California Street, Suite 2100
20                                          San Francisco, California  94104
                                            Telephone:    415-433-3200
21                                          *Local Counsel*

22                                          RICHARD W. COHEN (admitted *pro hac vice*)
                                            BARBARA J. HART (admitted *pro hac vice*)
23                                          DAVID C. HARRISON (admitted *pro hac vice*)
                                            LOWEY DANNENBERG COHEN
24                                             & HART, P.C.
                                            One North Broadway
25                                          White Plains, New York  10601-1714
                                            Telephone:    914-997-0500
26
                                            *Lead Counsel for Plaintiff and the Putative Class*
27

28  _____
    Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss
    the Consolidated Complaint [C 07-04073-PJH]
                                            39